**CIN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

COALITION FOR TJ,

                        Plaintiff,

           v.

FAIRFAX COUNTY SCHOOL BOARD;
and DR. SCOTT BRABRAND, in his official
capacity as Superintendent of the Fairfax
County School Board,

                      Defendants.

No. 1:21-cv-00296-CMH-JFA

<u>**MEMORANDUM IN SUPPORT OF MOTION**</u>
<u>**FOR PRELIMINARY INJUNCTION**</u>

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................... ii

INTRODUCTION AND SUMMARY OF ARGUMENT .............................................. 1

FACTUAL BACKGROUND ............................................................................................. 2

DISCUSSION ....................................................................................................................... 7

A.   Preliminary Injunction Standard ........................................................................ 7

B.   The Coalition Is Likely to Succeed on the Merits of Its Equal Protection Claim .............. 8

   1.   Defendants Were Motivated by a Racial Purpose ..................................... 8

      a.   The Challenged Admissions Policy Will Disproportionately Impact Asian-Americans ........................................................................ 9

      b.   Defendants' Statements Reveal an Intent to Racially Balance TJ ......................... 12

      c.   Irregularities in Passing the Challenged Admissions Policy Indicate a Racial Motive ........................................ 16

   2.   The TJ Admissions Policy Changes Cannot Survive Strict Scrutiny ........................... 18

      a.   Defendants Lack a Compelling Interest in Racially Balancing TJ ......................... 18

      b.   Defendants' Plan Is Not Narrowly Tailored ........................................ 21

C.   Coalition Members' Children Will Suffer Irreparable Harm if Preliminary Injunction Is Not Granted ...................................... 23

D.   The Balance of Hardships Weigh in Plaintiff's Favor .................................... 25

E.   A Preliminary Injunction Is in the Public Interest ....................................... 27

F.   No Security Should Be Required .................................................... 27

CONCLUSION .................................................................................................................... 28

CERTIFICATE OF SERVICE ........................................................................................ 29

CERTIFICATE OF CONFERENCE ............................................................................. 29

## TABLE OF AUTHORITIES

### Cases

*Adarand Constructors, Inc. v. Pena,*
    515 U.S. 200 (1995)...............................................................................................8, 18

*Aggarao v. MOL Ship Mgmt. Co.,*
    675 F.3d 355 (4th Cir. 2012) ...............................................................................7

*Citizens United v. FEC,*
    558 U.S. 310 (2010)...............................................................................................7

*Direx Israel, Ltd. v. Breakthrough Med. Corp.,*
    952 F.2d 802 (4th Cir. 1991) ...............................................................................23

*Doe ex rel. Doe v. Lower Merion Sch. Dist.,*
    665 F.3d 524 (3d Cir. 2011)............................................................................9, 17

*Eisenberg ex rel. Eisenberg v. Montgomery County Public Schools,*
    197 F.3d 123 (4th Cir. 1999) ...........................................................................8, 18

*Elrod v. Burns,*
    427 U.S. 347 (1976)...............................................................................................23

*Fisher v. University of Texas at Austin,*
    570 U.S. 297 (2013)....................................................................................18–19, 21

*Fusaro v. Cogan,*
    930 F.3d 241 (4th Cir. 2019) ...............................................................................2

*Giovani Carandola, Ltd. v. Bason,*
    147 F. Supp. 2d 383 (M.D.N.C. 2001) ...............................................................26

*Giovani Carandola, Ltd. v. Bason,*
    303 F.3d 507 (4th Cir. 2002) ...............................................................................26

*Gratz v. Bollinger,*
    539 U.S. 244 (2003)...............................................................................................17

*Grutter v. Bollinger,*
    539 U.S. 306 (2003)....................................................................................18–20

*Hall v. Virginia,*
    385 F.3d 421 (4th Cir. 2004) ...............................................................................2

*Hayes v. North State Law Enforcement Officers Ass'n,*
    10 F.3d 207 (4th Cir. 1993) ...............................................................................21

*Hoechst Diafoil Co. v. Nan Ya Plastics Corp.,*
    174 F.3d 411 (4th Cir. 1999) ...............................................................................27

*Hughes Network Sys. v. InterDigital Communications Corp.,*
    17 F.3d 691 (4th Cir. 1994) ...............................................................................23

*Hunt v. Cromartie,*
    526 U.S. 541 (1999)...............................................................................................8

ii

*Legend Night Club v. Miller*,
    637 F.3d 291 (4th Cir. 2011) .................................................................27

*Lewis v. Ascension Parish Sch. Bd.*,
    662 F.3d 343 (5th Cir. 2011) .................................................................17

*Marks v. United States*,
    430 U.S. 188 (1977)...............................................................................19

*Miller v. Johnson*,
    515 U.S. 900 (1995)................................................................................8

*Missouri v. Jenkins*,
    515 U.S. 70 (1995)................................................................................18

*Ne. Fla. Chapter of Assoc. Gen. Contractors of Am. v. City of Jacksonville*,
    508 U.S. 656 (1993)..............................................................................24

*North Carolina State Conference of NAACP v. McCrory*,
    831 F.3d 204 (4th Cir. 2016) ..................................................................8

*Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*,
    551 U.S. 701 (2007).................................................................18–21, 24

*Pashby v. Delia*,
    709 F.3d 307 (4th Cir. 2013) ............................................................7, 27

*Pers. Adm'r of Massachusetts v. Feeney*,
    442 U.S. 256 (1979)................................................................................9

*Real Truth About Obama, Inc. v. FEC*,
    575 F.3d 342 (4th Cir. 2009) ..................................................................7

*Real Truth About Obama, Inc. v. FEC*,
    607 F.3d 355 (4th Cir. 2010) ..................................................................7

*Regents of Univ. of Cal. v. Bakke*,
    438 U.S. 265 (1978)..............................................................................20

*Ross v. Meese*,
    818 F.2d 1132 (4th Cir. 1987) ..............................................................23

*Steves & Sons, Inc. v. JELD-WEN, Inc.*,
    No. 3:20-CV-98, 2020 WL 2312030 (E.D. Va. May 8, 2020) ........................27–28

*Tucker Anthony Realty Corp. v. Schlesinger*,
    888 F.2d 969 (2d Cir. 1989)..................................................................23

*United States v. Alcan Aluminum Corp.*,
    315 F.3d 179 (2d Cir. 2003)..................................................................20

*United States v. Garcia*,
    855 F.3d 615 (4th Cir. 2017) ..................................................................2

*United States v. Leonard*,
    844 F.3d 102 (2d Cir. 2016)..................................................................20

iii

*United States v. Paradise*,
    480 U.S. 149 (1987)................................................................................21

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
    429 U.S. 252 (1977)...................................................................8–9, 12, 16

*Winter v. Natural Res. Def. Council, Inc.*,
    555 U.S. 7 (2008)...............................................................................7, 23

**Statute**

42 U.S.C. § 1983.......................................................................................6

**Other Authorities**

Bonitatibus, Ann N., Message from the Principal, June 7, 2020,
    https://tinyurl.com/bdzj8su2 ..............................................................4, 12

Carson MS, School Profile, https://tinyurl.com/vc84cwts.........................10

Demographic Reports 2019, County of Fairfax, Virginia,
    https://tinyurl.com/567hz4mw .................................................................3

Fairfax County NAACP, *Town Hall on Systemic Racism*,
    Facebook (Aug. 5, 2020), https://tinyurl.com/phesrpn2 ........................13

Fairfax County Office of Research and Statistics,
    *1985 Fairfax County Profile* (1985), https://tinyurl.com/v8u2ytcs ...........3

Fairfax County Public Schools, *FCPS School Board Work Session—9-14-20—TJ
    Admissions Review*, YouTube (Sept. 15, 2020), https://tinyurl.com/4m9fb4nx.....................20

Fairfax County Public Schools, *FCPS School Board Work Session TJ Admission
    10-6-20*, YouTube (Oct. 6, 2020), https://tinyurl.com/36wa99eh ...................15–16

Fairfax County School Board, Agenda Item Details for October 8, 2020,
    Regular Meeting, Item 3.03, https://tinyurl.com/ftutsend........................17

*FCPS School Board Work Session – 9-15-20 – TJ Admissions Review*,
    YouTube (Sept. 15, 2020), https://tinyurl.com/pz4dc2fx ......................4, 13–14, 21

FCPS, *Individual School ACT Protocols*, https://www.fcps.edu/act .............................26

FCPS, *Individual School SAT Protocols*, https://www.fcps.edu/sat.............................26

FCPS, *PSAT Assessments*, https://www.fcps.edu/node/42102 ...............................25–26

FCPS, *TJ Admissions Merit Lottery Proposal School Board Work Session
    Sept. 15, 2020*, https://tinyurl.com/43xv5r6t ...................................4–5, 9

FCPS, TJ School Profile, https://tinyurl.com/47r67jxx ...............................4

FCPS, TJHSST Freshman Application Process, https://tinyurl.com/5p976tck.....................24–25

Kilmer MS, School Profile, https://tinyurl.com/53fe3zcs ...........................11

Longfellow MS, School Profile, https://tinyurl.com/49hz77cx.....................11

Minutes, Fairfax County School Board, Dec. 17, 2020,
    https://tinyurl.com/64dfxmx2 .................................................................................6

Minutes, Fairfax County School Board, Oct. 6, 2020, https://tinyurl.com/3f5wsf2y...................16

Press Release, FCPS, *TJHSST Offers Admission to 486 Students* (June 1, 2020),
    https://www.fcps.edu/news/tjhsst-offers-admission-486-students ...........................................4

Rocky Run MS, School Profile, https://tinyurl.com/jf3yc3vu......................................................11

Thomas Jefferson High School for Science and Technology 2020 2021,
    https://tinyurl.com/ymc4jdya ...............................................................................................25

U.S. News & World Report, https://tinyurl.com/y9xsu6dm...........................................................2

Virginia Dep't of Education, *Academic-Year Governor's Schools*,
    https://tinyurl.com/ rta8bm98 .................................................................................................2

*Virginia Education Secretary Compares Test Prep to Using Illegal*
    *'Performance Enhancement Drugs,'* from Listening Session with
    TJ Students held Sept. 8. 2020, YouTube (Sept. 13. 2020),
    https://www.youtube.com/watch?v=w5RcAhRyB6g&ab_channel=AsraNomani.................13

## INTRODUCTION AND SUMMARY OF ARGUMENT

Plaintiff Coalition for TJ, an organization of approximately 5,000 concerned parents of school-age children in and around Fairfax County, Virginia, challenges recent revisions of the admissions policy at Thomas Jefferson High School for Science and Technology (known as "TJ"), the nation's top-ranked public high school. These admissions policy changes—adopted with little warning or community input—eliminated the standardized TJ admissions test a mere one month before it was scheduled to be administered and replaced it with a geographic quota and "holistic" evaluation.

The Coalition alleges in its complaint and demonstrates through this motion that Defendants—the Superintendent and the Fairfax County School Board—implemented these changes to the admissions policy to limit the number of Asian-American students who are admitted to TJ. These changes violate the Equal Protection Clause of the Fourteenth Amendment because they are race-based and not narrowly tailored to further any compelling government interest. ECF 1, ¶¶ 63–65 (hereinafter Compl.). Based on the evidence presented here, the Coalition seeks a preliminary injunction prohibiting Defendants from applying the challenged admissions policy to the freshman classes entering TJ in the fall of 2021, the fall of 2022, and beyond while this litigation is pending.

The Coalition projects that under the new admissions policy, Asian-American enrollment for the incoming Class of 2025 (entering in the fall of 2021) will decrease by approximately 42 percentage points compared with the earlier policy. Under the Equal Protection Clause, Defendants' racial motivation for changing the admissions policy, particularly when coupled with such a substantial effect, shifts the burden to Defendants to prove that the new admissions policy satisfies strict scrutiny by being narrowly tailored to further a compelling government interest.

Defendants cannot satisfy this most demanding standard of review. They have no compelling interest in achieving their preferred racial balance at TJ. And even if they could establish a compelling interest in changing TJ's racial composition, the challenged admissions policy is not narrowly tailored to further any conceivable interest Defendants might have. Therefore, the Coalition is likely to succeed on the merits of its equal protection claim, satisfying the first and most important preliminary injunction factor.

The other factors are also satisfied. Being forced to compete in a race-based system with fewer available seats denies the Coalition members' children their equal protection rights and establishes irreparable harm. Defendants, meanwhile, would not be harmed by an injunction against administering an unconstitutional admissions policy, and it serves the public interest to assure that Virginia's largest public school district does not violate its students' equal protection rights.

For the reasons set forth below, this Court should grant Plaintiff's motion for a preliminary injunction, without which the challenged plan will impact imminent admissions decisions.

## FACTUAL BACKGROUND

TJ is the nation's top-ranked public high school.[1] An Academic-Year Virginia Governor's School[2] located in Alexandria and operated by Fairfax County Public Schools (FCPS), TJ educates approximately 1,800 students gifted in science, technology, engineering, and math. Graduates of

---

[1] U.S. News & World Report, https://tinyurl.com/y9xsu6dm.

[2] Virginia Dep't of Education, *Academic-Year Governor's Schools*, https://tinyurl.com/rta8bm98. The information and data cited in this pleading provided by FCPS and the Virginia Department of Education are government documents in the public record and thus subject to judicial notice. *See Fusaro v. Cogan*, 930 F.3d 241, 246 n.3 (4th Cir. 2019) (taking judicial notice of Maryland's list of registered voters); *Hall v. Virginia*, 385 F.3d 421, 424 n.3 (4th Cir. 2004) (taking judicial notice of population statistics publicly available on the official redistricting website of the Virginia Division of Legislative Services); *United States v. Garcia*, 855 F.3d 615 (4th Cir. 2017) (taking judicial notice of facts contained on government website).

2

TJ go on to excel in careers in medicine, engineering, business, and research, providing an enormous contribution to the community due in large part to TJ's rigorous curriculum and strong reputation.

Since TJ's founding in 1985, Fairfax County's population has grown from approximately 600,000 residents to over one million residents today.[3] Its demographics have shifted too, from approximately 86% white, 6% Black, 3% Hispanic, and 4% "Asian and American Indian" in 1980 to approximately 61% white, 10% Black, 16% Hispanic, and 19% Asian and Pacific Islander today.[4]

Prior to the challenged changes to the TJ admission process, selection for a seat at TJ was solely merit-based. To be eligible to attend TJ, students were required to meet residency requirements, have completed or be enrolled in Algebra I, have a core GPA of at least 3.0, and pay a $100 application fee, which could be waived for those with financial need. Compl. ¶ 26. The primary method for determining admission to TJ was a standardized test, typically administered each fall. The TJ admissions test consisted of Quant-Q, ACT Inspire Reading, and ACT Inspire Science components. Applicants scoring highly enough to become semi-finalists were then asked to submit teacher recommendations, complete a problem-solving essay, and respond to three writing prompts. *Id*. ¶ 27.

---

[3] Fairfax County Office of Research and Statistics, *1985 Fairfax County Profile* at II-13 (1985), https://tinyurl.com/v8u2ytcs.

[4] *Id*. at II-12; Demographic Reports 2019, County of Fairfax, Virginia, at II-6, https://tinyurl.com/567hz4mw.

This merit-based admissions process resulted in a student body that is approximately 80% non-white and approximately 72% Asian-American, as of the 2019-2020 school year.[5] The Class of 2024, the last class not subject to the new admissions policy, is approximately 73% Asian-American, 3% Hispanic, 17% white, and 6% multiracial/other.[6]

In September 2020, the Superintendent of FCPS, Scott Brabrand, presented the first version of a plan to radically overhaul the merit-based TJ admissions process. This overhaul was set against a backdrop of discriminatory bias towards Asian-American students and their families. From state legislators to TJ's own principal, officials have made no secret of the fact that the express intent of the changes to the admissions policy is to racially balance TJ. TJ's principal repeatedly told students and families that they "do not reflect the racial composition in FCPS"[7] and that the school district was making "efforts to ensure that we are more demographically representative of the region."[8] Superintendent Brabrand was equally forthcoming about Defendants' racial balancing intentions: "TJ should reflect the diversity of Fairfax County Public Schools, the community, and of Northern Virginia," he told the School Board in September 2020.[9]

Superintendent Brabrand's initial proposal included eliminating the TJ admissions test and implementing a region-based lottery, among other modifications.[10] Under that proposal, each

---

[5] FCPS, TJ School Profile, https://tinyurl.com/47r67jxx.

[6] Press Release, FCPS, *TJHSST Offers Admission to 486 Students* (June 1, 2020), https://www.fcps.edu/news/tjhsst-offers-admission-486-students. According to FCPS, the "multiracial/other" category includes students who checked "multiracial" on their application or students whose ethnic designation numbered 10 or fewer, which includes Black students. *Id.*

[7] Ann N. Bonitatibus, Message from the Principal, June 7, 2020, https://tinyurl.com/bdzj8su2.

[8] *FCPS School Board Work Session – 9-15-20 – TJ Admissions Review*, YouTube (Sept. 15, 2020), https://tinyurl.com/pz4dc2fx at 33:25.

[9] *Id.* at 4:31-5:04.

[10] FCPS, *TJ Admissions Merit Lottery Proposal School Board Work Session Sept. 15, 2020*, https://tinyurl.com/43xv5r6t.

FCPS middle school or other jurisdiction was assigned to one of five "regional pathways," with each regional pathway capped at sending 70 students to TJ per year. Under that plan, two middle schools—Kilmer Middle School and Longfellow Middle School—were grouped into the same regional pathway.[11] These schools are both majority Asian-American, and in 2018 (the last year for which school-level data is publicly available) sent a combined 99 students to TJ. Limiting those two schools, plus the other four schools in the proposed regional pathway, to a total of 70 seats at TJ would undoubtedly have decreased the number of Asian-American students accepted into TJ. According to FCPS' own projections, had these proposed changes been applied to the TJ Class of 2024, Asian-American student enrollment would have dropped from 73% to 54%.[12] All other racial groups would have seen increases under the proposed system.[13]

Superintendent Brabrand's initial proposal went through several rounds of revisions, after which the Fairfax County School Board adopted the new admissions policy that is challenged in this case. As part of the new policy, the School Board eliminated the standardized TJ admissions test just one month before it was scheduled to take place in November 2020. The adopted policy bears many similarities to Defendants' original proposed replacement admissions process. The two key differences are that (1) the initially proposed lottery was replaced by a "holistic review" that considers "experience factors," and (2) seats are allocated under a 1.5% per-middle school quota instead of by regional pathway. Under this quota system, the number of students that may be accepted to TJ from each middle school in a given year is limited to 1.5% of the school's eighth

---

[11] *Id*. at 16.

[12] *Id*. at 20.

[13] *Id*.; Black enrollment would have increased from 1% to 7%, Hispanic enrollment would have increased from 3% to 8%, enrollment of students identifying as two or more races would have increased from 5% to 6%, and white enrollment would have increased from 18% to 25%.

grade class.[14] When coupled with the concentration of Asian-American students at four middle schools with histories of sending high numbers of students to TJ—Carson Middle School, Kilmer Middle School, Rocky Run Middle School, and Longfellow Middle School—the Coalition projects that the new admissions process will reduce Asian-American students in the incoming Class of 2025 by at least 42 percentage points. Using the new, opaque rubric for admissions, Defendants will be able to replace these Asian-American students with other students whom they believe to be racially underrepresented according to the demographics of Fairfax County.

The Coalition filed this lawsuit under 42 U.S.C. § 1983 to challenge these changes to the TJ admissions process: specifically, the elimination of the nationally-normed standardized admissions test and the adoption of a process by which:

> The top 1.5 percent of the eighth grade class at each public middle school meeting the minimum standards will be eligible for admission. . . A holistic review will be done of students whose applications demonstrate enhanced merit; 550 seats will then be offered to the highest-evaluated students. Students will be evaluated on their grade point average (GPA); a portrait sheet where they will be asked to demonstrate Portrait of a Graduate attributes and 21st century skills; a problem-solving essay; and experience factors, including students who are economically disadvantaged, English language learners, special education students, or students who are currently attending underrepresented middle schools.

Compl. ¶ 36. The Coalition includes Asian-American families with children who have pending TJ applications, or who intend to apply to TJ in the eighth grade, and who will be denied the opportunity to compete for admission to TJ on an equal footing with other applicants because of their race. Compl. ¶¶ 11–12; McCaskill Decl. ¶¶ 3, 7, 11; Akella Decl. ¶¶ 3, 8. Defendant Fairfax County School Board operates FCPS, the largest public school district in the Commonwealth of Virginia. Compl. ¶ 20. Defendant Dr. Scott Brabrand is the Superintendent of FCPS and is responsible for implementing the challenged admissions process. Compl. ¶ 21. The Coalition

---

[14] Minutes, Fairfax County School Board, Dec. 17, 2020, at 4-5, https://tinyurl.com/64dfxmx2.

contends that because Defendants' changes to the TJ admissions process were enacted for a racially discriminatory purpose and further no compelling government interest, they violate the Equal Protection Clause. Compl. ¶ 67.

## DISCUSSION

### A.  Preliminary Injunction Standard

The Coalition seeks a prohibitory, not a mandatory, preliminary injunction. Mandatory injunctions alter the status quo, while prohibitory injunctions "aim to maintain the status quo and prevent irreparable harm while a lawsuit remains pending." *Pashby v. Delia*, 709 F.3d 307, 319 (4th Cir. 2013). The Fourth Circuit has defined status quo as "the last uncontested status between the parties which preceded the controversy." *Id*. at 320 (cleaned up). Here, the last uncontested status between the Coalition and Defendants was the TJ admissions process in place for the Class of 2024, and it is this status quo which the Coalition seeks to maintain through the issuance of a preliminary injunction. "To be sure, it is sometimes necessary to require a party who has recently disturbed the status quo to reverse its actions, but . . . [s]uch an injunction restores, rather than disturbs, the status quo ante." *Aggarao v. MOL Ship Mgmt. Co*., 675 F.3d 355, 378 (4th Cir. 2012) (cleaned up).

In the Fourth Circuit, parties seeking a preliminary injunction must show that (1) they are likely to succeed on the merits; (2) they will likely suffer irreparable harm absent an injunction; (3) the balance of hardships weighs in their favor; and (4) the injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc*., 555 U.S. 7, 20 (2008); *Pashby*, 709 F.3d at 320–21. Each preliminary injunction factor must be "satisfied as articulated." *Real Truth About Obama, Inc. v. FEC*, 575 F.3d 342, 347 (4th Cir. 2009), *vacated on other grounds*, *Citizens United v. FEC*, 558 U.S. 310 (2010), *aff'd*, *Real Truth About Obama, Inc. v. FEC*, 607 F.3d 355 (4th Cir. 2010) (per curiam). All four factors are satisfied here.

**B.  The Coalition Is Likely to Succeed on the Merits of Its Equal Protection Claim**

As to the first factor, likelihood of success, the Supreme Court has long recognized that enactments "are subject to strict scrutiny under the Equal Protection Clause not just when they contain express racial classifications, but also when, though race neutral on their face, they are motivated by a racial purpose or object." *Miller v. Johnson*, 515 U.S. 900, 913 (1995). Thus, although the challenged TJ admissions policy changes are facially race-neutral, if the Coalition succeeds in showing that Defendants were motivated by a racial purpose, the burden shifts to Defendants to prove that the new policies are narrowly tailored to further a compelling government interest. *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227 (1995); *Eisenberg ex rel. Eisenberg v. Montgomery County Public Schools*, 197 F.3d 123, 129 (4th Cir. 1999). Here, the Coalition will likely be successful in making that showing, thereby triggering strict scrutiny.

**1.  Defendants Were Motivated by a Racial Purpose**

The Supreme Court has developed a framework to root out racially discriminatory motivations masquerading as facially race-neutral policies. Under this framework, the Court has recognized four factors as particularly relevant in determining whether an ostensibly neutral policy was enacted for a racially discriminatory purpose: (1) the disparate impact of the policy on a particular race; (2) the historical background of the decision, particularly if it reveals a series of official actions taken for invidious purposes; (3) irregularities in the passage of legislation; and (4) legislative and administrative history. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266–67 (1977). These factors are non-exhaustive, and because "[o]utright admissions of impermissible racial motivation are infrequent and plaintiffs often must rely upon other evidence," courts are instructed to consider the broader context surrounding a policy's selection. *North Carolina State Conference of NAACP v. McCrory*, 831 F.3d 204, 221 (4th Cir. 2016) (quoting *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999)).

Importantly, challengers need not allege or prove that "the challenged action rested *solely* on racially discriminatory purposes." *Arlington Heights*, 429 U.S. at 265 (emphasis added). And a racially discriminatory purpose need not amount to racism or racial animus. *North Carolina State Conference of NAACP*, 831 F.3d at 233 (targeting voters based on race, even to accomplish partisan and not racial ends, constitutes racial discrimination). It is enough that Defendants acted "at least in part 'because of,' not merely 'in spite of,' [the policy's] adverse effects upon an identifiable group." *Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 279 (1979); *see also Doe ex rel. Doe v. Lower Merion Sch. Dist*., 665 F.3d 524, 548 (3d Cir. 2011) ("Racially discriminatory purpose means that the decisionmaker adopted the challenged action at least partially because the action would benefit or burden an identifiable group.").

Here, the Coalition will likely succeed in showing that the disparate impact of the policy on Asian-American students and the irregularities in the passage of the challenged admissions policy weigh particularly in favor of a finding that the TJ admissions changes were motivated by a racial purpose.

### a. The Challenged Admissions Policy Will Disproportionately Impact Asian-Americans

When they originally proposed revisions to the admissions process, Defendants also estimated the projected impact on TJ's racial demographics if a lottery system and regional pathways had been used to admit previous years' classes. By Defendants' own projections, for example, had that system been applied to the Class of 2024, Asian-American students would lose almost 20% of their representation at TJ while every other racial group gained seats.[15] In large part, this projected drop in Asian-American enrollment under the regional pathway model was due

---

[15] FCPS, *TJ Admissions Merit Lottery Proposal School Board Work Session Sept. 15, 2020*, *supra* n.10, at 20.

to grouping schools with high Asian-American populations and a history of sending many students to TJ together into a single pathway, then capping seats for each pathway at 70. In effect, the regional pathway plan capped TJ admissions for these schools.

Although the ultimately adopted admissions process abandoned the use of regional pathways, the 1.5% quota will have a similar—and even more pronounced—effect on Asian-American enrollment. This impact is particularly visible in the four middle schools that in recent years have sent the most students to TJ. For example, Rachel Carson Middle School ("Carson MS") currently enrolls approximately 1,472 students in grades 7 and 8.[16] As of the 2019–2020 school year, the school is about 30% white, 46% Asian-American, 7% Black, 10% Hispanic or Latino, and 6% "other."[17] In 2018, the most recent year for which school-level data is publicly available, Carson MS had 292 students apply for admission to TJ and 78 students accepted. But under the challenged admissions policy, Carson MS will only be allocated a *maximum* of approximately 12 seats at TJ (1.5% of its 806 student eighth grade class). That dramatic drop in admissions from Carson MS, with its heavily Asian-American population, will contribute to a significant decrease in the number of Asian-American students who are accepted into TJ.

---

[16] Carson MS, School Profile, https://tinyurl.com/vc84cwts.

[17] *Id*.

Other middle schools with large Asian-American populations will be similarly affected:

- Longfellow Middle School currently enrolls approximately 1,328 students in grades 7 and 8.[18] As of the 2019–2020 school year, more than a quarter of its students were Asian-American.[19] In 2018, Longfellow MS had 185 students apply for TJ and 62 students accepted. But under the challenged admissions policy, Longfellow MS will only be allocated approximately 10 seats at TJ.

- Kilmer Middle School currently enrolls approximately 1,134 students in grades 7 and 8.[20] As of the 2019–2020 school year, the school was about 24% Asian-American.[21] In 2018, Kilmer MS had 126 students apply for admission to TJ and 37 students accepted. But under the challenged admissions policy, Kilmer MS will only be allocated approximately 8 seats at TJ.

- Rocky Run Middle School currently enrolls approximately 1,044 students in grades 7 and 8.[22] As of the 2019–2020 school year, the school is nearly 45% Asian-American.[23] In 2018, Rocky Run MS had 175 students apply for admission to TJ and 33 students accepted. But under the challenged admissions policy, Rocky Run MS will be allocated approximately 10 seats at TJ.

Together, these four middle schools (Carson MS, Longfellow MS, Kilmer MS, and Rocky Run MS) will lose the opportunity to send approximately 170 students to TJ under the revised

---

[18] Longfellow MS, School Profile, https://tinyurl.com/49hz77cx.

[19] *Id.* (listing the population of Longfellow MS as 26.35% Asian-American).

[20] Kilmer MS, School Profile, https://tinyurl.com/53fe3zcs.

[21] *Id.* (listing the population of Kilmer MS as 23.87% Asian-American).

[22] Rocky Run MS, School Profile, https://tinyurl.com/jf3yc3vu.

[23] *Id.* (listing the population of Rocky Run MS as 44.71% Asian-American).

admissions plan, compared with prior years. Given the demographics of these schools, Asian-American students are likely to suffer disproportionately.

The Coalition's data analysis supports that conclusion. The Coalition projects that under the challenged admissions policy, the percentage of Asian-American students accepted into the incoming TJ Class of 2025 will drop to approximately 31%, a significant decrease from the Class of 2024, which was admitted under the previous merit-based race-blind admissions system and is 73% Asian-American. Decl. of H. Verma ¶ 19. This substantial and disproportionate impact on Asian-American students is strong evidence of Defendants' racial motivation.

### b. Defendants' Statements Reveal an Intent to Racially Balance TJ

Defendants and other FCPS officials have made multiple public statements—primarily in School Board meetings in late 2020—that are "direct evidence of intent," *Arlington Heights*, 429 U.S. at 266, and that support the Coalition's claim that the challenged admissions changes were enacted with a racially discriminatory purpose: namely, reducing the number of Asian-Americans admitted to TJ.

On June 7, 2020, TJ's Principal, Ann Bonitatibus, emailed the TJ community, asserting that TJ "is a rich tapestry of heritages; however, we do not reflect the racial composition in FCPS."[24] She went on to specifically delineate the desired racial balancing: "Our 32 black students and 47 Hispanic students fill three classrooms. If our demographics actually represented FCPS, we would enroll 180 black and 460 Hispanic students, filling nearly 22 classrooms."[25] In an August 2020 town hall meeting, Superintendent Brabrand complained that some prospective TJ students spent "thousands upon thousands" of dollars on test prep for the TJ admission test, negatively

---

[24] Ann N. Bonitatibus, Message from the Principal, June 7, 2020, https://tinyurl.com/bdzj8su2.
[25] *Id.*

stereotyping TJ's Asian-American students as attempting to "buy their way" into admission to TJ.[26] Virginia Secretary of Education Atif Qarni reinforced Brabrand's stereotypes in a listening session the next month, comparing test preparation by TJ students, who are majority Asian-American, to the use of illegal "performance enhancement drugs."[27]

When Superintendent Brabrand presented the first admissions change proposal to the School Board at a work session in September 2020, he highlighted the "need to recognize" that "TJ should reflect the diversity of Fairfax County Public Schools, the community and of Northern Virginia," lamenting that "the talent at Thomas Jefferson currently does not reflect the talent that exists in FCPS."[28] In context, it was clear that Brabrand's use of "diversity" and "talent" were thinly veiled references to the majority Asian-American composition of TJ's student body. FCPS Chief Operating Officer Marty Smith repeated Brabrand's discriminatory assertions by stating that "the diversity at TJ doesn't currently reflect the diversity of Northern Virginia and the talent at TJ does not reflect the talent in Fairfax County Public Schools."[29] Showing a slide that illustrated 15 years of TJ admissions data by race, including the trend of more Asian-American students winning seats at TJ, Smith stated: "[i]t's important to note that some of the gaps that we've seen over time for some of our groups of students have only gotten wider with regard to the applicant pool."[30]

---

[26] Fairfax County NAACP, *Town Hall on Systemic Racism*, Facebook (Aug. 5, 2020) at 1:28:31, https://tinyurl.com/phesrpn2.

[27] *Virginia Education Secretary Compares Test Prep to Using Illegal 'Performance Enhancement Drugs,'* from Listening Session with TJ Students held Sept. 8. 2020, YouTube (Sept. 13. 2020), https://www.youtube.com/watch?v=w5RcAhRyB6g&ab_channel=AsraNomani.

[28] *FCPS School Board Work Session – 9-15-20 – TJ Admissions Review*, *supra* n.8 at 4:31-5:04.

[29] *Id*. at 7:31.

[30] *Id*. at 7:58.

At that same School Board work session, Principal Bonitatibus made clear that racial balancing was the goal of the proposed TJ admissions process changes. She noted that while TJ is a "wonderfully diverse school," FCPS was making "efforts to ensure that we are more demographically representative of the region."[31] In fact, the opportunity to racially balance TJ, or "the notion that the school could be more representative of its region," was one of the reasons she was attracted to the principal position at TJ.[32] Bonitatibus stated that "we are all united in believing that there is a statistically significant enough difference in the disparities that we're seeing that action does need to be taken . . . . And I am fully supportive of FCPS' efforts to advance the representative demographics at our school."[33] Given the context of the discussion, Bonitatibus' use of terms such as "diversity," "representation," "disparities," and "representative demographics" referred to the School Board's attempts to racially balance the student body at TJ.

Also at the September 2020 work session, when asked to report on her experience at a statewide working group over the summer, School Board member Karen Keys-Gamarra stated "there was pretty much a unanimous view about the culture of these schools being not as healthy as I know all of us on this board would like to hear from our students."[34] Board member Melanie Meren went a step further and described the majority Asian-American TJ's culture as "toxic" for Black students.[35] Board member Karl Frisch complained about "the culture that we allow in the system."[36] In fact, at the September work session alone, concern for TJ's "culture" was referenced

---

[31] *Id*. at 33:25.

[32] *Id*. at 1:28:40.

[33] *Id*. at 1:29:37.

[34] *Id*. at 44:50.

[35] *Id*. at 1:24:00.

[36] *Id*. at 2:09:52.

ten times, which Coalition members understand to refer to both a racist "Tiger Mom" stereotype of Asian-American parents who push their children to achieve academic success at all costs, as well as a racist stereotype of Asian-Americans being anti-Black.

When the School Board voted to eliminate the TJ admissions test at a work session on October 6, 2020, racial balancing was again at the forefront of the discussion between Superintendent Brabrand and the School Board. Brabrand noted that the proposed changes to the TJ admission test "eliminat[es] the testing component that squeezed out talent and squeezed out diversity in our system."[37] Bonitatibus repeated the familiar refrain of a desire for a "student body that more closely aligns with the representation in FCPS."[38] Board member Abrar Omeish stated that a key point was to "make sure there's representation" that "should be proportional to the population numbers" of Fairfax County.[39]

During this discussion, the TJ admissions test—by which Asian-American and other students earned their places at TJ—was repeatedly referred to as biased, resulting in the admission to TJ of "students who have been [in] Test Prep since second grade."[40] This language is a direct attack on Asian-American families whose children hope to apply to TJ, demeaning students' hard work and families' sacrifices as "pay to play."[41] Board member Keys-Gamarra even cautioned her colleagues about this discriminatory language towards Asian-Americans:

> And I want to say, just as we are concerned about certain communities [i.e., Asian-Americans] feeling that we are maligning them by talking about tests, we must be very careful and we must be cognizant of how demeaning these types of comments

---

[37] Fairfax County Public Schools, *FCPS School Board Work Session TJ Admission 10-6-20*, YouTube (Oct. 6, 2020), at 6:57, 10:12, https://tinyurl.com/36wa99eh.

[38] *Id*. at 29:41.

[39] *Id*. at 1:03:30.

[40] *Id*. at 3:40:00.

[41] *Id*. at 39:00.

are and that many people consider these comments to be rooted in racism. I'm not saying it's intentional, but we need to be mindful.[42]

Taken together, the above-quoted statements show a consistent pattern of discriminatory intent by officials entrusted with the education and development of all children in Fairfax County. Specifically, they show that Defendants, in making changes to the TJ admissions process, were intent on doing so in a way that would disadvantage Asian-American applicants.

### c. Irregularities in Passing the Challenged Admissions Policy Indicate a Racial Motive

*Arlington Heights* instructs that "the specific sequence of events leading up to the challenged decision may also shed some light on the decisionmakers' purposes," and that "[d]epartures from the normal procedural sequence also might afford evidence that improper purposes are playing a role." 429 U.S. at 267. Here, the lack of transparency and unusual process that Defendants followed in changing TJ admissions procedures is evidence of an improper racial motive. **First**, Defendants rushed the decision to eliminate the objective standardized TJ admissions test the month before it was scheduled to be administered, without any alternative admissions system to take its place.[43] **Second**, despite the immediate impact on the hundreds of eighth grade students who had spent months preparing for the test, the vote to eliminate the test was held at an October 6, 2020, "work session," not a regular school board meeting.[44] Unlike regular school board meetings, work sessions typically do not include votes. Indeed, the October 6 work session's published agenda did not advise the public that the School Board would vote on any changes to the TJ admissions policy, but simply stated that the session would "provide an

---

[42] *Id*. at 2:58:53.

[43] Minutes, Fairfax County School Board, Oct. 6, 2020, https://tinyurl.com/3f5wsf2y.

[44] *Id*.

update . . . on the effort of continuous improvement of the Admissions Process for [TJ]" and "provide information regarding the current admissions process and proposed changes for future admissions processes."[45] **Third**, despite the considerable public interest in this issue, the Defendant School Board members voted to eliminate the TJ admissions test at its work session without hearing any public comments. **Fourth**, the School Board members never voted to ratify or affirm its working session vote at its regular school board meeting two days later, but instead used the later meeting to vote against a measure that would have called for further public engagement on the TJ admissions process.[46]

The disparate impact on Asian-Americans and the wealth of statements surrounding the development and enactment of the challenged admissions changes, coupled with the irregular history of the decision to eliminate the standardized admissions test, leave little doubt that Defendants chose the new admissions policy "because it would assign benefits or burdens on the basis of race." *Doe*, 665 F.3d at 553. In other words, the Coalition will likely succeed in showing that Defendants were motivated by an impermissible racial purpose sufficient to trigger strict scrutiny. *See Lewis v. Ascension Parish Sch. Bd*., 662 F.3d 343, 348 (5th Cir. 2011) ("If the government is found to have acted with a discriminatory purpose, strict scrutiny review places the burden on the government to prove that its actions are narrowly tailored to achieve a compelling government interest.") (citing *Gratz v. Bollinger*, 539 U.S. 244, 270 (2003)); *see also Fisher v. University of Texas at Austin*, 570 U.S. 297, 310 (2013) (holding that a law that distributes benefits or burdens based on race is inherently suspect and must be subject to the most "searching examination").

---

[45] Fairfax County School Board, Agenda Item Details for October 8, 2020, Regular Meeting, Item 3.03, https://tinyurl.com/ftutsend.

[46] *Id*.

### 2.   The TJ Admissions Policy Changes Cannot Survive Strict Scrutiny

Because the challenged admissions changes were motivated by a racial purpose, Defendants must prove that the changes are narrowly tailored to further a compelling government interest. *Adarand*, 515 U.S. at 227; *Eisenberg*, 197 F.3d at 129. "This most exacting standard 'has proven automatically fatal' in almost every case," and it is fatal here. *Fisher*, 570 U.S. at 316 (Scalia, J., concurring) (quoting *Missouri v. Jenkins*, 515 U.S. 70, 121 (1995) (Thomas, J., concurring)).

### a.   Defendants Lack a Compelling Interest in Racially Balancing TJ

The Supreme Court has recognized only two interests as potentially compelling enough to justify a race-conscious admissions policy: (1) remedying the effects of past intentional discrimination, and (2) obtaining the benefits that flow from diversity in higher education. *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 720–23 (2007). Neither interest is present in this case. FCPS has long since dismantled its previously segregated public school system, eliminating any interest it might have had in remedying past discrimination. *See id*. at 721 ("Once Jefferson County achieved unitary status, it had remedied the constitutional wrong that allowed race-based assignments. Any continued use of race must be justified on some other basis."). And the diversity rationale recognized in *Grutter v. Bollinger*, 539 U.S. 306 (2003), does not apply to K-12 education. *See Parents Involved*, 551 U.S. at 724–25 (noting that *Grutter* "relied upon considerations unique to institutions of higher education" and criticizing lower court rulings that assumed *Grutter* applied outside that context).

To survive strict scrutiny, then, Defendants must justify the changes to TJ's admissions policy with some other, previously unrecognized, compelling governmental interest. Defendants' problem is that they have repeatedly emphasized their goal to racially balance the student body at TJ according to the racial demographics of Fairfax County. *See supra* at 12-16. Far from being a

compelling interest, such racial balancing is "patently unconstitutional." *Fisher*, 570 U.S. at 311 (quoting *Grutter*, 539 U.S. at 330). And Defendants cannot transform racial balancing into a compelling interest "simply by relabeling it 'racial diversity.'" *Id.* (quoting *Parents Involved*, 551 U.S. at 732 (plurality opinion)). Taking them at their word, Defendants have not pursued a constitutionally permissible interest in their attempt to remake TJ's student body according to race.

Even if Defendants could differentiate between an interest in racial balancing and the promotion of racial diversity, they would be out of luck. In *Parents Involved*, four justices (led by Chief Justice Roberts) rejected the use of race in high school admissions to further any number of purported interests, including: reducing "racial concentration," preventing housing patterns from resulting in de facto segregation, and ensuring students are educated "in a racially integrated environment." 551 U.S. at 725 (plurality opinion). In the plurality's view, these "various verbal formulations" were simply different ways of articulating a desire to racially balance schools. *Id.* at 732. Justice Kennedy's lone concurrence, on the other hand, would have concluded that "[d]iversity, depending on its meaning and definition, is a compelling educational goal a school district may pursue." *Id.* at 783 (Kennedy, J., concurring in part and concurring in judgment). But he limited his endorsement to generic measures such as "strategic site selection of new schools; drawing attendance zones with general recognition of the demographics of neighborhoods; allocating resources for special programs; recruiting students and faculty in a targeted fashion; and tracking enrollments, performance, and other statistics by race." *Id.* at 789.

Neither *Parents Involved* opinion is controlling on the compelling interest point,[47] but Defendants do not fare well under either approach. Under the plurality's view, Defendants'

---

[47] Some courts have referred to Justice Kennedy's opinion as controlling, but it is not. As the Second Circuit has explained, the rule from *Marks v. United States*, 430 U.S. 188 (1977), that the

admissions changes effect an impermissible desire to racially balance TJ. And even under Justice Kennedy's view, Defendants' admissions changes go far beyond the mere acknowledgment of race and generic promotion of diversity. Defendants here have not simply tinkered with district lines or recognized neighborhood demographics. Instead, the TJ admission policy changes are rather transparently aimed at producing Defendants' desired racial result—at the expense of Asian-American students. Defendants' use of racial proxies thus transforms this case from one where the decisionmaker simply "considers the impact a given approach might have on students of different races" to one that is tantamount to "a crude system of individual racial classifications." *Parents Involved*, 551 U.S. at 789.

Simply put, Defendants lack any interest in diversity that could justify the harsh racial proxies they enacted. The evidence shows that Defendants were obsessed with racial balancing, far beyond even the "critical mass" theory that the Supreme Court discussed in *Grutter*.[48] *See* 539 U.S. at 329–34. But Defendants lack a compelling interest in adjusting the "specified percentage of a particular group merely because of its race or ethnic origin." *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 307 (1978) (controlling opinion of Powell, J.). Because Defendants have no interest compelling enough to justify their decision to change the TJ admissions process in a way that

---

opinion deciding the case on the narrowest ground is controlling applies only where a "fragmented [Supreme] Court decides a case and no single rationale explaining the result enjoys the assent of five Justices." *United States v. Leonard*, 844 F.3d 102, 108 (2d Cir. 2016) (quoting *Marks*, 430 U.S. at 193). In *Parents Involved*, five justices agreed that the school districts' race-based assignments systems were not narrowly tailored to further any conceivable compelling interest. The compelling interest discussion was therefore unnecessary to the judgment and simply produced "no law of the land." *United States v. Alcan Aluminum Corp.*, 315 F.3d 179, 189 (2d Cir. 2003). Both opinions are merely persuasive authority and the question remains open.

[48] *See, e.g.*, "TJ should reflect the diversity of Fairfax County Public Schools, the community, and of Northern Virginia," Fairfax County Public Schools, *FCPS School Board Work Session—9-14-20—TJ Admissions Review*, YouTube (Sept. 15, 2020), at 4:31-5:04, https://tinyurl.com/4m9fb4nx (statement by Scott Brabrand); FCPS was making "efforts to ensure that we are more demographically representative of the region," *id*. at 33:25 (statement by Ann Bonitatibus).

discriminates against Asian-American students, the Coalition is likely to succeed on the merits of its Equal Protection claim.

### b. Defendants' Plan is Not Narrowly Tailored

Even if Defendants could demonstrate a compelling interest, they still must prove that the changed admissions policy is "necessary" to accomplish that interest. *Fisher*, 570 U.S. at 312 (quoting *Bakke*, 438 U.S. at 305 (opinion of Powell, J.)). Though narrow tailoring generally does not require the government to exhaust "every conceivable race-neutral alternative," the "court must ultimately be satisfied that no workable race-neutral alternatives" exist. *Id*. Or in Justice Kennedy's words, the plan must be a "last resort" to accomplish Defendants' interests. *Parents Involved*, 551 U.S. at 790 (Kennedy, J., concurring in part and concurring in the judgment). In this case, Defendants' plans to alter TJ's admissions policy involved racial balancing from the very outset.[49] Far from being a "last resort," the race-conscious policy is closer to being Defendants' first resort.

When reviewing whether a racial classification is narrowly tailored, courts in this circuit consider factors such as

> (1) the efficacy of alternative race-neutral policies; (2) the planned duration of the policy; (3) the relationship between the numerical goal and the percentage of minority group members in the relevant population or work force[;] (4) the flexibility of the policy, including the provision of waivers if the goal cannot be met; and (5) the burden of the policy on innocent third parties.

*Hayes v. North State Law Enforcement Officers Ass'n*, 10 F.3d 207, 216 (4th Cir. 1993) (citing *United States v. Paradise*, 480 U.S. 149, 171 (1987)). While these factors were developed to assess the constitutionality of remedial programs, they can provide helpful guidance in this context as well.

---

[49] *See FCPS School Board Work Session – 9-15-20 – TJ Admissions Review*, *supra* n.8.

Particularly under the first, fourth, and fifth *Paradise* factors, Defendants cannot demonstrate that the challenged admissions process is narrowly tailored to further any potential interest they might have. The first *Paradise* factor weighs in favor of the Coalition because in revising the TJ admissions policy last fall, Defendants did not even consider any options that were not designed to racially balance TJ before choosing the current discriminatory policy. From the very first proposal presented to the School Board, the plan to change TJ's admission process involved geographic proxies designed to crowd Asian-American students into regional pathways with limited seat allocation. And the 1.5% per-middle school limit that Defendants ultimately adopted has the same effect.

The second *Paradise* factor also weighs in favor of the Coalition because the challenged admissions changes are permanent. It is not a temporary fix, nor a limited departure from standard procedure, such as due to challenges during COVID-19. Defendants intend to apply the discriminatory admissions procedure to the Class of 2025 applications currently before them, and every class moving forward, unless this Court acts to stop them.

The final *Paradise* factor—the burden of the policy on innocent third parties—is especially significant in this case. Asian-American children are the collateral damage in Defendants' push to racially balance TJ. With the challenged admissions policy in place, students of all races *except* Asian-Americans will increase their percentage of seats at TJ. Asian-American students alone will bear the burden of Defendants' racial balancing maneuvers, and that burden is assigned solely based on the students' race.

Even if this Court were to find that Defendants had identified a compelling interest, Defendants' racial gerrymandering is not narrowly tailored to achieve that interest. The Coalition is therefore likely to succeed on the merits of its Equal Protection claim.

### C.  Coalition Members' Children Will Suffer Irreparable Harm if Preliminary Injunction Is Not Granted

Absent this Court's entry of a preliminary injunction, Coalition members' children are highly likely to suffer irreparable harm. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) (the deprivation of a constitutional right, "for even minimal periods of time, unquestionably constitutes irreparable injury"); *Ross v. Meese*, 818 F.2d 1132, 1135 (4th Cir. 1987) (the "denial of a constitutional right . . . constitutes irreparable harm"). This Court must issue an injunction if the Coalition can show that it is "likely to suffer irreparable harm before a decision on the merits can be rendered." *Winter*, 555 U.S. at 22. That harm must be "neither remote nor speculative, but actual and imminent," *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991) (quoting *Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 975 (2d Cir. 1989)), and one for which monetary damages cannot compensate. *Hughes Network Sys. v. InterDigital Communications Corp.*, 17 F.3d 691, 694 (4th Cir. 1994). Here, the race-based changes to TJ's admissions subjects Coalition members' children to a racially discriminatory process instead of a fair and lawful one, reducing their chances of admission to TJ by virtue of what is effectively a racial proxy. For example, Coalition member Ying Y. McCaskill's child D.M., an eighth grader at Carson MS, currently has an application to TJ pending under the challenged racially discriminatory admissions process. McCaskill Decl. ¶¶ 4-7. Coalition members' younger children will be harmed as well, like Ms. McCaskill's younger child S.M., a sixth grader at Navy Elementary School who is zoned to attend Carson MS, where she will apply to TJ in the eighth grade. *Id*. ¶¶ 8-11. Similarly, Coalition member Srinivas Akella's child R.A., a seventh grader a Carson MS who will apply to TJ this fall, will also be denied the opportunity to compete for admission to TJ on an equal footing because of his race. Akella Decl. ¶¶ 4-8.

It is firmly established that "one form of injury under the Equal Protection Clause is being forced to compete in a race-based system that may prejudice the plaintiff." *Parents Involved*, 551 U.S. at 719 (majority opinion). It does not matter that some of the students identified in the complaint may get into TJ anyway (or perhaps, that they would not get in under any standard): the relevant injury "is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit." *Ne. Fla. Chapter of Assoc. Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993). Children of Coalition members in FCPS middle schools, and particularly those at Carson, Longfellow, Kilmer, and Rocky Run Middle Schools, will suffer just such an injury in future years as long as the challenged process remains in effect.[50] Absent a preliminary injunction, those admissions offers will have been extended before this lawsuit is resolved and the right of Coalition members' children to participate in a lawful admissions process will be permanently foreclosed. That is not an injury that could be compensated with money damages.

Additionally, without a preliminary injunction, Coalition members' children will experience a severe decline in their chance of admission to TJ under the challenged admissions process. As discussed previously, *supra* at 10–11, students at Carson MS will experience a drop from 78 accepted students three years ago to 12 available seats this year. Kilmer MS will drop from 37 accepted students in 2018 to 8 available seats, while Longfellow MS will drop from 62 accepted students in 2018 to 10 available seats, and Rocky Run MS from 33 accepted students in 2018 to 10 available seats. Coalition members have children attending each of these schools. Compl. ¶¶ 15-18. At each of these middle schools with high concentration of Asian-American

---

[50] FCPS, TJHSST Freshman Application Process, https://tinyurl.com/5p976tck.

students who apply to TJ, the challenged admissions process will act to significantly limit the opportunity of Asian-American students to earn a seat at TJ.

TJ is also a unique educational opportunity that cannot be replicated through attendance at another FCPS high school. As the only Academic-Year Governor's School in Fairfax County, TJ is purposefully designed to educate gifted students at levels above and beyond the traditional high school level. TJ offers courses, laboratories, externships, and co-curricular opportunities that are not offered at any other FCPS high school, and 99% of TJ seniors go on to a four-year college or university.[51] Denying students the chance to compete for the opportunity to attend TJ on a level playing field because of their race is an injury that cannot be remedied by attendance at any other FCPS high school.

### D. The Balance of Hardships Weigh in Plaintiff's Favor

Defendants intend to extend admissions offers to the TJ Class of 2025 on a delayed timetable in June 2021.[52] Should this Court grant the preliminary injunction and bar Defendants from employing the challenged admissions policy for the Class of 2025, Defendants should be ordered to return to the last uncontested status with the Coalition: the previous admissions process in place for entry to TJ during the fall of 2020, including administration of a nationally-normed standardized achievement test.

The delay in announcing this year's TJ acceptance decisions allows time to administer such a test.[53] Indeed, plans were already in place to administer the nationally-normed TJ admissions

---

[51] Thomas Jefferson High School for Science and Technology 2020 2021, https://tinyurl.com/ymc4jdya.

[52] FCPS, TJHSST Freshman Application Process, https://tinyurl.com/5p976tck.

[53] Should FCPS raise health and safety concerns about administering an in-person test at this stage in the COVID-19 pandemic, those concerns would be unavailing. With proper safeguards in place, FCPS hosted an in-person PSAT exam for tenth graders on April 19, 2021. FCPS, *PSAT*

test for Class of 2025 applicants until one month before the testing date, when the Defendant School Board unceremoniously voted to eliminate the test. Compl. ¶ 33. The Coalition does not pretend that administering a standardized test on an abbreviated timetable will be easy for Defendants, but when measured against the significant violation of the equal protection rights of hundreds of Asian-American TJ applicants, the balance of hardships tips in the Coalition's favor. *See Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002) (quoting *Giovani Carandola, Ltd. v. Bason*, 147 F. Supp. 2d 383, 395 (M.D.N.C. 2001)) ("[The government is] in no way harmed by issuance of a preliminary injunction which prevents the state from enforcing restrictions likely to be found unconstitutional. If anything, the system is improved by such an injunction.").

Should this Court conclude that it would not be feasible to order Defendants to administer a nationally-normed standardized achievement test as part of the evaluation of the TJ Class of 2025, this Court should nonetheless require Defendants to eliminate the 1.5% middle school quota from the admissions procedure for the Class of 2025. While this approach would not go all the way toward a return to the last uncontested status between the Coalition and Defendants, it would lessen the unequal impact on Asian-American applicants caused by their concentration in certain middle schools with a history of sending high numbers of students to TJ.

Moreover, any issue regarding timing for administering a standardized test represents an impediment only for this current admissions cycle. Even if the Court concludes that the equities favor not requiring a full return to a standardized testing scheme with respect to the Class of 2025,

---

*Assessments*, https://www.fcps.edu/node/42102. It will also be hosting in-person SAT exams at various high schools on May 8, 2021, and June 5, 2021. FCPS, *Individual School SAT Protocols*, https://www.fcps.edu/sat. FCPS also held an in-person ACT exam on April 17, 2021, and will administer the exam again on June 12, 2021. FCPS, *Individual School ACT Protocols*, https://www.fcps.edu/act.

that should not prevent the Court from issuing a preliminary injunction that would apply prospectively for future classes as long as the litigation is pending.

## E.  A Preliminary Injunction Is in the Public Interest

This lawsuit's heart is simple: it seeks to vindicate the constitutional right of Asian-American students to compete for admission to TJ on an equal footing, regardless of their race or ethnicity. Ensuring that a public-school admissions policy complies with the constitutional requirements of the Equal Protection Clause serves the public interest. *Legend Night Club v. Miller*, 637 F.3d 291, 303 (4th Cir. 2011) ("[U]pholding constitutional rights is in the public interest.").

Further, FCPS is not the only school district in the country to consider racial balancing. As the number-one ranked public high school in the nation and a part of the largest school district in Virginia, TJ's impact extends beyond the borders of Fairfax County. Allowing even one class of students to be subjected to Defendants' racially discriminatory admissions policy has the potential to embolden other school districts to institute similarly unconstitutional policies. Enjoining Defendants' racial balancing at TJ now will send a clear message that the Equal Protection Clause guarantee of equal treatment regardless of race has teeth.

## F.  No Security Should Be Required

Although a district court may not ignore Rule 65(c)'s bond requirement altogether, it "retains the discretion to set the bond amount as it sees fit or waive the security requirement." *Pashby*, 709 F.3d at 332 (citing *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 421 (4th Cir. 1999)). "The burden of establishing the bond amount rests with the party to be restrained . . . ." *Steves & Sons, Inc. v. JELD-WEN, Inc.*, No. 3:20-CV-98, 2020 WL 2312030, at *4 (E.D. Va. May 8, 2020) (citation omitted). Here, Defendants cannot show that the issuance of a preliminary injunction would cause them harm, especially since administering this year's TJ

27

admissions test was already an expected expense. No bond or other security should be required; at most, only a nominal bond would be appropriate. *See id.* at *7.

## CONCLUSION

For the reasons discussed above, this Court should grant the Coalition a preliminary injunction while litigation is pending.

DATED: April 22, 2021.

Respectfully submitted,

ERIN E. WILCOX*
  N.C. Bar No. 40078
CHRISTOPHER M. KIESER*
  Cal. Bar No. 298486
Pacific Legal Foundation
930 G Street
Sacramento, California 95814
Telephone: (916) 419-7111
Facsimile: (916) 419-7747
EWilcox@pacificlegal.org
CKieser@pacificlegal.org
*Pro Hac Vice*

<u>s/ Alison E. Somin</u>
ALISON E. SOMIN, Va. Bar No. 79027
Pacific Legal Foundation
3100 Clarendon Blvd., Suite 610
Arlington, Virginia 22201
Telephone: (202) 557-0202
Facsimile: (916) 419-7747
ASomin@pacificlegal.org

GLENN E. ROPER*, Colo. Bar No. 38723
Pacific Legal Foundation
1745 Shea Center Dr., Suite 400
Highlands Ranch, Colorado 80129
Telephone: (916) 503-9045
Facsimile: (916) 419-7747
GERoper@pacificlegal.org
*Pro Hac Vice*

*Counsel for Plaintiff*

28

## CERTIFICATE OF SERVICE

I hereby certify that on April 22, 2021, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system. Counsel for Defendants are registered with the Court's CM/ECF system and will receive a notification of such filing via the Court's electronic filing system.

s/ Alison E. Somin
ALISON E. SOMIN, Va. Bar No. 79027
Pacific Legal Foundation
3100 Clarendon Blvd., Suite 610
Arlington, Virginia 22201
Telephone: (202) 557-0202
Facsimile: (916) 419-7747
ASomin@pacificlegal.org
*Counsel for Plaintiff*

## CERTIFICATE OF CONFERENCE

I hereby certify that counsel for all parties conferred in good faith by Zoom on April 22, 2021, but were unable to narrow the area of disagreement.

s/ Alison E. Somin
ALISON E. SOMIN, Va. Bar No. 79027
