IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| COALITION FOR TJ, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 1:21-cv-00296-CMH-JFA |
| | ) | |
| FAIRFAX COUNTY SCHOOL BOARD, | ) | |
| and DR. SCOTT BRABRAND, in his | ) | |
| official capacity as Superintendent of the | ) | |
| Fairfax County School Board, | ) | |
| | ) | |
| Defendants. | ) | |

**BRIEF IN SUPPORT OF
<u>DEFENDANTS' MOTION TO DISMISS</u>**

Stuart A. Raphael (VSB No. 30380)
Sona Rewari (VSB No. 47327)
HUNTON ANDREWS KURTH LLP
2200 Pennsylvania Avenue, NW
Washington DC 20037
Telephone: (202) 955-1500
Facsimile: (202) 778-2201
sraphael@HuntonAK.com
srewari@HuntonAK.com

*Counsel for Defendants*

April 29, 2021

## TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ................................................................................................. i

TABLE OF AUTHORITIES ......................................................................................... ii

INTRODUCTION ......................................................................................................... 1

STATEMENT OF FACTS ............................................................................................ 1

      A.      The School Board adopts a new admissions policy for TJ. ..................................... 1

      B.      Multiple parents file suit in *K.C. v. Fairfax County School Board* but are denied a preliminary injunction to block the new policy. ........................................ 7

      C.      The Coalition files suit here, claiming that the TJ admissions policy discriminates against Asian Americans. .................................................................. 8

STANDARDS OF REVIEW .......................................................................................... 8

ARGUMENT ................................................................................................................. 9

I.      The Coalition lacks associational standing. ...................................................... 9

      A.      The Coalition is neither a traditional membership organization nor its functional equivalent. .......................................................................................... 10

      B.      The participation of individual members is required. ........................................... 15

II.     The complaint fails to state a claim for intentional racial discrimination. ......................... 16

      A.      The rules governing strict scrutiny and rational-basis review are well-settled. .................................................................................................................. 17

      B.      A race-neutral admissions plan is not subject to strict scrutiny even when adopted in the hope of improving racial diversity. .................................................. 18

      C.      Because the TJ admissions policy expressly prohibits the consideration of race and forbids racial balancing and racial targets, it does not intentionally discriminate against Asian Americans. .............................................. 24

      D.      The complaint fails to plead facts that plausibly allege that any School Board member, let alone a majority, intended to discriminate against Asian-American students. ..................................................................................... 25

      E.      The TJ admissions policy survives rational-basis review. ..................................... 29

III.    The official-capacity claim against Brabrand should be dismissed as duplicative. ........... 30

CONCLUSION ............................................................................................................. 30

CERTIFICATE OF SERVICE ..................................................................................... 31

## **TABLE OF AUTHORITIES**

**Page**

**Cases**

*Adarand Constructors, Inc. v. Peña*,
    515 U.S. 200 (1995)..................................................................................... 17

*Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*,
    367 F.3d 212 (4th Cir. 2004) ..................................................................... 9, 28

*Anderson ex rel. Dowd v. City of Boston*,
    375 F.3d 71 (1st Cir. 2004)....................................................................... 22, 29

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)................................................................................... 9, 25

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)....................................................................................... 9

*Boston Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. of Boston*,
    No. 21-10330-WGY, 2021 WL 1422827 (D. Mass. Apr. 15, 2021),
    *stay denied*, No. 21-1303, 2021 WL 1656225 (1st Cir. Apr. 28, 2021) .................... 23, 29

*Boston Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. of Boston*,
    No. 21-1303, 2021 WL 1656225 (1st Cir. Apr. 28, 2021) ......................................... 24, 26

*Boyapati v. Loudoun Cty. Sch. Bd.*,
    No. 1:20-cv-01075 (AJT/IDD), 2021 WL 943112 (E.D. Va. Feb. 19, 2021) ...... 23, 29, 30

*Brown v. Fifth Jud. Dist. Drug Task Force*,
    255 F.3d 475 (8th Cir. 2001) ......................................................................... 11

*Christa McAuliffe Intermed. Sch. PTO, Inc. v. de Blasio*,
    364 F. Supp. 3d 253 (S.D.N.Y.),
    *aff'd*, 788 F. App'x 85 (2d Cir. 2019)........................................................ 22, 29

*City of Richmond v. J.A. Croson Co.*,
    488 U.S. 469 (1989)..................................................................................... 19

*City of St. Louis v. Praprotnik*,
    485 U.S. 112 (1988)..................................................................................... 26

*Comcast Corp. v. Nat'l Ass'n of African American-Owned Media*,
    140 S. Ct. 1009 (2020)................................................................................. 25

*Crawford v. Bd. of Ed.*,
    458 U.S. 527 (1982)..................................................................................... 19

*Ctr. for Sustainable Econ. v. Jewell*,
  779 F.3d 588 (D.C. Cir. 2015) ............................................................... 15

*Doe ex rel. Doe v. Lower Merion Sch. Dist.*,
  665 F.3d 524 (3d Cir. 2011) .......................................................... 22, 29

*Emesowum v. Arlington Cty.*,
  No. 1:20-cv-113, 2020 WL 3050377 (E.D. Va. June 5, 2020) ....................... 30

*Evans v. Chalmers*,
  703 F.3d 636 (4th Cir. 2012) ............................................................... 25

*Fisher v. Univ. of Tex.*,
  136 S. Ct. 2198 (2016) ...................................................................... 20

*Funeral Consumers All., Inc. v. Serv. Corp. Int'l*,
  695 F.3d 330 (5th Cir. 2012) ............................................................... 13

*Gettman v. DEA*,
  290 F.3d 430 (D.C. Cir. 2002) ............................................................. 13

*Gomillion v. Lightfoot*,
  364 U.S. 339 (1960) ......................................................................... 17

*Gratz v. Bollinger*,
  539 U.S. 244 (2003) ......................................................................... 20

*Grp. Health Plan, Inc. v. Philip Morris, Inc.*,
  86 F. Supp. 2d 912 (D. Minn. 2000) ...................................................... 12

*Grutter v. Bollinger*,
  539 U.S. 306 (2003) .............................................................. 17, 19, 21

*Heap v. Carter*,
  112 F. Supp. 3d 402 (E.D. Va. 2015) ............................................. passim

*Heller v. Doe by Doe*,
  509 U.S. 312 (1993) ......................................................................... 18

*Hunt v. Wash. State Apple Advert. Comm'n*,
  432 U.S. 333 (1977) ............................................................... passim

*In re Holocaust Victim Assets Litig.*,
  225 F.3d 191 (2d Cir. 2000) ............................................................... 11

*Int'l Woodworkers of Am. v. Chesapeake Bay Plywood Corp.*,
  659 F.2d 1259 (4th Cir. 1981) ............................................................. 14

*K.C. v. Fairfax Cty. Sch. Bd.*,
  No. 2020-17283, 2021 Va. Cir. LEXIS 32 (Fairfax Feb. 2, 2021) ..................... 8

*Kentucky v. Graham*,
    473 U.S. 159 (1985) ................................................................................... 30

*Lehnhausen v. Lake Shore Auto Parts Co.*,
    410 U.S. 356 (1973) ................................................................................... 18

*Lewis v. Anthem Health Plans of Va., Inc.*,
    No. 1:20-cv-773, 2020 WL 5884290 (E.D. Va. Aug. 31, 2020) ................................ 9, 25

*Lewis v. Ascension Parish Sch. Bd.*,
    806 F.3d 344 (5th Cir. 2015) ..................................................................... 22, 29

*Love-Lane v. Martin*,
    355 F.3d 766 (4th Cir. 2004) ............................................................................ 30

*Massey v. Ojaniit*,
    759 F.3d 343 (4th Cir. 2014) ......................................................................... 9, 28

*McCleary-Evans v. Md. Dep't of Transp.*,
    780 F.3d 582 (4th Cir. 2015) ............................................................................. 9

*Md. Highways Contractors Ass'n, Inc. v. Maryland*,
    933 F.2d 1246 (4th Cir. 1991) ...................................................................... 11, 15

*Monell v. N.Y. City Dep't of Soc. Servs.*,
    436 U.S. 658 (1978) ................................................................................... 30

*Package Shop, Inc. v. Anheuser-Busch, Inc.*,
    CIV. A. No. 83-513, 1984 WL 6618 (D.N.J. Sept. 25, 1984) ......................................... 13

*Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*,
    551 U.S. 701 (2007) ................................................................... 21, 22, 23, 30

*Personnel Adm'r of Mass. v. Feeney*,
    442 U.S. 256 (1979) ............................................................................... 17, 28

*Philips v. Pitt Cty. Mem'l Hosp.*,
    572 F.3d 176 (4th Cir. 2009) ................................................................. 1, 25, 28

*Retail Indus. Leaders Ass'n v. Fielder*,
    475 F.3d 180 (4th Cir. 2007) ............................................................................ 15

*Reyes v. Saldana*,
    No. 1:16-cv-734, 2017 WL 102967 (E.D. Va. Jan. 10, 2017),
    *aff'd sub nom. Reyes v. Homan*, 700 F. App'x 311 (4th Cir. 2017) ................................. 8

*Richmond, Fredericksburg, & Potomac R.R. v. United States*,
    945 F.2d 765 (4th Cir. 1991) ............................................................................. 8

*Riddick v. Sch. Bd. of Portsmouth*,
    238 F.3d 518 (4th Cir. 2000) ........................................................................... 26

*Schuette v. BAMN*,
    572 U.S. 291 (2014) ........................................................................................ 24

*Small Sponsors Working Grp. v. Pompeo*,
    No. 1:19-2600-STA-jay, 2020 WL 2561780 (W.D. Tenn. May 5, 2020) ........... 10, 11, 14

*Sorenson Commc'ns, LLC v. FCC*,
    897 F.3d 214 (D.C. Cir. 2018) ...................................................................... 13

*Spurlock v. Fox*,
    716 F.3d 383 (6th Cir. 2013) ................................................................ 22, 29, 30

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
    980 F.3d 157 (1st Cir. 2020),
    *petition for cert. filed* (U.S. Mar. 1, 2021) (No. 20-1199) ................................ 15

*Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*,
    576 U.S. 519 (2015) ........................................................................................ 19

*United States v. Spruhan*,
    989 F.3d 266 (4th Cir. 2021) ........................................................................ 18

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
    429 U.S. 252 (1977) .................................................................................. 17, 26

*Wash. Legal Found. v. Leavitt*,
    477 F. Supp. 2d 202, 208 (D.D.C. 2007) ........................................................ 11

*Washington v. Davis*,
    426 U.S. 229 (1976) .................................................................................. 17, 18

*White Tail Park, Inc. v. Stroube*,
    413 F.3d 451 (4th Cir. 2005) ...................................................................... 9, 11

*Wright v. Lassiter*,
    921 F.3d 413 (4th Cir. 2019),
    *cert. denied*, 140 S. Ct. 165 (2019) ................................................................ 25

*Yick Wo v. Hopkins*,
    118 U.S. 356 (1886) ........................................................................................ 17

*Z.G. v. Pamlico Cty. Pub. Schs. Bd.*,
    744 F. App'x 769 (4th Cir. 2018) .................................................................. 30

*Zak v. Chelsea Therapeutics Int'l Ltd.*,
    780 F.3d 597 (4th Cir. 2015) .......................................................................... 9

## Statutes

42 U.S.C. § 1983 ............................................................................................ 8, 25

**Constitutional Provisions**

U.S. Const. amend. XIV, § 1 ........................................................................ 1, 8, 16, 17

U.S. Const. art. III ................................................................................................ 13

**Rules**

Fed. R. Civ. P. 12(b)(1).......................................................................................... 8

Fed. R. Civ. P. 12(b)(6)..................................................................................... 9, 28

Va. R. Sup. Ct. 1:6(a)............................................................................................ 16

**Miscellaneous**

Br. for the United States as Amicus Curiae Supporting Pet'r,
    *Gratz v. Bollinger*, 539 U.S. 244 (2003) (No. 02-516),
    https://tinyurl.com/y3vfek5e ....................................................... 20

Br. for the United States as Amicus Curiae Supporting Pet'r,
    *Grutter v. Bollinger*, 539 U.S. 306 (2003) (No. 02-241),
    https://tinyurl.com/dda527sd ....................................................... 19

Ryan, James E.,
    *The Supreme Court and Voluntary Integration*, 121 Harv. L. Rev. 131 (2007)............... 22

## INTRODUCTION

The plaintiff "Coalition for TJ" seeks in this case to invalidate the Fairfax County School Board's current admissions policy for the Thomas Jefferson High School for Science and Technology (TJ).  Although the Coalition acknowledges that the admissions policy is facially race-neutral, it claims that the School Board enacted it to discriminate against Asian-American students and to engage in "racial balancing" at TJ.  Inexplicably, the complaint fails to mention that the policy expressly forbids racial balancing and racial targets.

The complaint fails to state a claim and should be dismissed.  The Coalition lacks associational standing because it is not a membership association or its functional equivalent.  On the merits, the complaint fails to allege an Equal Protection Clause violation.  The admissions policy not only forbids racial balancing, it prevents admissions evaluators from even knowing the race of the applicant.  And if that fact alone were not dispositive, the Coalition also fails to plead facts that plausibly allege that the School Board enacted the policy to discriminate against Asian Americans.

## STATEMENT OF FACTS

The facts set forth below are taken from the complaint, matters of public record of which the Court may take judicial notice, and documents specifically cited or referenced in the complaint.  *See Philips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009).

### A.      The School Board adopts a new admissions policy for TJ.

The Fairfax County School Board has 12 elected members, and its division superintendent is Dr. Scott Brabrand, also sued here in his "official capacity."  The School Board operates TJ—the Thomas Jefferson High School for Science and Technology—a Virginia Governor's school that is "the top-ranked public high school in the nation."  Compl. ¶¶ 22, 24.  The complaint describes the racial demographics of Fairfax County and of TJ as follows:

1

| Race/Ethnicity | Fairfax County (as of 2019) | TJ (as of 2020) |
|---|---|---|
| Black | 10% | 1% |
| Hispanic or Latino | 16% | 3.3% |
| Asian/Pacific Islander | 19% | 73.0% |
| White | 61% | 17.7% |

Compl. ¶¶ 23, 25.

The Coalition challenges the admissions process for TJ that the School Board adopted at its meetings on October 6, 2020 and December 17, 2020.  Compl. ¶¶ 34, 36.  The Coalition claims that the School Board adopted these changes with a "discriminatory intent" to "intentionally harm[] Asian-American students," *id.* ¶¶ 62–63.

As evidence of alleged anti-Asian bias, the complaint cites specific statements by Dr. Brabrand and by certain School Board members at various meetings.  *E.g.*, Compl. ¶¶ 42, 45.  The complaint contains url hyperlinks to video recordings of those meetings and pinpoint citations to the relevant portions.  For the Court's convenience, Exhibit A to the Declaration of Cynthia C. Smoot (Exhibit 4) transcribes the quoted statements from the cited video clips; the video clips themselves are appended as Exhibit B to her declaration.[1]

At an August 5, 2020 "town hall" hosted by the local chapter of the NAACP, Dr. Brabrand described as inequitable the fact that wealthy parents but not poor parents could fund expensive test-prep classes to help their children gain admission to TJ.  Compl. ¶ 41.  The Coalition characterizes that comment as "laying the groundwork for negative stereotyping of TJ's majority Asian-American student body."  *Id.* ¶ 41 & n.31 (citing video).  But it was clear that the Superintendent's comments had no racial overtones:

---

[1] The complaint also cites several allegedly anti-Asian statements made by others, such as a retired FCPS teacher in 2018, Compl. ¶ 37.  Because the complaint does not show that those statements or views were adopted by any member of the School Board, they are not included in Exhibit A.

> [O]ur TJ admissions right now leans heavily on a test, and to be the
> highest score on a test.  So if you have test prep access, you have a
> big leg up.  And some families have the money and resources to
> spend thousands and thousands of dollars each year to get their kid
> TJ-test ready.  And I think we've got to look hard at that and say is
> that the most equitable way to run our admissions process.

Ex. 4, Smoot Decl. Ex. A at 1.

On September 15, 2020, the staff and the School Board conducted a public work session
to review the TJ admissions process.  Compl. ¶ 42 & n.33.  Dr. Brabrand proposed to eliminate
the standardized test required of applicants, eliminate the application fee, and create five
"regional pathways" to channel applicants for admission based on the location of their middle
school.  Compl. ¶ 31.  He presented a slide projecting that his proposal could increase the
percentage of Black students from 1% to 7%; increase the percentage of Hispanic students from
3% to 8%; increase economically disadvantaged students from 0.6% to 10.3%; and increase the
percentage of English Language Learners from 0.6% to 3.4%.  *Id*.  The same slide projected that
the percentage of Asian students would decrease from 73% to 54%, while the percentage of
white students would increase from 18% to 25%.  *Id*.

On October 6, 2020, the School Board voted unanimously at a work session to eliminate
the application fee and the standardized-test requirements for admission to TJ, leaving the other
elements of the admissions policy undecided.  Compl. ¶ 33.[2]  There is no truth to the Coalition's
assertion that Dr. Brabrand at that meeting "directly attack[ed] the Asian-American families" by
"demeaning" their sacrifices as 'pay to play,'" Compl. ¶ 47 & n.50, as if he were saying that
Asian-American families alone were the ones paying for expensive test-prep classes for their
children.  This is what Dr. Brabrand actually said:

---

[2] *See also* Minutes at 2, Fairfax County School Board, Oct. 6, 2020, https://tinyurl.com/5e99tren
(cited at Compl. ¶ 33 n.23).

3

> Merit is in the pool, and merit and talent is removed from the pool through the testing process.  I just want to make one comment on the testing process.  I know and received feedback through my own town halls that I talked about "pay-to-play" and many perceived that those were comments against parents and students who did support, as part of getting in TJ, taking those tests.  I did not mean in any way to make comments that were disparaging against them at all.  I do not support an industry that prays on the hopes and dreams of students and parents and requires thousands of dollars to be shelled out for students to be successful.  But the students and their parents are simply playing by the rules—the rules that we set up here in Fairfax County.

Ex. 4, Smoot Decl. Ex. A at 3.

The complaint further alleges that certain School Board members made comments at the October 6 meeting showing their alleged bias against Asian-American students, but none of the cited statements supports the Coalition's inference of racism.  Paragraph 45 claims that Board Member Meren "described majority-Asian-American TJ's culture as 'toxic' for Black students."  Compl. ¶ 45.  But Meren was not criticizing Asian Americans; she was empathizing with the plight of a Black student who felt isolated at TJ:

> We've heard from a student, whom I've spoken with many times now, who tried to bleach her skin, because she didn't feel welcome as a Black student in the school.  It's toxic for those students who feel left out.

Ex. 4, Smoot Decl. Ex. A at 5.

Likewise, Paragraph 45 falsely accuses Member Frisch of criticizing the Asian-majority "culture" at TJ.  He said no such thing.  Rather, Frisch expressed concern that some parents used bigoted stereotypes to explain the low numbers of "Black and Brown" students at TJ:

> Let me just say this is not a pipeline issue, and it's not a testing issue, it's both, and it's way more than that.  It's a problem with the message that we send our kids, the students, our underrepresented students, and the culture that we allow in this system.  I've received, I can't even count the number of emails I've received, from parents telling me that the real reason we have an underrepresentation is because Black and Brown families don't care, or they are culturally

> disinclined from pursuing STEM.  That's the sort of bigotry pointed
> at members of our own community is why we are here in the year
> 2020 asking for data about access to AAP and STEM and other
> opportunities, and for generations why they haven't had access to
> these opportunities, and why they've been denied the same dreams
> as everybody else has.

Ex. 4, Smoot Decl. Ex. A at 5.

The Coalition claims that another member (School Board Chair Ricardy Anderson) criticized "Asian-American students" as having "earned their places at TJ" because they were in "Test Prep since second grade."  Compl. ¶ 47 & n.49.  But Anderson said nothing about "Asian-American" students; she said that, assuming "TJ is for the gifted," then the standardized admissions tests required for admission did not fairly measure giftedness for students who had been "test-prepped since second grade."  Ex. 4, Smoot Decl. Ex. A at 6.

The Coalition similarly claims that Board Member Keys-Gamarra admitted to "discriminatory language towards Asian Americans."  Compl. ¶ 47 & n.51.  But the cited video does not support that statement either.  Keys-Gamarra instead called for respectful dialogue from community members so as to avoid unintended racial stereotypes:

> I also want to address this issue of what diversity means.  I've heard
> a number of comments from letters . . . and it all seems to equate
> diversity, some of it, with "Oh my God, are we're going to lower
> our standards."  And I want to say that, just as we are concerned
> about certain communities feeling that we are maligning them by
> talking about tests, we must be very careful and cognizant about
> how demeaning these types of comments are and that many people
> consider these comments to be rooted in racism.  I'm not saying that
> it's intentional, but we need to be mindful.[3]

The Coalition also complains that Board Member Omeish suggested at the October 6 meeting that the student population at TJ "should be proportional to the population numbers."

---

[3] Ex. 4, Smoot Decl. Ex. A at 4–5.

Compl. ¶ 46.  It is not apparent that Omeish was talking about *racial* proportionality, rather than regional representation.[4]  (Indeed, Omeish later joined her colleagues in voting to prohibit racial balancing and racial targets, noted below.)  The complaint, however, does not attribute any anti-Asian comments to Omeish.

On December 7, 2020, the Superintendent presented two admissions-policy alternatives to the Board, a hybrid lottery plan and a holistic review process.[5]  His recommendations included increasing the minimum GPA required for admission to TJ from 3.0 to 3.5, as well as requiring full-year honors algebra or higher; honors science; and one other honors course or participation in the Young Scholars Program.  *See* Ex. 1 at 5 (referencing 3.5 GPA).

On December 17, 2020, the Board adopted the holistic review plan but added its own requirement that the top 1.5% of students at each middle school be offered admission to attend TJ, if they wished to attend.  Ex. 1 at 4.  The 1.5% plan would expand "the pipeline for each middle school" and provide "equity of access and opportunity."  *Id*.  The percentage plan replaced the Superintendent's previously proposed "Regional pathway."  *Id*.

The Board also made clear that the TJ admissions process must "use only race-neutral methods."  *Id.*  The policy specifically prohibits the use of "any specific racial or ethnic mix,

---

[4] Member Omeish stated: "A school-by-school approach would allow us to have more diversity, more proper outreach, and it's not really just having diversity, to Mr. Smith's point about the region selection, but doing it right, and if you think about what is it that is going to effectively reach every child and make sure there is representation, that's a key point, and I would add that it should be proportional to the population numbers, not just by middle schools."  Ex. 4, Smoot Decl. Ex. A at 6.

[5] The complaint does not mention the December 7 meeting, but the Superintendent's presentation is mentioned in the minutes of the December 17 meeting, which the complaint incorporates by reference.  *See* Compl. ¶ 36 n.27 (citing Minutes, Fairfax County School Board, Dec. 17, 2020, https://go.boarddocs.com/vsba/fairfax/Board.nsf/files/BY5JH34D3388/$file/12-17-20%20ERM%20FINAL.pdf).  A copy of those minutes is attached as Exhibit 1.

balance, or targets," *id.*; *see also id.* at 5 (same), a key fact that the Coalition fails to mention.

The Board approved the top-1.5% plan and the race-neutral mandate by a vote of 10-1, with one

abstention.  *Id.* at 5.

On April 28, 2021, FCPS staff updated the regulation governing admissions to TJ to

bring the regulation in line with the School Board's adopted policy.  *See* Ex. 2, FCPS Regulation

3355.14, https://tinyurl.com/yhv764jk.  The regulation implements the race-neutrality

requirement as follows:

> [T]he admission process must use only race-neutral methods that do
> not seek to achieve any specific racial or ethnic mix, balance, or
> targets.  Candidate name, race, ethnicity, or sex collected on the
> application form will not be provided to admissions evaluators.
> Each applicant will be identified to the evaluators only by an
> applicant number (student ID number for FCPS students; applicant
> ID number for non-FCPS students).

*Id.*, FCPS Reg. 3355.14.V.A.3.b.

**B.      Multiple parents file suit in *K.C. v. Fairfax County School Board* but are
denied a preliminary injunction to block the new policy.**

On November 4, 2020, 34 parents (and their children) sued the School Board in Fairfax

Circuit Court, seeking to reverse the School Board's October 6, 2020 decision to not require

standardized testing for admission to TJ.  *K.C. v. Fairfax Cty. Sch. Bd.*, No. 2020-17283.  The

plaintiffs included 14 of the parents whom the Coalition for TJ claims to be its "members" in this

case.[6]  On January 7, 2021, the *K.C.* plaintiffs filed an amended complaint to add a challenge to

the top-1.5% Plan that the School Board adopted on December 17.  Ex. 3, *K.C.* First Am. Compl.

¶ 82.

---

[6] The following parents who are named as Coalition members in paragraph 13 and 14 of the
complaint are plaintiffs in *K.C.*: Hanning Chen; Justin Jia; Raja Kakayadi; Dheeram Kaleem;
Yuhong Lin; Ying Y. McCaskill; Mahua Mitra; Hemang Nagar; James Pan; Mayuri Prodhuturi;
Vijay Raghavan; Tilak Venigalla; Sampath Yarlagadda; and Srinivas Akella.  *See* Ex. 3, First Am.
Comp., *K.C. v. Fairfax Cty. Sch. Bd.*.

None of the *K.C.* plaintiffs claimed that the TJ admissions policy discriminates against Asian Americans.  They principally argued that the policy violated Virginia law by not requiring a standardized test for gifted students seeking admission to a Governor's school.  *Id.* ¶ 91.

After a day-long evidentiary hearing, however, the circuit court denied the parents' preliminary-injunction motion, finding that "plaintiffs have not clearly shown that they are likely to succeed on the merits nor have they shown that it is in the public interest to restore standardized testing as a prerequisite for admission to the class of 2021–2022."  *See K.C. v. Fairfax Cty. Sch. Bd.*, No. CL 2020-17283, 2021 Va. Cir. LEXIS 32, at *28 (Fairfax Feb. 2, 2021).

### C.   The Coalition files suit here, claiming that the TJ admissions policy discriminates against Asian Americans.

After the parents lost their preliminary-injunction motion in *K.C.*, the "Coalition for TJ" filed this case on March 10, 2021.  The Coalition claims to have 5,000 members, Compl. ¶ 11, but it does not appear to be a traditional membership association or its functional equivalent.  *See* Ex. 4, Declaration of Cynthia Smoot, ¶ 8.  The Coalition admits that the School Board's new policy is "facially race-neutral" but claims that "it was enacted with discriminatory intent" to "intentionally harm[]Asian-American students."  Compl. ¶¶ 62–63.  The complaint alleges a single cause of action under 42 U.S.C. § 1983 for a violation of the Equal Protection Clause. Among other relief, the Coalition seeks to enjoin the School Board to return to the prior admissions policy for TJ for the 2021-22 school year.  Compl. at 25.

### STANDARDS OF REVIEW

A motion to dismiss for lack of jurisdiction under Rule 12(b)(1) can be based either on the allegations in the complaint or on evidence outside of the pleadings.  *Reyes v. Saldana*, No. 1:16-cv-734, 2017 WL 102967, *2 (E.D. Va. Jan. 10, 2017) (Hilton, J.) (citing *Richmond, Fredericksburg, & Potomac R.R. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991)), *aff'd sub*

*nom. Reyes v. Homan*, 700 F. App'x 311 (4th Cir. 2017).  Either way, the plaintiff "bears the burden of establishing the court's subject matter jurisdiction."  *Id*.

   "To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)).  The court must accept all well-pleaded factual allegations as true but does not accept "'naked assertions devoid of further factual enhancement'" nor "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements."  *Lewis v. Anthem Health Plans of Va., Inc.*, No. 1:20-cv-773, 2020 WL 5884290, *1 (E.D. Va. Aug. 31, 2020) (Hilton, J.) (quoting *Iqbal*, 556 U.S. at 678).  The plaintiff must allege "'a *plausible* claim for relief,'" and not merely "leave open 'the possibility that a plaintiff might later establish some set of undisclosed facts to support recovery.'"  *Id.* (quoting *McCleary-Evans v. Md. Dep't of Transp.*, 780 F.3d 582, 587 (4th Cir. 2015)).  And without converting the motion to one for summary judgment, the Court may consider documents that are "integral to and explicitly relied on" in the complaint, and whose authenticity is not in question.  *Zak v. Chelsea Therapeutics Int'l Ltd.*, 780 F.3d 597, 606–07 (4th Cir. 2015); *Philips*, 572 F.3d at 180.  If there is a discrepancy between a document or exhibit cited in the complaint and how the plaintiff characterizes it, the document or exhibit itself controls.  *See, e.g.*, *Massey v. Ojaniit*, 759 F.3d 343, 347 (4th Cir. 2014); *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004).

## ARGUMENT

### I.     The Coalition lacks associational standing.

   The plaintiff bears the burden to prove standing.  *White Tail Park, Inc. v. Stroube*, 413 F.3d 451, 459 (4th Cir. 2005).  Citing *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333 (1977), the Coalition invokes "associational standing" to bring this case on behalf

of the parents of Asian-American students applying to TJ.  Compl. ¶ 12.  *Hunt* recognized that "an *association* has standing to bring suit on behalf of its *members* when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Id*. at 343 (emphasis added).

At a minimum, the Coalition fails both the preamble and element (c) of *Hunt*.

### A.      The Coalition is neither a traditional membership organization nor its functional equivalent.

To represent "members" in litigation, an association must be either "a traditional voluntary membership organization," like a trade association or union, or "its equivalent." *Id*. at 344–45.  The plaintiff in *Hunt*—a State advertising commission that promoted Washington apples—was the functional equivalent of a traditional membership organization because the apple growers and retailers it served "alone elect the members of the Commission; they alone may serve on the Commission; [and] they alone finance its activities, including the costs of this lawsuit, through assessments levied upon them." *Id*.  Functional equivalency existed because, "[i]n a very real sense . . . the Commission represents the State's growers and dealers and provides the means by which they express their collective views and protect their collective interests." *Id*. at 345.

But not every association is the "functional equivalent of a traditional membership organization." *Heap v. Carter*, 112 F. Supp. 3d 402, 418 (E.D. Va. 2015).  "An organization must do more than merely have members to establish the existence of a membership organization." *Small Sponsors Working Grp. v. Pompeo*, No. 1:19-2600-STA-jay, 2020 WL 2561780, at *5 (W.D. Tenn. May 20, 2020).  In other words, "every group that is not a corporation or partnership is not automatically an unincorporated association." *Brown v. Fifth*

*Jud. Dist. Drug Task Force*, 255 F.3d 475, 477 (8th Cir. 2001) (citation omitted) .

The Coalition fails the functional-equivalence test here.  At the outset, the Coalition "has not provided any information that would indicate whether it meets [the] requirements" for associational standing.  *In re Holocaust Victim Assets Litig.*, 225 F.3d 191, 196 (2d Cir. 2000). Just as in *Heap*, the Coalition "has provided no *details* about who the membership is or whether [plaintiff] truly can be considered a voluntary membership organization or a functional equivalent."  *Heap*, 112 F. Supp. 3d at 418 (emphasis added).  That failure alone requires dismissal because the Coalition has the burden to prove its associational standing.  *Id.*; *White Tail*, 413 F.3d at 459; *Md. Highways Contractors Ass'n, Inc. v. Maryland*, 933 F.2d 1246, 1252–53 (4th Cir. 1991).

The Coalition is obviously not a "traditional membership organization," like a labor union or trade association.  It appears to lack even the basic formalities of a membership organization, such as identified officers, a board of directors, or bylaws.  *Small Sponsors*, 2020 WL 2561780, at *6; *see* Ex. 4, Smoot Decl. ¶ 8.  What can be gleaned from its homepage and Facebook page suggests that the Coalition is also not "the functional equivalent of a traditional membership organization.'"  *Heap*, 112 F. Supp. 3d at 418 (quoting *Wash. Legal Found. v. Leavitt*, 477 F. Supp. 2d 202, 208 (D.D.C. 2007)).  As this Court explained in *Heap*, "[f]unctional equivalency is determined if the organization (1) serves a specialized segment of the community; (2) represents individuals that have all the indicia of membership, including (i) electing the entity's leadership, (ii) serving in the entity, and (iii) financing the entity's activities, and (3) its fortunes are tied closely to those of its constituency."  *Id*.

In this case, all of those elements are missing.  The second element is most obviously absent because the Coalition does not show any indicia of traditional membership, let alone "all

the indicia of membership" listed in items 2(i)–(iii) of *Heap*.  The Coalition's homepage and

Facebook page do not identify "the entity's leadership." Ex. 4, Smoot Decl. ¶ 8.  There is no link

through which one could apply for membership.  *Id.*  The website does not indicate whether or

how the unidentified leadership was elected by members (element 2(i)), nor how members are

eligible to serve in the entity (element 2(ii)).  *Id.*  Nor does it show how the members finance the

Coalition's activities (element 2(iii)).  *Id.* ¶ 4.  There is no mention of dues paid by members,

only an invitation to click and donate.  *Id.*  But donations go to a *different* unincorporated

association with a confusingly similar name: "Coalition for *Truth and Justice.*"  *Id.* (emphasis

added).  That entity also has a *different* mission: "to conduct original research, journalism, and

advocacy about significant public issues relegated to education, contribute to sound public policy

decisions and protect gifted and STEM education and the legal defense of the rights of students."

*Id.* ¶ 5.  The funding page instructs that: "You can make your tax-deductible donation through

Coalition for Truth and Justice, a program of United Charitable, a 501(c)3."  *Id.*  ¶ 4.  But the

website does not explain the financial arrangements by which United Charitable transfers money

to the Coalition for Truth and Justice, nor how the latter transfers funds to the plaintiff.  *Id.* ¶ 5.

In any case, the "Coalition for TJ" does not appear to be funded by traditional member dues, but

instead by small-donor contributions and by one "generous donor who will match donations up

to $100,000."  *Id.* ¶ 4.

The Coalition's structure, moreover, does not appear to provide a "means by which [the

members] express their collective views and protect their collective interests."  *Hunt*, 432 U.S. at

344–45.  To have associational standing, the members must "exercise a certain measure of

control over the organization."  *Grp. Health Plan, Inc. v. Philip Morris, Inc.*, 86 F. Supp. 2d 912,

918 (D. Minn. 2000).  "This requirement assures the substantial nexus between the organization

and its members necessary to meet the Article III injury requirement." *Id.*; *see also Funeral Consumers All., Inc. v. Serv. Corp. Int'l*, 695 F.3d 330, 344 n.9 (5th Cir. 2012) ("If the association seeking standing does not have traditional members, as here, the association establishes its standing by proving that . . . its members . . . finance the organization's activities, including the case's litigation costs.").

Like other organizations denied associational standing, the Coalition appears to be "run by people who are self-appointed, a fact which weighs heavily against its being considered a membership organization." *Package Shop, Inc. v. Anheuser-Busch, Inc.*, CIV. A. No. 83-513, 1984 WL 6618, at *40-41 (D.N.J. Sept. 25, 1984). There is no indication that the 5,000+ alleged members of the Coalition, Compl. ¶ 11, took any "vote to bring this lawsuit," or even that "a majority of the membership would have approved this lawsuit" had a vote been taken. *Id*. at 41. *See* Ex. 4, Smoot Decl. ¶ 8. "There is an important difference between having the opportunity to express opinions through letters or telephone calls and the power to control the activities of an organization." *Package Shop*, 1984 WL 6618, at *40-41; *id.* at *41 (rejecting association's standing where it did not "appear that the membership can control the actions of the officers and trustees, most of whom they did not elect"); *see also Sorenson Commc'ns, LLC v. FCC*, 897 F.3d 214, 225 (D.C. Cir. 2018) (holding that online-information forum with email "subscribers" and Facebook followers did not qualify as a membership association); *Gettman v. DEA*, 290 F.3d 430, 435 (D.C. Cir. 2002) (holding that *High Times Magazine* lacked standing to represent the interests of its readership because it failed to show that "its 'readers and subscribers' played any role in selecting its leadership, guiding its activities, or financing those activities").

The Coalition's allegedly broad membership also undermines the first and third elements of *Heap*, which condition representational standing on the association's serving "a specialized

segment of the community," such that the association's "fortunes are tied closely to those of its constituency." 112 F. Supp. 3d at 418.  The Coalition's membership is not so "specialized" or aligned with the relief sought here.  While the complaint alleges that the Coalition's members include current parents of seventh- and eighth-grade students planning to apply to TJ, Compl. ¶¶ 12–13, the Coalition's Facebook pages reflect a much broader constituency, calling the Coalition for TJ "a network of parents, students, staff, alumni and community members dedicated to advocating for diversity and excellence" at TJ.  Ex. 4 Smoot Decl. ¶ 6.  Providing a "diverse student body that includes a wide variety of backgrounds, experiences and skills [that] enriches the learning environment for the students" was a stated purpose of the admissions policy adopted by the School Board.  Ex. 1 at 4.  The School Board is elected by Fairfax County voters, and many parents, alumni and community members likely *support* the admissions policy to advance those purposes.  Yet nothing on the Coalition's social media pages says that its membership is limited to only those who oppose TJ's admissions policy.  Ex. 4, Smoot Decl. ¶ 8.  The resulting "diversity of views within its membership" prevents this entity from adequately representing its broad membership.  *Int'l Woodworkers of Am. v. Chesapeake Bay Plywood Corp.*, 659 F.2d 1259, 1267 n.12 (4th Cir. 1981).

In reality, the Coalition appears to be the kind of "loose-knit association" that cannot facilitate representational standing.  *Small Sponsors*, 2020 WL 2561780, at *6.  Loosely affiliated groups are unlike other activist entities that have taken more formal steps to establish their membership bona fides.  *Id.*  For instance, the association representing Asian Americans challenging Harvard's admissions process is a "validly incorporated 501(c)(3) nonprofit organization," with actual voting members, bylaws, and a defined mission to oppose Harvard's affirmative-action policy.  *Students for Fair Admissions, Inc. v. President & Fellows of Harvard*

*Coll.*, 980 F.3d 157, 164, 184 (1st Cir. 2020), *petition for cert. filed* (U.S. Mar. 1, 2021) (No. 20-1199).  Similarly, the association had standing in *Center for Sustainable Economy v. Jewell*, 779 F.3d 588 (D.C. Cir. 2015), because "all" of [its] current members [were] voting members entitled to elect its Board, no new voting members [could] join the organization unless approved by the present voting membership, and Board membership [was] limited to individuals who 'have demonstrated a commitment to the mission and purposes of' [the organization]." *Id.* at 598.  The Coalition lacks any such membership control or clearly defined mission statement.

> **B.      The participation of individual members is required.**

The breadth of the Coalition's membership and the relief it requests also render it unable to satisfy element (c) of *Hunt*, which requires that "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." 432 U.S. at 343.  We assume for argument's sake that the parents of eighth-grade students currently applying to TJ, Compl. ¶ 13, would have standing in their own right to challenge the new admissions process, and that their claimed injury would be redressed if the Coalition prevailed.  Nonetheless, the Coalition fails element (c) for at least two reasons.

First, "conflicts of interest among members of the association require that the members must join the suit individually in order to protect their own interests." *Md. Highways*, 933 F.2d at 1252.  As noted above, the members of the Coalition support excellence and diversity at TJ, not simply opposing the current admissions policy.  It is doubtful that the Coalition asked its 5,000 members to "vote[] *unanimously* to prosecute this action." *Retail Indus. Leaders Ass'n v. Fielder*, 475 F.3d 180, 188 (4th Cir. 2007).  The breadth of the Coalition's membership and the potential for opposing views among 5,000 members thus pose "actual conflicts of interest [that] would require that the individual members come into the lawsuit to protect their interests." *Md. Highways*, 933 F.2d at 1253.

And second, the vague membership of the Coalition, combined with the specific Coalition "members" identified in the complaint, create claim-splitting problems that require the participation of individual members as plaintiffs.  Fourteen of the Coalition's members identified in paragraphs 13 and 14 of the complaint are current plaintiffs in the lawsuit pending in Fairfax County Circuit Court that seeks to invalidate the TJ admissions policy on different, State-law grounds.  *Supra* at 7 & n.6.  To the extent the Coalition claims to represent them here, they have now split their claims by failing to include their State-law claims in this case and by omitting their federal claims in State Court.  *See* Va. R. Sup. Ct. 1:6(a) (requiring plaintiffs to join all claims arising from the "same conduct, transaction or occurrence").  The Coalition's alleged representation of 5,000 members also poses a challenge to identifying *who* is in privity with the Coalition for purposes of claim- and issue-preclusion.  Will all 5,000 members be bound by the judgment here?  Does a person become a Coalition "member" if he or she simply "liked" or "followed" the Coalition's Facebook page or Twitter post?  Who among the Coalition's members will pay any costs that may be awarded against the Coalition?  Avoiding these conundrums calls for requiring individual, natural-person plaintiffs.

In sum, because the Coalition fails the requirements of *Hunt* and *Heap*, it "does not have associational standing."  *Heap*, 112 F. Supp. 3d at 419.

## II.     The complaint fails to state a claim for intentional racial discrimination.

The complaint also fails to show a violation of the Equal Protection Clause, which provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.  Courts evaluating Equal Protection claims apply different levels of scrutiny depending on whether the challenged law in question uses a suspect classification or impairs a fundamental right.  Because the complaint in this case fails to plead facts that plausibly allege that the School Board adopted the TJ admissions policy for the

purpose of discriminating against Asian Americans, the plan is subject only to rational-basis review, which it easily satisfies.

### A.    The rules governing strict scrutiny and rational-basis review are well-settled.

Because the explicit use of race is inherently suspect, "all racial classifications imposed by government 'must be analyzed by a reviewing court under strict scrutiny.'" *Grutter v. Bollinger*, 539 U.S. 306, 326 (2003) (quoting *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 227 (1995)).  Such race-based classifications "are constitutional only if they are narrowly tailored to further compelling governmental interests." *Id*.  But "official action will not be held unconstitutional solely because it results in a racially disproportionate impact." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp*., 429 U.S. 252, 264–65 (1977) (following *Washington v. Davis*, 426 U.S. 229 (1976)).  "Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." *Id*.

To be sure, a facially neutral law may sometimes have such an overwhelmingly disparate racial impact that it cannot be explained on nonracial grounds and amounts to "an obvious pretext for racial discrimination." *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 272 (1979).  For instance, when the City of Tuskegee changed its political boundaries from a square to "an uncouth twenty-eight-sided figure," excluding all but four of the city's 400 Black voters and none of the white voters, the conclusion was "irresistible" that the redistricting was for racially discriminatory purposes. *Gomillion v. Lightfoot*, 364 U.S. 339, 340–41 (1960).  The same inference was compelled in *Yick Wo*, where San Francisco's vague licensure requirement was used to put 200 Chinese-owned laundries out of business but not their 80 white-owned competitors. *Yick Wo v. Hopkins*, 118 U.S. 356, 374 (1886).

But "such cases are rare." *Arlington Heights*, 429 U.S. at 266.  "Absent a pattern as stark as that in *Gomillion* or *Yick Wo*, impact alone is not determinative, and the Court must look to

17

other evidence." *Id.* (footnote omitted).  Thus, in *Arlington Heights*, no invidious racial purposes could be inferred from a rezoning denial that disproportionately affected minority tenants in a nearly all-white community.  *Id*. at 269–70.  And in *Washington v. Davis*, no invidious purpose could be inferred from the fact that the written-examination requirement disproportionately excluded minority applicants from becoming police officers in Washington, D.C.  426 U.S. at 246.

Absent a "suspect" classification like race, a facially neutral measure will be upheld if there is a "rational basis" to support it.  *Heller v. Doe by Doe*, 509 U.S. 312, 319–20 (1993).  The government's action is "presumed constitutional" and must be upheld if it "is 'rationally related to a legitimate government interest.'"  *United States v. Spruhan*, 989 F.3d 266, 270 (4th Cir. 2021) (citation omitted); *Heller*, 509 U.S. at 319 ("strong presumption of validity").  This is often called the "conceivable basis" test.  *Heller*, 509 U.S. at 320.  The action must be upheld "if there is any reasonably conceivable state of facts that could provide a rational basis for the classification."  *Id*. (citations omitted).  "The burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it."  *Id*. (quoting *Lehnhausen v. Lake Shore Auto Parts Co*., 410 U.S. 356, 364 (1973)); *Spruhan*, 989 F.3d at 270 (same).

### B.     A race-neutral admissions plan is not subject to strict scrutiny even when adopted in the hope of improving racial diversity.

Importantly for this case, there is a meaningful difference between (1) the government's explicit use of race when drawing legislative classifications, and (2) the government's use of race-neutral measures with a consciousness or hope that it will improve racial diversity.  The first triggers strict scrutiny; the second does not.  Thus, the Supreme Court has made clear that "race may be considered in certain circumstances and in a proper fashion."  *Tex. Dep't of Hous. &*

18

*Cmty. Affairs v. Inclusive Cmtys. Project, Inc*., 576 U.S. 519, 545 (2015).

For instance, "local housing authorities may choose to foster diversity and combat racial isolation with race-neutral tools, and mere awareness of race in attempting to solve the problems facing inner cities does not doom that endeavor at the outset." *Id*.  Similarly, the Court has long recognized a distinction "between state action that discriminates on the basis of race and state action that addresses, in neutral fashion, race-related matters." *Crawford v. Bd. of Ed*., 458 U.S. 527, 538 (1982).  As the Court said in *Crawford*, "certainly the purposes of the Fourteenth Amendment would not be advanced by an interpretation that discouraged the States from providing greater protection to racial minorities." *Id*. at 539.

In fact, race-neutral measures that could help minorities are typically used as the *benchmark* for assessing whether explicit, race-based measures are needed and, if so, whether they can survive strict scrutiny.  In *City of Richmond v. J.A. Croson Co*., 488 U.S. 469 (1989), the Court found that Richmond's 30% set-aside for minority contractors failed strict scrutiny because the city had not considered "race-neutral means to increase minority business participation in city contracting." *Id*. at 507.  The Court never suggested that the goal "to increase minority" participation was invalid or that such race-neutral means themselves would be subject to strict scrutiny.

In *Grutter*, the Bush administration argued that the explicit consideration of race as a factor in determining admission to the law school at the University of Michigan failed strict scrutiny because Michigan could have used a race-neutral plan instead.  *See* Br. for the United States as Amicus Curiae Supporting Pet'r 14–19, *Grutter v. Bollinger*, 539 U.S. 306 (2003) (No. 02-241), https://tinyurl.com/dda527sd.  Solicitor General Olson touted Texas's top "Ten Percent" plan, Florida's "top 20%" plan, and California's "top 4%" plan as examples of "race-

neutral programs"—plans admitting students at the top of their high-school class—arguing that those plans effectively increased racial diversity without requiring the explicit consideration of race. *Id*. at 14–17, 19.[7]  In holding that the law school's admissions plan survived strict scrutiny, the Court found that the race-neutral alternative proposed by the Government would not be workable for the law school.  Such plans may work for admission to college from high school, but not for admission from college to "graduate and professional schools."  *Grutter*, 539 U.S. at 340.  Importantly, not a single Justice in *Grutter* or *Gratz* suggested that strict scrutiny would apply to a top-percentage plan adopted to improve racial diversity.  *See, e.g.*, *Gratz v. Bollinger*, 539 U.S. 244, 297 (2003) (Souter, J., dissenting) ("[T]here is nothing unconstitutional about such a practice.").

More recently, the Supreme Court in *Fisher* upheld the constitutionality of Texas's Top-Ten Percent plan, which filled 75% of the freshman class at the University of Texas with students drawn from the top 10% of the State's public high schools, with the remaining 25% filled through a holistic evaluation that took race into account to improve racial diversity.  *Fisher v. Univ. of Tex.*, 136 S. Ct. 2198, 2206 (2016).  The Court said that the purpose of the Top Ten Percent Plan was "to boost minority enrollment."  *Id*. at 2213.  Yet neither the litigants nor any justice questioned its constitutionality or suggested that it triggered strict scrutiny.  The Court instead addressed only the explicit use of race as part of a holistic review to fill the remaining 25% of the class, *id*. at 2209, which the Court upheld under strict scrutiny, *id*. at 2214–15.

---

[7] The Government also argued in the companion case that the University's mechanical use of race in determining admission to the college failed strict scrutiny for the same reason.  *See* Br. for the United States as Amicus Curiae Supporting Pet'r 13–14, 18, *Gratz v. Bollinger*, 539 U.S. 244 (2003) (No. 02-516), https://tinyurl.com/y3vfek5e.

Justice Kennedy's concurrence in *Parents Involved* synthesizes the law that applies to this case. *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 782 (2007) (Kennedy, J., concurring in part and concurring in the judgment). Four justices there would have upheld the use of race-based student-assignment plans to advance what they found to be a compelling state interest in integrating public schools. *Id.* at 806 (Breyer, J., dissenting, joined by Stevens, Souter and Ginsburg, JJ.). Four other justices concluded that *Grutter*'s recognition of racial diversity as a compelling state interest in higher education did not answer whether it was compelling at the elementary and secondary-school level. *Id.* at 724–25 (Roberts, C.J., joined by Scalia, Thomas, and Alito, JJ.). And even if it were compelling, they found that the race-based assignment plans were not narrowly tailored to further that interest. *Id.* at 727.

The outcome thus hinged on Justice Kennedy's concurrence. He agreed with the plurality that strict scrutiny applied to the attendance plans because they explicitly invoked race, and he further agreed that the challenged plans failed strict scrutiny because the use of race was not narrowly tailored. *Id.* at 786–87 (Kennedy, J., concurring in part and concurring in the judgment). But he rejected the plurality's view that promoting racial diversity could not be a compelling state interest in public schools. *Id.* at 783. And he wrote separately to explain that public schools may adopt facially race-neutral policies to enhance racial diversity. *Id.* at 787–89.

Justice Kennedy gave specific examples of race-neutral measures to increase racial diversity that would *not* trigger strict scrutiny:

> School boards may pursue the goal of bringing together students of diverse backgrounds and races through other means, including strategic site selection of new schools; drawing attendance zones with general recognition of the demographics of neighborhoods; allocating resources for special programs; recruiting students and faculty in a targeted fashion; and tracking enrollments, performance, and other statistics by race. These mechanisms are race conscious but do not lead to different treatment based on a

21

> classification that tells each student he or she is to be defined by
> race, so it is unlikely any of them would demand strict scrutiny to
> be found permissible.

*Id*. at 789.  He added that such measures have been considered "for generations" and that

governmental actors "should be permitted to employ them with candor and with confidence that

a constitutional violation does not occur whenever a decisionmaker considers the impact a given

approach might have on students of different races."  *Id*.

As one academic commentator has observed, after *Parents Involved*, "[s]chool officials

can be confident that they can take race-neutral steps to try to achieve racial integration."  James

E. Ryan, *The Supreme Court and Voluntary Integration*, 121 Harv. L. Rev. 131, 138 (2007).

Indeed, four federal circuits have followed Justice Kennedy's *Parents Involved* opinion to hold

that race-neutral public-school student-assignment plans are subject only to rational-basis

review, even if adopted with the hope or goal of improving racial diversity.  *See Anderson ex rel.*

*Dowd v. City of Boston*, 375 F.3d 71, 87 (1st Cir. 2004) ("Contrary to plaintiffs' arguments, the

mere invocation of racial diversity as a goal is insufficient to subject the New Plan to strict

scrutiny."); *Doe ex rel. Doe v. Lower Merion Sch. Dist.*, 665 F.3d 524, 553 (3d Cir. 2011)

(upholding redistricting plan that was race neutral on rational-basis review, despite the school

district's awareness of racial consequences); *Lewis v. Ascension Parish Sch. Bd.*, 806 F.3d 344,

357 (5th Cir. 2015) (agreeing that "a school zoning plan that assigns students to schools based on

their home addresses is facially race neutral, and the rezoning body's consideration of

demographic data in drawing the relevant geographic boundaries does not amount to making an

express classification"); *Spurlock v. Fox*, 716 F.3d 383, 395 (6th Cir. 2013) (upholding

geographic assignment plan); *see also Christa McAuliffe Intermed. Sch. PTO, Inc. v. de Blasio*,

364 F. Supp. 3d 253, 279–80 (S.D.N.Y.) (finding equal-protection challenge unlikely to succeed

22

against race-neutral program designed to increase racial diversity at specialized public high schools), *aff'd*, 788 F. App'x 85 (2d Cir. 2019).

This Court recently followed *Parents Involved* in a very similar case. *Boyapati v. Loudoun Cty. Sch. Bd.*, No. 1:20-cv-01075 (AJT/IDD), 2021 WL 943112, at *9 (E.D. Va. Feb. 19, 2021) (Trenga, J.). The *Boyapati* plaintiffs challenged the Loudoun County School Board's decision to change the admissions policy at its exclusive STEM school to allot 75% of the seats to qualified students based on the geographic location of the student's middle school. *Id*. at *2. Judge Trenga found that the plaintiffs had plausibly alleged "that the new Plan would have a disproportionately negative effect on Asian students, when compared with previous admission levels at certain middle schools." *Id*. at *8. But even so, he concluded that "[s]trict scrutiny . . . is . . . not warranted unless there have been alleged facts that make plausible that the revised Plan has a disproportionate impact on Asian students, *coupled with a discriminatory intent*." *Id*. at *8 (emphasis added). The "discriminatory intent" allegations fell short. Such discriminatory intent could not be inferred simply because school officials engaged in outreach "to promote the racial and ethnic diversity of . . . black and brown students." *Id*. at *9. Those outreach efforts were specifically protected by *Parents Involved*. *Id*.

And just last month, the district court upheld the Boston school system's zip-code-based student-assignment plan for its prestigious "Exam" schools. *Boston Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. of Boston*, No. 21-10330-WGY, 2021 WL 1422827, *13 (D. Mass. Apr. 15, 2021), *stay denied*, No. 21-1303, 2021 WL 1656225 (1st Cir. Apr. 28, 2021). Citing Justice Kennedy's opinion in *Parents Involved*, the district court applied rational-basis review despite that school board members expressed hope that the race-neutral plan would increase the number of historically underrepresented Black and Hispanic students. *Id*. at *12–13

23

& nn. 16–17.  In declining to stay that ruling, the First Circuit blasted the plaintiff's "purported 'rule'" that a facially race-neutral admissions plan adopted to increase the percentage of an underrepresented minority would automatically trigger strict scrutiny.  2021 WL 1656225, at *7. The court of appeals refused to be the first in the country to adopt a rule requiring strict scrutiny whenever "anyone involved in designing [a race-neutral admissions plan] happened to think that its effect in reducing the underrepresentation of a group was a good effect."  *Id*. at *8.

### C.   Because the TJ admissions policy expressly prohibits the consideration of race and forbids racial balancing and racial targets, it does not intentionally discriminate against Asian Americans.

The Coalition fails to mention the single most important detail about the TJ admissions policy as it relates to this case.  The School Board expressly directed that "[t]he admission process must use only race-neutral methods that do not seek to achieve any specific racial or ethnic mix, balance, or targets."  Ex. 1 at 5.  To effectuate that directive, the implementing regulation prohibits TJ admissions evaluators from even knowing the name, gender, or race of any applicant.  Ex. 2, FCPS Reg. 3355.V.A.3.b.  Because admissions evaluators do not know an applicant's race or ethnicity, the Coalition's central claim—that the "new TJ admissions process *intentionally* harms Asian-American students," Compl. ¶ 62 (emphasis added), and that the School Board intended "to racially balance" TJ, *id.* ¶¶ 10, 30, 61—is demonstrably false.

"[A] law directing state actors to provide equal protection is (to say the least) facially neutral, *and cannot violate* the Constitution."  *Schuette v. BAMN*, 572 U.S. 291, 318 (2014) (Scalia, J., concurring).  In other words, "any law expressly requiring state actors to afford all persons equal protection of the laws . . . does not—*cannot*—deny 'to any person . . . equal protection of the laws,' regardless of whatever evidence of seemingly foul purposes plaintiffs may cook up in the trial court."  *Id*. at 331–32 (citation omitted).  As applied here, the School

Board's directive to the TJ admissions evaluators *not* to engage in race-based admissions is likewise constitutional as a matter of law.

> ### D.     The complaint fails to plead facts that plausibly allege that any School Board member, let alone a majority, intended to discriminate against Asian-American students.

Even assuming for argument's sake that a plaintiff could challenge an explicitly race-neutral and race-blind admissions process on the theory that it was intended to discriminate against Asian-American students, the complaint does not plead facts that come close to plausibly alleging that here.  Importantly, the Coalition must allege facts showing "but for" causation—that is, that the School Board would not have changed the admissions process "but for" an intent to discriminate against Asian Americans.  "It is 'textbook tort law' that a plaintiff seeking redress for a defendant's legal wrong typically must prove but-for causation." *Comcast Corp. v. Nat'l Ass'n of African American-Owned Media*, 140 S. Ct. 1009, 1014 (2020).  Claims under § 1983 are no different: the plaintiff must "show that his injury would not have occurred *but for* the defendant's conduct."  *Wright v. Lassiter*, 921 F.3d 413, 419 (4th Cir.) (emphasis added), *cert. denied*, 140 S. Ct. 165 (2019); *Evans v. Chalmers*, 703 F.3d 636, 647 (4th Cir. 2012) ("[C]onstitutional torts, like their common law brethren, require a demonstration of both but-for and proximate causation.").

The pleaded facts miss the mark.  Of course, the Court must disregard the Coalition's statements that the policy "was enacted with discriminatory intent."  Compl. ¶ 63.  "These bare assertions . . . . are conclusory and are not entitled to be assumed true." *Iqbal,* 556 U.S. at 680–81.  The Court must also disregard "unwarranted inferences" and "unreasonable conclusions," *Philips*, 572 F.3d at 180, such as the Coalition's snide assertion that Dr. Brabrand and Member Keys-Gamarra "carried the tone of racial discrimination back to Fairfax County."  Compl. ¶ 39. *See Anthem Health Plans*, 2020 WL 5884290, at *1 (rejecting "naked assertions").

In evaluating whether the Coalition has adequately alleged racially discriminatory intent, the Court should focus on the School Board members who voted to change the admissions policy.  The Coalition cites statements by non-school personnel, such as a former FCPS teacher who supposedly described Asian-American parents as "ravenous" in comments to a State legislative panel.  Comp. ¶ 37 & n. 29.  But such alleged statements, even if uttered, are no more imputable to the School Board than the bigoted statements by some community members in *Arlington Heights* who opposed integrated housing.  429 U.S. at 257–58, 269.

Similarly, although the Coalition does not identify Asian-American animus in statements by any School Board *employee* (Superintendent Brabrand, Chief Operating Officer Marty Smith, or TJ Principal Dr. Ann Bonitatibus), the statements of such subordinates are also not imputed to the School Board unless ratified by its members.  For "when a subordinate's decision is subject to review by the municipality's authorized policymakers, they have retained the authority to measure the official's conduct for conformance with *their* policies."  *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988).  Thus, it is only if the School Board approves both the "subordinate's decision *and the [unconstitutional] basis for it*" that such "ratification would be chargeable" to the Board.  *Id.* (emphasis added); *see, e.g.*, *Riddick v. Sch. Bd. of Portsmouth*, 238 F.3d 518, 523–24 (4th Cir. 2000) (holding that school board could not be liable for decisions by superintendent and principal to retain athletic coach who secretly videotaped female athletes); *cf. Boston Parent Coal.*, 2021 WL 1422827, *16 (finding that anti-Asian statements by a citizen-committee chairman who resigned could not be imputed to the school board members who voted for the race-neutral assignment plan).

The Coalition faces particular difficulty trying to show that *any* School Board member— let alone a majority—acted with prejudice against Asian Americans.  All twelve members voted

to approve the elimination of the application fee and the standardized-testing requirement for admission to TJ;[8] ten voted to adopt the top-1.5% plan, Ex. 1 at 5.  The complaint says nothing about seven of the twelve Board members: McLaughlin, Sizemore Heizer, Tholen, Derenak-Kaufax, Corbett Sanders, Cohen and Pekarsky.

What is more, the statements the Coalition attributes to the *other* five Board members reflect no discriminatory animus against Asian Americans.  Meren did not call the Asian-American "culture" at TJ "toxic," Compl. ¶ 45, but expressed concern about an African-American student feeling so isolated that she felt the need to bleach her skin.  Ex. 4, Smoot Decl. Ex. A at 5.  Frisch expressed his concerns about the "underrepresentation" of "Black and Brown families" and voiced alarm about bigoted emails he received blaming the low numbers on these students being "culturally disinclined from pursuing STEM."  *Id.* at 5.  While the Coalition complains that Omeish suggested at the October 6 work session that the student population at TJ "should be proportional to the population numbers," Compl. ¶ 46, it is not apparent that she was talking about *racial* proportionality.  Ex. 4, Smoot Decl. Ex. A at 6.   In any case, Omeish was among the ten members who specifically voted two months later, on December 17, to *forbid* staff from attempting any "racial balancing" or using any racial "targets."  Ex. 1 at 5.

The Coalition takes similar liberties with Keys-Gamarra's statement to incorrectly suggest that she admitted that Board members had engaged in "discriminatory language towards Asian Americans."  Compl. ¶ 47 & n.51.  Not so.  In the passage Plaintiff cites, Keys-Gamarra was instead calling for respect from all community members so as to avoid racial stereotyping, as some community members had complained that increasing diversity would "lower" the standards

---

[8] *See* Minutes at 2, Fairfax County School Board, Oct. 6, 2020, https://tinyurl.com/5e99tren (cited at Compl. ¶ 33 n.23).

at TJ. Ex. 4, Smoot Decl. Ex. A at 4–5.

Finally, the complaint cites a statement from the School Board chairman, Dr. Anderson, to suggest that she was biased against Asian-American students, Compl. ¶ 47, but her statement showed nothing of the sort. Anderson simply said that true giftedness was not being measured by the standardized tests used for TJ admissions because the students had "been test-prepped since second grade." Ex. 4 Smoot Decl. Ex. A at 6. She did not attribute that practice, as Plaintiff insinuates, to "Asian-American students." Compl. ¶ 47.

On a Rule 12(b)(6) motion, the Court must disregard unreasonable inferences, *Philips*, 572 F.3d at 180, and the text of the documents cited by a plaintiff control over the plaintiff's efforts to change their characterization, *Massey*, 759 F.3d at 347; *Am. Chiropractic Ass'n*, 367 F.3d at 234. No fair-minded observer could view the actual statements cited in the complaint— collected in Exhibit A to the Smoot Declaration (Ex. 4)—and conclude that *any* of these five School Board members was expressing prejudice against Asian Americans, let alone that any voted for the new admissions policy to harm Asian-American students.

Even assuming for argument's sake that a majority of the Board supported the new race-neutral admissions plan in the hope that it would improve the representation of Black and Hispanic students at TJ, that would not translate to discrimination against Asian Americans. The Supreme Court rejected similar reasoning in *Feeney*. Even though the Massachusetts legislature there knew that giving veterans a preference in public-sector hiring would disproportionately benefit men, that reality did not transform the legislature's desire to benefit veterans into unconstitutional discrimination against women. 442 U.S. at 278–79. "'Discriminatory purpose' . . . implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because

28

of,' not merely 'in spite of,' its adverse effects upon an identifiable group."  *Id*. at 279 (citation

omitted).  Just as there was nothing in *Feeney* to suggest that benefitting veterans was a ploy to

harm women, there is no plausible allegation here that any hoped-for increase in the

representation of Black and Hispanic students at TJ is a ploy to harm Asian Americans.

Indeed, the same claim was recently rejected in *Christa McAuliffe*.  Like the Coalition,

the plaintiffs there saw anti-Asian prejudice in the statements of the New York City mayor and

schools chancellor, both of whom "laud[ed] how the program changes [would] increase Black

and Latino enrollment at the specialized schools."  364 F. Supp. 3d at 278.  Coupling those

statements with the projected reduction in Asian-American students who would be admitted, the

plaintiffs insisted that discrimination against Asians was afoot.  *Id*.  But the court rejected the

notion that increasing the enrollment of historically underrepresented minorities means

discriminating against Asian Americans.  *Id*.

### E.    The TJ admissions policy survives rational-basis review.

Because the Coalition has not pleaded facts that plausibly allege that the School Board

would not have enacted the TJ admissions policy but for an intention to discriminate against

Asian Americans, the policy is subject only to rational-basis review.  Indeed, every other court to

consider similar claims has so held.  *See Spurlock*, 716 F.3d at 402; *Lower Merion Sch. Dist*.,

665 F.3d at 556; *Anderson*, 375 F.3d at 90; *Lewis*, 806 F.3d at 363; *Boston Parent Coal*., 2021

WL 1422827, at *13; *Boyapati*, 2021 WL 943112, at *10; *Christa McAuliffe*, 364 F. Supp. 3d at

279–80.  "Rational-basis review is 'highly deferential'" and will result in a holding of

unconstitutionality "'only in rare or exceptional circumstances.'"  *Spurlock*, 716 F.3d at 403

(citation omitted).

Just as in those cases, the Board's policy here "clearly passes muster."  *Boyapati*, 2021

WL 943112, at *10.  The purpose of the policy was to create a "diverse student body that

includes a wide variety of backgrounds, experiences and skills," one that "enriches the learning environment for the students" and "prepares them to be science and technology leaders in an increasingly diverse workforce." Ex. 1 at 4–5. That is precisely the type of interest that Justice Kennedy described not simply as rational and legitimate, but "compelling." *Parents Involved*, 551 U.S. at 788–90 (Kennedy, J., concurring in part and concurring in the judgment). Similarly, this Court found that Loudoun's geographic student-assignment plan served a rational basis in "achieving socio-economic and geographic diversity . . . particularly given the deference given to legislating bodies in making these policy decisions." *Boyapati*, 2021 WL 943112, at *10. "In the absence of any constitutional infirmity, it is not the province of the courts to dictate and supervise local school policy." *Spurlock*, 716 F.3d at 403.

### III.   The official-capacity claim against Brabrand should be dismissed as duplicative.

Finally, Dr. Brabrand should be dismissed as a defendant because he is named only in his "official capacity" as the Superintendent of the School Board, the principal defendant. Compl. ¶¶ 21, 57. Such official-capacity designations "represent only another way of pleading an action against an entity of which an officer is an agent." *Kentucky v. Graham*, 473 U.S. 159, 165 (1985) (quoting *Monell v. N.Y. City Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.55 (1978)). "It is *not* a suit against the official personally, for the real party in interest is the entity." *Id.* at 166. Accordingly, courts routinely dismiss official-capacity defendants as "duplicative." *Love-Lane v. Martin*, 355 F.3d 766, 783 (4th Cir. 2004) (affirming dismissal of official-capacity claim against school superintendent); *see also Z.G. v. Pamlico Cty. Pub. Schs. Bd.*, 744 F. App'x 769, 780 (4th Cir. 2018) (same); *Emesowum v. Arlington Cty.*, No. 1:20-cv-113, 2020 WL 3050377, *6 (E.D. Va. June 5, 2020) (dismissing duplicative official-capacity defendants with prejudice).

### CONCLUSION

The complaint should be dismissed.

Respectfully submitted,

FAIRFAX COUNTY SCHOOL BOARD and
DR. SCOTT BRABRAND in his "official
capacity" as Superintendent


By: _____/s/_____
    Stuart A. Raphael (VSB No. 30380)
    Sona Rewari (VSB No. 47327)
    HUNTON ANDREWS KURTH LLP
    2200 Pennsylvania Avenue, NW
    Washington DC 20037
    Telephone: (202) 955-1500
    Facsimile: (202) 778-2201
    sraphael@HuntonAK.com
    srewari@HuntonAK.com

    *Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on April 29, 2021, I electronically filed this document with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing (NEF) to counsel of record for all Parties.

By: _____/s/_____
    Stuart A. Raphael (VSB No. 30380)

**Exhibits**

1) Approved Minutes of Dec. 17, 2020 Meeting of the Fairfax County School Board

2) FCPS Regulation 3355.14 (Apr. 28, 2021)

3) First Am. Compl., *K.C. v. Fairfax Cty. Sch. Bd.*, No. 2020-17283 (Fairfax Cir. Ct. Jan. 7, 2021).

4) Declaration of Cynthia C. Smoot