**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

COALITION FOR TJ,

                  Plaintiff,

        v.

FAIRFAX COUNTY SCHOOL BOARD;
and DR. SCOTT BRABRAND, in his official
capacity as Superintendent of the Fairfax
County School Board,

                  Defendants.

No. 1:21-cv-00296-CMH-JFA

## PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................... ii

INTRODUCTION ....................................................................................................... 1

FACTUAL BACKGROUND ....................................................................................... 2

STANDARD OF REVIEW ......................................................................................... 4

ARGUMENT .............................................................................................................. 5

  I.   The Coalition Has Associational Standing ......................................................... 5

    A.  The complaint plausibly alleges that the Coalition has associational standing ............... 5

    B.  The Coalition's declarations cure any potential standing defect ...................................... 9

  II.  The Coalition Has Alleged a Plausible Equal Protection Claim ......................................... 11

    A.  The Coalition plausibly alleged that Defendants acted with a racially discriminatory purpose, triggering strict scrutiny ........................................................... 12

        1.  The Coalition plausibly alleged that the challenged admissions policy will have a significant disparate impact on Asian-American students ................... 13

        2.  The Coalition plausibly alleged that the historical background of the decision raises an inference of impermissible racial motive ..................................... 14

        3.  The Coalition plausibly alleged that irregularities in the decisionmaking process support a finding of discriminatory intent ................................................... 16

        4.  Contemporary statements by decisionmakers plausibly support an inference of discriminatory intent ...................................................................... 17

    B.  Defendants' remaining arguments against heightened scrutiny are unpersuasive .......... 23

    C.  The Coalition plausibly alleged that the challenged admissions process fails strict scrutiny ................................................................................................... 28

CONCLUSION ........................................................................................................... 30

CERTIFICATE OF SERVICE .................................................................................... 31

# TABLE OF AUTHORITIES

## Cases

*Adarand Constructors, Inc. v. Pena,*
515 U.S. 200 (1995)..................................................................................................11, 28

*Alexander v. Estepp,*
95 F.3d 312 (4th Cir. 1996) ......................................................................................11

*Avenue 6E Investments, LLC v. City of Yuma,*
818 F.3d 493 (9th Cir. 2016) ....................................................................................21

*In re Birmingham,*
846 F.3d 88 (4th Cir. 2017) ....................................................................................4–5

*Boston Parent Coal. for Acad. Excellence v. Sch. Comm. of City of Boston,*
No. 21-1303, 2021 WL 1656225 (1st Cir. Apr. 28, 2021) ......................................25

*Carcano v. Cooper,*
350 F. Supp. 3d 388 (M.D.N.C. 2018) ....................................................................13

*City of St. Louis v. Praprotnik,*
485 U.S. 112 (1988)..............................................................................................20–21

*Clatterbuck v. City of Charlottesville,*
708 F.3d 549 (4th Cir. 2013) ....................................................................................5

*David v. Alphin,*
704 F.3d 327 (4th Cir. 2013) ....................................................................................4

*Deegan v. City of Ithaca,*
444 F.3d 135 (2d Cir. 2006)......................................................................................29

*Doe ex rel. Doe v. Lower Merion Sch. Dist.,*
665 F.3d 524 (3d Cir. 2011)......................................................................12, 16, 24

*El-Amin v. McDonnell,*
No. 3:12–cv–00538–JAG, 2013 WL 1193357 (E.D. Va. Mar. 22, 2013)..............18

*Fisher v. Univ. of Tex. at Austin,*
570 U.S. 297 (2013)..................................................................................................29

*Fisher v. University of Texas at Austin,*
136 S. Ct. 2198 (2016)..............................................................................................26

*Funeral Consumers Alliance, Inc. v. Service Corp. International,*
695 F.3d 330 (5th Cir. 2012) ....................................................................................8

*Gomillion v. Lightfoot,*
364 U.S. 339 (1960)..................................................................................................14

*Group Health Plan, Inc. v. Philip Morris, Inc.,*
86 F. Supp. 2d 912 (D. Minn. 2000)........................................................................7

*Grutter v. Bollinger,*
539 U.S. 306 (2003)..................................................................................................28

*Heap v. Carter*,
112 F. Supp. 3d 402 (E.D. Va. 2015) ......................................................7

*Hunt v. Cromartie*,
526 U.S. 541 (1999)...........................................................................12

*Hunt v. Wash. State Apple Advert. Comm'n*,
432 U.S. 333 (1977)..........................................................................5, 7

*Lewis v. Ascension Par. Sch. Bd.*,
662 F.3d 343 (5th Cir. 2011) ....................................................23, 25–26

*Liberty Univ., Inc. v. Lew*,
733 F.3d 72 (4th Cir. 2013) ..................................................................5

*Marks v. United States*,
430 U.S. 188 (1977)...........................................................................26

*Md. Highways Contractors Ass'n, Inc. v. Maryland*,
933 F.2d 1246 (4th Cir. 1991) ...............................................................5

*Miller v. Johnson*,
515 U.S. 900 (1995)...........................................................................11

*Monell v. Department of Social Services*,
436 U.S. 658 (1978)...........................................................................20

*Ne. Fla. Chapter of the Associated Gen. Contractors v. City of Jacksonville*,
508 U.S. 656 (1993)............................................................................6

*North Carolina State Conference of NAACP v. McCrory*,
831 F.3d 204 (4th Cir. 2016) ...........................................12, 14, 17, 19, 23

*Package Shop, Inc. v. Anheuser-Busch, Inc.*,
No. 83-513, 1984 WL 6618 (D.N.J. Sept. 25, 1984) .................................8

*Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*,
551 U.S. 701 (2007)....................................................................6, 26–29

*Personnel Adm'r of Mass. v. Feeney*,
442 U.S. 256 (1979).....................................................................12, 24

*Presidio Golf Club v. Nat'l Park Serv.*,
155 F.3d 1153 (9th Cir. 1998) ...............................................................6

*Providence Hall Assocs. Ltd. P'ship v. Wells Fargo Bank, N.A.*,
816 F.3d 273 (4th Cir. 2016) .................................................................9

*Ray v. Roane*,
948 F.3d 222 (4th Cir. 2020) .................................................................4

*Regents of Univ. of Cal. v. Bakke*,
438 U.S. 265 (1978)...........................................................................29

*Ricci v. DeStefano*,
557 U.S. 557 (2009)...........................................................................26

*Richmond v. Polk*,
  375 F.3d 309 (4th Cir. 2004) ..........................................................................26

*Richmond, Fredericksburg & Potomac R.R. Co. v. United States*,
  945 F.2d 765 (4th Cir. 1991) ..........................................................................9

*Riddick v. School Board of Portsmouth*,
  238 F.3d 518 (4th Cir. 2000) ....................................................................20–21

*Schuette v. BAMN*,
  572 U.S. 291 (2014)........................................................................................27

*Small Sponsors Working Group v. Pompeo*,
  No. 1:19-2600-STA-jay, 2020 WL 2561780 (W.D. Tenn. May 20, 2020) ............8

*Smith v. Town of Clarkton*,
  682 F.2d 1055 (4th Cir. 1982) ......................................................................21

*Southern Walk at Broandlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*,
  713 F.3d 175 (4th Cir. 2013) ..........................................................................5

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
  261 F. Supp. 3d 99 (D. Mass. 2017) ..............................................................6

*Students for Fair Admissions, Inc. v. Univ. of N.C.*,
  No. 1:14-CV-954, 2018 WL 4688388 (M.D.N.C. Sept. 29, 2018) ....................6

*Summers v. Earth Island Inst.*,
  555 U.S. 488 (2009)..........................................................................................5

*Sylvia Dev. Corp. v. Calvert Cty.*,
  48 F.3d 810 (4th Cir. 1995) ..........................................................................13

*Synovus Bank v. Coleman*,
  887 F. Supp. 2d 659 (W.D.N.C. 2012) ..........................................................13

*United Food and Com. Workers Union Local 751 v. Brown Grp., Inc.*,
  517 U.S. 544 (1996)..........................................................................................6

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
  429 U.S. 252 (1977)..................................................................................12, 17

*Vitol, S.A. v. Primerose Shipping Co.*,
  708 F.3d 527 (4th Cir. 2013) ......................................................................4–5

*Washington Legal Found. v. Leavitt*,
  477 F. Supp. 2d 202 (D.D.C. 2007) ................................................................7

*Yick Wo v. Hopkins*,
  118 U.S. 356 (1886)........................................................................................14

**Constitution**

U.S. Const. amend. XIV, § 1 ................................................................................11

**Statute**

2020 Va. Acts 183................................................................................2, 14–15

**Rules**

Fed. R. Civ. P. 12(b)(1)..........................................................................................4, 11

Fed. R. Civ. P. 12(b)(6)..........................................................................................4, 11

**Other Authorities**

Angwin, Julia, Mattu, Surya & Larson, Jeff,
   *Test Prep Is More Expensive—for Asian Students*, The Atlantic (Sept. 3,
   2015), https://www.theatlantic.com/education/archive/2015/09/princeton-
   review-expensive-asian-students/403510/ ..............................................................22

Brief Amicus Curiae of Pacific Legal Foundation et al. in Support of Petitioner,
   *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*
   (U.S. No. 20-1199), *available at*
   https://www.supremecourt.gov/DocketPDF/20/20-
   1199/173382/20210330164638558_AMICUS%20CURIAE%20BRIEF%20FI
   NAL.pdf ..................................................................................................................22

FCPS School Board Meeting, 12-17-2020,
   https://www.youtube.com/watch?v=1EjeA3EUzoY&ab_channel=FairfaxCou
   ntyPublicSchools....................................................................................................17

Spann, Girardeau A., *Neutralizing* Grutter, 7 U. Pa. J. Const. L. 633 (2005) ..............25

**INTRODUCTION**

Thomas Jefferson High School for Science and Technology (TJ) is, by many accounts, the nation's best public high school. Its merit-based admissions system and focus on science, technology, engineering, and mathematics (STEM) has made it unique among high schools in Fairfax County and nationally. Yet the Fairfax County School Board and Fairfax County Public Schools (FCPS) Superintendent Dr. Scott Brabrand saw one particular aspect of TJ as problematic—its racial makeup. Specifically, they were concerned that Asian-American students have achieved great success at gaining admission to TJ, such that the percentage of Asian-American students gaining admission to TJ is noticeably higher than the percentage of Asian-Americans in Fairfax County as a whole.

In response, Superintendent Brabrand, TJ principal Ann Bonitatibus, and other high-ranking FCPS officials urged the Board to scrap the longstanding examination requirement for admissions. In its place, they sought a new system that would ensure that the racial composition of TJ's student body looked more like Fairfax County as a whole. The Board complied. The resulting admissions system will ensure that far fewer Asian-Americans get into TJ, while every other racial group will collectively increase their share of offers to attend TJ because of the changes.

Because Plaintiff Coalition for TJ plausibly alleges that Defendants intended this result in implementing changes to TJ's admissions process, the admissions changes must pass the most demanding level of judicial scrutiny. The Equal Protection Clause requires strict scrutiny of even facially race-neutral efforts to intentionally discriminate against a racial group to obtain racial balance proportional to a greater population. Defendants have no compelling interest in racially

balancing TJ and make no argument that the admissions changes are narrowly tailored to any more limited interest in promoting diversity. Their motion to dismiss should be denied.

## FACTUAL BACKGROUND

Founded in 1985, TJ is one of Virginia's 19 Academic Year Governor's Schools. Complaint ¶¶ 24–25. These schools provide education for gifted high school students in various fields, including TJ's STEM focus. *Id.* ¶¶ 22, 24. TJ's traditional admissions process reflected this focus. The famously competitive process was primarily based on a rigorous standardized examination consisting of Quant-Q, ACT Inspire Reading, and ACT Inspire Science components. *Id.* ¶ 27. Applicants also had to complete Algebra I in middle school and maintain a core GPA of at least 3.0. *Id.* ¶ 26. TJ typically offered admission to the top 480 to 500 scorers on the examination. *Id.* ¶ 28.

Trouble began in 2020 when the Virginia General Assembly enacted a law that required each Academic Year Governor's School to "set diversity goals for its student body and faculty, and develop a plan to meet said goals in collaboration with community partners at public meetings." 2020 Va. Acts 183; Complaint ¶ 29. TJ's student body is incredibly diverse—it is 79 percent non-white and includes students of dozens of different ethnicities. Complaint ¶ 23. But in jumping to change TJ's admissions process, Defendants and other FCPS officials focused on the racial balance at TJ compared to Fairfax County or Northern Virginia as a whole. *Id.* ¶¶ 30, 40, 42–44, 46. That spelled trouble for Asian-American students, since Asian-Americans comprise only 19% of Fairfax County, but 73% of TJ's class of 2024 is Asian-American. *Id.* ¶ 23–25. Every other racial group is "underrepresented" at TJ—in particular, Fairfax County is 61% white, but white students make up less than 20% of the TJ class of 2024. *Id.*

On September 15, 2020, Superintendent Brabrand proposed to the Board eliminating the TJ admissions exam and replacing the admissions process with a "regional pathways" system that would cap yearly admission to TJ at 70 students from each of five pathways. *Id.* ¶ 31. Under Brabrand's plan, admissions within these pathways would be determined by lottery among students meeting the minimum qualifications. *Id.* In accordance with the desire to racially balance TJ, FCPS projected that this plan would have decreased Asian-American representation in the class of 2024 by 19 percentage points and increased the representation of every other group, including white students. *Id.*

On October 6, 2020, about a month before the scheduled exam for the prospective class of 2025, the Board voted at a "work session" to eliminate the exam. *Id.* ¶ 33. Because the Board took the vote at a "work session," where such votes are not typically taken, the public had no notice of the impending decision and no opportunity to comment on it. *Id.* ¶¶ 33–34. Two days later, the Board voted at a regular meeting to oppose a resolution that would have required greater public engagement with the TJ admissions changes. *Id.* ¶ 35. The Board took no action on the regional pathways plan, but ultimately voted on December 17, 2020, to adopt a plan limiting eligibility for admission to a maximum of 1.5% of the eighth grade class at each public middle school. *Id.* ¶ 36. The new plan, in effect for the class of 2025 and beyond, replaces the traditional admissions examination with the 1.5% rule, combined with a "holistic" evaluation that considers "experience factors, including students who are economically disadvantaged, English language learners, special education students, or students who are currently attending underrepresented middle schools." *Id.* The effect of elimination of the exam combined with the middle-school limitation and holistic admissions process is projected to fall even more heavily on Asian-American students

than the proposed regional-pathway lottery would have. Projections show that Asian-American enrollment for the class of 2025 is likely to decline by as much as *42 percentage points*. *Id.* ¶ 52.

As detailed more fully below, the circumstances surrounding the decision to change TJ admissions and the public comments of Board members, Superintendent Brabrand, and other high-ranking FCPS officials show that this substantial disparate impact is by design. *See id.* ¶¶ 37–47. Plaintiff Coalition for TJ, an organization of mostly Asian-American parents in Fairfax County that was formed in response to the possibility of racial balancing at TJ, sued to vindicate the equal-protection rights of its members with children preparing to go through the TJ admissions process. *Id.* ¶¶ 3, 10–14. Many member parents have children who attend middle schools that are heavily Asian-American and particularly targeted by the 1.5% limitation because they historically send many students to TJ. *Id.* ¶¶ 15–18. The Coalition seeks declaratory and injunctive relief that would prohibit Defendants from implementing the challenged admissions changes designed to discriminate against Asian-American students. Prayer for Relief ¶¶ 1–3.

## STANDARD OF REVIEW

Defendants have moved to dismiss the case under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). On either a motion to dismiss for lack of standing or for failure to state a claim, the Court must assume the truth of the Coalition's factual allegations and draw any reasonable inferences in favor of the Coalition. *David v. Alphin*, 704 F.3d 327, 333 (4th Cir. 2013) (challenges to standing); *Ray v. Roane*, 948 F.3d 222, 226 (4th Cir. 2020) (motions to dismiss for failure to state a claim). Put simply, to survive a motion to dismiss, a "complaint must contain sufficient factual allegations, taken as true, 'to raise a right to relief above the speculative level' and 'nudge [the] claims across the line from conceivable to plausible.'" *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017) (quoting *Vitol, S.A. v. Primerose Shipping Co.*, 708 F.3d 527, 543 (4th

Cir. 2013)). "The facial plausibility standard requires pleading of 'factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id.* (quoting *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 554 (4th Cir. 2013)). The same plausibility standard applies to allegations supporting a plaintiff's standing. *Liberty Univ., Inc. v. Lew*, 733 F.3d 72, 89 (4th Cir. 2013).

## ARGUMENT

### I.     The Coalition Has Associational Standing

#### A.     The complaint plausibly alleges that the Coalition has associational standing

An association may sue on behalf of its members when "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977); *see also Md. Highways Contractors Ass'n, Inc. v. Maryland*, 933 F.2d 1246, 1251 (4th Cir. 1991). The Coalition satisfies these three requirements.

*First*, "to show that its members would have standing, an organization must 'make specific allegations establishing that at least one identified member had suffered or would suffer harm.'" *Southern Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 184 (4th Cir. 2013) (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009)) (emphasis deleted). The Coalition has identified several Asian-American members with children in sixth, seventh, and eighth grade who will suffer imminent injury should the Coalition not prevail in this case. Complaint ¶¶ 13–14. These students attend middle schools that will see their students' opportunity to enroll at TJ plummet under the challenged admissions plan. Complaint ¶¶ 15–18. The Coalition alleges that Defendants enacted the revised admissions plan at least in part to make

it harder for Asian-American children to obtain admission to TJ, and that these children will specifically face longer odds because of the plan. That is sufficient for standing in an Equal Protection case—a plaintiff need only allege that racial discrimination places him on an unequal playing field, not that he would ultimately fail to receive the benefit (here, admission to TJ). *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 719 (2007); *Ne. Fla. Chapter of the Associated Gen. Contractors v. City of Jacksonville*, 508 U.S. 656, 666 (1993).

*Second*, the Equal Protection interests that the Coalition seeks to protect are germane to its mission. The Coalition alleged that it was "formed in response to FCPS' efforts to racially balance TJ." Complaint ¶ 10. Surely, an organization formed to oppose the very thing it now challenges seeks to protect interests germane to its mission. In any event, "courts have generally found the germaneness test to be undemanding[,]" *Presidio Golf Club v. Nat'l Park Serv.*, 155 F.3d 1153, 1159 (9th Cir. 1998), so it is no surprise that Defendants do not mount a serious argument on this prong.

*Third*, as the Supreme Court has recognized, "*Hunt* held that 'individual participation' is not normally necessary when an association seeks prospective or injunctive relief for its members." *United Food and Com. Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 546 (1996); *see also Students for Fair Admissions, Inc. v. Univ. of N.C.*, No. 1:14-CV-954, 2018 WL 4688388, at *5–6 (M.D.N.C. Sept. 29, 2018) ("[B]ecause SFFA does not seek monetary damages but, rather, seeks declaratory and injunctive relief, 'obtaining such relief, based on the claims in this case, would not require individual participation by its members.'" (quoting *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 261 F. Supp. 3d 99, 110 (D. Mass. 2017)). The Coalition seeks prospective relief on behalf of its members, so its members need not individually participate for the Court to grant effective relief.

The Coalition therefore meets the traditional *Hunt* test and has standing. Even so, Defendants mount various attacks on the sufficiency of the Coalition as a membership organization. Defendants' primary complaint is that the Coalition has not alleged that it is a membership organization or its functional equivalent. Br. at 10–13. But Defendants misread the authority they cite. They rely heavily on this Court's decision in *Heap v. Carter*, 112 F. Supp. 3d 402 (E.D. Va. 2015), for the proposition that the Coalition is not the "functional equivalent" of a membership organization, but that test is irrelevant because the Coalition has sufficiently alleged that it is an *actual* membership organization. Complaint ¶ 11 (describing the Coalition's membership); *id.* ¶¶ 13–14 (naming actual Coalition members). In *Heap*, this Court concluded that The Humanist Society lacked associational standing because it "provided no details about who the membership is or whether THS truly can be considered a voluntary membership organization or a functional equivalent." *Heap*, 112 F. Supp. 3d at 418. The Coalition not only alleges that it has members, it identifies many of them and their interest in the case with specificity.

Defendants jump to the "functional equivalent" inquiry, but that inquiry is only necessary where an organization has *no members*. *See id.* ("[A]n organization with *no formal members* can still have associational standing if it is the functional equivalent of a traditional membership organization." (quoting *Washington Legal Found. v. Leavitt*, 477 F. Supp. 2d 202, 208 (D.D.C. 2007)); *see also Hunt*, 432 U.S. at 342 ("[T]he Commission is not a traditional voluntary membership organization such as a trade association, for it has no members at all."). Much of Defendants' other authority suffers from the same defect. For example, the court in *Group Health Plan, Inc. v. Philip Morris, Inc.*, 86 F. Supp. 2d 912, 918 (D. Minn. 2000), applied the functional equivalence inquiry because "the relationship between Plaintiffs and their 'members' is most aptly described as . . . that of a business-consumer relationship, which is readily distinguishable from

the traditional association-member relationship necessary to support an assertion of associational standing." And the footnote in *Funeral Consumers Alliance, Inc. v. Service Corp. International*, 695 F.3d 330, 344 n.9 (5th Cir. 2012), makes clear that the "indicia of membership" inquiry becomes relevant only when an association "does not have traditional members." The Coalition has traditional members, so it need not satisfy the functional equivalent test to have standing. Especially at the pleading stage, the Coalition's allegations render it plausible that the Coalition is a traditional membership organization entitled to assert associational standing.[1]

Defendants speculate about whether the Coalition's members might have a conflict of interest, but that speculation does not undermine the Coalition's standing. It appears that Defendants perused the Coalition's website and Facebook page and believe that the Coalition's broad membership makes it implausible that every one of its members opposes the challenged admissions plan. Br. at 13–15. But again, the Coalition alleges it was formed in response to the current effort to racially balance TJ. Complaint ¶ 10. It is at least plausible to infer that only those who oppose the challenged admissions plan—"concerned parents," *id.* ¶ 3—would become members of the Coalition. Certainly, Defendants' unfounded speculation that some Coalition members might *support* the admissions plan does not warrant dismissal at the pleading stage.

Finally, Defendants complain that "claim-splitting" problems require the participation of some individual members. But other than a Virginia Supreme Court practice rule requiring

---

[1] Defendants have cited some out-of-circuit district court cases that at least nominally support their position. *See, e.g.*, *Small Sponsors Working Group v. Pompeo*, No. 1:19-2600-STA-jay, 2020 WL 2561780, at *5–6 (W.D. Tenn. May 20, 2020) (holding that an organization of companies lacked associational standing because it did "not have a board of directors or a written mission statement, and not all members have the same level of interest"); *Package Shop, Inc. v. Anheuser-Busch, Inc.*, No. 83-513, 1984 WL 6618, at *40–41 (D.N.J. Sept. 25, 1984) (no standing because there was no evidence that the members even voted to approve the lawsuit or had any control over the leadership). But, as discussed below, declarations from Coalition leaders submitted along with this response cure even these concerns.

plaintiffs to join all claims arising out of a particular event—which does not apply in federal court—Defendants cite no authority for this claim. Even if some claim preclusion issues might arise if the Coalition and individual members who are plaintiffs in the pending state litigation are found to be in privity, the state litigation has not reached final judgment, so res judicata is not an issue at this point. *See Providence Hall Assocs. Ltd. P'ship v. Wells Fargo Bank, N.A.*, 816 F.3d 273, 276 (4th Cir. 2016). It is not clear how "claim-splitting" might affect the Coalition's standing, and Defendants cite no authority suggesting that speculative concerns about res judicata are sufficient to require individual participation under *Hunt*.

In short, considering the Coalition's allegations at the pleading stage, it has plausibly alleged that it may assert the equal-protection rights of its members. The motion to dismiss for lack of jurisdiction should be denied.

## B.    The Coalition's declarations cure any potential standing defect

Even if the Court were to conclude that the allegations in the Coalition's complaint could not plausibly establish its standing as a membership organization, declarations from two Coalition leaders submitted along with this brief cure any potential issues. As Defendants recognize, the Court may consider evidence outside the complaint to determine whether it has jurisdiction. *See Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991) ("In determining whether jurisdiction exists, the district court is to regard the pleadings' allegations as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment."). The evidence presented here resolves all potential doubts about the Coalition's standing.

Declarants Asra Nomani and Glenn Miller state that they co-founded the Coalition in August 2020 in response to credible threats to the TJ admissions process that they believed would

discriminate against Asian-American applicants. Nomani Dec. ¶ 5; Miller Dec. ¶ 5. They explain that the Coalition is a membership organization that maintains three tiers of membership: it currently has 298 general members, 27 members of a "core team," and ten members of the "leadership team," including Nomani and Miller. Nomani Dec. ¶¶ 8–10, 12–13; Miller Dec. ¶¶ 8–10, 12–13. The leadership team was chosen by consensus after self-nominations. Nomani Dec. ¶ 11; Miller Dec. ¶ 11. It meets weekly to discuss strategy and Coalition business. Nomani Dec. ¶ 9; Miller Dec. ¶ 9. As the Complaint indicated, the Coalition also has about 5,000 "supporters." Nomani Dec. ¶ 14; Miller Dec. ¶ 14. But just as the Complaint distinguished between "members" and "supporters," this broad base of support is not coextensive with the Coalition's membership. Instead, to become a member of the Coalition, an individual must fill out a membership form on the Coalition's website and then pass a vetting process in which Coalition leadership ensures that the prospective member shares the Coalition's interest in fighting discriminatory admissions at TJ. Nomani Dec. ¶¶ 17, 19; Miller Dec. ¶¶ 17, 19. This ensures that Coalition members unanimously oppose the challenged admissions changes. *See also* Nomani Dec. ¶¶ 33–36; Miller Dec. ¶¶ 32–35 (Coalition leaders have no knowledge of any dissent on this issue and note that an opposing group, the "TJ Alumni Action Group," was formed to support the admissions changes). In short, the submitted declarations rebut Defendants' speculation about Coalition members' conflicts of interest, as well as their suggestion that becoming a member of the Coalition is akin to "liking" a page on Facebook.

While the Coalition has no bylaws or membership dues, that is not determinative. The submitted declarations show that the Coalition has the attributes of a traditional membership organization. It has an organizational structure with leadership chosen by members. Nomani Dec. ¶ 11; Miller Dec. ¶ 11. By unanimous consent of the leadership and core teams, the Coalition chose

to pursue this litigation to further the Coalition's mission of fighting discriminatory admissions policies at TJ. Nomani Dec. ¶¶ 46–47; Miller Dec. ¶¶ 49–50. In short, the declarations make it abundantly clear that Defendants' attacks on the Coalition's sufficiency as a membership organization lack merit. The declarations also remove any doubt that the Coalition is membership organization entitled to assert the interests of its members under *Hunt*.[2]

The Court should deny Defendants' motion to dismiss under Rule 12(b)(1).

## II.     The Coalition Has Alleged a Plausible Equal Protection Claim

The Fourteenth Amendment declares that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. State actions are "subject to strict scrutiny under the Equal Protection Clause not just when they contain express racial classifications, but also when, though race neutral on their face, they are motivated by a racial purpose or object." *Miller v. Johnson*, 515 U.S. 900, 913 (1995). Should a plaintiff establish such a purpose, the burden shifts to the defendant to prove that its actions are narrowly tailored to further a compelling government interest. *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227 (1995); *Alexander v. Estepp*, 95 F.3d 312, 315 (4th Cir. 1996). Unless the defendants can make that showing, the state action is unlawful.

Here, the Coalition has properly alleged a violation of the Equal Protection Clause sufficient to state a claim. The Court should deny Defendants' motion to dismiss under Rule 12(b)(6).

---

[2] The declarations also explain the Coalition's connection with the Coalition for Truth and Justice, a sister organization formed in part because the Coalition could not remain a Fiscally Sponsored Program of United Charitable if it participated in litigation. Nomani Dec. ¶¶ 28–32; Miller Dec. ¶¶ 27–31. Contrary to Defendants' suggestions, the link on the Coalition's website allowing supporters to donate to the Coalition for Truth and Justice does not undermine the Coalition's standing.

## A. The Coalition plausibly alleged that Defendants acted with a racially discriminatory purpose, triggering strict scrutiny

Because the challenged admissions policy is facially race-neutral, the Coalition must allege that Defendants acted with a racially discriminatory purpose to trigger strict scrutiny. In the context of a motion to dismiss, the Complaint must plausibly allege that Defendants implemented the changes to TJ's admissions process "at least in part 'because of,' not merely 'in spite of,' [their] adverse effects upon" Asian-Americans. *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). The Coalition need not allege that any decisionmaker harbored racial animus toward Asian-Americans. *See North Carolina State Conference of NAACP v. McCrory*, 831 F.3d 204, 233 (4th Cir. 2016). Rather, as the Third Circuit has put it, "[r]acially discriminatory purpose means that the decisionmaker adopted the challenged action at least partially because the action would benefit or burden an identifiable group." *Doe ex rel. Doe v. Lower Merion Sch. Dist.*, 665 F.3d 524, 548 (3d Cir. 2011).

"When considering whether discriminatory intent motivates a facially neutral law, a court must undertake a 'sensitive inquiry into such circumstantial and direct evidence of intent as may be available.'" *McCrory*, 831 F.3d at 220 (quoting *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977)). As the Supreme Court has explained, "[o]utright admissions of impermissible racial motivation are infrequent and plaintiffs often must rely upon other evidence." *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999). *Arlington Heights* set forth four particular types of relevant evidence: (1) disparate impact of the policy on a particular racial group; (2) the historical background of the challenged decision, particularly if it reveals a series of official actions taken for invidious purposes; (3) irregularities in the passage of legislation; and (4) legislative and administrative history. *Arlington Heights*, 429 U.S. at 266–67. The fourth factor includes evidence

of "contemporary statements by decisionmakers on the record or in minutes of their meetings." *Sylvia Dev. Corp. v. Calvert Cty.*, 48 F.3d 810, 819 (4th Cir. 1995).

The Coalition is "not required to show all four *Arlington Heights* factors in order to survive a motion to dismiss." *Carcano v. Cooper*, 350 F. Supp. 3d 388, 420 (M.D.N.C. 2018). Rather, stating a claim in this context "remains a relatively low bar." *Synovus Bank v. Coleman*, 887 F. Supp. 2d 659, 668 (W.D.N.C. 2012). Ultimately, the Court need only be convinced that Defendants *plausibly* acted with the requisite intent. The Coalition's allegations easily satisfy this standard.

### 1.    The Coalition plausibly alleged that the challenged admissions policy will have a significant disparate impact on Asian-American students

The first *Arlington Heights* factor is disparate impact. Defendants do not even contest the Coalition's plausible allegations that the new admissions plan will result in far fewer Asian-American students gaining admission to TJ. The complaint details how the challenged plan caps the number of students from heavily Asian-American middle schools who may be admitted to TJ. Complaint ¶¶ 48–51. Specifically, students at Rachel Carson, Longfellow, Rocky Run, and Kilmer middle schools—all of which have a higher percentage of Asian-American students than FCPS as a whole—will bear the brunt of the new policy. *Id.* ¶ 49. Rachel Carson, where several of the named Coalition members' children attend, is about 46% Asian-American and had 78 students accepted to TJ for the class of 2022. *Id.* ¶ 50. The new top 1.5 percent plan severely limits the seats available for students at Rachel Carson, where the top 1.5 percent amounts to 12 students.[3] *Id.* A similar effect occurs at the other three middle schools named in the Complaint. *See id.* ¶ 49, 51. Combined with the elimination of the admissions exam, it is no surprise that the Coalition's data

---

[3] Defendants assert that students outside the top 1.5 percent of these middle schools would still be eligible for unallocated seats. Even so, these students would be disadvantaged under the "holistic" admissions process, which counts against them their attendance at a middle school that sends many students to TJ. *Id.* ¶ 36.

analysis projects Asian-American enrollment at TJ for the upcoming entering classes to decline by *more than half* under the challenged plan.[4] *Id.* ¶ 52.

Defendants' only answer is to point out that the projected disparate impact is not dispositive. Br. at 17–18. True enough. But while this case may not be the next *Yick Wo v. Hopkins*, 118 U.S. 356 (1886), or *Gomillion v. Lightfoot*, 364 U.S. 339 (1960), the Coalition's plausible allegation of substantial disparate impact weighs heavily in favor of a finding of discriminatory intent at this stage. Indeed, the Fourth Circuit in *McCrory* criticized the district court for requiring "too much" disparate impact "in the context of an intentional discrimination claim." *McCrory*, 831 F.3d at 231. In that voting rights case, the court said that "findings that African Americans disproportionately used each of the removed [voting] mechanisms, as well as disproportionately lacked the photo ID required by" the new law, were enough to establish disparate impact. *Id.* And "[s]howing disproportionate impact, even if not overwhelming impact, suffices to establish one of the circumstances evidencing discriminatory intent." *Id.* Here, the projected effect of Defendants' revised policy on Asian-Americans *is* overwhelming. The Court should weigh disparate impact in favor of a finding of discriminatory intent.

### 2. The Coalition plausibly alleged that the historical background of the decision raises an inference of impermissible racial motive

The second *Arlington Heights* factor is the historical background of the decision. As the Coalition alleges, the backdrop for the rapid changes to TJ's admissions process was the Virginia General Assembly's 2020 requirement that each Academic Year Governor's School "set diversity goals for its student body and faculty, and develop a plan to meet said goals in collaboration with

---

[4] The projected disparate impact of the challenged plan on Asian-Americans is even greater than the predicted effect of the proposed "regional pathways" plan, which FCPS itself projected would have reduced Asian-American representation in the TJ Class of 2024 from 73% to 54%. Complaint ¶ 31.

community partners at public meetings." 2020 Va. Acts 183; *see* Complaint ¶ 29. The law required these schools, including TJ, to submit reports to the Governor by October 1, 2020, detailing, among other things, "admission processes in place or under consideration that promote access for historically underserved students." 2020 Va. Acts 183; *see* Complaint ¶ 29. Reporting requirements included "racial/ethnic make-up and socioeconomic diversity of its students, faculty, and applicants." 2020 Va. Acts 183; *see* Complaint ¶ 29.

Although these reporting requirements were minimal, Superintendent Brabrand saw an opportunity to remake the TJ admissions process along racial lines. Complaint ¶ 30. He presented an initial plan to the Board on September 15, 2020, that proposed ditching the admissions exam that had been a bedrock of TJ admissions for decades. *Id.* ¶ 31. Along with eliminating the exam, Superintendent Brabrand proposed a system of "regional pathways" that would set a limit of 70 students that each of five Fairfax County regions could send to TJ. *Id.* ¶ 31. Unsurprisingly, the plan grouped heavily Asian-American middle schools that historically did well in TJ admissions together. *Id.* FCPS projected that Asian-American enrollment at TJ would fall by 19 percentage points under Brabrand's proposed plan, while every other racial group, including white students, was projected to gain representation. *Id.*

Just three weeks later, on October 6, the Board voted to eliminate the TJ admissions exam, although it did not adopt Superintendent Brabrand's "regional pathways" framework. *Id.* ¶ 33. Uncertainty about the admissions process persisted for more than two months. Then, on December 17, 2020, the Board voted to adopt the challenged plan effective immediately. *Id.* ¶ 36. The rush to change the TJ admissions procedures in light of the 2020 General Assembly directive supports a plausible inference that the new plan was adopted under a perceived mandate to change the racial balance of TJ to the detriment of Asian-Americans. Although the General Assembly did

not require Governor's Schools to actually *change* anything about their admissions processes, the timing of Brabrand's proposal and the Board's ultimate actions suggests an urgency to change TJ's admissions process to conform to state diversity guidelines. If that is true, then it necessarily follows that Defendants' new admissions procedure was "developed or selected because it would assign benefits or burdens on the basis of race." *Doe*, 665 F.3d at 553. This factor should support a finding of discriminatory intent.

### 3. The Coalition plausibly alleged that irregularities in the decisionmaking process support a finding of discriminatory intent

Beyond its background, the Board's decision itself was fraught with procedural irregularities that suggest improper motive. The October 6, 2020 vote to eliminate the longstanding TJ admissions exam was done at a "work session" rather than a regular Board meeting. Complaint ¶ 33. The Board does not usually take votes at work sessions, and the description of that particular session did not suggest that the Board would suddenly eliminate the exam scheduled for the following month. *Id.* ¶¶ 33–34. Holding the vote during a work session also precluded public comment on the issue, despite its extraordinary impact. *Id.* What is more, at the regular Board meeting two days later, the Board not only failed to ratify its work session vote, but—with no affirmative votes, seven votes against, and five abstentions—defeated a measure that would have required Superintendent Brabrand to solicit "public engagement" and "community input and dialogue" on "how best to determine merit, design an admissions process aimed at ensuring the demographics at TJ are more representative of our regional student demographics, and how to communicate the TJ opportunity to our communities" before presenting an updated admissions proposal in December. *Id.* ¶ 35 & n.26.

Similar irregularities taint the Board's adoption the challenged admissions policy on December 17. Indeed, Board member Megan McLaughlin stressed that she was "really upset that

we're doing this so quickly that at 4:30 this afternoon there was nothing posted. No motions, no amendments, no follow-ons. Not for me, not for the public to be able to review and read." FCPS School Board Meeting, 12-17-2020, https://www.youtube.com/watch?v=1EjeA3EUzoY&ab_channel=FairfaxCountyPublicSchools at 2:17:02. She lamented that "[t]his is not how we do the board work. This is not public transparency." *Id.*

The Supreme Court and the Fourth Circuit have stressed that "'[d]epartures from the normal procedural sequence,' . . . may demonstrate 'that improper purposes are playing a role.'" *McCrory*, 831 F.3d at 227 (quoting *Arlington Heights*, 429 U.S. at 267). The *McCrory* court specifically mentioned a rushed process with a lack of public input as factors supporting an inference of improper motive, even where a legislative body follows its own rules. *See id.* at 228. At the very least, the Board's actions—including to (1) hold the vote to eliminate the exam at a "work session" with no warning or public notice; (2) refuse to subject the proposed admissions plan to further public engagement; and (3) adopt the final plan in such a rushed and haphazard manner that a member of the Board criticized the process—suggests that a discriminatory purpose was afoot. At this stage, the Court should weigh these procedural irregularities in favor of a finding of discriminatory intent.

4.       **Contemporary statements by decisionmakers plausibly support an inference of discriminatory intent**

Perhaps the most important evidence of discriminatory intent here is the series of statements by Superintendent Brabrand, Board members, and other influential individuals made in the course of enacting the challenged changes. And it is here where Defendants offer the most significant pushback, arguing that the Coalition has taken the alleged statements out of context. *See* Br. at 26–27. But at the pleading stage, the Court cannot weigh competing evidentiary claims.

*See El-Amin v. McDonnell*, No. 3:12–cv–00538–JAG, 2013 WL 1193357, at *4 (E.D. Va. Mar. 22, 2013). While Defendants are of course correct that the Court should examine the full record of judicially-noticeable materials, the additional context does not render the Coalition's allegation of discriminatory intent implausible.

First, the statements. To begin with, the Virginia Secretary of Education convened a statewide working group in the summer of 2020 to address diversity at the Governor's Schools. Complaint ¶ 38. The working group, which included Board member Karen Keys-Gamarra and TJ principal Ann Bonitatibus, produced incendiary statements about Asian-American parents of TJ students—State Delegate Mark Keam even highlighted the supposedly "unethical ways" that Asian-American parents "push their kids into [TJ]" even though they are "not even going to stay in America." *Id.* ¶ 38–39. Around the same time, Bonitatibus emailed the TJ community lamenting that TJ's student population does "not reflect the racial composition in FCPS." *Id.* ¶ 40. No giant leap is needed to draw an inference between the discriminatory statements made at the statewide working group that she attended and Bonitatibus' stated desire for racial balance at TJ.

Superintendent Brabrand continued the pattern. At an August 2020 public forum hosted by the Fairfax County NAACP, he complained that parents spent "thousands upon thousands" of dollars on test prep to obtain admission to TJ. *Id.* ¶ 41. Then, when he presented his initial "regional pathways" plan to the Board the next month, he emphasized the "need to recognize" that "TJ should reflect the diversity of Fairfax County Public Schools, the community, and of Northern Virginia," and lamented that "the talent at Thomas Jefferson currently does not reflect the talent that exists in FCPS." *Id.* ¶ 42. Context matters, and here the context is clear—since Asian-Americans are the only racial group that is "overrepresented" at TJ compared to Fairfax County as a whole, Brabrand's statements warrant a plausible inference of discriminatory intent. *Cf.*

*McCrory*, 831 F.3d at 227 (noting in support of discriminatory intent the finding that "the change in accepted photo IDs is of particular note: the new ID provision retained only those types of photo ID disproportionately held by whites and excluded those disproportionately held by African Americans").

Further, at that initial September working group with the Board, Brabrand showed the members a slide depicting the racial demographics of FCPS in 2019, then handed the presentation over to FCPS Chief Operating Officer Marty Smith. Complaint ¶ 43. Smith echoed Brabrand's complaint about the lack of racial balance at TJ and added that "past boards have been focused on diversity at TJ for quite some time" but "we haven't realized *the outcomes that we were looking for*, which is why we're bringing this proposal to [the School Board] today." *Id.* (emphasis added). Bonitatibus added her assertion that "we are all united" in a desire to take action on the racial composition of TJ, and that she was "fully supportive of FCPS efforts to advance the representative demographics at our school." *Id.* ¶ 44. Given the context, the only reasonable inference is that "outcomes" refers to "racial outcomes" and that the purpose of the plan was to drastically alter the racial composition of TJ to the detriment of Asian-Americans.

At the same meeting, Board member Keys-Gamarra reflected on her participation in the statewide working group: "there was pretty much a unanimous view about the culture of these schools being not as healthy as I know all of us on this board would like to hear from our students." *Id.* ¶ 45. Board members Melanie Meren and Karl Frisch echoed these concerns. *Id.* In the context of a discussion about balancing the racial demographics of a school that is 73% Asian-American, it is a plausible inference that these references to a "toxic" culture, *see id.*, especially when coupled with complaints about students engaging in test prep, are thinly veiled attacks on Asian-American parents and students.

A similar tone prevailed at the October 6, 2020, work session where the Board voted to eliminate the examination. Superintendent Brabrand proposed eliminating the exam because it "squeezed out talent and squeezed out diversity in our system," while Bonitatibus again focused on a desire for a "student body that more closely aligns with the representation in FCPS." *Id.* ¶ 46. Board member Abrar Omeish stressed that a key point was to "make sure there's representation" that "should be proportional to the population numbers" of Fairfax County. *Id.* Again, in the context of the discussion that day, it is *at the very least* a plausible inference that these statements referred to *racial* representation at TJ compared to Fairfax County as a whole. What is more, conversation at the work session lamented TJ students "who have been [in] Test Prep since second grade" and trivialized the success of these students as "pay to play." *Id.* ¶ 47. Keys-Gamarra seemingly worried that the discussion was veering into overt racism, as she warned attendees that "we must be very careful and we must be cognizant of how demeaning these types of comments are and that many people consider these comments to be rooted in racism. I'm not saying it's intentional, but we need to be mindful." *Id.*

Defendants unsuccessfully try to minimize many of these statements. *First*, they say that the statements of Superintendent Brabrand and other FCPS subordinates like Smith and Bonitatibus cannot be imputed to the Board. Br. at 26. But their cited authorities miss the mark. Both *City of St. Louis v. Praprotnik*, 485 U.S. 112 (1988), and *Riddick v. School Board of Portsmouth*, 238 F.3d 518 (4th Cir. 2000), involved *decisions* pursued by subordinates that the municipality or board did not ratify. The plurality opinion in *Praprotnik* that Defendants cite was simply an application of the principle from *Monell v. Department of Social Services*, 436 U.S. 658 (1978), that municipalities are liable under Section 1983 only for their policies, not for their employees' actions under a respondeat superior theory. *See Praprotnik*, 485 U.S. at 128 (plurality

opinion) ("The city cannot be held liable under § 1983 unless respondent proved the existence of an unconstitutional municipal policy. Respondent does not contend that anyone in city government ever promulgated, or even articulated, such a policy."). And *Riddick* concerned independent decisions of a superintendent and a principal that were not ratified by the school board. *Riddick*, 238 F.3d at 523–24. Here, by contrast, there is no dispute that the Board has promulgated a policy. The question is whether that policy is tainted by discriminatory intent. And on that question, the statements of subordinates might be relevant if they influenced the decisionmakers—as Brabrand, Bonitatibus, and Smith obviously intended to do. Indeed, there are cases holding that the "presence of community animus can support a finding of discriminatory motives by government officials, even if the officials do not personally hold such views." *Avenue 6E Investments, LLC v. City of Yuma*, 818 F.3d 493, 504 (9th Cir. 2016); *see also Smith v. Town of Clarkton*, 682 F.2d 1055, 1066 (4th Cir. 1982) ("There can be no doubt that the defendants knew that a significant portion of the public opposition was racially inspired, and their public acts were a direct response to that opposition."). Particularly at this stage, the Court should not discount the statements of high-level employees who participated in presentations to the Board that directly preceded and led to the enactment of the challenged admissions policy.

*Second*, Defendants protest that the Coalition has taken the statements made by Board members Keys-Gamarra, Meren, Frisch, Omeish, and Anderson[5] out of context. Defendants have submitted evidence in an attempt to correct the record. While the Coalition does not object to the consideration of that evidence, it does dispute Defendants' assertion that the additional context changes the picture. Reasonable observers could plausibly see the totality of these statements as

---

[5] Though it is not noted in the Complaint, Defendants' brief says that the comments about test preparation in Paragraph 47 were made by Board chair Ricardy Anderson.

evidence of discriminatory intent on the part of these Board members.[6] Defendants say it is "not apparent" that the Omeish statement referred to racial proportionality, Br. at 27, but given the context, there is no other kind of proportionality she reasonably might have had in mind. Defendants also complain that the Meren and Frisch "culture" statements were taken out of context, *id.*, but the ten references to TJ's culture during a discussion about TJ's lack of diversity would plausibly lead a reasonable person to infer that in the Board's view, the problem with TJ's "culture" is that there are too many Asian-American students. And while Defendants proffer that Anderson did not attribute her test-prep comments to Asian-American students, that is a well-known stereotype—so much so that a 2015 study found that Princeton Review's algorithm charged people in heavily Asian-American zip codes more for test prep classes.[7]

*Third*, Defendants imply that even if the statements from the five cited Board members were evidence of their discriminatory intent, the Coalition had to allege statements from a majority of the twelve Board members to survive a motion to dismiss. Defendants cite no authority for this questionable proposition. The Fourth Circuit has explained that evidence of contemporary

---

[6] The Keys-Gamarra statement does not reflect on her discriminatory intent, but appears to give her sense of the comments by other Board members that might have crossed a line. Defendants present another interpretation of her comments, but that is not a dispute the Court may resolve at this stage.

[7] *See* Julia Angwin, Surya Mattu & Jeff Larson, *Test Prep Is More Expensive—for Asian Students*, The Atlantic (Sept. 3, 2015), https://www.theatlantic.com/education/archive/2015/09/princeton-review-expensive-asian-students/403510/. *See also* Brief Amicus Curiae of Pacific Legal Foundation et al. in Support of Petitioner at 12–14, *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.* (U.S. No. 20-1199), *available at* https://www.supremecourt.gov/DocketPDF/20/20-1199/173382/20210330164638558_AMICUS%20CURIAE%20BRIEF%20FINAL.pdf (citing evidence that Asian American students applying to highly selective colleges are often negatively stereotyped as narrowly focused on maximizing their standardized test scores at the cost of personal development and extracurricular achievement; including a Princeton Review guidebook that encourages Asian American students applying to selective colleges "to avoid being an Asian Joe Bloggs" and to "distance [themselves] from stereotypes about Asians").

statements may be entirely unavailable in some cases, and it has found discriminatory intent without relying on discriminatory statements. *See McCrory*, 831 F.3d at 229. In the same case, it weighed the legislative body's "requests for and use of race data in connection with" the challenged law in favor of finding discriminatory intent. *Id.* at 230. Here, the pervasive discussions of race, including the presentation of a racial-effect model at the September Board meeting, similarly weigh in favor of intent. *See also Lewis v. Ascension Par. Sch. Bd.*, 662 F.3d 343, 350 (5th Cir. 2011) (reversing grant of summary judgment in favor of a school board in part based on evidence that "Superintendent Songy compiled, and the School Board considered, documentation detailing the percentage of black students that would be enrolled at each East Bank school under Option 2f"). In any event, it is doubtful that the Coalition would have to produce *any* discriminatory statements to survive a motion to dismiss here, especially given the allegations on the remaining *Arlington Heights* factors.

<p style="text-align:center">*    *    *</p>

Because the Coalition has adequately pleaded a claim that Defendants acted with discriminatory intent in eliminating the TJ admissions exam and replacing it with the challenged admissions plan, the Court should subject the plan to strict scrutiny.

**B.    Defendants' remaining arguments against heightened scrutiny are unpersuasive**

Defendants' primary argument against the application of strict scrutiny is that the Coalition misses the mark entirely—in their view, this is not a case of bigotry against Asian-Americans, but imposition of a race-neutral policy simply intended to increase the diversity at TJ. *See* Br. at 18–24. Such a policy, they say, is never subject to strict scrutiny. Even assuming Defendants are correct that the Coalition cannot demonstrate any animus on the part of Board members, there is little doubt that the Board changed TJ's admissions procedures to change the racial composition

of the school. Admissions to TJ are a zero-sum game, so if the Board changes the rules of the game to increase representation of racial groups considered "underrepresented"—here, Black, Hispanic, and white students—it necessarily makes admissions harder for the group that was "overrepresented"—here, Asian-Americans. The Coalition need not prove that the Board members or Superintendent Brabrand are racist or harbor ill intent toward Asian-Americans. They need only plausibly allege that Defendants did what they did "at least in part 'because of,' not merely 'in spite of,' its adverse effects upon" Asian-Americans. *Feeney*, 442 U.S. at 279.[8] Here, the Complaint plausibly alleges that the racial effects were the predominant reason for the change.[9]

Defendants' argument that the use of facially race-neutral means to achieve race-conscious goals need not satisfy strict scrutiny proves far too much. Such a rule would effectively swallow *Arlington Heights*. Suppose that a school district found and implemented a perfect racial proxy that guaranteed almost exact racial balance in admissions to a competitive high school like TJ each year, disfavoring dozens of high-achieving Asian-American students who would have been invited had each student been subject to the same criteria. Defendants' argument would allow use of that proxy to evade strict scrutiny, while an explicitly race-based plan with the same results and intent would almost certainly be invalidated. As one commentator supportive of race-based admissions

---

[8] Defendants suggest that the facts of *Feeney* help them, but the opposite is true. *Feeney* involved a claim that a legislature discriminated against women when it extended a benefit to veterans knowing that veterans are disproportionately male. The Court explained that was not problematic because the legislature extended the benefit to veterans *in spite of* its disparate impact based on sex, not *because of* it. *Id.* Here, on the other hand, the Coalition alleges that Defendants changed the admissions process at TJ precisely *because* it would disproportionately affect Asian-Americans and thus "improve" the racial balance at TJ.

[9] That distinguishes this case from cases like *Doe* that involve drawing attendance zones. A map-drawer may be race-conscious without intending to benefit or burden any particular racial group. *See Doe*, 665 F.3d at 554 (finding no discriminatory intent because "[a]voiding discriminatory impact seemed to be one of the District's goals in developing and adopting a plan"). But since admissions to a competitive school like TJ are a zero-sum game, changing the rules because of race will always have a disparate impact on the targeted "overrepresented" group.

noted, "the intent to promote racial balance through the use of a racial proxy would initially seem to be identical to—and just as unconstitutional as—the intent to pursue racial balance explicitly." Girardeau A. Spann, *Neutralizing* Grutter, 7 U. Pa. J. Const. L. 633, 650 (2005). And while Spann hypothesized that the Supreme Court would not actually go down that road, he admitted that "the more effective a racial proxy is in promoting meaningful racial balance, the more likely the Supreme Court is to invalidate it as a veiled attempt to sidestep the Court's own racial policy preferences." *Id.* at 652. Here, the Coalition has alleged that Defendants' plan does a very good job at promoting the Board's preferred racial balance, and the Court should treat it the same way it would treat an explicitly race-based plan geared toward the same ends. Simply put, "[t]o allow a school district to use geography as a virtually admitted proxy for race, and then claim that strict scrutiny is inapplicable because" it is facially race-neutral "is inconsistent with the Supreme Court's holdings." *Lewis*, 662 F.3d at 354 (Jones, J., concurring).[10]

That does not mean, as Defendants suggest, that "anyone involved in designing [a race-neutral admissions plan] happened to think that its effect in reducing the underrepresentation of a group was a good effect." Br. at 24 (quoting *Boston Parent Coal. for Acad. Excellence v. Sch. Comm. of City of Boston*, No. 21-1303, 2021 WL 1656225, at *8 (1st Cir. Apr. 28, 2021)). Mere motive to increase the representation of a particular racial group does not render an action racially discriminatory for purposes of an *Arlington Heights* analysis. There are plenty of actions Defendants might take to increase racial diversity at TJ that would not discriminate against anyone—such as increasing the size of TJ, dedicating resources to target underserved students to

---

[10] The Coalition of course acknowledges that several recent cases considering similar admissions changes have rejected this argument, but the Coalition would submit that the allegations of discriminatory intent under the *Arlington Heights* factors are stronger here. And in any event, the Coalition would urge the Court not to follow those cases, none of which are binding authority here.

improve their chances at admission, or other "affirmative efforts to ensure that all groups have a fair opportunity" to compete in the admissions process. *Cf. Ricci v. DeStefano*, 557 U.S. 557, 585 (2009). Instead, Defendants changed the rules of the process so that similarly situated applicants to TJ will not have a similar chance to get in—and they did so, at least plausibly, because they did not like the racial makeup of TJ and wanted to change it. The Equal Protection Clause prohibits that approach.[11]

Defendants alternatively point to Justice Kennedy's concurring opinion in *Parents Involved*, incorrectly suggesting that it is the controlling opinion. Br. at 21. It is not. The Fourth Circuit has explained that a separate opinion is controlling under *Marks v. United States*, 430 U.S. 188 (1977), only if it represents "the narrowest grounds upon which the majority [of the Justices] agreed." *Richmond v. Polk*, 375 F.3d 309, 331 (4th Cir. 2004). In *Parents Involved*, a majority of the justices agreed to invalidate the challenged race-based assignment programs on narrow-tailoring grounds. *See Parents Involved*, 551 U.S. at 733–35. Thus, neither the discussion of compelling interests in the plurality opinion, *see id.* at 725–32 (plurality opinion), nor Justice Kennedy's concurrence are controlling authority.

Of course, Justice Kennedy's opinion may still be persuasive authority. Even so, it does not help Defendants. His opinion merely "approves the possibility of a school board's adopting generic measures to increase racial diversity in primary and secondary schools." *Lewis*, 662 F.3d at 355 (Jones, J., concurring). Such generic measures might include, as he wrote, "strategic site selection of new schools; drawing attendance zones with general recognition of the demographics

---

[11] Defendants suggest that the Supreme Court tacitly approved a geographic-based quota systems in *Fisher v. University of Texas at Austin*, 136 S. Ct. 2198 (2016), but the plaintiff in *Fisher* did not challenge the "top 10 percent" plan, and the case cannot be controlling authority on a question not raised. The *Arlington Heights* discriminatory intent inquiry does not provide Defendants a safe harbor because they employed a geography-based system.

of neighborhoods; allocating resources for special programs; recruiting students and faculty in a targeted fashion; and tracking enrollments, performance, and other statistics by race." *Parents Involved*, 551 U.S. at 789 (Kennedy, J., concurring in part and concurring in the judgment). None of these come close to approving differential treatment of students applying to a competitive high school on account of the school board's mission to racially balance the student body. Indeed, it is true that "a constitutional violation does not occur whenever a decisionmaker considers the impact a given approach might have on students of different races." *Id.* But one very well might occur when that decisionmaker adopts a particular plan *because* it would have a disparate impact on members of a particular race.

Finally, Defendants suggest that their actions should be immune from strict scrutiny because the Board expressly prohibited consideration of race and voted against adopting racial targets. Br. at 24–25. This argument has no basis in law. *Arlington Heights* exists precisely because some actions that are facially race-neutral are also discriminatory. The School Board can't immunize itself from an Equal Protection claim simply by declaring that its plan is facially race-neutral. And the fact that FCPS does not see an individual's name or race during the application process is similarly irrelevant—the 1.5 percent system is designed to work *without* having to individually scrutinize every applicant. Defendants mistakenly rely on Justice Scalia's concurrence in *Schuette v. BAMN*, 572 U.S. 291, 318 (2014), but *Schuette* was a facial challenge to the constitutionality of a state constitutional amendment banning racial discrimination. Justice Scalia's point was simply that the action of banning racial discrimination can't itself violate the Equal Protection Clause. But the Coalition doesn't challenge the Board's decision not to adopt explicit race-based targets or to conduct a race and name-blind admissions process. Rather, it alleges that despite these actions, the Board eliminated the exam and enacted the challenged admissions

process with intent to discriminate against Asian-Americans by reducing their share of offers to attend TJ. Given those allegations, the Board's actions merit strict scrutiny.

### C. The Coalition plausibly alleged that the challenged admissions process fails strict scrutiny

Because strict scrutiny applies, Defendants must show that the challenged process is narrowly tailored to further a compelling government interest. *Adarand*, 515 U.S. at 227. Defendants make only a passing reference to their supposedly compelling interest in promoting diversity at TJ, but the Supreme Court has never recognized promoting diversity in K-12 schools as a compelling interest. On the contrary, a majority of the Court in *Parents Involved* explicitly refused to extend the holding of *Grutter v. Bollinger*, 539 U.S. 306 (2003)—that race may be used as a factor in admission to obtain the educational benefits of diversity in higher education—to K-12 schools. *Parents Involved*, 551 U.S. at 724–25 (majority opinion). The majority criticized lower-court decisions applying *Grutter* to K-12 schools, saying those courts "largely disregarded" key limitations on *Grutter*'s holding. *Id.* The most important such limit was that *Grutter* "relied upon considerations unique to institutions of higher education." *Id.* That *Grutter* could not justify racially discriminatory admissions in K-12 schools was the *only* holding in *Parents Involved* on the subject of compelling interest.

Once again, Justice Kennedy's solo concurrence in *Parents Involved* is neither binding on this Court nor particularly helpful to Defendants. Justice Kennedy declined to commit to any particular definition of diversity. *See id.* at 783 (Kennedy, J., concurring in part and concurring in the judgment) ("Diversity, *depending on its meaning and definition*, is a compelling educational goal a school district may pursue." (emphasis added)). And even assuming that his concurrence stands for the proposition that promotion of diversity may be a compelling interest in K-12 education, the opinion contains nothing that would justify applying what amount to differential

admissions standards to a competitive high school to achieve greater racial diversity at the expense of one particularly "overrepresented" racial group.

Particularly problematic for Defendants' diversity rationale, however, is the well-documented and persistent focus on balancing TJ in accordance with the demographics of Fairfax County or Northern Virginia as a whole. While Defendants characterize their efforts as attempts to promote diversity, "[r]acial balancing is not transformed from patently unconstitutional to a compelling state interest simply by relabeling it racial diversity." *Fisher v. Univ. of Tex. at Austin*, 570 U.S. 297, 311 (2013) (quoting *Parents Involved*, 551 U.S. at 732 (plurality opinion)) (internal quotation marks omitted). "Preferring members of any one group for no reason other than race or ethnic origin is discrimination for its own sake. This the Constitution forbids." *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 307 (1978) (controlling opinion of Powell, J.). And even under *Grutter*, Defendants would not be permitted to seek "diversity for its own sake" through racial discrimination. *See Fisher*, 570 U.S. at 319 (Scalia, J., concurring). Defendants have not pointed to any particular educational benefits they hoped to obtain by shifting the racial demographics of TJ, and even if they had, the Court could not resolve such a dispute at the pleading stage. It suffices to say that the Coalition has pleaded sufficient facts to allow the Court at this stage to hold that Defendants lacked a compelling interest to pursue the alleged racial discrimination.

Defendants do not even attempt a narrow tailoring argument. Since it is Defendants' burden to show that a complaint should be dismissed—and particularly their burden to show narrow tailoring in a strict scrutiny inquiry—the Court cannot conclude that the challenged changes to TJ's admissions are narrowly tailored to any particular interest. And in any event, narrow tailoring is a "fact specific and situation specific inquiry." *Deegan v. City of Ithaca*, 444 F.3d 135, 142 (2d Cir. 2006). That makes it particularly poorly suited for disposition at the pleading stage. Therefore,

even if the Court finds that Defendants were pursuing a compelling interest, the motion to dismiss should be denied.[12]

## CONCLUSION

Defendants' motion to dismiss should be denied.

Dated: May 12, 2021.                    Respectfully submitted,

                                        s/ Alison E. Somin
ERIN E. WILCOX*,                        ALISON E. SOMIN, Va. Bar No. 79027
  N.C. Bar No. 40078                    Pacific Legal Foundation
CHRISTOPHER M. KIESER*,                 3100 Clarendon Blvd., Suite 610
  Cal. Bar No. 298486                   Arlington, Virginia 22201
Pacific Legal Foundation                Telephone: (202) 557-0202
930 G Street                            Facsimile: (916) 419-7747
Sacramento, California 95814            ASomin@pacificlegal.org
Telephone: (916) 419-7111
Facsimile: (916) 419-7747               GLENN E. ROPER*, Colo. Bar No. 38723
EWilcox@pacificlegal.org                Pacific Legal Foundation
CKieser@pacificlegal.org                1745 Shea Center Dr., Suite 400
                                        Highlands Ranch, Colorado 80129
*Pro Hac Vice                           Telephone: (916) 503-9045
                                        Facsimile: (916) 419-7747
                                        GERoper@pacificlegal.org

                    *Counsel for Plaintiff*

---

[12] Defendants cite precedent holding that an official capacity action against a school superintendent is duplicative of an action against the school board. Even assuming that the claims here are duplicative, dismissal of the claim against Superintendent Brabrand would not materially affect the case.

**CERTIFICATE OF SERVICE**

I hereby certify that on the day of May 12, 2021, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system. Counsel for Defendants are registered with the Court's CM/ECF system and will receive a notification of such filing via the Court's electronic filing system.

<div style="margin-left:50%">

s/ Alison E. Somin
ALISON E. SOMIN, Va. Bar No. 79027
Pacific Legal Foundation
3100 Clarendon Blvd., Suite 610
Arlington, Virginia 22201
Telephone: (202) 557-0202
Facsimile: (916) 419-7747
ASomin@pacificlegal.org
*Counsel for Plaintiff*

</div>