IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

COALITION FOR TJ,          )
                                    )
       Plaintiff,          )
                                    )
v.                              )       Civil No. 1:21-cv-00296-CMH-JFA
                                    )
FAIRFAX COUNTY SCHOOL BOARD,  )
and DR. SCOTT BRABRAND, in his    )
official capacity as Superintendent of the  )
Fairfax County School Board,      )
                                    )
       Defendants.       )

## REPLY BRIEF IN SUPPORT OF
## <u>DEFENDANTS' MOTION TO DISMISS</u>

Stuart A. Raphael (VSB No. 30380)
Sona Rewari (VSB No. 47327)
HUNTON ANDREWS KURTH LLP
2200 Pennsylvania Avenue, NW
Washington, DC 20037
Telephone: (202) 955-1500
Facsimile: (202) 778-2201
sraphael@HuntonAK.com
srewari@HuntonAK.com

*Counsel for Defendants*

May 18, 2021

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS........................................................................................................ i

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION ................................................................................................................ 1

ARGUMENT ........................................................................................................................ 2

I.   The official-capacity claim against Brabrand should be dismissed as duplicative.............2

II.  Associational standing is lacking because the members do not control the
     Coalition's actions. ........................................................................................................2

III. The complaint fails to state a claim for intentional racial discrimination..........................5

    A.   The Coalition fails to explain how the race-neutral policy will disparately
          affect Asian-American students. ..............................................................................6

    B.   The history and background of the policy shows no bias against Asian
          Americans. ...............................................................................................................9

    C.   The October 6 work-session vote creates no inference of discrimination
          against Asian Americans..........................................................................................11

    D.   There is no evidence that the Board had the purpose to discriminate
          against Asian Americans..........................................................................................13

        1.   The Coalition does not dispute that adopting a race-neutral policy to
               increase Black and Hispanic representation at TJ would not violate the
               Equal Protection Clause......................................................................... 13

        2.   The Coalition pleads no facts that plausibly allege discrimination
               against Asian Americans......................................................................... 16

        3.   *McCrory* undermines the Coalition's claims. ......................................... 19

CONCLUSION................................................................................................................... 20

CERTIFICATE OF SERVICE ........................................................................................... 20

# TABLE OF AUTHORITIES

## Cases

*Anderson ex rel. Dowd v. City of Boston*,
  375 F.3d 71 (1st Cir. 2004)................................................................. 14

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)........................................................................ 13

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)........................................................................ 13

*Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. of Bos.*,
  No. 21-10330-WGY, 2021 WL 1422827 (D. Mass. Apr. 15, 2021),
  *stay denied*, No. 21-1303, 2021 WL 1656225 (1st Cir. Apr. 28, 2021) .................... 14, 15

*Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. of Bos.*,
  No. 21-1303, 2021 WL 1656225 (1st Cir. Apr. 28, 2021) ......................... 9, 14

*Boyapati v. Loudoun Cty. Sch. Bd.*,
  No. 1:20-cv-01075 (AJT/IDD), 2021 WL 943112 (E.D. Va. Feb. 19, 2021) ................. 16

*Christa McAuliffe Intermediate Sch. PTO, Inc. v. de Blasio*,
  364 F. Supp. 3d 253 (S.D.N.Y.),
  *aff'd*, 788 F. App'x 85 (2d Cir. 2019)................................................ 15

*Ctr. for Sustainable Econ. v. Jewell*,
  779 F.3d 588 (D.C. Cir. 2015)............................................................ 5

*Doe ex rel. Doe v. Lower Merion Sch. Dist.*,
  665 F.3d 524 (3d Cir. 2011)............................................................. 14

*Gomillion v. Lightfoot*,
  364 U.S. 339 (1960)...................................................................... 6, 7

*Grp. Health Plan, Inc. v. Philip Morris, Inc.*,
  86 F. Supp. 2d 912 (D. Minn. 2000)....................................................... 5

*Hart v. Cmty. Sch. Bd.*,
  536 F. Supp. 2d 274 (E.D.N.Y. 2008) ..................................................... 15

*Health Research Grp. v. Kennedy*,
  82 F.R.D. 21 (D.D.C. 1979)............................................................... 4

*Heap v. Carter*,
  112 F. Supp. 3d 402 (E.D. Va. 2015) ..................................................... 5

*Hunt v. Wash. State Apple Advert. Comm'n*,
  432 U.S. 333 (1977)...................................................................... 4, 5

*Lewis v. Ascension Parish Sch. Bd.*,
806 F.3d 344 (5th Cir. 2015) ....................................... 14

*Manning v. Caldwell*,
930 F.3d 264 (4th Cir. 2019) ....................................... 16

*Marks v. United States*,
430 U.S. 188 (1977) ....................................................... 15

*N.C. State Conf. of NAACP v. McCrory*,
*831 F.3d 204 (4th Cir. 2016)* ........................... passim

*Package Shop, Inc. v. Anheuser-Busch, Inc.*,
Civ. A. No. 83-513, 1984 WL 6618 (D.N.J. Sept. 25, 1984) ....................... 2, 5

*Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*,
551 U.S. 701 (2007) ................................................ 14, 15, 16

*Pers. Adm'r of Mass. v. Feeney*,
442 U.S. 256 (1979) ....................................................... 18

*Reyes v. Waples Mobile Home Park LP*,
903 F.3d 415 (4th Cir. 2018),
*cert. denied*, 139 S. Ct. 2026 (2019) ......................... 8

*Shelby Cty. v. Holder*,
570 U.S. 529 (2013) ....................................................... 11

*Smith v. Town of Clarkton*,
682 F.2d 1055 (4th Cir. 1982) ................................. 17

*Spurlock v. Fox*,
716 F.3d 383 (6th Cir. 2013) ................................... 15

*Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*,
576 U.S. 519 (2015) .............................................. 7, 15

*United States v. Alamance-Burlington Bd. of Educ.*,
640 F. Supp. 2d 670 (M.D.N.C. 2009) ................... 15

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
429 U.S. 252 (1977) ........................................... passim

*Yick Wo v. Hopkins*,
118 U.S. 356 (1886) .................................................. 6, 7

**Statutes**

2020 Va. Acts ch. 1289, item 145.C.27(i) ................... 10

**Rules**

Fed. R. Civ. P. 12(b)(1)................................................................................ 5

Fed. R. Civ. P. 12(b)(6)................................................................................ 5

**Secondary Sources**

Anderson, Nick, *Applications surge after big-name colleges halt SAT and ACT testing rules*, Wash. Post (Jan. 29, 2021), https://tinyurl.com/yx5phd3h.................................... 12

Ryan, James E.,
    *The Supreme Court and Voluntary Integration*, 121 Harv. L. Rev. 131 (2007).............. 15

Wilkinson III, J. Harvie,
    *The Seattle and Louisville School Cases: There is No Other Way*, 121 Harv. L. Rev. 158 (2007) ........................................................................... 15

# INTRODUCTION

The Coalition fails to persuasively address either of the two independent flaws that require the complaint to be dismissed. First, the Coalition lacks associational standing because it fails to show that its members control the Coalition's leadership or its decisions. The "general members," for example—a number whittled down to 298 from the 5,000 originally suggested in the complaint—do not vote for the Coalition's leaders and had no role in approving this litigation. Absent control by the membership, an association lacks representational standing.

Second, the complaint fails to state a claim for intentional discrimination against Asian Americans. The admissions policy at issue here specifically mandates race-neutral methods and prohibits racial targets and racial balancing (something the Coalition failed to mention either in the complaint or in its preliminary-injunction motion). Admissions evaluators do not even know the race of the applicants. Though disparate impact alone would be insufficient by itself to state an Equal Protection claim, the Coalition cannot even muster that. Despite parallel briefing on both the motion to dismiss and preliminary-injunction motions, it still cannot articulate how any aspect of the revised admissions policy could even have an adverse disparate impact on Asian-American students. By contrast, in the principal case on which the Coalition relies, *McCrory*, each of the challenged voting restrictions was shown to disproportionately harm African-American voters. And other evidence in *McCrory* corroborated that the North Carolina legislature acted to intentionally disenfranchise Black voters. The Coalition pleads nothing of that sort here.

To the contrary, the Coalition now concedes that the facially race-neutral admissions policy is *not* subject to strict scrutiny even if School Board members who voted for it hoped and believed that the policy would increase the representation of underrepresented Black and Hispanic students. To justify strict scrutiny, the Coalition must instead plead facts that plausibly

1

allege that the School Board sought to harm Asian-American students. But as shown in Exhibit A to the Smoot Declaration (ECF No. 22-4), *none* of the statements on which the Coalition relies plausibly supports that claim. And the statements themselves—which are now part of the record—control over the contorted versions of those statements described in the complaint.

The complaint should be dismissed on both independent grounds.

## ARGUMENT

**I.      The official-capacity claim against Brabrand should be dismissed as duplicative.**

The Coalition does not dispute that its official-capacity claim against Superintendent Brabrand should be dismissed as duplicative. *See* Coal. 12(b) Opp'n 30 n.12; FCSB 12(b) Br. 30.

**II.     Associational standing is lacking because the members do not control the Coalition's actions.**

The Coalition's two declarations, from Glenn Miller and Asra Nomani, do not improve its claim to associational standing because they only confirm that the Coalition is not a traditional membership association (like a labor union or trade association) or its functional equivalent. The complaint implied that the Coalition had "5,000" members. Compl. ¶ 11. The Coalition now calls those 5,000 people "supporters," not members. Miller Decl. ¶ 14; Nomani Decl. ¶ 14. The Coalition claims to have "three tiers of membership": (1) "298 general members"; (2) "27 members of a 'core team'"; and (3) "ten members of the 'leadership team,' including Nomani and Miller." Coal. 12(b) Opp'n 10.

But the two declarations corroborate that the Coalition is "run by people who are self-appointed, a fact [that] weighs heavily against its being considered a membership organization." *Package Shop, Inc. v. Anheuser-Busch, Inc*., Civ. A. No. 83-513, 1984 WL 6618, at *40-41 (D.N.J. Sept. 25, 1984). Miller and Nomani self-identify as the co-founders. Miller Decl. ¶ 5;

Nomani Decl. ¶ 5. They were not elected by the members and do not appear to be removable by the members. The "leadership team" was "chosen through self-nominations," but the plaintiff does not say what it means that they were "then chosen by consensus." Miller Decl. ¶ 11; Nomani Decl. ¶ 11. The declarations fail to identify any officers or agents who can bind the Coalition; any directors who can elect the officers or managing agents; or any mechanism for members to choose new leadership or to exercise any other form of control over the Coalition's decisions.

Though it now claims to have 298 "general members," the Coalition still does not say what it means to be a "general member." Do "general members" have voting rights or the right to elect members of the "core team" or the "leadership team"? Apparently not. The declarations also confirm that general members were not consulted about whether to file this lawsuit. *See* Miller Decl. ¶ 50; Nomani Decl. ¶ 47.

The Coalition also fails to disclose if the parents listed in paragraphs 13 and 14 of the complaint—who include the 14 plaintiffs in *K.C. v. Fairfax County School Board*—are "general members," "leadership team" members, "core team" members, or mere "supporters." Similarly, when the Coalition filed declarations from three parents in support of its motion for a preliminary injunction, ECF Nos. 16-1 to 16-3, those declarations were conspicuously silent about their level of membership, or whether the declarants were Coalition members at all. Notably, neither Miller nor Nomani would have standing in their own right. They each claim to have a child currently attending TJ, not one who is applying for admission. Miller Decl. ¶ 3; Nomani Decl. ¶ 3.

Miller and Nomani concede, at least, that the "Coalition does not have bylaws." Miller Decl. ¶ 25; Nomani Decl. ¶ 26. They identify no other written controls. The absence of such

fundamental tools of corporate governance means that the Coalition's self-appointed leaders—whomever they may be—remain free to chart the Coalition's course and to make up the membership rules as they go along.

To exercise representational standing means that the association must serve as the "*representative* of its members." *Hunt v. Wash. State Apple Advert. Comm'n,* 432 U.S. 333, 343 (1977) (emphasis added) (quoting *Warth v. Seldin*, 422 U.S. 490, 511 (1975)). Such representation requires direct democracy or representative democracy. Traditional membership associations—like labor unions and trade associations—earn their representational standing because their members control the association, such as by electing the leadership. Similarly, even though the State advertising commission in *Hunt* was not a traditional membership association and had no formal members, it *acted* like a traditional membership association because the apple growers and dealers it represented "alone elect[ed] the members of the Commission," "alone [could] serve on the Commission," and "alone finance[d] its activities." *Id*. at 344. The Coalition lacks any of those essential attributes.

It is not enough that advocates of a particular issue insist that they represent the interests of others who share their viewpoint. "[S]omething more is required and must be found in the special relationship between an association and its members." *Health Research Grp. v. Kennedy*, 82 F.R.D. 21, 25 (D.D.C. 1979) (Sirica, J.). Membership control is necessary so that "it can reasonably be presumed that, in effect, [the association] *is* the injured party who is [itself] seeking review." *Id*. at 26 (emphasis added). "Absent this element of control, there is simply no assurance that the party seeking judicial review represents the injured [p]arty, and not merely a well-informed point of view." *Id*. at 27.

This Court correctly imposed the control requirement in *Heap v. Carter*, 112 F. Supp. 3d 402, 418 (E.D. Va. 2015). The association there claimed that "it maintains an active membership, including members who are enlisted in the United States Navy." *Id*. But the association lacked representational standing because it failed to show "that its members exert any control over the direction of the organization." *Id*. at 419. Associational standing in other cases has turned on the member-control requirement as well. *E.g.*, *Ctr. for Sustainable Econ. v. Jewell*, 779 F.3d 588, 598 (D.C. Cir. 2015) ("voting members entitled to elect" board); *Grp. Health Plan, Inc. v. Philip Morris, Inc*., 86 F. Supp. 2d 912, 918 (D. Minn. 2000) ("[T]he constituents of an organization must exercise a certain measure of control over the organization."); *Package Shop*, 1984 WL 6618, at *41 ("[I]t does not appear that the membership can control the actions of the officers and trustees, most of whom they did not elect.").

Just as in *Heap* and unlike in *Hunt*, the Coalition in this case has failed to show that its members control the decisions of the Coalition or its leadership. Accordingly, the Coalition lacks standing to represent its members' interests in this litigation and the case must be dismissed under Rule 12(b)(1).

## III.    The complaint fails to state a claim for intentional racial discrimination.

The complaint also fails on the merits and should be dismissed under Rule 12(b)(6).

The Coalition and School Board at least start from common legal ground: "official action will not be held unconstitutional solely because it results in a racially disproportionate impact." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp*., 429 U.S. 252, 265–65 (1977) (following *Washington v. Davis*, 426 U.S. 229 (1976)). "Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." *Id*. at 265.

After all of the briefing in this case, the Coalition has failed to explain how TJ's admissions policy could plausibly do "a very good job at promoting . . . racial balance," Coal. 12(b) Opp'n 25, when the policy itself specifically directs admissions evaluators to use "only race-neutral methods that do not seek to achieve any specific racial or ethnic mix, balance or targets." ECF No. 22-1 at 5. What is more, in determining admission to the freshman class, admissions evaluators are blinded to each applicant's "name, race, ethnicity, [and] sex." FCPS Reg. 3355.14.V.A.3.b (ECF No. 22-2). So how do admissions evaluators discriminate against Asian students or engage in racial balancing? The Coalition never says.

Conceding that the TJ admissions policy is "facially race-neutral," Comp. ¶ 63, the Coalition marches through the four *Arlington Heights* considerations of "circumstantial and direct evidence of intent" to discriminate, in the hope of dodging this motion to dismiss. Coal. 12(b) Opp'n 12–23. But none of those considerations renders it plausible that the School Board intentionally discriminated against Asian Americans.

A.     **The Coalition fails to explain how the race-neutral policy will disparately affect Asian-American students.**

The consideration of disparate impact does not help the Coalition here. The Coalition does not dispute that, "[a]bsent a pattern as stark as that in *Gomillion*[1] or *Yick Wo*,[2] [racial] impact alone is not determinative, and the Court must look to other evidence." *Arlington Heights*, 429 U.S. at 226 (footnote omitted). The disparate impact in *Yick Wo* and *Gomillion* was so inexplicable—grossly discriminatory treatment of Chinese-owned laundries and redistricting

---

[1] *Gomillion v. Lightfoot*, 364 U.S. 339 (1960).

[2] *Yick Wo v. Hopkins*, 118 U.S. 356 (1886).

that excluded virtually all Black voters—the inference of racial discrimination was inescapable. *See* FCSB 12(b) Br. 17.

The Coalition is right that this case is *not* the "next *Yick Wo* or *Gomillion*," but wrong to suggest that it is the next *McCrory*. Coal. 12(b) Opp'n 14 (citing *N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204 (4th Cir. 2016)). *McCrory* held that the North Carolina legislature unconstitutionally enacted a voter-suppression bill in 2013 for the purpose of disenfranchising Black voters. 831 F.3d at 215.

Unlike in this case, however, the plaintiffs in *McCrory* showed that the invalidated provisions "target[ed] African Americans with almost surgical precision." *Id*. at 214. The North Carolina legislature "enacted legislation restricting all—and only—practices disproportionately used by African Americans." *Id*. at 230. For instance, the bill eliminated one of two "souls to the polls" early-voting opportunities used overwhelmingly by Black voters after Sunday church services. *Id*. at 217. It also imposed a photo ID requirement for in-person voting (which disproportionately harmed Black voters), but not for absentee voting (which disproportionately benefited white voters). *Id*. at 235–36. The facts of *McCrory* were nearly as appalling as in *Yick Wo* and *Gomillion*.

The Coalition does not and cannot make any similar allegation here. The Coalition's claim that the new policy will disproportionately harm Asian-American students is not based on any plausible explanation as to *how* it can do so in light of the race-blind admissions requirement. "[A] disparate-impact claim that relies on a statistical disparity must fail if the plaintiff cannot point to a defendant's policy or policies causing that disparity." *Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 542 (2015). A plaintiff must "'demonstrate that the disparity they complain of is the result of one or more of the [ ]

practices that they are attacking . . . , specifically showing that each challenged practice has a significantly disparate impact' on the protected class." *Reyes v. Waples Mobile Home Park LP*, 903 F.3d 415, 425 (4th Cir. 2018) (citation omitted), *cert. denied*, 139 S. Ct. 2026 (2019).

The Coalition is unable to make that showing for *any* aspect of the new admissions policy. For instance, how does eliminating the $100 application fee disparately harm Asian-American students? Or increasing the minimum GPA from 3.0 to 3.5? Or increasing the class size to 550 students? Or eliminating the standardized-testing requirement? The Coalition never says.

The Coalition continues to suggest that the top-1.5% plan disproportionately affects Asian-American students because they are enrolled in higher percentages at four middle schools. Coal. 12(b) Opp'n 13. But the Coalition ignores that the top-1.5% plan applies to *all middle schools,* not just the four "heavily Asian-American" schools that it singles out for discussion. The Coalition also has now grudgingly conceded that the top-1.5% plan does not operate as a cap or a ceiling on admissions. Coal. PI Reply 2. That is evident in the regulation itself, which provides that "[u]nallocated" seats remain available for students who rank below the top-1.5% of their middle-school class. *See* FCPS Reg. 3355.14.V.A.5(b) (ECF No. 22-2). The Coalition fails to articulate how the selection of students ranked at the top of their class, or even below the top 1.5%, disproportionately burdens Asian-American students.

Even assuming for argument's sake that the new admissions policy results in a smaller proportion of admitted students of Asian-American descent than the 73% in last year's freshman class, such a raw comparison is not probative of an adverse disparate impact on Asian Americans. An appropriate apples-to-apples comparison would consider the proportion of Asian Americans offered admission in comparison to the proportion in Fairfax County Public Schools

(19.5% in 2019), or in comparison to the proportion in the applicant pool (56% in 2019).[3]  By

the Coalition's faulty logic, a purely random-selection or lottery system would be

"discriminatory" against Asian Americans because the proportion of Asian-Americans in such a

random sample would be lower than the proportion in last year's class.  As in *Boston Parent*

*Coalition*, the Coalition here has failed to show that "as compared to a random distribution of

[admissions]," the policy has any "adverse disparate impact" on Asian students.  *Bos. Parent*

*Coal. for Acad. Excellence Corp. v. Sch. Comm. of Bos.*, No. 21-1303, 2021 WL 1656225, *5

(1st Cir. Apr. 28, 2021).

**B.**     **The history and background of the policy shows no bias against Asian Americans.**

As for the second *Arlington Heights* consideration, the history and background of the

revised TJ admissions policy bears no resemblance to the shameful history of discrimination

against Black voters that preceded the voter-suppression bill in *McCrory*.  North Carolina had a

"long history of race discrimination generally and race-based vote suppression in particular."  *Id*.

at 223.  The Court cited, among other things, "fifty-five successful cases under § 2 of the Voting

Rights Act" to invalidate racially discriminatory voting laws, *id*. at 224, as well as a recent

decision by a three-judge court finding intentional discrimination against Black voters in the

State's congressional redistricting, *id*. at 225.  That evidence showed that the legislature had

continued to "restrict or dilute African American voting strength . . . up to the present day."  *Id*.

---

[3] The complaint states that 19% of Fairfax County residents are Asian.  Compl. ¶ 25.  Footnote 16 of the complaint cites and contains a hyperlink to the school system's September 15, 2020 presentation, which shows 19.5% of the FCPS population in 2019 as Asian, and 56% of 2019 applicants for the freshman class at TJ as Asian.  FCPS, TJ Admissions Merit Lottery Proposal, School Board Work Session 4, 10 (Sept. 15, 2020), https://tinyurl.com/fee63jeb.

The Coalition offers nothing like that here. Instead, it cites a provision in Virginia's 2020 budget bill requiring each Governor's School to "set diversity goals for its student body and faculty, and develop a plan to meet said goals in collaboration with community partners at public meetings." 2020 Va. Acts ch. 1289, item 145.C.27(i).[4] The annual reporting requirement calls for information about "the racial/ethnic make-up and socioeconomic diversity of its students, faculty, and applicants." *Id.* But nothing in that budget item suggests that Governor's Schools must promote diversity by discriminating against Asian-American students. The reporting requirement calls for information about such race-neutral measures as "utilization of universal screenings in feeder divisions; admission processes in place or under consideration that promote access for historically underserved students; and outreach and communication efforts deployed to recruit historically underserved students." *Id*. Those race-neutral measures are similar to the race-neutral measures challenged here. And the Coalition admits, as it should, that the budget bill requirements "were minimal" and "did not require Governor's Schools to actually *change* anything about their admissions processes." Coal. 12(b) Opp'n 15–16.

Recognizing that the 2020 budget bill did not require the School Board to adopt measures discriminating against Asian Americans, the Coalition claims that the Superintendent "saw an opportunity to remake the TJ admissions process along racial lines" by proposing a system of "regional pathways" that would have had the effect, the Coalition claims, of grouping together middle schools with higher percentages of Asian students, thereby reducing the percentage admitted to TJ. Coal. 12(b) Br. 15. But as discussed in part D below, the Coalition cannot point to anything that Dr. Brabrand said that reflected a motivation to harm Asian students. And in

---

[4] *See* https://tinyurl.com/59v4atw5. The Coalition mistakenly cites this bill as chapter 183, rather than chapter 1289.

any case, the Coalition admits that the School Board "did not adopt Superintendent Brabrand's 'regional pathways' framework." *Id.*

### C. The October 6 work-session vote creates no inference of discrimination against Asian Americans.

Nor does the third *Arlington Heights* factor (procedural irregularities suggesting racial motivation) support the Coalition in this case. Coal. 12(b) Opp'n 16. *McCrory*, again, undercuts the Coalition's position. Even under the extreme facts of that case, the Court noted that the presence of procedural irregularity "is not dispositive on its own." 831 F.3d at 229. The sequence of events in *McCrory* nonetheless supported an inference of discrimination against Black voters.

The critical fact there was the legislature's rush to adopt a voter-suppression bill right after the Supreme Court in *Shelby County* invalidated the Voting Rights Act requirement that voting changes enacted by covered jurisdictions like North Carolina be "precleared" by the Department of Justice. *See id.* at 228–29 (discussing actions after *Shelby County v. Holder*, 570 U.S. 529 (2013)). The bill that was pending in the legislature *before* the decision in *Shelby County* "numbered only sixteen pages and contained none of the challenged provisions, with the exception of a much less restrictive photo ID requirement." *Id.* at 227. Just after the Supreme Court decided *Shelby County*, however, the bill swelled to

> fifty-seven pages in length—targeted four voting and registration mechanisms, which had previously expanded access to the franchise, and provided a much more stringent photo ID provision . . . . [T]he change in accepted photo IDs is of particular note: the new ID provision retained only those types of photo ID disproportionately held by whites and excluded those disproportionately held by African Americans.

*Id*. at 227 (citation omitted).

That "sequence of events—the General Assembly's eagerness to, at the historic moment of *Shelby County*'s issuance, rush through the legislative process the most restrictive voting law North Carolina has seen since the era of Jim Crow—bespeaks a certain purpose." *Id*. at 229. It provided "another compelling piece of the puzzle of the General Assembly's motivation." *Id*.

By contrast, the School Board's October 6, 2020 vote to eliminate the standardized-testing requirement (and the $100 application fee) bears no similar badges of racism. The Coalition does not connect that decision to any desire to harm Asian Americans. The consistently stated reason was promoting equity and fairness. As the Superintendent noted in recommending that change, "if you have test prep access, you have a big leg up. And some families have the money and resources to spend thousands and thousands of dollars each year to get their kid TJ-test ready." Smoot Decl. Ex. A at 1 (ECF No. 22-4). The Coalition offers nothing to undermine the genuineness of that rationale or to connect it to a motive to harm Asian Americans.[5]

Furthermore, the Coalition has no response to the obvious explanation for why the School Board made the no-testing decision at its October 6 work session, leaving the rest of the admissions policy unfinished until December 17: the Board needed to give students and staff time to change their plans in advance of the looming November-testing date. *See* Compl. ¶ 33 (alleging that the admissions testing was due to take place "the next month"). Students had to preregister and staff had to order testing materials weeks in advance. *See* FCSB PI Opp'n 16. "As between that 'obvious alternative explanation' . . . and the purposeful, invidious

---

[5] Notably, the nation's Ivy League colleges and other top universities are increasingly eliminating the use of standardized tests in their admissions processes too. *See, e.g.*, Nick Anderson, *Applications surge after big-name colleges halt SAT and ACT testing rules*, Wash. Post (Jan. 29, 2021), https://tinyurl.com/yx5phd3h.

discrimination [plaintiff] asks us to infer, discrimination is not a plausible conclusion." *Ashcroft v. Iqbal,* 556 U.S. 662, 682 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 567 (2007)).

Moreover, the top-1.5% plan that is the crux of the Coalition's complaint was not adopted at the October 6 work session but two months later, at a regular meeting of the School Board on December 17. The Coalition seizes on one Board member's comments that she felt that the Board was moving too "quickly" and claims that this shows a "procedural irregularity." Coal. 12(b) Opp'n 16. Not so. The school system was already well behind the regular TJ admissions timeline by mid-December. As the Coalition itself notes, "[u]ncertainty about the TJ admissions process [had] persisted for two months" since the October 6 meeting. Coal. 12(b) Opp. 15. The Board's final vote on December 17 resolved that uncertainty.

### D. There is no evidence that the Board had the purpose to discriminate against Asian Americans.

Turning to the fourth and final *Arlington Heights* consideration, the Coalition claims that "the most important evidence of discriminatory intent" in this case consists of statements by School Board members and staff "in the course of enacting the challenged changes." Coal. 12(b) Opp'n 17. But the Coalition elides statements reflecting a desire to increase access to TJ for underrepresented socioeconomic and racial minorities—which does *not* trigger strict scrutiny— with statements reflecting a desire to harm Asian-American students, of which there were *none*.

#### 1. The Coalition does not dispute that adopting a race-neutral policy to increase Black and Hispanic representation at TJ would not violate the Equal Protection Clause.

To its credit, the Coalition does not press the extreme legal theory urged by the plaintiff in *Boston Parent Coalition*. The parent group there claimed that "*any* consideration of race" in adopting an otherwise race-neutral policy triggers strict scrutiny, a novel claim rejected by the

court as "contrary to controlling precedent." *Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. of Bos.*, No. 21-10330-WGY, 2021 WL 1422827, at *8 & n.14 (D. Mass. Apr. 15, 2021) (emphasis added), *stay denied*, No. 21-1303, 2021 WL 1656225 (1st Cir. Apr. 28, 2021).

Moreover, the Coalition concedes that "[m]ere motive to increase the representation of a particular racial group does not render an action racially discriminatory for purposes of an *Arlington Heights* analysis." Coal. 12(b) Opp'n 25. Thus, the Coalition does not dispute that *if* School Board members voted to change the TJ admissions policy "to increase the representation" of Black and Hispanic students, doing so was permissible and does not trigger strict scrutiny.

That concession is compelled by the great weight of precedent, including Justice Kennedy's concurring opinion in *Parents Involved in Community Schools v. Seattle School District No. 1*, 551 U.S. 701, 789 (2007) (Kennedy, J., concurring in part and concurring in the judgment). *See* FCSB 12(b) Br. 18–24. Four other federal circuits since *Parents Involved* have held that race-neutral public-school student-assignment plans adopted to improve racial diversity are subject only to rational-basis review. *See Anderson ex rel. Dowd v. City of Boston*, 375 F.3d 71, 87 (1st Cir. 2004) ("Contrary to plaintiffs' arguments, the mere invocation of racial diversity as a goal is insufficient to subject the New Plan to strict scrutiny."); *Boston Parent Coal.*, 2021 WL 1656225, at *4 (same, applying rational-basis review); *Doe ex rel. Doe v. Lower Merion Sch. Dist.*, 665 F.3d 524, 547–48 (3d Cir. 2011) (upholding race-neutral redistricting plan under rational-basis review despite school district's awareness of racial consequences); *Lewis v. Ascension Parish Sch. Bd.*, 806 F.3d 344, 357 (5th Cir. 2015) (agreeing that "a school zoning plan that assigns students to schools based on their home addresses is facially race neutral, and the rezoning body's consideration of demographic data in drawing the relevant geographic boundaries does not amount to making an express classification"); *Spurlock v. Fox*, 716 F.3d

383, 395 (6th Cir. 2013) (upholding geographic assignment plan); *see also Christa McAuliffe Intermediate Sch. PTO, Inc. v. de Blasio*, 364 F. Supp. 3d 253, 279–80 (S.D.N.Y.) (finding equal-protection challenge unlikely to succeed against race-neutral program designed to increase racial diversity at specialized public high schools), *aff'd*, 788 F. App'x 85 (2d Cir. 2019).

Despite that important and correct concession, however, the Coalition cannot quite bring itself to admit that Justice Kennedy's opinion in *Parents Involved* provides the "controlling" opinion under *Marks v. United States*, 430 U.S. 188, 193 (1977). Coal. 12(b) Opp'n 26. The Coalition's hesitation does not matter to the outcome here, since the Coalition acknowledges Justice Kennedy's opinion as "persuasive authority." *Id.* But the Coalition's ambivalence is unwarranted.

As Judge Wilkinson has explained, Justice Kennedy's concurring opinion in *Parents Involved* is "controlling" because it provides "the narrowest rationale in support of the prevailing judgment." J. Harvie Wilkinson III, *The Seattle and Louisville School Cases: There is No Other Way*, 121 Harv. L. Rev. 158, 170 (2007).[6] Other scholars likewise recognize *Parents Involved* to allow "[s]chool officials [to] be confident that they can take race-neutral steps to try to achieve racial integration." James E. Ryan, *The Supreme Court and Voluntary Integration*, 121 Harv. L. Rev. 131, 138 (2007). The Supreme Court confirmed that point again in 2015—eight years after *Parents Involved*. Writing for the Court in *Inclusive Communities*, Justice Kennedy explained that government officials may use "race-neutral tools" to "foster diversity and combat racial

---

[6] *See also Spurlock*, 716 F.3d at 394–96 (treating Justice Kennedy's concurrence as controlling); *Boston Parent Coal.*, 2021 WL 1422827, at *11 (same); *United States v. Alamance-Burlington Bd. of Educ.*, 640 F. Supp. 2d 670, 683 n.5 (M.D.N.C. 2009) (same); *Hart v. Cmty. Sch. Bd.*, 536 F. Supp. 2d 274, 282–83 (E.D.N.Y. 2008) (same).

isolation" without running afoul of the Equal Protection Clause. *Inclusive Cmtys.*, 576 U.S. at 545.

And even if one treated as "dicta" the discussion in *Parents Involved* that race-neutral measures may be used to improve racial diversity, courts in this circuit are *not* "free to ignore" it. *Manning v. Caldwell*, 930 F.3d 264, 281–82 (4th Cir. 2019) (en banc). To the contrary, the Fourth Circuit follows the dicta found in the opinion of a Supreme Court justice whose concurrence, like Justice Kennedy's, was necessary to the outcome of the case. *See id.* ("[W]e routinely afford substantial, if not controlling deference to dicta from the Supreme Court."). This Court thus correctly followed Justice Kennedy's concurrence in *Boyapati v. Loudoun County School Board*, No. 1:20-cv-01075 (AJT/IDD), 2021 WL 943112, *6 (E.D. Va. Feb. 19, 2021) (Trenga, J.), a case the Coalition has still not acknowledged.

### 2. The Coalition pleads no facts that plausibly allege discrimination against Asian Americans.

Having conceded that strict scrutiny is *not* triggered either by considering the racial effects of a race-neutral admissions policy, or by a desire to increase the enrollment of underrepresented Black and Hispanic students, the Coalition has pleaded no facts falling outside of those safe harbors. The table in Exhibit A to the Smoot Declaration (ECF No. 22-4) sets forth all of the statements that the complaint attributes to Superintendent Brabrand and to School Board members on which the Coalition bases its claims of anti-Asian prejudice. That table shows how the complaint mischaracterizes what the speakers actually said. And the Coalition concedes that, if there is a conflict, the speakers' actual statements control over the characterization pleaded in the complaint. Coal. 12(b) Opp'n 18; *see* FCSB 12(b) Br. 9.

Yet not a single one of the cited statements reflects bias against Asian Americans. For instance, School Board Member Meren did not describe "*majority-Asian-American* TJ's culture

as 'toxic' for Black students."  Compl. ¶ 45 (emphasis added).  She instead described "a student . . . who tried to bleach her skin, because she didn't feel welcome as a black student in the school.  It's toxic for those students who feel left out."  Smoot Decl. Ex. A at 5 (ECF No. 22-4).  It is easy to understand how such a student could feel racially isolated, since African Americans (who comprise 10% of the Fairfax County population) comprised only 1% of last year's freshman class at TJ.  Compl. ¶¶ 23, 25.  Recognizing the problem of racial isolation is commendable, not an act of racial prejudice against Asian Americans.

None of the other cited statements reflect any bias against Asian Americans either.  The complaint identified statements by five of twelve School Board members that reflect, at most, a hope that changes to TJ's admissions policy would increase the representation of underrepresented minorities, including Black and Hispanic students at the school.  Smoot Decl. Ex. A (ECF No. 22-4).

The Coalition falls back to relying on statements by FCPS staff-members Marty Smith and Ann Bonitatibus, arguing that "statements by subordinates might be relevant if they influenced" the School Board members who voted in favor of the policy changes on October 6 and December 17.  Coal. 12(b) Opp'n 21.  But none of those statements expressed any anti-Asian animus either.  They were not like the statements in *Smith v. Town of Clarkton*, 682 F.2d 1055 (4th Cir. 1982), where the city council voted down a public-housing project, for which "black families" constituted nearly 70% of the eligible population, *id.* at 1061, after hearing of the Mayor's racially charged concern that it would lead to "an influx of 'undesirables'" and "'dilute the public schools,'" *id.* at 1066.  At best, the statements attributed to Smith and Bonitatibus expressed a desire for greater representation of Black and Hispanic students at TJ, a view that the Coalition concedes is "not racially discriminatory."  Coal. 12(b) Opp'n 25.

Without any statements by School Board members reflecting anti-Asian bias, the Coalition is reduced to arguing that admission to TJ is a "zero-sum game," so if the Board changed the policy in the hope of increasing the representation of Black and Hispanic students, it "necessarily makes admissions harder for the group that was 'overrepresented'—here, Asian-Americans." Coal. 12(b) Opp'n 24. The zero-sum theory is factually inaccurate because the School Board also expanded TJ's freshman class from 480 to 550 students, FCPS Reg. 3355.14.V (ECF No. 22-2), something the parent plaintiffs acknowledged in *K.C.*, ECF No. 22-3 at 33 n.8. But the zero-sum theory is also precluded by the Coalition's concession that a race-neutral policy adopted to benefit Black and Hispanic students would "not render an action racially discriminatory." Coal. 12(b) Opp'n 25. The Coalition eventually recognizes, albeit it in a footnote, that it must show that the School Board adopted the revised policy "*because* it would disproportionately" harm Asian-American students. *Id*. 24 n.8.

Since there are no such facts pleaded here, however, this case is controlled by *Feeney*. The Supreme Court there found that legislation adopted to benefit veterans was not adopted for the purpose of discriminating against women, despite that "over 98%" of veterans were men. *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 270, 272 (1979). It did not matter that the Massachusetts legislature knew that a preference for hiring veterans would disproportionately benefit men. "'Discriminatory purpose' . . . implies more than intent as volition or intent as awareness of consequences." *Id*. at 279. Because there was no indication that the legislature adopted the hiring preference "because of" a desire to harm women, it did not constitute invidious discrimination against them. *Id*. Likewise, adopting a new admissions policy with the hope of improving the admission of underrepresented Black and Hispanic students does not show an intent to harm Asian-American students, even if School Board members understood that

increasing Black and Hispanic representation would correspondingly decrease Asian-American representation.

### 3. *McCrory* undermines the Coalition's claims.

Citing *McCrory* out of context, the Coalition claims that it "need not allege that any decisionmaker harbored racial animus toward Asian-Americans." Coal. 12(b) Opp'n 12 (citing *McCrory*, 831 F.3d at 233). But *McCrory* does not relieve a plaintiff of the burden to plead facts plausibly alleging that the decisionmaker intentionally discriminated against a group on the basis of race or ethnicity. The cited passage from *McCrory* simply parried the legislature's defense that it targeted Black voters because they were *Democrats*, not out of hatred of African Americans. *See* 831 F.3d at 233. It was enough that legislators targeted them *because they were Black*.

In North Carolina, "African-American race is a better predictor for voting Democratic than party registration." *Id.* at 225. The legislature tried to justify its voter restrictions by claiming partisan motivation. For instance, it defended early-voting restrictions on the ground that counties with high early voting "'were disproportionately black' and 'disproportionately Democratic.'" *Id*. at 226. Yet that defense was "as close to a smoking gun" as one sees "in modern times." *Id*. The Court credited that legislators may have voted for the voter-suppression law "for partisan ends," not out of "racial hatred or animosity" towards African Americans. *Id*. at 233. But disenfranchising Black voters "as a proxy" for disenfranchising Democrats is still "intentional racial discrimination in violation of the Fourteenth Amendment." *Id*. at 222–23.

The Coalition identifies no comparable use of race in this case. It pleads no facts showing that the School Board used Asian-American ethnicity as a proxy to achieve some other goal, as in *McCrory*, let alone acted out of animus against Asian Americans. In short, nothing in *McCrory* excuses the Coalition from having to plead facts that plausibly allege intentional

discrimination against Asian Americans. And since the Coalition has failed to make that showing here, the complaint must be dismissed.

## CONCLUSION

The motion to dismiss should be granted and the complaint should be dismissed with prejudice.

Respectfully submitted,

FAIRFAX COUNTY SCHOOL BOARD and DR. SCOTT BRABRAND in his "official capacity" as Superintendent


By: _____/s/_____

Stuart A. Raphael (VSB No. 30380)
Sona Rewari (VSB No. 47327)
HUNTON ANDREWS KURTH LLP
2200 Pennsylvania Avenue, NW
Washington, DC 20037
Telephone: (202) 955-1500
Facsimile: (202) 778-2201
sraphael@HuntonAK.com
srewari@HuntonAK.com

*Counsel for Defendants*


## CERTIFICATE OF SERVICE

I hereby certify that on May 18, 2021, I electronically filed this document with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing (NEF) to counsel of record for all Parties.

By: _____/s/_____

Stuart A. Raphael (VSB No. 30380)