

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION


COALITION FOR TJ                        )
                                        )
                                        )
      VS.                               )    1:21-CV-296  CMH/JFA
                                        )
                                        )    ALEXANDRIA, VIRGINIA
                                        )      MAY 21, 2021
FAIRFAX COUNTY SCHOOL BOARD,            )
ET AL.                                  )
_____)


_____

**TRANSCRIPT OF MOTIONS HEARING**
**BEFORE THE HONORABLE CLAUDE M. HILTON**
**UNITED STATES DISTRICT JUDGE**
_____


**Proceedings reported by stenotype, transcript produced by**

**Julie A. Goodwin.**

2

1                      A P P E A R A N C E S

2

3    FOR THE PLAINTIFF:
           PACIFIC LEGAL FOUNDATION
4          By:  MS. ERIN E. WILCOX
           MR. CHRISTOPHER M. KIESER
5          930 G Street
           Sacramento, California 95814
6          916.419.7111
           ewilcox@pacificlegal.org
7          ckieser@pacificlegal.org

8
           PACIFIC LEGAL FOUNDATION
9          By:  MS. ALISON E. SOMIN
           3100 Clarendon Blvd.
10         Suite 610
           Arlington, Virginia 22201
11         202.557.0202
           asomin@pacificlegal.org
12

13

14
     FOR THE DEFENDANTS:
15         HUNTON ANDREWS KURTH LLP
           By:  MR. STUART A. RAPHAEL
16         MS. SONA REWARI
           MR. MICHAEL DINGMAN
17         2200 Pennsylvania Avenue, NW
           Washington, DC 20037
18         202.955.1500
           sraphael@huntonak.com
19         srewari@huntonak.com

20

21

22   OFFICIAL U.S. COURT REPORTER:
           MS. JULIE A. GOODWIN, CSR, RPR
23         United States District Court
           401 Courthouse Square
24         Eighth Floor
           Alexandria, Virginia  22314
25         512.689.7587

3

1   (MAY 21, 2021, 10:12 A.M., OPEN COURT.)

2          THE COURTROOM DEPUTY:  Civil Action 21-CV-296,

3   *Coalition for TJ versus Fairfax County Public School Board, et*

4   *al.*

5          If counsel would please note your appearance for

6   the record.

7          MR. RAPHAEL:  Stuart Raphael for the defendants, Your

8   Honor.

9          MS. WILCOX:  Erin --

10         MR. RAPHAEL:  I'm sorry.  And with me is Sona Rewari,

11   my partner, and Michael Dingman.

12         MS. WILCOX:  Erin Wilcox for the plaintiffs, Your

13   Honor.  And with me is Alison Somin and Christopher Kieser.

14         THE COURT:  All right.

15          Okay.

16         MR. RAPHAEL:  Your Honor has two motions before you,

17   our motion to dismiss and then the plaintiffs have filed a

18   motion for preliminary injunction.  I'm happy to take up the

19   motion to dismiss first if that is okay with you.

20         THE COURT:  Go ahead.

21         MR. RAPHAEL:  The most significant fact in this case

22   is that the policy that the plaintiffs are challenging here as

23   racially discriminatory specifically prohibits discrimination

24   on the basis of race.  And this is found at ECF 22-1 at pages

25   4 and 5.

4

1          The December 17th policy provides that the
2   admissions process must use only race-neutral methods that do
3   not seek to achieve any specific racial or ethnic mix, balance,
4   or targets.  In the implementing regulation, which is also in
5   the record at ECF 22-2 at page 4, provides that in accordance
6   with that policy the admissions evaluators are not even -- they
7   don't even know the race, ethnicity, or gender of any of the
8   applicants.  There's a number assigned to each file, so it is
9   literally a race-blind policy.
10          Now, the plaintiff concedes that the policy is
11  facially race neutral - that's paragraph 63 of the complaint -
12  but they contend that it was nonetheless enacted for the
13  purpose of discriminating against Asian-Americans.
14          Now, we pointed out in our opening brief Justice
15  Scalia's concurrence in the *Schuette* case where he said that, a
16  policy that specifically prohibits discrimination on the basis
17  of race cannot -- cannot be as a matter of law
18  unconstitutional.
19          The plaintiffs say, well, that was just a
20  concurrence.  And they're right as far as that goes.
21          But even assuming hypothetically that you could
22  envision a set of facts where a governmental body adopts a
23  facially race-neutral policy that prohibits discrimination on
24  the basis of race, surely the facts that you would have to
25  plead to show racial intense to discriminate must be a very

1   high burden, and the plaintiffs have not come close to pleading

2   anything like that here.

3          Before getting to the facts, I want to make sure

4   that we're all on the same page as to what the controlling law

5   is.  The law allows governmental actors to adopt race-neutral

6   measures aware that -- of what the racial consequences might

7   be, and even with a motivation to help underrepresented

8   minorities.

9          The most recent Supreme Court case that sets forth

10  that proposition is the *Inclusive Communities* decision.  That's

11  the Texas Fair Housing Act case from 2015 where the majority

12  wrote in an opinion by Justice Kennedy, Local housing

13  authorities may choose to foster diversity and combat racial

14  isolation with race-neutral tools, and mere awareness of race

15  in attempting to solve the problem of facing inner cities does

16  not doom that endeavor at the outset.

17         And of course that opinion cited Justice Kennedy's

18  concurrence in the *Parents Involved* decision from 2007, which

19  is widely cited as the leading authority that collects the

20  relevant case law on this.  And Justice Kennedy said at pages

21  788 to 89 of his concurrence that, in the administration of

22  public schools by the state and local authorities, it is

23  permissible to consider the racial makeup of schools and to

24  adopt general policies to encourage a diverse student body one

25  aspect of which is racial composition.  And he goes on to offer

1  a number of examples of race-neutral measures that could be

2  adopted for the purpose of promoting racial integration.

3        The Coalition doesn't dispute that this is the

4  governing law.  It's been followed in four other circuits that

5  we've cited in our papers.  It was recently followed by Judge

6  Trenga in the *Loudoun County* case, the *Boyapati* decision.

7        The Coalition quibbles about whether Justice

8  Kennedy's concurrence is controlling under the Supreme Court's

9  decision in *Marks* which looks at whether a concurring opinion

10 with the plurality opinion provides the -- the controlling

11 authority.

12       We think that it is legally controlling, just to --

13 just so we're clear.  We think it is legally controlling

14 because the Supreme Court majority cited it for the same

15 proposition in the *Inclusive Communities* case.  But even if you

16 thought it were just *dicta*, the Fourth Circuit held in its 2019

17 *en banc* decision in the *Manning* case that in this circuit,

18 courts should follow *dicta* in concurring opinions that provide

19 the fifth vote under the *Marks* line of cases.

20       No -- moreover, not as -- the plaintiffs don't cite

21 any court that suggests that the principles of *Parents Involved*

22 should not apply.  So, that brings us to the motion to dismiss,

23 and the question is whether the plaintiffs have pleaded facts

24 sufficient to plausibly allege that the school board enacted

25 this policy for the purpose of harming Asian-Americans.

1            On a 12(b)(6) motion, as the Court is well aware,

2   you disregard conclusory assertions.  That's the teaching of

3   *Iqbal* and *Twombly*.  And where, as here, the plaintiff relies on

4   statements of school board members from public meetings, the

5   defendant can attach those statements, which we've done, and

6   those statements control over any kind of spin or puffing about

7   them in the complaint.  You look to the statements directly.

8            We filed with our motion to dismiss the declaration

9   of Cindy Smoot at ECF 22-4.  And Exhibit A to that declaration

10  sets out what the complaint alleges was said by the

11  superintendent and five of the 12 school board members, and

12  then what they actually said.  And we included the video clips

13  as Exhibit B to that declaration.

14           The Coalition cites the statements of only five of

15  the 12 board members who voted for the policy.  None of the

16  statements reflects any anti-Asian animus or an intent to

17  discriminate against Asian-Americans.

18           Now, it's important to focus on what the Coalition

19  concedes.  They concede -- and this is at page 25 of their

20  12(b)(6) opposition brief, ECF 25.  They concede that adopting

21  a race-neutral program with the hope of increasing enrollment

22  of Black and Hispanic students would not trigger strict

23  scrutiny.  Of course, that's fully consistent with *Parents*

24  *Involved*.

25           The concession is this:  Mere motive to increase

8

1  the representation of a particular racial group does not render

2  an action racially discriminatory for purposes of an *Arlington*

3  *Heights* analysis.

4      Given that concession, when you look at the

5  statements they attribute to board members and the

6  superintendent, they all fall into the safe harbor of

7  statements that at best show a desire to support an increased

8  enrollment of Black and Hispanic students at Thomas Jefferson

9  High School.  None shows an intent to discriminate against

10  Asian-Americans or to harm Asian-Americans.

11      Now, at this point the dispositive case becomes the

12  Supreme Court's decision in *Personnel Administrator versus*

13  *Feeney*.  That was the case where the Supreme Court upheld a

14  Massachusetts law that created hiring preferences for veterans.

15  Women plaintiffs sued and said, that law discriminates against

16  women because 98 percent of veterans are men.

17      And the U.S. Supreme Court said, no, no, it -- the

18  policy was not enacted to harm women.  It was enacted to help

19  veterans, and it doesn't matter that it's disproportionately

20  beneficial to men.  You have to show that it was enacted for

21  the purpose of harming women.

22      *Feeney* is cited by each of the four other circuits

23  that have followed *Parents Involved* as the rationale which

24  explains why helping underrepresented minorities doesn't mean

25  you're hurting others who are -- who are there.  And so it's

9

1  just not enough to plead discrimination against Asian-Americans
2  to say, well, the school board wanted to help underrepresented
3  Black and Hispanic students.

4          They've also failed to show how any aspect of the
5  new admissions policy could have a discriminatory impact on
6  Asian-American students.  *Inclusive Communities*, again, the
7  2015 Supreme Court case says, a disparate impact claim that
8  relies on a statistical disparity must fail if the plaintiff
9  cannot point to a defendant's policy or policies causing that
10  disparity.

11          They can't make that showing for any aspect to the
12  policy.  For example, how does eliminating the $100 application
13  fee disparately affect Asian-Americans, or increasing the
14  minimum GPA from 3.0 to 3.5, or eliminating the standardized
15  testing requirement, or eliminating the requirement that
16  students obtain two teacher recommendations?  None of those
17  things has a disparate impact on Asian-Americans.  And this
18  is -- their -- their best cases are -- which is that North
19  Carolina voting rights -- voting suppression case.  In each of
20  the measures that was struck down in *McCrory* was shown to have
21  a disproportionate impact on African-American voters.

22          So, for example, the elimination of the Souls to
23  the Poles early voting day overwhelmingly affected
24  African-American voters, and the legislature knew that.  And so
25  the evidence there was overwhelming.

1          Here, the plaintiffs have done nothing to tie any

2  aspect of this policy to a disparate impact on Asian-Americans,

3  with one possible exception.  They plead in paragraph 49 of

4  their complaint that -- that there would be a disparate impact

5  from the top 1.5 percent plan.  This is the portion of the

6  policy that says that students who are in the top 1.5 percent

7  of their middle schools will be given admission to TJ.

8          But the flaw there is that they assume that it's

9  a -- they assumed when they filed the complaint that the 1.5

10 percent plan operates as a cap or a ceiling on admissions from

11 middle schools and it doesn't.  It operates as a floor, so the

12 top 1.5 percent get in.

13          There's still a hundred seats left that are

14 unallocated, and folks -- students who are at the top of their

15 class but below the top 1.5 percent are still eligible for

16 admission to the school.  In any event, they haven't shown how

17 that discriminates against Asian-Americans or singles

18 Asian-Americans out.

19          They also use the wrong baseline for determining

20 whether there is discrimination against Asian-Americans.  They

21 want to use the baseline of how many -- what the percentage of

22 Asian-American students was in last year's class.  In the -- in

23 the complaint it sets out in the attached -- in the citations

24 to the documents on which it relies.

25          Data that shows that the student population in

1  Fairfax County is 19.5 percent Asian.  In 2019, 56 percent of

2  the students who applied for admission to TJ were Asian, and 73

3  percent were admitted.  The plaintiff's theory is, well, if we

4  think that there are going to be fewer than 73 percent in the

5  next year's class, that's a disparate impact.

6         That is not how disparate impact analysis works.

7  The First Circuit pointed that out in the -- in the *Boston*

8  *Parents Coalition* case just last month.

9         If they were right, that that's how it works, then

10 if you adopted a completely random lottery it would -- it would

11 result in a reduction in the percentage of Asian students in

12 the class.  That couldn't possibly be an equal protection

13 violation, but it would be under their theory, which it just

14 shows that their theory is wrong.

15        Now, they also advance this idea that a -- of a

16 zero-sum gain.  That if you admit an additional Black or

17 Hispanic student, you're going to admit one less or one fewer

18 Asian-American student.  That theory has a couple of

19 assumptions that are just wrong.  The first is that there is

20 some different rule for admission for Black and Hispanic

21 students than Asian students.  There's no different rule.

22        What -- their theory would be true if you had a

23 quota system.  So, for example, the *Bakke* case involving the

24 Davis Medical School.  There were 16 seats set aside for

25 minority applicants, and you could fairly make the argument

1  there that by guaranteeing a seat for a minority applicant

2  you're taking one away for a white applicant.

3          But here, there's no set-aside.  There's no quota.

4  All students compete on the same -- on the same equal footing,

5  and it's race-blind.  The top students get in regardless of

6  race.  As I said at the outset, the admissions evaluators don't

7  even know the race of the students.  And the class size

8  incidentally was increased from 480 students to 550 students,

9  so zero-sum theory just has no application here.

10          Last point on this before touching briefly on

11  standing.

12          The Coalition says, don't decide this on a 12(b)(6)

13  motion.  Let it go into discovery.  But in the words of the

14  Supreme Court in *Iqbal*, you can't unlock the doors to discovery

15  without pleading facts that plausibly allege that the defendant

16  engaged in intentional discrimination.

17          And of course, your colleague, Judge Trenga,

18  applied this principle in the *Loudoun County* case in *Boyapati*.

19  He granted the motion to dismiss the challenge to Loudoun

20  County's admissions policy changes just a few months ago, and

21  of course -- and that was even assuming for argument's sake

22  that the Loudoun policy would have a disparate impact on Asian

23  students.  He nonetheless found that there was no -- no

24  allegations pleaded of an intent to harm Asian-American

25  students, and again said, a desire to benefit underrepresented

1  minorities does not equal an intent to discriminate against

2  Asian-Americans.

3          An even better example may be *Ashcroft versus Iqbal*

4  where the Supreme Court set forth the standards for a 12(b)(6)

5  motion that we now -- you know, we all apply.  And you recall

6  in that case the plaintiff claimed that Attorney General

7  Ashcroft and FBI Director Mueller intended to discriminate

8  against him.  He was an Arab Muslim from Pakistan, and he said,

9  they intended to discriminate against me in the post-9/11

10  policies that were adopted that resulted in his being subject

11  to harsh interrogation tactics.

12          The -- the majority in *Iqbal* said, no, no.  The

13  much more plausible explanation for what happened was that

14  because the gentleman came from Pakistan and was connected

15  possibly with the 9/11 hijackers, that explains the policy much

16  more than an intent to discriminate on the basis of race or

17  ethnicity.

18          That was a much harder case than this one given

19  that there is zero evidence, zero allegations pleaded here of

20  an intent to discriminate on the basis of the students being

21  Asian-American.  So, that case clearly stands for the

22  proposition that a 12(b)(6) dismissal is appropriate.

23          Now, I'll touch briefly on associational standing.

24          We've argued that the Coalition lacks associational

25  standing principally because the members don't have the ability

Julie A. Goodwin, CSR, RPR

1    to control the decisions of the entity.  And we've -- you know,

2    we'll stand on our brief on that.  Think the law on that is

3    clear from the Supreme Court's decision in *Hunt* and from Judge

4    Cacheris' decision in *Heap*, but I acknowledge a dismissal for

5    lack of standing would be without prejudice.  If you have any

6    doubts about what the right answer is on that, we would ask you

7    to reach the merits and to decide the case and dismiss it with

8    prejudice on a Rule 12(b)(6) motion.  And in the event that

9    this case goes up on appeal, if the Court can see its way clear

10   to do it to deciding both issues, I think that would -- that

11   would be helpful to the Fourth Circuit.

12              Would you like me to yield and hear the -- so you

13   can hear the response to that in the PI motion, or should I

14   address the preliminary --

15              THE COURT:  You can do that.  We'll take them --

16              MR. RAPHAEL:  On the PI motion?  Yes.

17              So on the -- on the -- the plaintiff's -- and I

18   have only about maybe three or four minutes on this.

19              On the plaintiff's motion for a preliminary

20   injunction, they have to satisfy all four of the *Winter*

21   factors.  *Blackwelder* is no longer the test in this circuit.

22   I've addressed likelihood of success on the merits.  We think

23   you should dismiss the case.  That they -- the case is

24   meritless.

25              With regard to irreparable harm, we don't think

1   that the Coalition has demonstrated it.  Eighth graders who
2   applied to TJ are going to find out in just a few weeks if
3   they're getting in or not.  The application process is
4   race-blind.  There are no set-asides or reserved seats for
5   anybody, and I don't -- I don't think the plaintiffs can
6   plausibly show, and certainly not for a PI motion, how they're
7   about to be discriminated against on the ground that they are
8   Asian-American.
9          The balance of hardship clearly weighs against the
10  injunctive relief the plaintiffs are seeking.  3500 students
11  nearly, 3470, from a 130 middle schools have applied for
12  admission to TJ.  85 staff members of Fairfax County Public
13  Schools have been working virtually around the clock since
14  May 3rd processing those applications, including working on
15  weekends.  They estimate a total of 3400 personnel hours to do
16  that.
17         It's -- and the decisions are going to be mailed
18  out in -- in just a few weeks in June.  It's simply not
19  possible to revert to the old admission system at this point
20  for the new school year.  Two of the standardized tests that
21  the plaintiffs want reinstated, the last day to take them is
22  today and they won't be offered again until after September.
23  School starts August 23rd.
24         The other test you could order the school board to
25  administer, but they couldn't do it before mid-July.  And if

1    that happened, they wouldn't be able to -- they'd have to redo

2    the admissions process because the old process allowed students

3    with GPAs as low as 3.0 to apply, so you would have to reopen

4    it.  They couldn't finish it until mid-September at the

5    earliest, more likely October.

6            Again, school starts August 23rd.  And the cost of

7    that would be nearly $200,000.  $72,000 to administer the

8    Quant-Q exam, and then because the admissions evaluators would

9    have to work in the summertime when they're not on their -- an

10   annual contract, a year-long contract, the cost of that will be

11   nearly $120,000.  So, that totals $191,409.  And whether you

12   consider that is with a bond on that would be if they got an

13   injunction or as the harm to Fairfax County Public Schools, the

14   balance of hardship clearly weighs against the preliminary

15   injunction.

16           Public interest, likewise, weighs against a

17   preliminary injunction.  It's simply not in the public interest

18   to disrupt the expectations of 3500 students and their families

19   who have done everything that they believed was needed to apply

20   to TJ and they're just waiting to hear the news in a couple

21   weeks and they -- who would be forced to find other -- make

22   other plans and arrangements for the upcoming school year.

23           As the First Circuit just said in the *Boston Parent*

24   *Coalition* case, the public interest is best served by

25   forbidding defendants to finalize and communicate admissions

1    decisions, not by entering plaintiff's proposed injunction and

2    throwing the school admissions process into chaos.

3            Last point on this laches.  The plaintiff's delay

4    in bringing this suit and seeking a preliminary injunction is

5    really inexcusable.  We didn't -- we've raised this argument in

6    our opposition to their PI motion.  After that, we just

7    received the declarations they filed from Mr. Miller and

8    Ms. Nomani.  And if you take a look at paragraph 5 of those

9    declarations, they say that they founded the Coalition in

10   August 2020 because they -- they believed, quote, that the new

11   policy, quote, would discriminate against Asian-American

12   applicants.  They believed that in August of 2020.  The

13   no-testing decision was made on October 6, 2020.  The decision

14   to have the 1.5 percent plan was December 17th.

15           Why -- they -- they had one bite at the apple in

16   the *K.C.* case.  Fourteen of the Coalition's members brought

17   suit there on state law grounds, and the district -- the trial

18   Court denied the preliminary injunction motion because it was

19   too late to change things, and it wasn't in the public

20   interest.  And Judge Tran said they weren't likely to succeed

21   on the merits.

22           They waited another five weeks to file suit and

23   then six weeks after that to bring on the PI motion.  The delay

24   is inexcusable.  And as this Court said in *Perry versus Judd* in

25   an opinion that was affirmed by the Fourth Circuit, laches

1    applies with particular force in the context of preliminary

2    injunctions against governmental action, like we have here,

3    where litigants try to block imminent steps by the government.

4              And so for those reasons, we think you should

5    dismiss the complaint with prejudice and obviously deny the

6    preliminary injunction motion.

7              Thank you, Your Honor.

8              THE COURT:  All right.

9              MS. WILCOX:  Good morning, Your Honor.  And may it

10   please the Court.  My name is Erin Wilcox, and I represent the

11   plaintiff, the Coalition for TJ.

12             The Coalition for TJ alleges that defendants

13   intended to discriminate against Asian-American students when

14   they altered the admissions procedure at Thomas Jefferson High

15   School for Science and Technology.  These allegations are -- of

16   discriminatory purpose are sufficient to survive the motion to

17   dismiss, and they're sufficient to show likelihood of success

18   on the merits for a preliminary injunction.  So this Court,

19   with respect, we request this Court to grant a preliminary

20   injunction and to deny defendant's motion to dismiss.

21             Your Honor, on the merits, according to defendants,

22   Asian-American students are overrepresented at TJ compared to

23   the rest of the Fairfax County Public Schools.  And I would

24   like to be clear that overrepresented is just a nicer way of

25   saying that there are too many Asian-American students at TJ

1    and defendants would prefer there were fewer.  The Coalition

2    contends that defendants have changed the admissions policy at

3    TJ at least in part so that incoming -- the incoming TJ

4    freshmen class will have fewer Asian-American students in it.

5            Overrepresentation is not an acceptable reason for

6    racial discrimination in K through 12 admissions.  To succeed

7    an *Arlington Heights* claim, as the Coalition has alleged, the

8    Coalition must prove that the TJ admissions changes were due at

9    least in part to a racially discriminatory purpose.  These

10   changes, Your Honor, were made in part because of their adverse

11   impacts on Asian-American students and not just in spite of

12   those adverse impacts.  This is discriminatory intent, and that

13   is a violation of the equal protection clause.

14           Coalition has alleged numerous inference or

15   numerous evidence that would support an inference that the TJ

16   admissions process is motivated at least in part by a racially

17   discriminatory purpose.  These inferences are everywhere

18   starting with an e-mail from the TJ principal, Ann Bonitatibus,

19   urging TJ parents last June to consider the racial makeup of

20   TJ, and that it was not representative of its community, and

21   then going on to provide examples of what TJ's racial makeup

22   ought to be in order to be more representative of its

23   community.  That process ended with the passage of a racially

24   discriminatory process for TJ admissions in December.

25           The intent to discriminate against Asian-Americans

1   and the expected disparate impact shows up in the first draft

2   of their revised TJ admissions process that was presented last

3   September by Superintendent Brabrand.  That racial

4   consideration was so significant in that draft that the

5   school -- or that Superintendent Brabrand not only applied the

6   process to the class of 2025 and showed what its racial impacts

7   would be through a pie chart, but he went back and applied that

8   to the classes of 2015 and 2019 as well.  Those were outcomes

9   that they knew initially and were able to predict.

10              In all three cases, Asian-American enrollment and

11  only Asian-American enrollment decreased.  Discriminatory

12  impact was not only expected, it was intended.  When there are

13  a finite numbers of seats at TJ, you cannot intend to increase

14  seats for one race without expecting and knowing that that will

15  result in the decrease of another race.

16              Your Honor, while the defendant ceased modeling the

17  racial impact of its changes and later drafts, a Coalition for

18  TJ parent took on that work and crunched the numbers himself,

19  arriving at a 40 pursuit -- two percent decrease in

20  Asian-American students in the incoming class of 25 -- or 2025.

21  That would be this year's current 8th graders.

22              Race was mentioned more than just in passing.  It

23  was more than just one consideration.  It is the anchor of this

24  new admissions plan.  This plan was chosen because of its

25  impact on Asian-American enrollment and not in spite of it.

1           The historical backgrounds and other *Arlington*

2 *Heights* factors supports this.  Coming back from a working

3 session in the summer, TJ's principal and a board member were

4 charged with increasing diversity at Governor's Schools.  That

5 was the topic of the work session.

6           The Virginia Secretary of Education charged all

7 Governor's Schools with presenting a plan to increase their

8 diversity last year.  So against this backdrop, TJ went much

9 further -- the defendants went much further than just a simple

10 form on how to increase diversity at TJ.  They revamped the

11 entire process.

12           Throughout multiple meetings with the community

13 through the fall and with multiple school board meetings and

14 work sessions, balancing TJ was discussed.  Racial

15 proportionality was discussed and at the tip of everyone's

16 mind.

17           And, Your Honor, irregularities in that process are

18 also a factor that supports an inference of racial intent.  The

19 TJ admissions test, the objective measure of merit that had

20 been in place for several years and that students were

21 expecting to take in Oct -- or in November of last year, was

22 eliminated at a school board work session one month before the

23 test was set to be administered.  As defendants point out, this

24 is not illegal under Virginia policy, but it's certainly

25 irregular and certainly a datapoint to support something

1   unusual.

2           Your Honor, the 1.5 percent plan was ultimately

3   adopted with apparently little warning given to school board

4   members.  One commented that she hadn't seen that plan until

5   4:30 that afternoon.  These are unusual and irregular

6   procedures for a massive change that affected so many students

7   and so much of the community surrounding TJ.

8           And finally, Your Honor, we do have the statements

9   and comments surrounding these change at TJ that went on

10  throughout the fall and into the winter of last year.  Your

11  Honor has been provided with those comments and they stand on

12  their own, but there's little doubt that when you read the

13  context, to understand the context of those statements, that

14  race was in the forefront of the decision maker's mind as they

15  were revamping the TJ process.

16          And, Your Honor, I will touch briefly on their

17  preliminary injunction as well, if that's all right.

18          THE COURT:  Go ahead.

19          MS. WILCOX:  Sure.

20          So, Your Honor, to truly return the Coalition to

21  its last uncontested status with defendants would require the

22  Court to reinstate the TJ admissions process prior to last

23  October.  We understand that that is a difficult and a

24  complicated request.  We are asking you to do it anyways

25  because of the rights that are at stake here.

1          Right now there are 8th graders whose applications

2   to TJ are pending under a process that discriminates based on

3   the race -- color of your skin.  But, Your Honor, I would also

4   like to point out, in our briefing we've provided some other

5   options for the Court to consider.  Notably, if the Court finds

6   that returning to the prior admissions process for this round

7   of 8th grade applicants is not possible, then eliminating the

8   1.5 percent plan would still relieve some of the injustice that

9   is being visited upon those Asian-American applicants.

10          But, Your Honor, we've also requested that -- or

11  want to draw the Court's attention really to the fact that the

12  current year 7th graders will be 8th graders starting in August

13  and will be applying to TJ this fall, so in about six months

14  they will be submitting their TJ applications.  And there is

15  time, we believe, before those students engage in the TJ

16  admissions process to return to the last uncontested admissions

17  process in time for the defendants to put that in place, which

18  would happen during a school year and not during the summer.

19  And of course, that would apply to future rounds of students as

20  long as this litigation is pending.

21          And with that, Your Honor, thank you.

22          THE COURT:  All right.  What do you say about the

23  standing issue?

24          MS. WILCOX:  Your Honor, on the standing issue, the

25  Coalition for TJ is a traditional membership organization.  We

1  don't believe you even need to look to the -- whether it has

2  the traditional -- or features of a membership organization

3  because it is a membership organization.

4          As we've alleged in our complaint and buttressed by

5  the declarations of Ms. Nomani and Mr. Miller, the Coalition

6  for TJ has members.  It has three tiers of members.  It has a

7  leadership structure.  Members communicate regularly through a

8  telegram chat app.  They hold events and have all of the basic

9  traditional functions of a membership organization.

10          When members have disagreed with the mission of the

11  organization in the past, they're free to leave.  So we believe

12  that there is no question that the Coalition for TJ is a

13  traditional membership organization.  It has demonstrated

14  associational standing.

15          THE COURT:  All right.

16          MS. WILCOX:  Thank you.

17          MR. RAPHAEL:  It's not enough to say we've alleged

18  intentional discrimination.  You have to plead facts that

19  plausibly show intentional discrimination against

20  Asian-Americans, and I don't think the plaintiffs have really

21  responded to that problem.  They -- they have conceded that an

22  effort to help underrepresented Black and Hispanic students

23  does not equal intentional discrimination against

24  Asian-Americans.  And when Your Honor -- if you haven't had a

25  chance to look at it, if you look at the -- Exhibit A to

1   Ms. Smoot's declaration at ECF 22-4, it sets out what the

2   complaint says and then what the actual statements are, and the

3   actual statements control over what the complaint says.

4           Here's a good example.  Paragraph 45 accuses Board

5   Member Meren of, quote, going a step further and describing the

6   majority Asian-American TJ culture as toxic for Black students.

7           What Meren actually said is, We've heard from a

8   student who I have spoken with many times now who tried to

9   bleach her skin because she didn't feel welcome as a Black

10  student in the school.  It's toxic for those students who feel

11  left out.

12          So, the characterizations of these statements are

13  incorrect, and not one of these statement shows discrimination

14  against Asian-Americans or an intent to harm Asian-Americans.

15          I heard no response by Ms. Wilcox to the -- to the

16  overarching the -- the elephant in the room here, which is that

17  the policy not only prohibits the use of race; the admissions

18  evaluators don't know who -- don't know the race of the

19  applicants.  The plaintiff has provided no explanation for how

20  that could possibly result in something that is racially

21  discriminatory, and they haven't explained how even the 1.5

22  percent plan could have a disparate impact on -- on Asian

23  students.

24          There is a statement Ms. Wilcox made about

25  referencing their -- their allegation, and they've got a

1   declaration from a parent whose last name is Verma that

2   predicts a 42 percent reduction in Asian-Americans.  The

3   plaintiffs have no response to what we said about the problems

4   with that in our papers, which are Verma assumed that the 1.5

5   percent plan would operate as a cap.  It doesn't.  It's a

6   floor.  And also provides no work product, that no -- doesn't

7   show his work.  We have no idea how they came up with that

8   projection.

9          There has -- you heard nothing from Ms. Wilcox to

10  explain how any aspect of this policy could have a disparate

11  impact on Asian-Americans.

12         With regard to the claim of a procedural

13  irregularity, they say, well, the no-testing decision was

14  adopted at a school board work session, not a regular meeting.

15  They can see that that wasn't illegal, but they say it was

16  rushed.

17         You heard no response to what we said about that,

18  which is there's a good reason for why the board acted on

19  October 6th.  The tests were to be taken in November, and it

20  takes time to order them, and students have to preregister for

21  them.  So that's a much more plausible explanation for the

22  timing than some desire to discriminate against

23  Asian-Americans.  It's not like another case that they -- was

24  their lead case in their briefing but you didn't hear mentioned

25  here, the *McCrory* case.  That's the North Carolina voting

1   suppression case where what was procedurally irregular there
2   was the day after Shelby County came down from the Supreme
3   Court that eliminated the pre-clearance requirement, the
4   legislature rushed to pass a voter suppression bill and -- and
5   that was a procedural irregularity that actually bore upon
6   discriminatory effect or an intent.  You have nothing like that
7   in this case.

8           There -- there is just no -- no allegation anywhere
9   in the complaint that shows an intent to harm Asian-Americans
10  or to prejudice against Asian-Americans.

11          And then last point on standing, you heard no
12  response to the problem that we've made, that we've pointed out
13  is the main problem, and that is the members don't have control
14  over the decisions of the entity.  And that's a fundamental
15  requirement under *Hunt*, and he -- but we would ask you to
16  decide both issues and to dismiss the case with prejudice.

17          Thank you.

18          THE COURT:  Well, they have allegations here that
19  there are a limited number of positions at TJ, so that this
20  desire to -- for diversity or for racial mixing goes at the
21  majority of the students who are there now, or the biggest
22  group of students who are there now, and that this has been
23  intentionally done.  And while you -- you say that the policy
24  itself states that it's going to be race-neutral, everybody
25  knows that the policy is not race-neutral, and it's designed to

1   affect the racial composition of the school.

2        MR. RAPHAEL:  So assuming all of that is true, under

3   *Parents Involved*, it is -- does not trigger strict scrutiny.

4   That's the holding of *Parents* -- of the concurrence in *Parents*

5   *Involved* and the four other circuits.  Race consciousness does

6   not trigger strict scrutiny.  What triggers strict scrutiny is

7   if you treat a particular individual differently because of

8   their race on purpose, and that's not happening here.  And then

9   it's also not a limited number of --

10       THE COURT:  Well, if -- if this policy -- it seems to

11  me that they're alleging that this school board has come up

12  with a policy that is directly aimed at reducing the number of

13  Asian students at TJ.  And that can be done in a variety of

14  ways without just simply coming out and limiting the race of

15  the people that are there.

16           I don't know the numbers in these schools or -- but

17  I'm sure that you can change the numbers as to the -- how they

18  affect each school and each geographical area, and you could

19  probably come up with whatever you intended to do.  And they

20  have some statements here that seem to indicate that that's

21  what it's about.  We want more diversity, so that means we want

22  less Asians here.

23       MR. RAPHAEL:  Well, but -- so we want more diversity,

24  that statement is fine.  Right?  That that -- they concede that

25  at page 25 of their opposition brief.  Under *Parents Involved*,

1 | wanting more diversity is --

2 |      THE COURT:  Well, it's not the statement that bothers

3 | me.  It's what they're doing and how it affects the Asian

4 | composition of the school.

5 |      MR. RAPHAEL:  Yeah.  Well, so --

6 |      THE COURT:  I mean, you can say all sorts of good

7 | things while you're doing others.

8 |      MR. RAPHAEL:  Well, but, again, why wouldn't that

9 | argument have applied in *Feeney* where the veterans preferences

10 | reduced -- you know, benefitted 92 percent of veterans were

11 | men, but they weren't -- it wasn't adopted to harm women.

12 |      You have to show an intent to harm Asian-Americans.

13 | Wanting to help underrepresented minorities isn't enough, and

14 | that's the holding of all the cases we've cited:  *Parents*

15 | *Involved*, the First Circuit, Third Circuit, Fifth Circuit,

16 | Sixth Circuit, all of those cases say that.  It's -- and if

17 | you -- it's fine to try to plead intentional discrimination

18 | against Asian-Americans, but you have to allege facts that

19 | plausibly show that.  And when you look at the statements that

20 | they've cited in table -- in Exhibit A -- just please take a

21 | look at that because the facts -- none of the statements

22 | actually suggest an intent to harm Asian-Americans.

23 |      Last point on this.  Suppose when law schools

24 | didn't admit women and they were ordered to admit women under

25 | the Equal Protection Clause, could a -- a male or a minority

1  male have said, this is hurting my chances of getting in now

2  because you're letting women in?  Of course not.  The intent is

3  not to discriminate against people who are there who are in the

4  majority.  It's the -- at best an intent to help

5  underrepresented students.  That does not trigger strict

6  scrutiny.

7         And that's where I think we really part company

8  with the plaintiffs.  I mean, they -- they've conceded the

9  legal point.  They've conceded that Justice Kennedy's

10  concurrence in *Parents Involved* is right.  So in order -- so

11  nothing that says we want to help underrepresented Black and

12  Hispanic students, that is not enough to trigger strict

13  scrutiny.  You have to show an intent to harm Asian-Americans.

14  And if they haven't pleaded that, they can't get in the door on

15  it.  And that's really the critical, legal distinction here,

16  Your Honor.

17         THE COURT:  All right.

18         Do you want to respond?

19         MS. WILCOX:  I would love to.  Thank you, Your Honor.

20  Just a couple of things.

21         First, I do want to make clear, though, we are not

22  conceding that *Parents Involved* that Justice Kennedy's

23  concurrence is controlling.  The only controlling part of that

24  opinion is on narrow tailoring, and so we would not concede

25  that the compelling interest section of his concurrence is

1    controlling on this Court or any other.

2            Your Honor, also, I would like to point out that

3    *McCrory* tells us that animus is not required for a finding of

4    discriminatory intent, only that the school board acted

5    intentionally to discriminate against Asian-Americans, but

6    there's no requirement that the school board had racist or any

7    kind of animus towards or was feeling racist or had any kind of

8    animus towards Asian-Americans.

9            Your Honor, regarding Mr. Verma, Himanshu Verma's

10   declaration and his findings, it's -- it doesn't matter whether

11   the 1.5 percent plan is a floor or a ceiling or a cap.  What

12   matters is that it is a policy put in place that acts as a

13   proxy, a geographic proxy, essentially, for race, and it is

14   really targeting with excellent precision Asian-American

15   students who attend certain middle schools.  Those middle

16   schools are getting drastically reduced numbers of seats at TJ.

17   And anyone who's left over from those middle schools who

18   doesn't fit into that 1.5 percent, which I should also point

19   out is not a pure ranking as best we can tell.  It's not just

20   based on who has the highest GPA in those middle schools

21   because there are other holistic factors that the decision

22   makers will be considering.  But whoever is left over after

23   that 1.5 percent, goes into this unallocated pool of seats that

24   competes against private school students, that competes against

25   home school students and everybody else who's left.  So it's

1   really these students who are Asian and attend high performing

2   middle schools, these advanced academic center middle schools

3   are really doubly being targeted because of their -- their race

4   and abilities.

5           Your Honor, regarding the standing, touching on

6   that with the Coalition for TJ, there's no hard and fast

7   requirement that, for example, to be a membership association

8   you have to hold a vote, or there could be associations with

9   very strict rules and policies where members have very little

10  to no control over their leadership or the leadership's

11  decisions.

12          The Coalition for TJ tends to, as Ms. Nomani and

13  Mr. Miller testified, tends to operate by consensus.  That's

14  how they work.  But they still maintain a membership structure.

15  The members still converse and debate and engage with all

16  levels of leadership and membership on their decisions.  And I

17  think there is simply no evidence that their leadership -- or

18  the members have no control over their leadership.

19          And, Your Honor, last point that I would like to

20  make.  As far as canceling the admissions test one month before

21  it occurred, if only one month was all it took to prepare this

22  entire test and get that ready to go, then I think that might

23  lean towards considering how difficult it would be to

24  re-implement that test in future for future years of students.

25          All right.  Thank you, Your Honor.

1          THE COURT:  All right.  Thank you.

2          MR. RAPHAEL:  May I make one response?

3          THE COURT:  You may use 30 seconds.

4          MR. RAPHAEL:  Yes, Your Honor.

5          On *McCrory*, *McCrory* does not stand for the

6    proposition that Ms. Wilcox says.  She says, you don't have to

7    show animus.  That's not exactly right.  What *McCrory* said is,

8    we're not saying the legislature necessarily had racial hatred

9    against Black people.  The legislature defended the decision by

10   saying, they -- they -- they adopted these suppression moves

11   because they wanted to discriminate against Democrats, and most

12   Black voters vote Democrat.

13          The Court said, that's -- that's still

14   discrimination on the basis of race.  That's intentional

15   discrimination, and that's absent in this case.  No factual

16   allegations to show it.

17          Thank you, Your Honor.

18          THE COURT:  All right.

19          Well, I am -- as far as the standing issue is

20   concerned, I'm satisfied that this is a voluntary association

21   with members that set out to accomplish or be involved in some

22   common purpose and that they do have every right to bring this

23   lawsuit.

24          As to the motion to dismiss, I find that the -- the

25   plaintiff has stated a claim that can go forward.  Some of your

1  arguments are well taken as far as the defendants here are

2  concerned, but I believe the plaintiff has made sufficient

3  allegations to go forward and to sort out the facts of the

4  case.  So the motion to dismiss will be denied.

5          And as to injunctive relief, obviously there is --

6  some harm is going to come to the plaintiffs here as far as the

7  applications and who may or may not get into school.  There is

8  also some irreparable harm that's going to come to the

9  defendants if I start enjoining a process that seems to be

10  completed and can't really be reworked.

11          I listened and thought about your alternative

12  remedies of reducing the one percent and 1.5 percent

13  requirement or getting rid of that, and I couldn't enjoin that.

14  I'm not sure what that would call for.  Sometimes there are a

15  lot of unintended consequences of things that you do or try to

16  do and try not to do.

17          And again, to try to do it for the incoming

18  students for the following year, it would be the same kind of

19  thing, it seems to me, and probably not necessary.  I mean,

20  this pandemic has slowed us down a little bit, but we can move

21  cases pretty quickly here and get them to trial and get them

22  resolved.

23          So, for those reasons -- and I'll just mention the

24  public interest.  I believe in this case that the -- that the

25  public -- Fairfax public and Fairfax County has an interest in

1  seeing that their schools operate in an orderly fashion and not

2  be interrupted.  So I think that the balance of hardship here

3  or harm, the entry of an injunction would harm the defendants

4  more than they -- they would the plaintiffs.  So I'm going to

5  deny the request for a preliminary injunction.  And if you-all

6  get about working this case, well, we can move it along pretty

7  quickly I believe you'll find.

8         MR. RAPHAEL:  The only remaining item, Your Honor, was

9  we also moved to dismiss the division superintendent in his

10 official capacity as duplicative.  I don't think that's

11 disputed.

12        THE COURT:  He will be dismissed in that capacity.

13        MR. RAPHAEL:  Thank you, Your Honor.

14        THE COURT:  All right.  Thank you-all.

15         All right.  We'll adjourn until Monday morning at

16 10:00 o'clock.

17        THE LAW CLERK:  All rise.

18         (PROCEEDINGS CONCLUDED AT 11:01 A.M.)

19                        -oOo-

20

21

22

23

24

25

36

1  UNITED STATES DISTRICT COURT    )

2  EASTERN DISTRICT OF VIRGINIA     )

3

4           I, JULIE A. GOODWIN, Official Court Reporter for

5  the United States District Court, Eastern District of Virginia,

6  do hereby certify that the foregoing is a correct transcript

7  from the record of proceedings in the above matter, to the best

8  of my ability.

9           I further certify that I am neither counsel for,

10 related to, nor employed by any of the parties to the action in

11 which this proceeding was taken, and further that I am not

12 financially nor otherwise interested in the outcome of the

13 action.

14           Certified to by me this 20TH day of JUNE, 2021.

15

16

17

18                      __/s/_____

19                      JULIE A. GOODWIN, RPR
                        Official U.S. Court Reporter
20                      401 Courthouse Square
                        Eighth Floor
                        Alexandria, Virginia  22314

21

22

23

24

25