**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

COALITION FOR TJ,

<em>Plaintiff</em>,

<em>v.</em>

FAIRFAX COUNTY SCHOOL BOARD,

<em>Defendant</em>.

Civil No. 1:21-cv-00296-CMH-JFA

<u>BRIEF OF AMICI CURIAE</u>
<u>TJ ALUMNI FOR RACIAL JUSTICE,</u>
<u>VIRGINIA STATE CONFERENCE OF THE NAACP,</u>
<u>CASA VIRGINIA,</u>
<u>HISPANIC FEDERATION,</u>
<u>ASIAN AMERICAN YOUTH LEADERSHIP EMPOWERMENT AND
DEVELOPMENT, AND</u>
<u>NATIONAL KOREAN AMERICAN SERVICE & EDUCATION CONSORTIUM
VIRGINIA</u>

## TABLE OF CONTENTS

Page(s)

INTEREST OF AMICI CURIAE .................................................................................... 1

INTRODUCTION ........................................................................................................... 2

I.     TJHSST's Revised Admissions Policy Has Eliminated Barriers and
       Increased Access for All Students ...................................................................... 4

II.    Plaintiff Is Unlikely To Succeed on the Merits. ............................................... 8

       A.     TJHSST's Race Neutral Admissions Policy Has No Discriminatory
              Motive, and, Therefore, Does Not Trigger Strict Scrutiny ..................... 8

       B.     The Change In The Admissions Policy Would Pass Constitutional
              Muster Under Any Standard of Review.................................................. 15

III.   Plaintiff Cannot Show that the Balance of Hardships Weighs In Their
       Favor Or That An Injunction Would Be In the Public Interest And,
       Therefore, Fails To Establish The Requirements For A Preliminary Injunction............. 17

       A.     Plaintiff Requests A Preliminary Injunction That Would Deny
              Equal Opportunities To Many Asian American Students..................... 18

       B.     A Preliminary Injunction Would Further Deny Equal Opportunities
              To Black, Latinx, ELLs, and Economically Disadvantaged Students. ................ 23

CONCLUSION................................................................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Assoc. for Educ. Fairness v. Montgomery Cnty. Bd. Of Educ.*,
No. 8:20-cv-2540 (D. Md. Sept. 1, 2020) ...............................................................................10

*Boyapati v. Loudon Cty. Sch. Bd.*,
No. 1:20-cv-01075, 2020 WL 6797365 (E.D. Va. Oct. 7, 2020) ...........................................17

*Boyapati v. Loudoun Cty. Sch. Bd.*,
No. 1:20-cv-01075, 2021 WL 943112 (E.D. Va. Feb. 19, 2021) ......................................15, 24

*Bush v. Vera*,
517 U.S. 952 (1996) ................................................................................................................13

*Christa McAuliffe Intermediate Sch. PTO, Inc. v. de Blasio*,
364 F. Supp. 3d 253 (S.D.N.Y.), *aff'd*, 788 F. App'x 85 (2d Cir. 2019) ................................15

*Christa McAuliffe Intermediate Sch. PTO, Inc. v. de Blasio*,
No. 1:18-cv-11657 (S.D.N.Y. Dec. 13, 2018) ........................................................................10

*City of Richmond v. JA Croson Co.*,
488 U.S. 469 (1989) ................................................................................................................13

*Doe v. Lower Merion Sch. Dist.*,
665 F.3d 524 (3d Cir. 2011) ...................................................................................................14

*Anderson ex rel. Dowd v. City of Boston*,
375 F.3d 71 (1st Cir. 2004) .....................................................................................................16

*Hart v. Cmty. Sch. Bd. of Brooklyn, New York Sch. Dist. # 21*,
536 F. Supp. 2d 274 (E.D.N.Y. 2008) ....................................................................................10

*Hecht Co. v. Bowles*,
321 U.S. 321 (1944) ................................................................................................................24

*Lewis v. Ascension Par. Sch. Bd.*,
806 F.3d 344 (5th Cir. 2015) ..................................................................................................11

*Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*,
551 U.S. 701 (2007) .......................................................................................................... *passim*

*Personnel Adm'r of Massachusetts v. Feeney*,
442 U.S. 256 (1979) ..........................................................................................................11, 12

*Real Truth About Obama, Inc. v. FEC*,
575 F.3d 342 (4th Cir. 2009), *vacated on other grounds*, 559 U.S. 1089
(2010), *reinstated in relevant part*, 607 F.3d 355 (4th Cir. 2010) ...................................8, 17

*Regents of Univ. of California v. Bakke*,
438 U.S. 265 (1978) ...................................................................................................10, 12, 16

*D.S. ex rel. S.S. v. New York City Dep't of Educ.*,
255 F.R.D. 59 (E.D.N.Y. 2008) ................................................................................................10

*Spurlock v. Fox*,
716 F.3d 383 (6th Cir. 2013) ...............................................................................10, 11, 14

*Texas Dep't of Housing and Comm. Affairs v. Inclusive Comms. Project, Inc.*,
576 U.S. 519 (2015) ...................................................................................................................13

*United States v. Alamance-Burlington Bd. of Educ.*,
640 F. Supp. 2d 670 (M.D.N.C. 2009) .............................................................................10, 18

*United States v. Hayes*,
515 U.S. 737 (1995) ...................................................................................................................11

*Village of Arlington Heights v. Metropolitan Housing Dev. Corp.*,
429 U.S. 252 (1977) ...............................................................................................................9, 16

*Winter v. NRDC, Inc.*,
555 U.S. 7 (2008) ...................................................................................................8, 17, 18, 24

**Statutes**

42 U.S.C. § 4000d(b) ...................................................................................................................18

Civil Rights Act Title VI .............................................................................................................18

Va. Code Ann. § 2.2-3902 ...........................................................................................................18

Virginia Human Rights Act ..........................................................................................................18

**Other Authorities**

34 C.F.R. § 100.3(b)(2) ...............................................................................................................18

2020 ASIAN AMERICAN VOTER SURVEY (AAVS),
https://aapidata.com/2020-survey/ ..............................................................................................1

Fairfax County Association for the Gifted, TJHSST Admissions Statistics,
http://www.fcag.org/tjstatistics.shtml .......................................................................................22

FCPS, *Fairfax County Public Schools Announces Standards of Learning Data in Line with Pandemic Tends Felt Across Region* (Aug. 26, 2021), https://www.fcps.edu/news/fairfax-county-public-schools-announces-standards-learning-data-line-pandemic-trends-felt ...................................................................17

Hala Elhoweris et al., *Effect of children's ethnicity on teachers' referral and recommendation decisions in gifted and talented programs*, 26 Remedial and Special Education at 25–31 (2005) ...........................................................................................9

Hannah Natanson, *Standardized testing scores drop in Virginia, reflecting impact of pandemic*, WASH. POST (Sept. 2, 2021) https://www.washingtonpost.com/local/eucation/virginia-school-exams-sol-scores-covid/2021/09/01/781483a2-0b4f-11ec-aea1-42a8138f132a_story.html ....................17

*Here We Go Again: Tests for the Common Core May Be Unfair to Some and Boring to All*, HISTORY NEWS NETWORK (Nov. 18, 2014), https://historynewsnetwork.org/blog/153543 .............................................................9

J. Rosner, *The SAT: Quantifying the Unfairness Behind the Bubbles*, in SAT WARS: THE CASE FOR TEST-OPTIONAL COLLEGE ADMISSIONS 134 (Joseph A. Soares 2015) ...........................................................................................9

Jennifer Glynn, *Opening Doors: How Selective Colleges and Universities Are Expanding Access For High Achieving, Low-Income Students*, Jack Kent Cooke Foundation (2020), https://www.jkcf.org/research/opening-doors-how-selective-colleges-and-universities-are-expanding-access-for-high-achieving-low-income-students/ .........................9

Letter from Department of Education, Office for Civil Rights to Coalition of the Silence and NAACP-Fairfax (Sept. 25, 2012), https://coalitionofthesilence.files.wordpress.com/2012/10/cp-tj-notif-letter-pdf.pdf................................................................................................................6

Loudoun County Public School Profiles, https://dashboards.lcps.org/extensions/Dashboards/SchoolProfiles.html...............................22

M. Gentry, A. Gray, G.W. Whiting, Y. Maeda, & N. Pereira, *Access denied/system failure. Gifted education in the United States: Laws, access, equity, and missingness across the country by locale, Title I school status, and race* (2019), https://www.dropbox.com/s/0lxzznnyh5u0jj1/Access%20Denied.pdf ....................................2

M. Santelices et al., *Unfair Treatment? The Case of Freedle, the SAT, and the Standardization Approach to Differential Item Functioning*, 80 HARV. EDUC. REV. 106, 126 (2010), https://eric.ed.gov/?id=EJ930622 ...........................................................9

Nancy E. Dowd, *Children's Equality Rights: Every Child's Right to Develop to their Full Capacity*, 41 CARDOZO L. REV. 1367, 1400 (2020) ................................................24

R. Freedle, *Correcting the SAT's Ethnic and Social-Class Bias: A Method for Reestimating SAT Scores*, 73 HARV. EDUC. REV. 1 (2003), http://www.hepgjournals.org/doi/pdf/10.17763/haer.73.1.8465k88616hn4757?code=hepg-site ...................................................................................................9

*TJHSST Admissions Class of 2024 by Middle School*, http://www.fcag.org/ClassOf2024TotalsbySchool.xlsx .......................................................3

*TJHSST Admissions Class of 2025 by Middle School*, http://www.fcag.org/tjstatistics.shtml ...................................................................................3

*TJHSST Offers Admission to 486 Students* (2020), http://www.fcag.org/TJ%20Admissions%20class%20of%202024.pdf (showing demographic data for the TJHSST class of 2024) ......................................................3

*TJHSST Offers Admission to 500 Students; Broadens Access to Students Who Have an Aptitude for STEM* (June 23, 2021), https://www.fcps.edu/news/tjhsst-offers-admission-550-students-broadens-access-students-who-have-aptitude-stem .............................................................................5, 7

U.S. Dep't of Education, Office for Civil Rights, *Education in a Pandemic: The Disparate Impacts of COVID-19 on America's Students* (June 9, 2021), https://www2.ed.gov/about/offices/list/ocr/docs/20210608-impacts-of-covid19.pdf .........................................................................................................................17

VA Dep't of Educ., 2020-21 Fall Membership Reports, https://p1pe.doe.virginia.gov/buildatable/fallmembership .........................................14, 19, 21

VA Dep't of Educ., 2020-21 Fall Membership Reports, https://p1pe.doe.virginia.gov/buildatable/fallmembership ............................................3, 19, 21

VA Dep't of Educ., School Quality Profiles, Thomas Jefferson High for Science and Technology, https://schoolquality.virginia.gov/schools/thomas-jefferson-high-for-science-and-technology#fndtn-desktopTabs-enrollment .........................................23

THE VALIDITY OF TESTING IN EDUCATION AND EMPLOYMENT (Eileen Rudert, ed., 1993) ........................................................................................................................................8

VDOE Fall Membership Build-A-Table, https://p1pe.doe.virginia.gov/apex/f?p=180:1:13562355156285:SHOW_REPORT:::: ...............................................................................................................................20

W. Kidder et al., *How the SAT Creates "Built-In Headwinds": An Educational and Legal Analysis of Disparate Impact*, 43 SANTA CLARA L. REV. 131, 146, 156-57 (2002) ................................................................................................................................9

Wilfred U. Codrington, III, *The Benefits of Equity in the Constitutional Quest for Equality* ...............................................................................................................................24

## INTEREST OF AMICI CURIAE

Amici curiae TJ Alumni for Racial Justice, Virginia State Conference of the NAACP, CASA Virginia, Hispanic Federation, Asian American Youth Leadership Empowerment and Development ("AALEAD"), and National Korean American Service & Education Consortium Virginia ("NAKASEC VA") (collectively, "Amici") are community-based nonprofit organizations that promote equality of opportunity for all, including in education.[1] Amici each have an interest in supporting equal access to Thomas Jefferson High School for Science and Technology ("TJHSST"), and in offering the perspective of allied communities of color that appropriate efforts to equalize opportunities and foster diversity are beneficial and do not contravene the Equal Protection Clause.[2] Amici file this brief to explain that controlling precedent forecloses the grant of Plaintiff's proposed preliminary injunction because Plaintiff is unlikely to prevail on the merits, the balance of the hardship weighs against Plaintiff, and the preliminary injunction would not be in the public interest.

---

[1] A complete description of Amici TJ Alumni for Racial Justice, NAKASEC VA, Virginia State Conference of the NAACP, CASA Virginia, and Hispanic Federation can be found in the previously-filed Unopposed Motion for Leave to File Brief as Amici Curiae (ECF 27) and is incorporated herein by reference.  Further, AALEAD supports low-income and underserved Asian Pacific American youth, including in Fairfax County, Virginia, with educational empowerment, identity development, and leadership opportunities through after-school, summer, and mentoring programs.  *See* Declaration of Akil Vohra, Executive Director of AALEAD ("Vohra Decl."), Exhibit 2 hereto, at ¶¶ 5–8.

[2] *See, e.g.,* 2020 ASIAN AMERICAN VOTER SURVEY (AAVS), https://aapidata.com/2020-survey/ (noting that over 70% of Asian Americans polled as part of the 2020 Asian American Voter Survey supported programs designed to help Black and other minority communities obtain greater access to higher education).

# INTRODUCTION

The Fairfax County School Board ("FCSB") has a responsibility to ensure that all students have fair and equal access to the unquestionably valuable educational opportunity to attend TJHSST, a public, taxpayer-supported regional Governor's School intended to serve gifted students.  That responsibility is also governed by federal and state anti-discrimination laws, which prohibit excluding and unfairly disadvantaging students in protected classes.  Yet for well over a decade, stark racial disparities in TJHSST admissions persisted, and Black and Latinx students were less than 5% of those admitted.  *See* Table 1, *infra*.  Recognizing its failures to identify Black and Latinx students across five school divisions with the aptitude to excel at TJHSST,[3] FCSB endeavored to fulfill its responsibility to ensure fair and equal access through race-neutral improvements to TJHSST's admissions procedures that benefit all communities eligible to attend TJHSST.  These improvements have led to considerable progress in making the admissions policy more equal, while maintaining the academic excellence that has distinguished TJHSST. Now, there is greater student body diversity in TJHSST's class of 2025 among Black, Latinx, Asian, white, economically disadvantaged students, English language learners, female students, and historically excluded schools than in prior years.  As Amici explain in Section I of this brief, TJHSST's revised admissions policy provides students from all middle schools and from myriad backgrounds, including a more representative cross-section of the Asian American community, a fairer opportunity for admission.

---

[3] Indeed, the research supports this inference.  *See, e.g.*, M. Gentry, et al., *Access denied/system failure. Gifted education in the United States: Laws, access, equity, and missingness across the country by locale, Title I school status, and race* (2019), https://www.dropbox.com/s/0lxzznnyh5u0jj1/Access%20Denied.pdf (showing that schools fail to identify 63-74% of gifted Black students and 53-66% of gifted Latinx students for known, correctable reasons).

Plaintiff recognizes that "[d]enying students the chance to compete for the opportunity to attend TJ[HSST] on a level playing field because of their race" is a significant injury.  ECF 59, Pl.'s Mem. at 29.  But what Plaintiff ignores is that the rules were patently unfair to many qualified students and denied them an equal opportunity to compete. Plaintiff alleges harm to Asian American students based on a decline in admissions from just four schools[4]—schools that have comparatively low percentages of economically disadvantaged students[5]—but whose students comprised 39% of those admitted to TJHSST's class of 2024.[6] By focusing on only these four middle schools, Plaintiff obscures the interests of many other qualified students, including a number of Asian American students, at 121 of the 125 (97%) area public and private schools.[7] In seeking a preliminary injunction yet again, Plaintiff would have FCSB abdicate its responsibility to make the rules fair for *all* students, including low-income Asian Americans and students attending historically underrepresented middle schools. As Amici demonstrate in Sections I and III, Plaintiff's narrow focus on a small slice of the population—and attempts to label measures to expand access for all students as "anti-Asian"—are not only misguided, they simply do not reflect

---

[4] VA Dep't of Educ., 2020-21 Fall Membership Reports, https://p1pe.doe.virginia.gov/buildatable/fallmembership (showing that less than 20% of the eighth grade class at Carson, Longfellow, Kilmer, and Rocky Run Middle Schools are economically disadvantaged).

[5] VA Dep't of Educ., 2020-21 Fall Membership Reports, https://p1pe.doe.virginia.gov/buildatable/fallmembership (showing that less than 20% of the eighth grade class at Carson, Longfellow, Kilmer, and Rocky Run Middle Schools are economically disadvantaged).

[6] *Compare* ECF 59, Pl.'s Mem. at 59 (noting that Plaintiff's children attend Carson, Longfellow, Kilmer, and Rocky Run Middle Schools) with *TJHSST Offers Admission to 486 Students*, (2020), http://www.fcag.org/TJ%20Admissions%20class%20of%202024.pdf (showing demographic data for the TJHSST class of 2024) and *TJHSST Admissions Class of 2024 by Middle School*, http://www.fcag.org/ClassOf2024TotalsbySchool.xlsx.

[7] *TJHSST Admissions Class of 2025 by Middle School*, http://www.fcag.org/tjstatistics.shtml.

the geographic, socioeconomic, ethnic, and linguistic diversity and wealth of lived experiences of the Asian American community in Northern Virginia.

Plaintiff's arguments turn the Equal Protection Clause on its head, using it as a tool to prevent all children from enjoying the equal protection of the law.  In suggesting that any policy effort that arguably benefits Black and Latinx students is "racial balancing," Plaintiff baselessly characterizes a race neutral effort to provide all students with equal educational opportunities as intentional racial discrimination against Asian American students in hopes that this Court will take the bait and issue an injunction—despite the complete absence of any discriminatory intent and the actual benefit to all students, including Asian Americans.  But as Section II explains, this Court should not countenance Plaintiff's transparent attempt to leverage the Equal Protection Clause to revert back to an unfair admissions policy.  Indeed, as Amici explain in Sections II and III, controlling precedent dictates this result as Plaintiff cannot show a likelihood of success on the merits, the balance of hardships does not weigh in Plaintiff's favor, and the requested injunction is not in the public interest.

Accordingly, this Court should deny Plaintiff's motion for a preliminary injunction.

I.      **TJHSST's Revised Admissions Policy Has Eliminated Barriers and Increased Access for All Students.**

In December 2020, FCSB revised TJHSST's admissions policy by eliminating any form of standardized admissions testing; eliminating the $100 application fee; raising the minimum GPA required; implementing a holistic review of applicant experience factors, which considers whether an applicant is economically disadvantaged, is an English language learner ("ELL") (i.e., a middle school student for whom English is not their first language), is a special education student, or attends a middle school historically underrepresented among TJHSST's students; and accepting the top 1.5% of the 8th grade class at each public school TJHSST serves that meet the minimum

standards for admission (e.g., a 3.5 GPA or higher).[8] There is no question that FCSB's revisions reduced structural barriers to admission and broadened access to talented and qualified students across a multitude of dimensions:

- For the first time in at least the last 15 years, *all* of Fairfax County's middle schools had students accepted into TJHSST;

- Students admitted to TJHSST from historically underrepresented schools increased from 5.56% for the class of 2024 to 30.73% in the current class of 2025;

- Economically disadvantaged students admitted to TJHSST increased from 0.62% to 25.09%.  The proportion had not exceeded 2% in any of the previous four years;

- ELLs admitted to TJHSST increased from 0.62% to 7.09%.  The proportion had not exceeded 1% in any of the previous four years;[9]

- Female students admitted to TJHSST increased from 41.80% to 46.00%;

- Black students admitted to TJHSST increased from 1.23% to 7.09%;

- Latinx students admitted to TJHSST increased from 3.29% to 11.27%;

- White students admitted to TJHSST increased from 17.70% to 22.36%;

- Asian American students continued to constitute a majority of the class at 54.36%.[10]

Furthermore, 2.36% of accepted students are special education students.[11]

As Amici explained in their previous amicus brief, TJHSST's prior admissions policy failed to adequately address structural barriers to equal educational opportunity, resulting in the

---

[8] *See TJHSST Offers Admission to 500 Students; Broadens Access to Students Who Have an Aptitude for STEM*, (June 23, 2021), https://www.fcps.edu/news/tjhsst-offers-admission-550-students-broadens-access-students-who-have-aptitude-stem.

[9] *Id.*; *see also* ECF 64, FCSB Opp. at 15. Of FCPS students, 5.45% admitted were ELLs.

[10] *See TJHSST Offers Admission to 500 Students; Broadens Access to Students Who Have an Aptitude for STEM*, (June 23, 2021), https://www.fcps.edu/news/tjhsst-offers-admission-550-students-broadens-access-students-who-have-aptitude-stem; *see also* ECF 64-2 at Page ID#701-702 (Shughart Declaration at ¶¶ 16-17).

[11] *See TJHSST Offers Admission to 500 Students; Broadens Access to Students Who Have an Aptitude for STEM* (June 23, 2021), https://www.fcps.edu/news/tjhsst-offers-admission-550-students-broadens-access-students-who-have-aptitude-stem.

near exclusion of students across a broad range of demographic and socioeconomic groups.  *See* ECF 27-1 at Section I (detailing, for example, the unequal access to Level IV Advanced Academic Program Centers; the unequal access to Algebra I classes; and unequal access to test preparation services and extracurricular activities).[12]  TJHSST's revised admissions policy begins to address these barriers, and TJHSST's class of 2025 reflects demonstrable progress: FCSB's changes in its admissions policy encouraged 500 more students to apply to TJHSST than in 2020—a 17% increase—and after five consecutive years in which TJHSST did not admit more than ten Black students or more than 23 Latinx students, TJHSST admitted 39 Black students and 62 Latinx students this past admissions cycle:

---

[12] Indeed, in 2012, the Coalition of the Silence and the Fairfax County Branch of the NAACP—a branch of the Virginia State Conference of the NAACP, an amicus on this brief—filed a complaint with the U.S. Department of Education, Office for Civil Rights on behalf of Black and Latinx students, alleging discriminatory exclusion from TJHSST. OCR Complaint No. 11-12-1503 (July 23, 2012), http://mlkcommission.dls.virginia.gov/meetings/2012/OCR_FCPS_COTS_fairfax_complaint_NAACP_TJHSST_admissions_etc_7-23-12.pdf. By letter dated September 25, 2012, OCR dismissed allegations asserted on behalf of students with disabilities, but retained jurisdiction over complainants' race-based allegations. Letter from U.S. Department of Education, Office for Civil Rights to Coalition of the Silence and NAACP-Fairfax, (Sept. 25, 2012), https://coalitionofthesilence.files.wordpress.com/2012/10/cp-tj-notif-letter-pdf.pdf.

| Graduating Academic Class Year | Percentage of Admitted Students who Identify as Black | Percentage of Admitted Students who Identify as Latinx |
|---|---|---|
| **TABLE 1**<br>**Available Demographic Data of Students Admitted to the**<br>**TJHSST Graduating Classes of 2008-2025[13]** | | |
| **2025** | **7.09%**<br>**(39 Students)** | **11.27%**<br>**(62 Students)** |
| 2024 | **TS (Less than 10) | 3.3% (16) |
| 2023 | **TS (Less than 10) | 2.43% (12) |
| 2022 | 2.1% (10) | 4.7% (23) |
| 2021 | 1.8% (9) | 1.6% (8) |
| 2020 | 1.7% (8) | 2.3% (11) |
| 2019 | 1.80% | 2.40% |
| 2018 | 2.10% | 1.60% |
| 2017 | 1.00% | 3.10% |
| 2016 | 1.50% | 2.70% |
| 2015 | 1.30% | 2.70% |
| 2014 | 0.80% | 2.70% |
| 2013 | 1.70% | 1.30% |
| 2012 | 1.86% | 2.06% |
| 2011 | 1.43% | 2.66% |
| 2010 | 1.97% | 3.55% |
| 2009 | 2.42% | 3.84% |
| 2008 | 2.44% | 2.22% |

Notably, the average GPA for applicants in 2021 increased to its highest level in at least five years, the mean GPA of admitted students remained virtually unchanged, and the new admissions policy ensured that FCSB evaluators made their admissions decisions without knowledge of applicants' name, race, ethnicity, and gender.[14]

---

[13] *See TJHSST Offers Admission to 500 Students; Broadens Access to Students Who Have an Aptitude for STEM*, (June 23, 2021), https://www.fcps.edu/news/tjhsst-offers-admission-550-students-broadens-access-students-who-have-aptitude-stem; *see also* ECF 27-1 at Page ID#452.
[14] *See* ECF 64-2 at Page ID#701-702 (Shughart Decl. ¶ 17) & Page ID#724 (Regulation 3355.14 at V.A.3.(b)).

## II.      Plaintiff Is Unlikely To Succeed on the Merits.

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter*

*v. NRDC, Inc*., 555 U.S. 7, 24 (2008).  "[T]o obtain a preliminary injunction . . . the plaintiff must

establish '[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable

harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4]

that an injunction is in the public interest.'"  *Real Truth About Obama, Inc. v. FEC*, 575 F.3d 342,

346 (4th Cir. 2009), *vacated on other grounds*, 559 U.S. 1089 (2010), *reinstated in relevant part*,

607 F.3d 355 (4th Cir. 2010) ("all four requirements [of *Winter*] must be satisfied").  Here, Amici

address three of the four requirements, which are relevant to their interests:  likelihood of success

on the merits, the balance of equities, and the public interest.  As explained below, Plaintiff fails

to establish any of these prerequisites, thus strongly counseling against an extraordinary remedy

like a preliminary injunction.

### A.      TJHSST's Race Neutral Admissions Policy Has No Discriminatory Motive, and, Therefore, Does Not Trigger Strict Scrutiny.

The stark racially disparate impact of TJHSST's prior admissions policy exposed it as

invalid, in that it failed to identify all qualified students who could benefit from TJHSST's

academic program.[15]  Indeed, research shows that standardized tests like the TJHSST admissions

tests under-predict the potential of Black and Latinx students,[16] application fees dissuade

---

[15] Admissions criteria (including TJHSST's admissions test) are "valid" when they assess "what they claim to measure (i.e., content validity) and correlate strongly with performance in [the academic institution they are used to assess suitability for, here, TJHSST] (predictive validity)." *Consultation on the Validity of Testing in Education and Employment Before the U.S. Comm'n on Civil Rights* (June 16, 1989) (statement of James W. Loewen, Harvard-trained sociologist and author) in THE VALIDITY OF TESTING IN EDUCATION AND EMPLOYMENT, 42 (Eileen Rudert, ed., 1993).

[16] Rather than measuring what they claim to measure, standardized tests such as the ACT assess cultural literacy; that is, how familiar the examinee is with the colloquial language commonly used in white middle class homes like those of the test creators, artificially depressing the test scores of Black and Latinx examinees and calling into question the validity of the test results.  J. Loewen,

economically disadvantaged students from applying,[17] and teacher recommendation letters are often infected with racial bias.[18]  As such, policies that remove obstacles preventing some students from enjoying an equal opportunity to be admitted to selective public schools like TJHSST do not evince a racially discriminatory intent within the meaning of *Village of Arlington Heights v. Metropolitan Housing Development Corporation*, 429 U.S. 252 (1977).  This is so regardless of whether such policies—by equalizing opportunity—yield a greater representation of previously underrepresented students, thereby fostering racial, socioeconomic, geographic, gender, and other forms of diversity.  It remains so even if decisionmakers anticipated and welcomed this effect.  Absent a racially discriminatory intent, strict scrutiny does not apply to such policies so long as they do not classify individual students based on race.

---

*Here We Go Again: Tests for the Common Core May Be Unfair to Some and Boring to All*, HISTORY NEWS NETWORK (Nov. 18, 2014), https://historynewsnetwork.org/blog/153543; R. Freedle, *Correcting the SAT's Ethnic and Social-Class Bias: A Method for Reestimating SAT Scores*, 73 HARV. EDUC. REV. 1 (2003), http://www.hepgjournals.org/doi/pdf/10.17763/haer.73.1.8465k88616hn4757?code=hepg-site; M. Santelices et al., *Unfair Treatment? The Case of Freedle, the SAT, and the Standardization Approach to Differential Item Functioning*, 80 HARV. EDUC. REV. 106, 126 (2010), https://eric.ed.gov/?id=EJ930622 (noting that the study's findings called into "question the validity of SAT verbal scores for African American examinees"); W. Kidder et al., *How the SAT Creates "Built-In Headwinds": An Educational and Legal Analysis of Disparate Impact*, 43 SANTA CLARA L. REV. 131, 146, 156-57 (2002), https://digitalcommons.law.scu.edu/lawreview/vol43/iss1/3/.; J. Rosner, *The SAT: Quantifying the Unfairness Behind the Bubbles*, in SAT WARS: THE CASE FOR TEST-OPTIONAL COLLEGE ADMISSIONS 134 (Joseph A. Soares 2015).

[17] *See* Jennifer Glynn, *Opening doors: How selective colleges and universities are expanding access for high-achieving, low-income students*, Jack Kent Cooke Foundation (2020), https://www.jkcf.org/research/opening-doors-how-selective-colleges-and-universities-are-expanding-access-for-high-achieving-low-income-students/ (describing the need to cancel application fees for low-income students).

[18] *See* Hala Elhoweris et al., *Effect of children's ethnicity on teachers' referral and recommendation decisions in gifted and talented programs*, 26 Remedial and Special Education, at 25–31 (2005) (describing white students receiving higher referral rates than their minority counterparts, despite having similar student descriptions).

Because FCSB's attempt to remedy the obvious flaws in TJHSST's admissions criteria was facially race neutral and uniformly applied, "good faith [is] presumed in the absence of a showing to the contrary." *Regents of Univ. of California v. Bakke*, 438 U.S. 265, 318-19 (1978). Controlling precedent makes clear that there is nothing inherently nefarious about school officials' acknowledgement of a symptom of the problem—stark, unjustified, and longstanding racial disparities—that would automatically render subsequent policy action constitutionally infirm.

Plaintiff misconstrues controlling precedent in arguing that allegations of a racially disparate impact and non-decisionmakers' acknowledgment of race are enough to imbue a race neutral policy with discriminatory intent sufficient to trigger strict scrutiny.[19]  In fact, as Justice Kennedy explained in his controlling opinion in *Parents Involved*,[20] even when decisionmakers in a school district are aware of race and seek to take affirmative measures to equalize educational opportunities and foster diversity, strict scrutiny does not apply unless the measures classify individual students based on race. *See Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 788-89 (2007) (Kennedy, J., concurring in part and concurring in judgment).  Here, there is no classification of TJHSST applicants by race—the entire admissions policy is expressly race neutral, with decisionmakers having absolutely no knowledge of an applicant's race when

---

[19] Yet, Plaintiff's counsel has advanced a disparate impact argument in an effort to reinstate the prior status quo that they believe best served their interests. Indeed, Plaintiff's counsel have been leveraging disparate impact arguments on behalf of some Asian American and white students in courts across the country, while simultaneously challenging race neutral policies that seek to cure barriers to educational opportunities that have an adverse racially disparate impact that deprive Black and Latinx students of equal educational opportunities. *See, e.g*., *Assoc. for Educ. Fairness v. Montgomery Cnty. Bd. Of Educ.*, No. 8:20-cv-2540 (D. Md. filed Sept. 1, 2020); *Christa McAuliffe Intermediate Sch. PTO, Inc. v. De Blasio*, No. 1:18-cv-11657 (S.D.N.Y. Dec. 13, 2018).
[20] *See Spurlock v. Fox*, 716 F.3d 383, 395 (6th Cir. 2013) (acknowledging Justice Kennedy's concurrence in *Parents Involved* as controlling); *United States v. Alamance-Burlington Bd. of Educ.*, 640 F. Supp. 2d 670, 684 (M.D.N.C. 2009) (same); *D.S. ex rel. S.S. v. New York City Dep't of Educ.*, 255 F.R.D. 59, 63 (E.D.N.Y. 2008) (same); *Hart v. Cmty. Sch. Bd. of Brooklyn, New York Sch. Dist. # 21*, 536 F. Supp. 2d 274, 282 (E.D.N.Y. 2008) (same).

rendering admissions decisions.  Moreover, enrollment in a well-resourced and economically advantaged middle school which has historically sent large numbers of students to TJHSST is clearly not a protected class.

Importantly, a facially race neutral policy "does not violate the Equal Protection Clause solely because it results in a racially disproportionate impact; instead the disproportionate impact must be traced to a purpose to discriminate on the basis of race."  *Personnel Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 260 (1979).  Neither decisionmakers' awareness of the racial dynamics involved nor their desire to promote diversity and/or provide equal opportunities to Black and Latinx students constitutes a racially discriminatory purpose that triggers strict scrutiny.  Indeed, "'[d]iscriminatory purpose' . . . implies more than intent as volition or intent as awareness of consequences."  *Id.* at 279.[21]  Rather, "[i]t implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group."  *Feeney*, 442 U.S. at 279.

Plaintiff fails to plausibly allege that FCSB changed the admissions policy because of any adverse effect on Asian Americans.  *See* ECF 64, FCSB Opp. at Argument II.B.  Yet even

---

[21] *See also Spurlock*, 716 F.3d at 394 ("Racial classification requires more than the consideration of racial data. If consideration of racial data were alone sufficient to trigger strict scrutiny, then legislators and other policymakers would be required to blind themselves to the demographic realities of their jurisdictions and the potential demographic consequences of their decisions. The import of the plaintiffs' argument, in other words, is to impose a duty of ignorance on the part of public officials. Such a requirement would be counterproductive. It would also be impossible to enforce because there is no practical way to monitor and supervise the data that policymakers are permitted to consider."); *Lewis v. Ascension Par. Sch. Bd.*, 806 F.3d 344, 358 (5th Cir. 2015) ("[T]he district court's legal conclusion that the Board's consideration of demographic data in formulating Option 2f 'does not amount to [adopting] a rezoning plan that assigns students on the basis of race' conforms to Supreme Court case law."); *cf. United States v. Hayes*, 515 U.S. 737, 745 (1995) ("We recognized in *Shaw* [*v. Reno*], however, that 'the legislature always is aware of race when it draws district lines, just as it is aware of age, economic status, religious and political persuasion, and a variety of other demographic factors. That sort of race consciousness does not lead inevitably to impermissible race discrimination.'").

assuming the Board members who adopted the change in admissions policy were motivated in part by an attempt to promote racial diversity or remedy barriers to educational opportunities—and Plaintiff's evidence on this point does not concern statements of the Board members who actually adopted the policy[22]—that interest cannot and would not constitute a racially discriminatory motive sufficient to trigger strict scrutiny. "Just as there are cases in which impact alone can unmask an invidious classification, there are others, in which – notwithstanding impact – the legitimate noninvidious purposes of a law cannot be missed." *Feeney*, 442 U.S. at 275. Promoting diversity, integration, and equal educational opportunities in PK-12 schools is a legitimate noninvidious purpose. Controlling precedent requires this Court to reject Plaintiff's efforts to twist the plain meaning of these and similar words. *Bakke*, 438 U.S. at 318-19 (presuming good faith in the case of facially race neutral policies in the absence of evidence to the contrary).

As Justice Kennedy explained in *Parents Involved*, the government has a "legitimate interest . . . in ensuring all people have equal opportunity regardless of their race." *Parents Involved*, 551 U.S. at 787-88 (Kennedy, J., concurring in part and concurring in judgment). Accordingly, "[s]chool districts can seek to reach *Brown*'s objective of equal educational opportunity." *Id*. at 788. Towards this end:

> In the administration of public schools by the state and local authorities **it is permissible to consider the racial makeup of schools and to adopt general policies to encourage a diverse student body, one aspect of which is its racial composition**. If school authorities are concerned that the student-body compositions of certain schools interfere with the objective of offering an equal educational opportunity to all of their students**, they are free to devise race-conscious measures to address the problem in a general way and without treating each student in different fashion solely on the basis of a systematic, individual typing by race.**

---

[22] Furthermore, Plaintiff point to two statements from board members, but those statements are not discriminatory. *See* ECF 64, FCSB Opp. at Argument II.B.4.

> School boards may pursue the goal of bringing together students of diverse backgrounds and races through other means, including strategic site selection of new schools; drawing attendance zones with **general recognition of the demographics of neighborhoods**; allocating resources for special programs; recruiting students and faculty in a targeted fashion; and **tracking enrollments, performance, and other statistics by race**.  These mechanisms are race conscious but do not lead to different treatment based on a classification that tells each student he or she is to be defined by race, so it is unlikely any of them would demand strict scrutiny to be found permissible.

*Id*. at 788-89 (emphasis added).  The majority of the Court reaffirmed these principles in *Texas Department of Housing and Community Affairs v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 545 (2015), explaining that  "race may be considered in certain circumstances and in a proper fashion,"[23] and quoting the portion of Justice Kennedy's *Parents Involved* opinion recognizing that "[s]chool boards may pursue the goal of bringing together students of diverse backgrounds and races through other means, including strategic site selection of new schools; [and] drawing attendance zones with general recognition of the demographics of neighborhoods."

Plaintiff fails in its attempt to transform a facially race neutral policy into one endowed with discriminatory intent by characterizing race neutral measures as racial proxies.  If, as Plaintiff claims, the top 1.5% plan is actually a "geographic quota system" and "holistic" factors were intended to give the school board "leeway to favor students from 'underrepresented' middle schools," all for the singular purpose to admit more Black, Latinx, and white students, then FCSB chose to go about their scheme in a rather inefficient way.  ECF 59, Pl.'s Mem. at 1, 28.  As of the 2020-21 school year (the latest figures available), none of the schools that served eighth graders

---

[23] *See, e.g*., *City of Richmond v. JA Croson Co*., 488 U.S. 469, 507 (1989) (endorsing the use of race neutral means of increasing minority participation in city contracting); *see also Bush v. Vera*, 517 U.S. 952, 958 (1996) (plurality opinion) ("Electoral district lines are 'facially race neutral' so a more searching inquiry is necessary before strict scrutiny can be found applicable in redistricting cases than in cases of 'classifications based explicitly on race.'").

in Arlington County, Fairfax County, Prince William County, Loudoun County, or Falls Church City had an 8th grade student population that was even 50% Black, while only ten had a student population that was 50% or more Latinx.[24]   Indeed, only eight of the 71 public middle schools in the region had a student population that was at least 25% Black.[25]   Given this, the top 1.5% plan simply cannot guarantee that more Black and Latinx students will be admitted since there is no school where the top 1.5% of the class will necessarily be Black and/or Latinx.   Moreover, Plaintiff's favored four schools are just four of 14 schools in the region that had 8th grade student bodies that were at least 25% Asian American.   Indeed, 83% of Asian American 8th graders did not attend those four schools.[26]   Given this, Plaintiff's contention that geography is a proxy for race falls flat.   This Court should dismiss Plaintiff's *ipse dixit* that race neutral measures akin to those explicitly approved by five Supreme Court Justices in *Parents Involved* – like geography – are actually nefarious racial proxies.   Indeed, as a matter of law, courts have "repeatedly disavowed" the "claim that geography-based school-assignment policies are unconstitutional because they are really nothing more than race-based policies in disguise." *Spurlock v. Fox*, 716 F.3d 383, 396 (6th Cir. 2013).

Accordingly, strict scrutiny does not apply. *See, e.g.*, *Doe v. Lower Merion Sch. Dist.*, 665 F.3d 524, 548 (3d Cir. 2011) ("The [Supreme] Court has never held that strict scrutiny should be applied to a school plan in which race is not a factor merely because the decisionmakers were aware of or considered race when adopting the policy.").   This Court should decline Plaintiff's invitation to depart from decades of precedent, which firmly holds that decisionmakers' mere

---

[24]    VA   Dep't   of   Educ.,   2020-21   Fall   Membership   Reports, https://p1pe.doe.virginia.gov/buildatable/fallmembership.
[25] *Id.*
[26] *Id.*

awareness of race whilst enacting a facially race neutral policy does not trigger strict scrutiny absent a racially discriminatory intent.  As Justice Kennedy explained, school districts "should not [be] prevent[ed] from continuing the important work of bringing together students of different racial, ethnic, and economic backgrounds" using strategies such as "drawing attendance zones with general recognition of neighborhoods," and "tracking enrollments, performance, and other statistics by race . . . with candor and with confidence that a constitutional violation does not occur whenever a decisionmaker considers the impact a given approach might have on students of different races."  *Id*. at 789.

> **B.      The Change In The Admissions Policy Would Pass Constitutional Muster Under Any Standard of Review.**

To be clear, the constitutionality of the change in admissions policy does not turn on the applicable standard of review.  A facially race neutral policy seeking to remove barriers to equal educational opportunity would pass constitutional muster under any level of review, regardless of whether decisionmakers openly sought to foster diversity or integration.  *See Boyapati v. Loudoun Cnty. Sch. Bd*., No. 1:20-cv-01075 (AJT/IDD), 2021 WL 943112, at \*10 (E.D. Va. Feb. 19, 2021) (granting a motion to dismiss after "conclud[ing] that the Plan [(which sought to foster socioeconomic and geographic diversity)] "is subject to review based on the rational basis test, under which the Plan clearly passes muster."); *Christa McAuliffe Intermediate Sch. PTO, Inc. v. de Blasio*, 364 F. Supp. 3d 253, 280 (S.D.N.Y.), *aff'd*, 788 F. App'x 85 (2d Cir. 2019) (denying Plaintiffs' preliminary injunction motion because the plan to promote diversity and equal opportunity would likely survive both rational basis and strict scrutiny review).

Despite Plaintiff's concession that a commitment "to increase the representation of a particular racial group does not [standing alone] render [the] action racially discriminatory," *see* ECF 59, Pl.'s. Mem. at 25, Plaintiff speciously asserts that "there's no diversity exception to [the]

*Arlington Heights*" rule.  *Id*.  Plaintiff's confounding claim is constitutionally unsound.  *Arlington Heights*, discussed *supra*, instructs that proof of racially discriminatory intent is required to show a violation of the Equal Protection Clause, and affords guideposts for ferreting out direct and circumstantial evidence of discriminatory intent.  429 U.S. at 265-68.  But nothing in *Arlington Heights* raised or considered, let alone foreclosed consideration of diversity in Equal Protection jurisprudence.

Tellingly, Justice Powell, who authored the majority opinion in *Arlington Heights*, pronounced a year later in *Regents of the University of California v. Bakke*, 438 U.S. 265 (1978), that "attainment of a diverse student body . . . clearly is a constitutionally permissible goal."  *Id*. at 311.  The Court acknowledged "the freedom of a [school district] to make its own judgments as to education include the selection of its student body."  *Id*. at 312.  Indeed, in *Parents Involved*, five Supreme Court Justices agreed that, given the Nation's "moral and ethical obligation to fulfill its historic commitment to creating an integrated society that ensures equal opportunity for all of its children," "[a] compelling interest exists in avoiding racial isolation" and in "achiev[ing] a diverse student population."  *Parents Involved*, 551 U.S. at 797-98 (Kennedy, J., concurring in part and concurring in judgment; Breyer, J., joined by Stevens, J., Souter, J., & Ginsburg, J., dissenting)); *see also Anderson ex rel. Dowd v. City of Boston*, 375 F.3d 71, 91 (1st Cir. 2004) (finding race neutral K-12 plan "to foster excellence, equity and diversity . . .  are legitimate state interests").

Rather than a likelihood of success on the merits, there is a strong likelihood that Plaintiff will lose its constitutional claim given the absence of any racial classification or discriminatory purpose.  Accordingly, Plaintiff cannot show a likelihood of success on the merits, and Plaintiff's preliminary injunction motion must be denied.

**III.    Plaintiff Cannot Show That the Balance of Hardships Weighs In Their Favor or
That An Injunction Would Be In the Public Interest and, Therefore, Fails To
Establish The Requirements For A Preliminary Injunction.**

The Supreme Court instructs in *Winter* that "[i]n exercising their sound discretion, courts

of equity should pay particular regard for the public consequences in employing the extraordinary

remedy of injunction."  555 U.S. at 24.  Where a plaintiff "fail[s] to make the required showing

that the equities weigh in their favor and that a preliminary injunction is in the public interest," the

request must be denied.  *Boyapati v. Loudon Cty. Sch. Bd.*, No. 1:20-cv-01075 (AJT/IDD), 2020

WL 6797365, at *5 (E.D. Va. Oct. 7, 2020); *see also Real Truth*, 575 F.3d 342 at 346 ("all four

requirements [of *Winter*] must be satisfied").

Here, the public consequences of a preliminary injunction will fall heavily on the thousands

of prospective applicants to TJHSST who have started the school year relying on the current

admissions policy.  While a preliminary injunction will impact all prospective applicants to

TJHSST, the impact is likely to fall disproportionately on students who have historically been

underrepresented at TJHSST and have also experienced outsized educational impacts of the

COVID-19 pandemic.[27]

Furthermore, the balance of equities tips decidedly in favor of FCSB, given the strong

public interest in having its premier public high school reap the educational benefits that flow from

---

[27] *See, e.g.*, U.S. Department of Education, Office for Civil Rights, *Education in a Pandemic: The
Disparate Impacts of COVID-19 on America's Students* at iii-iv    (June 9, 2021)
https://www2.ed.gov/about/offices/list/ocr/docs/20210608-impacts-of-covid19.pdf;        Hannah
Natanson, *Standardized testing scores drop in Virginia, reflecting impact of pandemic*, Wash. Post
(Sept.    2,    2021)    https://www.washingtonpost.com/local/eucation/virginia-school-exams-sol-
scores-covid/2021/09/01/781483a2-0b4f-11ec-aea1-42a8138f132a_story.html;    Fairfax    County
Public Schools Announces Standards of Learning Data in Line with Pandemic Tends Felt Across
Region, FCPS (Aug. 26, 2021)    https://www.fcps.edu/news/fairfax-county-public-schools-
announces-standards-learning-data-line-pandemic-trends-felt; Oh Decl. (Ex. 1) at ¶ 8; Vohra Decl.
(Ex. 2) at ¶ 9.

a diverse student body, avoid racial isolation, and mitigate the lingering effects of past racial segregation.[28]  *See generally* ECF 27-1 at Section III.  As discussed in Amici's prior brief in further detail, *see id.* at 28-29, as a recipient of federal funds, FCSB has a continued obligation to comply with Title VI of the Civil Rights Act and its implementing regulations, which prohibit discrimination based on race, color, or national origin, including both intentional discrimination and disparate impact discrimination.  *See* 42 U.S.C. § 4000d(b); 34 C.F.R. § 100.3(b)(2).[29]  Thus, reverting back to the prior admissions system, which will certainly harm Black, Latinx, ELL, and low-income students, will result in FCSB abdicating its legal obligations to comply with federal and state non-discrimination policies.  The balance of equities and the public interest, therefore, strongly counsel against a preliminary injunction.

### A.     Plaintiff Requests A Preliminary Injunction That Would Deny Equal Opportunities To Many Asian American Students.

Plaintiff ignores how the revised admissions policy expanded access to educational opportunities without, as Plaintiff erroneously suggests, targeting Asian American students or otherwise making it more difficult for Asian American students to gain admission to TJHSST.  Plaintiff's motion instead focuses exclusively on the total number of Asian American students admitted—thus inaccurately treating Asian Americans as a single monolith and conveniently disregarding how the revised admissions policy actually *increases* access for numerous subgroups within the Asian American community.

---

[28] *See United States v. Alamance-Burlington Bd. of Educ.*, 640 F. Supp. 2d 670, 684 (M.D.N.C. 2009) (finding that the school system operated under unitary status and dissolving the desegregation order, "but with the expectation that the School System will continue to act in good faith to ensure that the prior discriminatory system is not allowed to resurface, and that all students in the School System will have equal access to high quality educational opportunities").

[29] In addition, FCSB is bound by the Virginia Human Rights Act, which likewise prohibits intentional and disparate impact racial discrimination in educational institutions. Va. Code Ann. § 2.2-3902.

As a threshold matter, the Asian American community is not, as Plaintiff implies, homogenous. Rather, the Asian American community is an internally diverse group. *See, e.g.,* Declaration of Linda Sookyung Oh, Director of NAKASEC VA ("Oh Decl.") (Exhibit 1) at ¶ 10; Vohra Decl. (Ex. 2) at ¶ 6. For example, the Asian American community in Northern Virginia consists of numerous diverse ethnic subgroups, including low-income Asian Americans and Asian Americans from refugee backgrounds, such as the Bhutanese, Cambodian, and Vietnamese communities. *See, e.g.,* ECF 27-1 at Page ID#426-427; *see also* Oh Decl. (Ex. 1) at ¶ 5; Vohra Decl. (Ex. 2) at ¶¶ 5-6. In addition, among the Chinese, Indian, and Korean American communities, for example, there are students and families who struggle with poverty, lack of citizenship, medical debt, and housing insecurity—students at substantial risk of being underserved. *See* Oh Decl. ¶ 12.

The reality is that economically disadvantaged groups—including economically disadvantaged Asian American students—have historically been underrepresented at TJHSST. According to Virginia Department of Education data, for the 2020-21 school year, 19.8% of Asian American 8th grade students who attended the school divisions served by TJHSST were economically disadvantaged.[30] However, only 2% of Asian American students attending TJHSST in the 2020-21 school year were economically disadvantaged. *Id.* In contrast, in the most recent admissions cycle, the percentage of economically disadvantaged students admitted overall increased from 0.62% to 25.09%, illustrating increased access that benefitted the historically underrepresented subgroups, which likely include Asian Americans.

---

[30] VA Dep't of Educ., 2020-21 Fall Membership Reports, https://p1pe.doe.virginia.gov/buildatable/fallmembership.

More students from middle schools with significant shares of Asian American students who are economically disadvantaged were admitted to TJHSST in 2020-21 than in the prior four years combined:

- 26.25% of students at Franklin Middle School are Asian American, 16.9% of whom are economically disadvantaged.  Only six students were admitted from Franklin (of all races) in 2017-2020, whereas under the new admission policy, at least seven students were admitted to the class of 2025.

- Liberty Middle School, which has 27.88% Asian American students, 23.23% of whom are economically disadvantaged, saw a dramatic increase in students admitted, from a total of three students over the prior four years, to at least eight students admitted to the Class of 2025.

- At Lanier Middle School, 23.99% are Asian American, 18.80% of whom are economically disadvantaged.  While a total of seven students were admitted to TJHSST in the prior four years, at least eight students were admitted to the TJHSST class of 2025.[31]

In fact, the middle schools that have been historically underrepresented at TJHSST include schools with student bodies with proportions of Asian American students comparable to Kilmer and Longfellow Middle Schools, two of the middle schools Plaintiff rely upon (though it incorrectly describes them as "majority Asian-American" [ECF 59, Pl.'s. Mem. at 6]).  Holmes Middle School has a student population that is approximately 20% Asian American, FCSB Br. at n.7, approximately 20% of whom are economically disadvantaged, and its graduates are

---

[31] *See* ECF 64-2 at Page ID#703 (Shughart Decl. ¶ 19) (providing the percentage of Asian American students at each school and admissions numbers for 2017-2020); VDOE Fall Membership                                         Build-A-Table, https://p1pe.doe.virginia.gov/apex/f?p=180:1:13562355156285:SHOW_REPORT:::: (data for Asian American economically disadvantaged students). The number of students admitted to the class of 2025 for each middle school is based on data received through FOIA requests for the number of offers made and the minimum seat allocation per school under the 1.5% plan. Where the number of offers made below ten were suppressed as too small for reporting, the minimum seat allocations indicated the number of acceptances. "In 2021, under the 1.5%-plan, all 26 middle schools [in FCPS] fulfilled their seat allocations with qualified applicants." ECF 64-2 at Page ID#701 (Shughart Decl. ¶ 16).

historically underrepresented at TJHSST.[32] The change in FCSB's admission policy resulted in more than double the number of Holmes' students applying to TJHSST—from 17 for the class of 2024 to 40 for the class for 2025.  And of those 40 applicants, 18 were Asian American—more than the total number of applicants for all students from Holmes for the class of 2024.  While disaggregated data for applicants to TJHSST by both race and socioeconomic status is not publicly available, the expanded access at these schools with significant shares of economically disadvantaged Asian American students illustrates how a more equal admissions policy benefitted historically underrepresented racial and ethnic groups and subgroups, including those within the Asian American community.

With only 2% of Asian American students who are economically disadvantaged, and less than ten students who are ELLs attending TJHSST in the 2020-21 school year, measures to expand access to all students also help the diverse Asian American communities access TJHSST.[33] Many of the Asian American community members that Amici NAKASEC VA and AALEAD serve are low-income and have limited English proficiency.  *See* Oh Decl. (Ex. 1) at ¶ 5; Vohra Decl. (Ex. 2) at ¶¶ 6, 11.  The Asian American communities that AALEAD and NAKASEC VA serve include families that are recent immigrants who are unfamiliar with the complex school systems and face

---

[32] ECF 64-2 at Page ID# 724 ("A public school is considered historically "underrepresented" if its average number of attending students offered admission to TJHSST based on the previous five years is at least three standard deviations below the school with the highest average number during the same period. For example, based on 9th grade admissions for the five years comprising the Classes of 2019 through 2024, the middle school with the highest five-year average of admitted students averaged 44 admission offers per year. Among all FCPS middle schools, the standard deviation of these five-year averages during the same period was 13. Based on this data, for Class of 2025 admissions, a middle school will be considered "underrepresented" if its average number of students offered admission to the Classes of 2019 through 2024 was five students or less per year (highest average minus three standard deviations, i.e., 44 − (3x13)).").
[33] VA Dep't of Educ., 2020-21 Fall Membership Reports, https://p1pe.doe.virginia.gov/buildatable/fallmembership; *see also* Suppression Rules provided on the webpage, explaining that numbers less than ten are suppressed.

language barriers in navigating systems and accessing resources.  *See* Vohra Decl. (Ex. 2) at ¶ 8,

10; *see also* Oh Decl. (Ex. 1) at ¶ 6, 8.  NAKASEC VA has spoken to students who reported having

to form their own study groups to study for the prior admission test because their parents could not

afford private tutoring, which impacted their mental health and resulted in missed opportunities

for participation in extracurricular opportunities.  *See* Oh Decl. (Ex. 1) at ¶ 12.  On the other hand,

several students were able to apply under the new admissions policy because barriers such as the

application fee and admissions test were eliminated.  *Id*. ¶ 13.  Thus, measures to expand access

to educational opportunities benefit the Asian American community members Amici serve and

help reflect the diversity of the Asian American community.  *Id*. ¶ 14; Vohra Decl. (Ex. 2) at ¶ 11-

12.

Further, the increase in numbers of students from historically underrepresented schools

from 5.56% to 30.73% also increased access that benefitted Asian American students.  Trailside

Middle School in Loudoun County is an example.  23.4% of Trailside's students identify as Asian

American (comparable to the Asian American populations at Kilmer and Longfellow middle

schools, two of the only four middle schools Plaintiff relies upon).[34]  FCSB identified Trailside

students as historically underrepresented at TJHSST,[35] and in the previous admissions cycle, 19

Trailside students applied and fewer than ten were admitted.[36]  In contrast, for the class of 2025,

[34]       *See*       Loudoun       County       Public       School       Profiles,
https://dashboards.lcps.org/extensions/Dashboards/SchoolProfiles.html.
[35] According to FCSB, a public school is considered historically "underrepresented" if its average
number of attending students offered admission to TJHSST based on the previous five years is at
least three standard deviations below the school with the highest average number during the same
period.  "Underrepresented Schools" received through FOIA request.
[36]  *See* Fairfax County Association for the Gifted, TJHSST Admissions Statistics,
http://www.fcag.org/tjstatistics.shtml.

almost twice as many Trailside students applied (37)—31 of whom were Asian American—and 12 were admitted.[37]

### B.   A Preliminary Injunction Would Further Deny Equal Opportunities To Black, Latinx, ELLs, and Economically Disadvantaged Students.

As described in Amici's brief in opposition to Plaintiff's first motion for preliminary injunction, the effects of FCPS' history of racial segregation lingers and is reflected in the inequities in educational opportunity today.  *See* ECF 27-1 at Section I.  These inequities extended to TJHSST's admissions policy, resulting in persistent barriers to access for Black and Latinx, students—as well as ELLs, economically disadvantaged students, and students with disabilities, all of which include Asian American students.[38]  Given the failed attempts to equalize access to TJHSST over the years, and the notable reduction in barriers to TJHSST for the first time under the current admissions policy, a return to the prior system (as Plaintiff requests) is likely to harm future applicants seeking admission to TJHSST.

FCSB and the public, therefore, have a strong interest in maintaining FCSB's ability to address the historic and systemic inequities in educational opportunities, and these interests will be harmed by a preliminary injunction.  Successive waves of qualified students from diverse backgrounds and historically underrepresented schools—that Plaintiff ignores—can and should rely on the FCSB's new admissions policy to access the significant educational benefits and opportunities at TJHSST.  The balance of equities and the public interest, therefore, weigh in favor

---

[37] "TJHSST Admissions Data" received through FOIA request.

[38] In the 2020-2021 school year, Black students made up less than 2% of the student body at TJHSST. Just 3% of students were Latinx, and 2% of students were economically disadvantaged. ELLs and students with disabilities each represented less than 1% of students at TJHSST. *See* Virginia Department of Education, School Quality Profiles, Thomas Jefferson High for Science and Technology, https://schoolquality.virginia.gov/schools/thomas-jefferson-high-for-science-and-technology#fndtn-desktopTabs-enrollment. For further description and statistics illustrating the historic inequities in access to TJHSST, *see* ECF 27-1 at Page ID#438-440 & 452 (App'x 1).

of maintaining the current admissions policy.[39]  *See Winter*, 555 U.S. at 24; *Boyapati*, No. 1:20-cv-01075 (AJT/IDD), at *5.

*     *     *

FCSB's changes to the admissions policy have resulted in broader racial, ethnic, gender, economic, and geographic access to TJHSST.  Many communities—including many Asian American communities—benefit from and support the changes to the admissions policy.  *See, e.g.,* Oh Decl. (Ex. 1) at ¶ 14; Vohra Decl. (Ex. 2) at ¶ 11-12.  While the current admissions policy allows more students to access TJHSST and signals an important step towards equal educational opportunity, the admissions changes have not resolved all barriers to access, nor can they cure systemic inequities.  As Amici previously raised, *see supra* at 23, FCSB and the public have a strong interest in continuing to implement methods to remove barriers and consider additional measures to provide educational opportunity for all students.  As discussed above, in addition to being beneficial to many Northern Virginia families, the changes to the admissions policy are also squarely within the bounds of the law—enjoining them would be harmful.

---

[39] Equity recognizes that each person has different circumstances and, thus, allocates opportunities and resources as needed to reach a fair and just outcome. *See* Nancy E. Dowd, *Children's Equality Rights: Every Child's Right to Develop to their Full Capacity*, 41 Cardozo L. Rev. 1367, 1400 (2020); Wilfred U. Codrington, III, *The Benefits of Equity in the Constitutional Quest for Equality*, 43 Harbinger 105, 106 (2019); *see also Hecht Co. v. Bowles*, 321 U.S. 321, 329–30 (1944) ("The essence of equity jurisdiction has been the power of the [old English] Chancellor to do equity and to mold each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it. The qualities of mercy and practicality have made equity the instrument for nice adjustment and reconciliation between the public interest and private needs as well as between competing private claims.").

## CONCLUSION

TJHSST—a public, taxpayer-funded Governor's school—must be equally accessible to all. Controlling precedent forecloses enjoining FCSB's efforts to reduce barriers to access to TJHSST that benefit all students.  For the foregoing reasons, the Court should deny Plaintiff's Motion for Preliminary Injunction.


DATED:  September 14, 2021                    Respectfully submitted,

                                              /s/ *Christine J. Choi*
                                              Christine J. Choi (VSB No. 90623)
                                              Kristen O. Riemenschneider (VSB No. 73360)
                                              Arthur Luk (admitted *pro hac vice*)
                                              Elizabeth Denning (admitted *pro hac vice*)
                                              Megan Pieper (admitted *pro hac vice*)
                                              ARNOLD & PORTER KAYE SCHOLER LLP
                                              601 Massachusetts Ave. NW
                                              Washington, D.C. 20001
                                              Telephone: (202) 942-5000
                                              Facsimile: (202) 942-5999
                                              Christine.Choi@arnoldporter.com
                                              Kristen.Riemenschneider@arnoldporter.com
                                              Arthur.Luk@arnoldporter.com
                                              Elizabeth.Denning@arnoldporter.com
                                              Megan.Pieper@arnoldporter.com

                                              Niyati Shah (admitted *pro hac vice*)
                                              Eri Andriola (admitted *pro hac vice*)*
                                              ASIAN AMERICANS ADVANCING
                                              JUSTICE-AAJC
                                              1620 L St. NW
                                              Suite 1050
                                              Washington, D.C. 20036
                                              Telephone: (202) 296-2300
                                              Facsimile: (202) 296-2318
                                              NShah@advancingjustice-aajc.org
                                              EAndriola@advancingjustice-aajc.org

                                              *Admitted only in New York. D.C. practice
                                              limited to Federal Courts.*

Michaele N. Turnage Young
(admitted *pro hac vice*)
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
700 14th Street NW, Suite 600
Washington, DC 20005
Telephone: (202) 682-1300
Facsimile: (202) 682-1312
Mturnageyoung@naacpldf.org

Francisca D. Fajana (admitted *pro hac vice*)
LATINOJUSTICE PRLDEF
475 Riverside Drive, Suite 1901
New York, NY 10115
Telephone: 212.219.3360
Facsimile: 212.739.7507
Ffajana@latinojustice.org

*Counsel for Amici Curiae*

## **CERTIFICATE OF SERVICE**

I hereby certify that on September 14, 2021, I electronically filed this document with the Clerk of the Court using the CM/ECF system, which will send a notice of such filing (NEF) to counsel of record for all Parties.

*/s/ Christine J. Choi*
Christine J. Choi (VSB No. 90623)