IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

COALITION FOR TJ,                  )
                                   )
                Plaintiff,         )
                                   )
v.                                 )          Civil No. 1:21-cv-00296-CMH-JFA
                                   )
FAIRFAX COUNTY SCHOOL BOARD,       )
                                   )
                Defendant.         )


**BRIEF IN SUPPORT OF DEFENDANT'S
<u>MOTION FOR SUMMARY JUDGMENT</u>**

Sona Rewari (VSB No. 47327)
Daniel Stefany (VSB No. 91093)
HUNTON ANDREWS KURTH LLP
2200 Pennsylvania Avenue, NW
Washington, DC 20037
Telephone: (202) 955-1500
Facsimile: (202) 778-2201
srewari@HuntonAK.com
dstefany@HuntonAK.com

Trevor S. Cox (VSB No. 78396)
HUNTON ANDREWS KURTH LLP
951 E. Byrd Street
Richmond, VA 23219
Telephone: (804) 788-7221
Facsimile: (804) 788-8218
tcox@HuntonAK.com


*Counsel for Defendant*

December 3, 2021

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS.................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................ ii

INTRODUCTION ............................................................................................................ 1

STATEMENT OF UNDISPUTED MATERIAL FACTS ("SUF").............................. 2

ARGUMENT ................................................................................................................. 17

I.      The Coalition lacks standing to maintain this suit. ........................................... 18

        A.      The Coalition is not a traditional membership organization................... 19

        B.      The Coalition lacks functional equivalency with a traditional membership
                organization............................................................................................ 20

II.     The Coalition cannot prove a claim of intentional discrimination against Asian-
        American students.............................................................................................. 23

        A.      The admissions policy does not have a disparate impact on Asian
                Americans. ............................................................................................. 24

                1.      The policy does not disproportionately burden Asian Americans............ 24

                2.      The Coalition cannot prove disparate impact by comparing this
                        year's admission numbers to last year's. ................................... 24

        B.      The Coalition cannot prove that the Board acted with a racially
                discriminatory purpose............................................................................ 26

                1.      The admissions policy is not discriminatory merely because the
                        Board was aware that it could have an impact on racial diversity........... 26

                2.      The policy adopted by the Board is legally indistinguishable from
                        the plans upheld across the country and the Coalition's own
                        proposal for TJ admissions. .................................................... 28

                3.      The Coalition cannot show that the Board adopted changes to the
                        TJ policy to reduce the number of Asian-American students.................. 30

                4.      No procedural irregularities support the Coalition's theories................. 32

                5.      The Coalition has not shown that any School Board members'
                        votes—let alone a majority's—were motivated by discriminatory
                        intent. ...................................................................................... 34

CONCLUSION.............................................................................................................. 35

CERTIFICATE OF SERVICE ...................................................................................... 36

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)...................................................................................................18

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)...................................................................................................33

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)...................................................................................................33

*Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. of City of Bos.*,
    No. CV 21-10330-WGY, 2021 WL 4489840 (D. Mass. Oct. 1, 2021).............25, 27, 29, 30

*Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. of City of Bos.*,
    996 F.3d 37 (1st Cir. 2021)................................................................................. *passim*

*Boyapati v. Loudoun Cty. Sch. Bd.*,
    No. 1:20-cv-01075, 2021 WL 943112 (E.D. Va. Feb. 19, 2021)..........................23, 28, 29, 30

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)...................................................................................................18

*Christa McAuliffe Intermed. Sch. PTO, Inc. v. de Blasio*,
    364 F. Supp. 3d 253 (S.D.N.Y.), *aff'd*, 788 F. App'x 85 (2d Cir. 2019)..............................28

*Doe ex rel. Doe v. Lower Merion Sch. Dist.*,
    665 F.3d 524 (3d Cir. 2011).........................................................................................28

*Anderson ex rel. Dowd v. City of Bos.*,
    375 F.3d 71 (1st Cir. 2004)....................................................................................2, 26, 28

*Funeral Consumers All., Inc. v. Serv. Corp. Int'l*,
    695 F.3d 330 (5th Cir. 2012) .................................................................................22, 32

*Gettman v. DEA*,
    290 F.3d 430 (D.C. Cir. 2002)......................................................................................22

*Grp. Health Plan, Inc. v. Philip Morris, Inc.*,
    86 F. Supp. 2d 912 (D. Minn. 2000).............................................................................20

*Health Research Grp. v. Kennedy*,
    82 F.R.D. 21 (D.D.C. 1979).........................................................................................21

*Heap v. Carter,*
   112 F. Supp. 3d 402 (E.D. Va. 2015) ....................................20, 21, 22, 23

*Hunt v. Wash. State Apple Adv. Comm'n,*
   432 U.S. 333 (1977).................................................................19, 20, 21, 23

*Jeffries v. Harleston,*
   52 F.3d 9 (2d Cir. 1995).................................................................................35

*Kawaoka v. City of Arroyo Grande,*
   17 F.3d 1227 (9th Cir. 1994) .........................................................................35

*Kirkland v. Mabus,*
   206 F. Supp. 3d 1073 (E.D. Va. 2016) ..........................................................18

*LaVerdure v. Cty. of Montgomery,*
   324 F.3d 123 (3d Cir. 2003)...........................................................................35

*Lewis v. Ascension Parish Sch. Bd.,*
   806 F.3d 344 (5th Cir. 2015) .........................................................................28

*Lujan v. Defs. of Wildlife,*
   504 U.S. 555 (1992)..................................................................................18, 19

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
   475 U.S. 574 (1986)........................................................................................18

*Matthews v. Columbia Cty.,*
   294 F.3d 1294 (11th Cir. 2002) .....................................................................35

*Md. Highways Contractors Ass'n, Inc. v. Maryland,*
   933 F.2d 1246 (4th Cir. 1991) .......................................................................20

*Nationstar Mortg., LLC v. Ahmad,*
   155 F. Supp. 3d 585 (E.D. Va. 2015) ............................................................18

*Package Shop, Inc. v. Anheuser-Busch, Inc.,*
   CIV. A. No. 83-513, 1984 WL 6618 (D.N.J. Sept. 25, 1984) ..................21, 22

*Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1,*
   551 U.S. 701 (2007)............................................................................26, 27, 28

*Personnel Adm'r of Mass. v. Feeney,*
   442 U.S. 256 (1979).................................................................................23, 30

*Small Sponsors Working Grp. v. Pompeo,*
   No. 1:19-2600-STA-jay, 2020 WL 2561780 (W.D. Tenn. May 20, 2020) ......19, 23

*Sorenson Commc'ns, LLC v. FCC*,
    897 F.3d 214 (D.C. Cir. 2018) ..................................................................21

*Spurlock v. Fox*,
    716 F.3d 383 (6th Cir. 2013) ....................................................................28

*Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*,
    576 U.S. 519 (2015)............................................................................26, 28

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
    429 U.S. 252 (1977)............................................................................23, 32

*White Tail Park, Inc. v. Stroube*,
    413 F.3d 451 (4th Cir. 2005) ....................................................................19

*Wittman v. Personhuballah*,
    578 U.S. 539 (2016)....................................................................................18

## Statutes and Other Authorities

2020 Va. Acts ch. 1289.....................................................................................4, 5

Va. Code Ann. § 2.2-3707 (Supp. 2020) .........................................................10

Va. Code Ann. § 22.1-73 (2016)......................................................................10

Va. Code Ann. § 22.1-79(8) (Supp. 2020)........................................................32

<u>**INTRODUCTION**</u>

Last fall, the Fairfax County School Board changed the admissions process for the Thomas Jefferson High School for Science and Technology (TJ) to eliminate historical barriers and expand access to the school for students from every part of the County and neighboring jurisdictions. These changes included eliminating the $100 application fee and standardized testing, and guaranteeing each public middle school seats in the freshman class for its top applicants, in a number equal to 1.5% of each school's eighth-grade population. After many months and tens of thousands of pages of discovery, the Coalition for TJ has come up empty-handed on its hyperbolic claim that these changes constitute intentional discrimination against Asian-American students. There are no material facts in dispute, and the Court should grant summary judgment to the School Board for two main reasons.

<u>First</u>, the Coalition cannot carry its burden of establishing standing to maintain this suit. Discovery has fatally undermined the Coalition's claim that it has "associational standing" to sue on behalf of parents of Asian-American students applying to TJ. The Coalition is neither a traditional membership organization nor its functional equivalent.

<u>Second</u>, the Coalition cannot prove its Equal Protection Claim. Facially race-neutral admission policies do not trigger strict scrutiny, absent evidence of both a discriminatory impact and discriminatory intent. The Coalition can show neither. Asian-American students received the largest share of offers under the new policy, and their relative share of offers also exceeded their relative share of the applicant pool. In short, there was no disparate impact. The Coalition also cannot prove a discriminatory purpose. It cannot show that the Board voted 12–0 to eliminate standardized testing and application fees in order to harm (or even to benefit) any racial group. Nor can the Coalition show that the Board voted 10–1 to adopt a plan that gives the highest-evaluated students at every middle school access to TJ in order to harm (or even to

1

benefit) any racial group.  What's more, it could not have done so:  the school system could not, and did not, calculate how the new policy would affect the racial demographics of TJ.

Longstanding Supreme Court jurisprudence makes clear that public school systems can use race-neutral means to promote equality of access for all groups, including racial minorities. They need not leave such progress to blind luck.  In other words, the "motive of increasing minority participation and access is not suspect."  *Anderson ex rel. Dowd v. City of Bos*., 375 F.3d 71, 87 (1st Cir. 2004).  The Coalition's erroneous legal arguments to the contrary have been rejected by jurists across the country, including Judge Trenga earlier this year.  This Court should reject them as well.

## STATEMENT OF UNDISPUTED MATERIAL FACTS ("SUF")

1.      TJ is one of 198 public schools operated by the School Board, which oversees the Fairfax County Public Schools (FCPS), the largest public school division in Virginia.  Answer ¶ 20 (ECF No. 49).

2.      TJ was established in 1985 as a high school for science and technology.  Answer ¶ 22; Ex. 1, FCSB Policy 3355.4.  It is open to residents of the counties of Fairfax, Arlington, Loudoun, and Prince William and the City of Falls Church.  Answer ¶ 22.

3.      TJ is one of 19 Academic-Year Governor's schools in Virginia—regional schools that provide advanced studies in a variety of areas, that conduct admission by application, and that receive additional funding from the General Assembly.  *Id.* ¶ 24.

4.      Policy 3355.4 states the Board's purpose in operating TJ.  Ex. 1.  Last amended in 2013, Policy 3355.4 recognizes "diversity of the student body and staff" as an "important factor in developing leaders who will be prepared to address future scientific and technological challenges."  *Id.*  "Diversity is broadly defined to include a wide variety of factors, such as race, ethnicity, gender, English for speakers of other languages (ESOL), geography, socioeconomic

status[,] prior school and cultural experiences, and other unique skills and experiences." *Id.*  The Policy charges the Division Superintendent to "develop a comprehensive admissions process that establishes rigorous standards" and directs that "students meeting the established admissions standards shall undergo a comprehensive, holistic evaluation process…." *Id.*

5.     FCPS periodically publishes a regulation, Regulation 3355, which describes the procedures for student selection and admission to TJ.  *See* Ex. 2.

6.     The admissions process at TJ is regularly reviewed for ways to better serve the community, while serving its mission and maintaining the high quality of education at the school.  Ex. 3, Decl. of J. Shughart, ¶ 9.

7.     Since 2013, students have been selected for admission to TJ based on a holistic review of numerous qualitative and quantitative components.  *Id.* ¶ 4.  Before Fall 2017, the TJ admissions process included one standardized admissions test.  *Id.* ¶ 6.  From Fall 2017 until the start of the 2020–21 school year, the admission process included three standardized tests, in mathematics, science, and reading comprehension.  *Id.* ¶¶ 5, 7.

8.     Before the admissions changes of 2020, the student body of TJ tended to be drawn from a small subset of middle schools, and included very few low-income students, English Language Learners, students receiving special education services, and students who identify as Black, Latino, or multiracial.  Ex. 4, FCSB's Ans. to Interrog. No. 11.

9.     The admissions process in place before 2020 prevented talented students (including Asian Americans) deserving of admission from accessing TJ because of where they attended middle school.  Ex. 5, Miller Dep., at 95:3–97:21.

10.     For example, in the four admissions cycles before the 2020 changes, students at just eight of FCPS's 26 middle schools accounted for 86.53% of FCPS students offered

admission to TJ. Ex. 3, Shughart Decl., ¶ 10(b). *See also* Ex. 6, Admissions Statistics (Sealed). During the same four-year period, students from economically disadvantaged households (based on qualifying for Free or Reduced-price Meals (FRM)) comprised less than 2%, and English Language Learners (ELL) comprised less than 1%, of students offered admission to TJ. Ex. 3, ¶ 17(a)&(b). By contrast, 29.3% of FCPS's division-wide student body are FRM students, and 27.4% are ELL. Ex. 7, September 15, 2020 Presentation, at 4.

11.     On May 27, 2020, the School Board was briefed by staff regarding potential changes to the admissions process projected to take effect for the 2022–2023 application year. Ex. 8, Brabrand Dep., at 70:12–14, 71:3–7; Ex. 9, May 27, 2020 TJ Admissions Proposal; Ex. 10, Executive Summary of Proposal. The presentation to the Board noted that "[t]alented students enrolled in each middle school have traits important to the mission and goals of [TJ] and could contribute to the school's learning environment," and that the changes would "more directly account for the fact that many students who want to enroll" at TJ "and who could be successful at" TJ "may have different academic, curricular, and personal experiences and differing arrays of strengths and interests." Ex. 9 at 2.

12.     The same month, May 2020, the Governor of Virginia signed into law the 2020–2022 biennial budget enacted by the General Assembly. 2020 Va. Acts ch. 1289. The budget included language that required each Academic Year Governor's School to "set diversity goals" and "to develop a plan to meet said goals in collaboration with community partners at public meetings"; and to submit to the Governor, by October 1 of each year, a report on its diversity goals for student body and faculty, and on the status of implementing a plan to meet those goals. *Id.* § Item 145.C.27.i. The report was also to include information on the "racial/ethnic make-up and socioeconomic diversity" of students, faculty, and applicants and "admission processes in

place or under consideration that promote access for historically underserved students." *Id.*

13.     In June 2020, then-Chair of the Board Karen Corbett Sanders received correspondence from then-Virginia Secretary of Education Atif Qarni and a General Assembly member, calling attention to the new law and noting TJ's very small proportions of disadvantaged students over the prior five years.  Ex. 11; Ex 12.  Division Superintendent Brabrand advised members of his senior staff to "plan on a work session" with the Board "on what we are putting in this report."  Ex. 12 at 1.

14.     In Summer 2020, Secretary Qarni convened a working group to examine barriers to access at Governor's Schools and ways to improve equity of access.  Ex. 8, Brabrand Dep., at 58:4–14.  Several FCPS staff members, including Dr. Brabrand, were invited to their meetings.  *Id.* at 58:4–59:16.  Though the Coalition decried the working group as "Anti-Asian," Qarni, who himself is Asian, vehemently disagreed, pointing out that "[m]any children from Asian working-class families are also not benefiting from Governor Schools."  Ex. 13 at 4.

15.     By August 2020, Dr. Brabrand had concluded that what FCPS submitted in its report on TJ's diversity plan "would have impact on any additional action that the General Assembly or Governor" would take and that "a report" that "we're just doing the same thing we've always done was not going to be received well."  Ex. 8, Brabrand Dep, at 55:6–56:9; Ex. 5, Miller Dep, at 70:5–8 ("[O]ur understanding was that Fairfax County was attempting to 'get out ahead' of what they thought Atif Qarni was going to demand that they do.").

16.     In early September 2020, Secretary Qarni announced that the Governor would release his own policy position on potential legislative changes to the admissions processes of Governor's Schools, including TJ, around December 2020.  Ex. 14.

17.     Under the process for admission to TJ prior to 2020, applicants had to score above

certain percentile minimums on the standardized tests in order to advance to the "semifinalist" round where they were administered a qualitative exam and submitted two teacher recommendations. Ex. 3, Shughart Decl., ¶ 8(b)–(d). Students were then selected for admission from the semi-finalist pool, based on a holistic evaluation. *Id.* ¶ 8(e)–(f).

18.     On September 15, 2020, Dr. Brabrand presented to the Board at a public work session a proposal to make multiple changes to the admissions process to enhance the pool of talented applicants and remove potential barriers that kept students from disadvantaged groups from applying or advancing in the admissions process. *Id.* ¶ 10(b). His "Merit Lottery Proposal" proposed to: eliminate the three standardized tests, one qualitative assessment, the $100 application fee, and teacher recommendations; increase the minimum GPA from 3.0 to 3.5; and implement a lottery, under which qualified students would be considered in "Regional Pathways"—pools to which students would be assigned based on the FCPS administrative region in which they resided or their participating locality—each of which would be allocated an equal number of seats. Ex. 7 at 12–13. These "Regional Pathways" corresponded to the same five administrative Regions in which FCPS had been organized in since 2014. Ex. 3, ¶ 5.

19.     Dr. Brabrand advised the Board that "admissions testing has been a barrier for historically underrepresented students to move to the semifinalist stage. We have applicants that have talent, that have merit, and those applicants are drained out in the semifinalist stage through the use of admissions test[ing]. It has had a disproportionate impact on the diversity of the existing application pool." Ex. 15, Transcript of September 15, 2020 Work Session, at 15:5–14. He also explained that the "pathway" approach would ensure "equitable access for students across all regions in FCPS and in participating jurisdictions" and "create[] geographic diversity across Fairfax and participating jurisdictions." *Id.* at 19:24–20:3, 21:15–17.

20.     The Board discussed the Merit Lottery Proposal at length on September 15, 2020. *See generally id.* Each of the 12 Board Members spoke at the meeting, expressing their individual views and concerns. *Id.* Member Corbett Sanders noted that "this concept of a merit-based admission without a test … is merit-based on GPA and a holistic review of kids. That is consistent with over a thousand universities across the United States, including Stanford, Columbia, Barnard, voted many of the top schools in the country." *Id.* at 58:25–59:9. She further stated that "as the school board representative of a region of the county that has been historically underrepresented, to the point that kids don't even bother applying anymore….I absolutely think that we have to do something new, and we have to do something that ensures that we have a holistic merit-based approach that creates opportunities and access for every child who needs to take advantage of a school like TJ and is not an environment in which we are actually disincenting kids so much so that they don't even bother applying." *Id.* at 136:4–17. Member Pekarsky shared the sense of "urgency" but expressed a "worry" that "with this lottery system…those kids who are truly highly exceptional will not get in" to TJ. *Id.* at 145:7–14.

21.     The Board was advised that Dr. Brabrand and staff would engage in "community outreach" and bring a "final proposal" to the Board on October 8. *Id.* at 27:25–28:12. Over the course of the work session, Board members provided staff direction on more than two dozen "next steps," including asking the State to allow additional time for submission of FCPS's plan for TJ, evaluating the merits of a "school-based or pyramid approach," and adding the topic of TJ admissions to the Board's October 8 regular meeting agenda. *Id.* at 28:6–9; Ex. 16, FCSB Mtg. Minutes (September 15, 2020).

22.     The Coalition publicly opposed the Merit Lottery Proposal, issuing a press release claiming that its analysis shows that "[a]ll racial minorities will lose" under the plan. Ex. 17.

23. On September 29, 2020, the Coalition submitted an alternative proposal for the Board's consideration—its Second-Look Semifinalist Alternative to the Merit Lottery (the "Second-Look Proposal"). Ex. 18. That plan proposed to retain the standardized tests but to guarantee that a minimum of five applicants from every FCPS middle school would advance to the semifinal round, where candidates would be subjected to a holistic, qualitative evaluation in which "underrepresented background and moral traits to overcome these barriers" would be "evaluated favorably and weighted in the admissions process." *Id.* at 4.

24. The Coalition agreed that some worthy applicants were not offered admission under the pre-2020 process because they lacked access to "practice taking standardized tests" and to "STEM enrichment," and overall did "not have the same advantages as kids who have two parents." Ex. 5, Miller Dep., at 98:7–16. In the Coalition's view, a "disproportionate number" of such applicants "are Black and Hispanic, who live in parts of the county that are historically underrepresented." *Id.* at 100:15–20. As a result, the Coalition believed that even its own "proposal would result in disproportionately more Black and more Hispanic students benefiting," *id*. at 101:1–4, and would "materially increase both the geographic and the socioeconomic diversity at [TJ]," Ex. 18, at 3.

25. The Coalition also made its Second-Look Proposal in the hope that it would allow the School Board to focus on other matters because "addressing admissions at TJ" was already "taking up a disproportionate amount of the county's time." Ex. 5, Miller Dep. at 76:21–77:6.

26. On October 6, 2020, the Board held another work session regarding TJ admissions. In advance of the work session, Dr. Brabrand issued his "Revised Merit Lottery" Proposal. This proposal revised the original Merit Lottery proposal to set aside 100 seats for the top overall applicants. Ex. 19, FCSB Mtg. Agenda (October 6, 2020). These top 100 applicants

would be identified based on their scores using a holistic review process that included two qualitative assessments (the Student Portrait Sheet and the Problem Solving Essay) and four Experience Factors—namely, whether the student came from an economically disadvantaged household based on FRM , was an English-Language Learner, had an Individualized Education Plan, or attended a historically underrepresented public middle school. *Id.*

27.     The Coalition voiced its opposition to the Revised Merit Lottery before the October 6 work session. It affirmed that "[t]he underrepresentation of Blacks and Hispanics at [TJ] is unacceptable" but lamented that, under the Superintendent's revised proposal, only the "20 percent of students" admitted via the holistic review would be "chosen by merit" and represent the county's "top STEM students." Ex. 20, Coalition Email to School Board, at 2.

28.     Meanwhile, individual Board members exchanged ideas for the framework of an admissions policy that would identify the most-qualified applicants from each middle school and ensure those students access to TJ. *See* Ex. 21, Emails from S. Pekarsky to K. Corbett Sanders.

29.     On October 6, 2020, the School Board met for four-and-half hours to consider Dr. Brabrand's "Revised Merit Lottery" proposal and other potential changes. *See* Ex. 22, FCSB Work Session Minutes (Oct. 6, 2020); Ex. 23, Transcript of October 6, 2020 Work Session.

30.     The School Board did not approve Dr. Brabrand's revised proposal at the October 6 work session. Instead, the Board voted unanimously, 12–0, to eliminate the application fee and the standardized-test requirements, and directed the Superintendent to increase the size of the admitted class to 550. Ex. 22 at 2. The School Board also directed Dr. Brabrand to return with revised admissions proposals that included a non-lottery option. *Id.* at 3.

31.     The timing of the Board's decision to eliminate standardized testing was driven, at least in part, by the fact that testing normally occurred in October and November. Ex. 23,

61:7–11, 63:7–64:11; Ex. 3, ¶¶ 10(b), 16.  The COVID-19 pandemic also would have complicated testing and increased its cost.  *Id.* ¶ 22.

32.     The Board was not precluded by its own internal policy or Virginia law from taking a vote on the admission process at a work session.  *See* Va. Code Ann. § 2.2-3707 (Supp. 2020); Va. Code Ann. § 22.1-73 (2016).  The Board has previously taken votes at both work sessions and regular meetings.  Ex. 8, Brabrand Dep. at 126:14–18.

33.     Before the October 6 work session, the School Board had received public comment, through a variety of means, regarding TJ admissions.  Ex. 24, Pekarsky Dep., at 25:5–8 (the School Board "heard lots of public comment regarding TJ and the admissions tests and the policy and process through many different avenues"); Ex. 8, 148:13–18 (discussing "extensive discussion, work sessions, community discussion, community feedback").

34.     Two days after the October 6 work session, the Coalition alerted the Board and school administrators to purportedly "egregious issues" uncovered by its "data team"—that the proposed increase of the minimum GPA from 3.0 to 3.5 would "maliciously eliminat[e] more Black and Hispanic students" and "deprive [them] of admission to TJ."  Ex. 25, Coalition Email to School Board.  The Coalition faulted Dr. Brabrand, noting that he had admitted that FCPS "staff did not study the racial demographics within Fairfax County to determine who would qualify" before proposing to raise the minimum GPA from 3.0 to 3.5.  *Id.*

35.     On October 8, 2020, the Board held another regular meeting during which it received public comments on TJ admissions and held discussion on TJ admissions.  Ex. 24, Pekarsky Dep., at 34:5–21; Ex. 26, FCSB Mtg. Minutes (October 8, 2020).  A motion was made to direct the Superintendent to develop and implement a "stakeholder engagement plan" to "allow for more thorough community input and dialogue on TJ admissions" prior to bringing the

updated TJ plan to the Board in November, but the motion failed 0–7 with five abstentions. Ex. 26 at 4; *see also id.* at 5–6 (other TJ-related motions and votes).

36.    On October 9, FCPS submitted the report on diversity goals required by the General Assembly. Ex. 27, Report. The report indicated TJ's "long-term diversity goal is to increase the broad diversity that represents all participating jurisdictions," with diversity "broadly defined to include a wide variety of factors," including "race, ethnicity, gender, English Language Learners (ELLs), geography, [and] socioeconomic status." *Id.* at 2. The report indicated TJ's "short-term primary goal is to achieve a" talented student population "that is representative of the applicant population, with additional emphasis to increase the number of students in historically underrepresented groups applying to [TJ]." *Id.* The report was completed by FCPS staff, and the Board did not take any votes on what the report should include. Ex. 24, Pekarsky Dep., at 61:1–66:2.

37.    At its October 22, 2020 meeting, the Board discussed some of the broader "systemic issues that impact TJ admissions," and a motion by Board member Tamara Derenak Kaufax to address those issues passed 11–0. Ex. 24, 37:20–38:16; Ex. 28, FCSB Mtg. Minutes (October 22, 2020), at 4–5.

38.    In November, the Superintendent made two "final proposals" for the School Board's consideration. Ex. 3, ¶ 10(d). One was a "Hybrid Merit Lottery," an updated version of the Revised Merit Lottery proposal under which the 100 highest-ranked applicants would be offered admission, and 450 seats would be allocated to other qualified applicants through a lottery. *Id.* The other was a "Holistic Review Proposal," under which all 550 seats for admission would be allocated based on the same holistic review used to evaluate the top 100 applicants under the Hybrid Merit Lottery proposal. *Id.* Under both proposals, applicants would

be grouped into the administrative Region in which their middle school was located (or, for non-FCPS students, their jurisdiction of residence), with caps for each region. *Id.*

39. The Superintendent issued the proposals in a Powerpoint presentation and "White Paper" that were shared with the Board and the public on November 17, 2020. *See* Exs. 29 and 30. Dr. Brabrand's staff did not do any modeling of the demographic results under the Holistic Review Proposal. Ex. 8, Brabrand Dep., at 106:5–107:3.

40. The same day, the Coalition issued a press release criticizing Dr. Brabrand's proposals. Ex. 31. Among other things, the Coalition called on the School Board to reject Dr. Brabrand's proposals and to "implement a 'second look' plan to increase representation of underrepresented minorities." *Id.*

41. In early December, Secretary Qarni shared with Dr. Brabrand language drafted for proposed General Assembly legislation that would impose a new admissions policy for TJ and one other Governor's School. Ex. 32. Among other things, the bill would expressly prohibit the use of standardized tests in the admission process, required preferred consideration of economically disadvantaged students, and cap at 5% the proportion of admitted students from any single school. *Id. See also* Ex. 33, Email from Secretary Qarni to S. Brabrand.

42. On December 7, 2020, the Board conducted another work session to discuss Dr. Brabrand's final proposals. Ex. 3, ¶ 10(e); *see* Ex. 34, Transcript of December 7, 2020 Work Session; Ex. 35, FCSB Mtg. Minutes (December 7, 2020).

43. On December 17, the School Board met again, with a plan to make final decisions on the TJ admissions policy. Ex. 36, FCSB Mtg. Agenda (Dec. 17, 2020). Public comment was taken, during which multiple citizens addressed TJ admissions. Ex. 37, FCSB Mtg. Minutes (December 17, 2020), at 2.

44.     A motion to adopt the Hybrid Merit Lottery Proposal failed 4–8.  Ex. 37 at 4.

45.     Another Board member moved to direct use of a holistic review process that would guarantee each public middle school seats in TJ's freshman class for its highest-ranked candidates (based on increased GPA, Student Portrait Sheet, Problem Solving Essay, and Experience Factors), in a number equal to 1.5% of the school's eighth-grade student population (the "1.5% Plan").  *Id.* at 4–5.  This 1.5% Plan was designed to expand "the pipeline for each middle school" and provide "equity of access and opportunity."  *Id*. at 5.

46.     In support of the 1.5% Plan, numerous Board members noted how, year after year, most of FCPS's middle schools had very few, if any, students admitted to TJ.  Ex. 38, Transcript of December 17, 2020 Mtg., at 116:13–15 (Cohen), 109:23–110:7 (Tholen), 110:17–23 (Pekarsky), 112:11–20 (Corbett Sanders), 122:11–17 (Sizemore Heiser), 138:25–139:8 (Keys-Gamarra), 144:23–145:4 (Corbett Sanders).

47.     The Board approved the 1.5% Plan and the race-neutral mandate by a vote of 10–1–1. Ex. 37 at 4–5.  The sole dissenting vote was cast by Chair Anderson.  *Id.*  Member McLaughlin abstained.  *Id.*

48.     In adopting the 1.5% Plan, the Board made clear that racial balancing and racial targets would be prohibited.  The motion that carried expressly provided:  "The admission process must use only race-neutral methods that do not seek to achieve any specific racial or ethnic mix, balance, or targets."  *Id*. at 4.

49.     No one at FCPS conducted any analysis to predict how the 1.5% Plan would affect the racial makeup of students admitted to TJ.  Ex. 3, Shughart Decl., ¶ 10(g).  *See also* Ex. 8, Brabrand Dep., at 134:2–7 (Q: . . . Did you or your staff ever consider the racial impact of the decision to guarantee that 1.5 percent of schools feeds to TJ? . . . A: No.").

50.     Minutes and video recordings of each of the School Board meetings in which TJ admissions was discussed are available online at https://www.fcps.edu/school-board/school-board-meetings.  The September 15, October 6, December 7, and December 17 meetings have also been transcribed for the Court's benefit.  *See* Exs. 15, 23, 34, 38.  No School Board member made any statements at any School Board meeting expressing intent to change any element of the admissions process at TJ in order to decrease the number of Asian-American students or even discussed Asian-American representation at TJ.  *See id.*

51.     The changes adopted at the December 17 meeting were effective with the admission process for the Class of 2025.  Ex. 37 at 4.  On April 28, 2021, FCPS staff updated Regulation 3355 to bring it in line with changes adopted by the Board in 2020.  *See* Ex. 3, Shughart Decl. ¶ 11, Ex. B (FCPS Regulation 3355.14).

52.     The 1.5% Plan is "facially race-neutral."  Compl. ¶ 63.  FCPS Regulation 3355.14 provides that "[c]andidate name, race, ethnicity, or sex collected on the application form will not be provided to admissions evaluators.  Each applicant will be identified to the evaluators only by an applicant number…."  Ex. 3, Shughart Decl. ¶ 11, Ex. B.  TJ admissions officials have abided by this requirement.  *Id.* ¶ 14.

53.     FCPS received a significantly higher number of applications for entry into TJ's Class of 2025 than in prior years.  *Id.* ¶ 15.  A total of 3,470 eighth-graders from 130 different schools applied for admission to the Class of 2025.  *Id.*

54.     For the first time in at least 15 years, the Class of 2025 includes students from all 26 FCPS middle schools; each school filled its allocated seats with qualified applicants.  Ex. 3, Shughart Decl., ¶ 16.

55.     FRM students received 25% of admission offers for the Class of 2025.  *Id.* ¶ 17.

ELL students received 5.45% of offers. *Id.* The proportion of women admitted in the Class of 2025—46%—was greater than in the four preceding classes: 41.8% (Class of 2024); 42.1% (Class of 2023); 42.68% (Class of 2022); 40.6% (Class of 2021). *Id.* ¶ 17(c).

56. The average GPA for applicants (3.91) was higher than it has been for five years. *Id.* ¶ 17. The average GPA of admitted students—3.9539—was within a hundredth of a point from the prior year. *Id.*

57. Asian-American students comprised a smaller proportion of total applicants in 2021 (48.59%) than in 2020 (56.08%). *Id.* ¶ 18. While the raw number of applications from Asian-American students increased, that increase was relatively smaller than the jumps in applications from all other racial groups. *Id.* As a result, Asian Americans were the only racial group whose share of the applicant pool fell this year. *Id.*

58. Asian Americans accounted for, by far, the largest share of students accepted into the Class of 2025 (54.36%). *Id.* ¶ 18.

59. Asian-Americans students were the only racial group other than Hispanic students whose representation in the accepted-students pool (54.36%) exceeded their representation of total applicants (48.59%). *Id.* Black, White, and Multi-Racial/Other students comprised smaller proportions of admitted students (7.09%, 22.36%, and 4.91%, respectively) than applicants (10.00%, 23.86%, and 6.60%, respectively). *Id.*

60. The Coalition predicted that Asian-American students would comprise only 31% of students receiving offers under the new policy. Compl. ¶ 52. According to the Coalition, its prediction was so off-base because "everyone would acknowledge that…it was very difficult to project the outcome of what would happen because of the holistic factors that go into evaluation" of the applicants. Ex. 39, Tr. of 9/17/21 Hr'g at 19:6–9.

61.    The Coalition cannot identify any applicant who was denied admission to TJ on the basis of their race under the new policy.  Ex. 40, Nomani Dep., at 183:19–184:2.

62.    The Coalition does not intend to offer any expert testimony to prove its claim of disparate impact on Asian-American students.  Ex. 41, Coalition's Ans. to Interrog. No. 1.

63.    The Coalition does not have a position on what process should be used for admission to TJ in lieu of the current process.  Ex. 5, Miller Dep., at 88:16–17, 135:5–20.

64.    The Coalition "came together" in August 2020.  Ex. 40, Nomani Dep., at 14:12–19.  It does not have a charter, articles of incorporation, or bylaws.  *Id.* at 20:4–8, 41:18.  It is not registered with any federal or state agency.  *Id.* at 20:9–21:4.

65.    The Coalition claims to have over 200 members.  *Id.* at 62:2–5; *id.* at 82:1.  The Coalition counts as "members" those who have completed a form on the "Contact Us" tab of its website and are joined to its messaging platform.  *Id.* at 78:2–9.

66.    The online contact form is not labeled as a "membership application."  *Id.* at 78:10–13; Ex. 42, Coalition for TJ "Contact Us" form.  The form does not ask individuals to provide any address (home or business, in Virginia or not), phone number, school affiliation, or even whether they are parents of affected children.  Ex. 40, Nomani Dep., at 83:1–17.  The Coalition also does not collect racial information about its members.  *Id.* at 93:6–7.

67.    The sole requirement for membership in the Coalition is "supporting the mission of the organization."  *Id.* at 80:12–14.  That mission, as described in deposition and on its website, is "to advocate for diversity and excellence at" TJ.  *Id.* at 35:16–18.  Yet, the Coalition reported a different mission to United Charitable last fall, when applying to become a fiscally-sponsored program of that 501(c)(3): "to conduct original research, journalism, and advocacy about significant public issues relegated [sic] to education, contribute to sound public policy

16

decisions and protect gifted and STEM education and the legal defense of the rights of students." Ex. 43, Letter from United Charitable; Ex. 40, Nomani Dep., at 144:7–16.

68.     The Coalition has no formal membership approval process. *Id.* at 76:5–88:3.

69.     The Coalition could not identify any members of its leadership team who are parents of seventh- and eighth-grade students planning to apply to TJ. *Id.* at 53:16–58:9.

70.     The Coalition has no officers. *Id.* at 18:18–21, 41:13–15.  It is led by unelected volunteers who "self-nominated" themselves by "just rais[ing] their hands." *Id.* at 52:11–21.

71.     The Coalition has never put any decisions to a vote, either by its unelected leaders or its members. *Id.* at 44:15–18, 51:2–6.  The Coalition's leadership meetings have no agendas. *Id.* at 132:9–12.

72.     The Coalition has no operating budget or bank account. *Id.* at 93:8–14.  It collects no dues or membership application fees from members. *Id.* at 65:13–18.  It has: (1) raised $150,000 for the Coalition for Diversity and Excellence in Education (a 501(c)(4) organization created by some of the Coalition's leaders), *id.* at 95:14–96:4, 97:17–98:3, 99:20–22; (2) solicited donations for itself as a program of United Charitable, *id.* at 116:4–17, 119:17–120:1; and (3) solicited and continues to solicit donations via its webpage for the Coalition for Truth and Justice, *id.* at 116:4–17, 119:17–120:1.  The Coalition for Truth and Justice is another informal group that was created by one of the Coalition's leaders, due to United Charitable's rules prohibiting program participants from being involved in litigation. *See id.* at 96:18–97:1.

## **ARGUMENT**

Summary judgment is appropriate when "there is no genuine dispute as to any material fact" and "the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  It is not a "disfavored procedural shortcut, but rather [an] integral part of the Federal Rules . . . which are designed to 'secure the just, speedy, and inexpensive determination of every action.'" *Nationstar*

*Mortg., LLC v. Ahmad*, 155 F. Supp. 3d 585, 589 (E.D. Va. 2015) (Hilton, J.) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (internal quotation omitted)).

When "a motion for summary judgment is properly made, the opposing party has the burden of showing that a genuine dispute of material fact exists." *Kirkland v. Mabus*, 206 F. Supp. 3d 1073, 1080 (E.D. Va. 2016) (Hilton, J.) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)). "While the Court will view the facts and inferences drawn in the light most favorable to the nonmoving party, the party opposing the motion for summary judgment must put forth specific facts showing a genuine issue for trial." *Nationstar Mortg., LLC*, 155 F. Supp. 3d at 589 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "[I]t is ultimately the nonmovant's burden to persuade [the Court] that there is indeed a dispute of material fact. It must provide more than a scintilla of evidence—and not merely conclusory allegations or speculation—upon which a jury could properly find in its favor." *Id.* (internal citation omitted).

Under these well-established standards, the Court should enter summary judgment for the Board on the Coalition's single Equal Protection Clause claim.

I.     **The Coalition lacks standing to maintain this suit.**

This Court previously declined to dismiss this suit based on the Coalition's lack of standing. ECF No. 50 (order denying motion to dismiss). It found, at that preliminary stage, that the Coalition had adequately alleged it was "a voluntary association with members that set out to accomplish or be involved some common purpose." ECF No. 52 at 33:20–22 (transcript of hearing). But the Coalition's "need to satisfy the[] . . . requirements [of standing] persists throughout the life of the lawsuit." *Wittman v. Personhuballah*, 578 U.S. 539, 543 (2016). "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice[.]" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (cleaned up). "In response

18

to a summary judgment motion, however, the plaintiff can no longer rest on such 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts.' " *Id.* (quoting Fed. R. Civ. P. 56(e)).

Discovery confirms that the Coalition cannot carry its burden of establishing standing. *White Tail Park, Inc. v. Stroube*, 413 F.3d 451, 459 (4th Cir. 2005). "An *association* has standing to bring suit on behalf of its *members* when" it is either "a traditional voluntary membership organization," like a trade association or union, or "its equivalent." *Hunt v. Wash. State Apple Adv. Comm'n*, 432 U.S. 333, 344–45 (1977). The Coalition is neither.

**A.     The Coalition is not a traditional membership organization.**

The Coalition possesses few, if any, of the features that characterize a traditional membership organization. *See, e.g.*, *Small Sponsors Working Grp. v. Pompeo*, No. 1:19-2600-STA-jay, 2020 WL 2561780, at *6 (W.D. Tenn. May 20, 2020). The Coalition lacks even the basic formalities of a membership organization. It:

- does not have a charter, articles of incorporation, or bylaws, SUF #64;

- is not registered with any federal agency (such as the IRS) or Virginia agency (such as the Virginia Secretary of State), SUF #64;

- has no officers, SUF #70;

- is led by volunteers who "self-nominated" themselves by "just rais[ing] their hands," SUF #70;

- has no agendas at meetings, SUF #71;

- collects no dues, SUF #72;

- has no operating budget or bank account, SUF #72;

- has no formal member application or approval process, SUF ##65-68; and

- has never put any decisions to a vote, SUF #71.

According to the Coalition, "The most formal thing that we did to institutionalize the

formation of Coalition for TJ was we created a Facebook page" that is "open" to the "public." Ex. 40, Nomani Dep., at 18:14–19:2. It clearly is not a traditional membership organization.

## B. The Coalition lacks functional equivalency with a traditional membership organization.

While an organization with no formal members can still have associational standing if it is the "functional equivalent of a traditional membership organization," *Heap v. Carter*, 112 F. Supp. 3d 402, 418 (E.D. Va. 2015), the Coalition lacks that functional equivalency. As this Court explained in *Heap*, "[f]unctional equivalency is determined if the organization (1) serves a specialized segment of the community; (2) represents individuals that have all the indicia of membership, including (i) electing the entity's leadership, (ii) serving in the entity, and (iii) financing the entity's activities, and (3) its fortunes are tied closely to those of its constituency." *Id*. These indicate whether members exercise the requisite "measure of control over the organization." *Grp. Health Plan, Inc. v. Philip Morris, Inc*., 86 F. Supp. 2d 912, 918 (D. Minn. 2000) (requirement "assures the substantial nexus between the organization and its members necessary to meet the Article III injury requirement"). *See also Hunt,* 432 U.S. at 344–45.

Although the burden rests with the Coalition to prove its standing, *see, e.g.*, *Md. Highways Contractors Ass'n, Inc. v. Maryland*, 933 F.2d 1246, 1253 (4th Cir. 1991), the Coalition has brought forth no evidence to establish *any* of the required elements identified in *Heap*. The second *Heap* element is the one most obviously missing here. As summarized above, the Coalition does not bear *any* indicia of traditional membership, much less "*all* the indicia of membership" listed in elements 2(i)–(iii).

For starters, the Coalition's consideration of what constitutes "membership" is so loose as to be meaningless. The Coalition has no formal criteria for membership—just "supporting the mission of the organization" can make one a member, but the Coalition has expressed its mission

in different ways to different audiences.  SUF #67.  The Coalition also counts as "members"
those who have completed a form on the "Contact Us" tab of its website, and are thereby joined
to the Telegram messaging application.  SUF #65.  But that form does not ask those filling out
the form to state where they reside, their race, whether they have any children, much less
whether their children are or could ever be eligible to attend TJ.  SUF #66.  Indeed, because the
online contact form is not labeled as a "membership application," SUF #66, the Coalition cannot
even show that all the individuals who have filled out these forms actually know that they are
"members" of an association.  *See Sorenson Commc'ns, LLC v. FCC*, 897 F.3d 214, 225 (D.C.
Cir. 2018) (holding that online-information forum with email "subscribers" and Facebook
followers did not qualify as a membership association).

Even if the membership were carefully defined, the Coalition's structure simply does not
provide a "means by which [the members] express their collective views and protect their
collective interests."  *Hunt*, 432 U.S. at 344–45.  Relevant to *Heap* element 2(i), the Coalition
has no officers, and instead is led by an unelected group of volunteers who "self-nominated"
themselves by "just rais[ing] their hands," SUF #70.  The fact that the Coalition is "run by
people who are self-appointed . . . weighs heavily against its being considered a membership
organization."  *Package Shop, Inc. v. Anheuser-Busch, Inc*., CIV. A. No. 83-513, 1984 WL 6618,
at *40–41 (D.N.J. Sept. 25, 1984).

The absence of membership control means that the Coalition's self-appointed leaders, not
the members whom the Coalition purports to represent in this case, are the ones who chart the
Coalition's course and can make up the rules as they go along.  Without that "element of
[membership] control, there is simply no assurance that the party seeking judicial review
represents the injured [p]arty, and not merely a well-informed point of view."  *Health Research*

*Grp. v. Kennedy*, 82 F.R.D. 21, 27 (D.D.C. 1979).  In fact, the Coalition admits it has never put *any* decisions to a vote, which necessarily includes whether to initiate this lawsuit.  SUF #71.  *See Package Shop, Inc.*, 1984 WL 6618, at *41 ("Significantly, the alleged members of the organization did not vote to bring this lawsuit . . . . [T]here is no evidence that a majority of the membership would have approved this lawsuit.").

The Coalition also has not adduced evidence showing that its members are financing the Coalition's activities (*Heap* element 2(iii)).  *See Funeral Consumers All., Inc. v. Serv. Corp. Int'l*, 695 F.3d 330, 344 n.9 (5th Cir. 2012) ("If the association seeking standing does not have traditional members, as here, the association establishes its standing by proving that . . . its members . . . finance the organization's activities, including the case's litigation costs.").  The Coalition has made clear it does not collect dues or membership application fees.  SUF #72.  While the Coalition admits to raising money for *other* groups, including at least one Rule 501(c)(4) political lobbying organization, SUF #72, it has failed to establish that its members are financing its activities.  *See Gettman v. DEA*, 290 F.3d 430, 435 (D.C. Cir. 2002) (holding that *High Times Magazine* lacked standing to represent its readers' interests because it failed to show that "its 'readers and subscribers' played any role in selecting its leadership, guiding its activities, or financing those activities").

Just as the Coalition has not adduced evidence establishing the second *Heap* element, it cannot satisfy the first and third elements either.  Those elements condition representational standing on the association's serving "a specialized segment of the community," such that the association's "fortunes are tied closely to those of its constituency."  112 F. Supp. 3d at 418.  The Coalition's broad membership is not so "specialized" or aligned with the relief sought here.  To be sure, the Complaint alleges that the Coalition's members include current parents of seventh-

and eighth-grade students planning to apply to TJ, Compl. ¶¶ 12–13—but the Coalition's sworn

testimony could not support that allegation, *see* SUF ##66–69.

In sum, discovery has confirmed that the Coalition is the kind of "loose-knit association"

that, lacking membership control, cannot facilitate representational standing. *Hunt*, 432 U.S. at

344–45; *Heap*, 112 F. Supp. 3d at 419; *Small Sponsors,* 2020 WL 2561780, at *6.

## II. The Coalition cannot prove a claim of intentional discrimination against Asian-American students.

Even if the Coalition could demonstrate associational standing, the School Board would

still be entitled to summary judgment because the Coalition cannot prove that the TJ admissions

policy violates the Equal Protection Clause.

To prevail, the Coalition must first demonstrate that the policy is subject to strict scrutiny.

*See* Compl. ¶¶ 63–67 (alleging only that the policy does not withstand strict scrutiny). It cannot.

As the Coalition has always conceded, the new admissions policy is "facially race-

neutral." Compl. ¶ 63. A facially race-neutral policy is not subject to strict scrutiny unless the

plaintiff can demonstrate *both* (1) that the policy has a "racially disproportionate impact"; *and*

(2) that it had an "invidious discriminatory purpose." *Vill. of Arlington Heights v. Metro. Hous.*

*Dev. Corp.*, 429 U.S. 252, 265–66 (1977). *Accord Personnel Adm'r of Mass. v. Feeney*, 442

U.S. 256, 272 (1979) ("if a neutral law has a disproportionately adverse effect upon a racial

minority, it is unconstitutional under the Equal Protection Clause only if that impact can be

traced to a discriminatory purpose"); *Bos. Parent Coal. for Acad. Excellence Corp. v. Sch.*

*Comm. of City of Bos. ("Boston Parent II")*, 996 F.3d 37, 45 (1st Cir. 2021); *Boyapati v.*

*Loudoun Cty. Sch. Bd*., No. 1:20-cv-01075 (AJT/IDD), 2021 WL 943112, at *8 (E.D. Va.

Feb. 19, 2021) (Trenga, J.).

The Coalition cannot prove either, let alone both, elements.

**A.** **The admissions policy does not have a disparate impact on Asian Americans.**

The undisputed facts demonstrate that the Coalition cannot carry its burden of showing that the admissions policy disproportionately burdens Asian-American students.

      **1.** **The policy does not disproportionately burden Asian Americans.**

The Coalition has adduced utterly no evidence that Asian-American students are disproportionately harmed by the TJ admissions policy. Asked which aspects of the policy it is contending disparately impacts Asian-American students, the Coalition stated: "The elimination of the nationally-normed, standardized admissions test, coupled with the 1.5% middle school limitation, had an adverse disparate impact on Asian-American students." Ex. 41, Coalition's Ans. to Interrog. 6. The only data that the Coalition cited as evidence of "disparate impact" was "the admissions statistics of the TJ Class of 2025." *Id.*

But the admissions statistics of the TJ Class of 2025 show no evidence of any disparate impact on Asian-American students. On the contrary, Asian-American students were the largest racial group among the students offered admission (54.36%), and their share of offers was also higher than their share of the applicant pool (48.59%). SUF #59. Of the four other racial groups, three groups (Black, White, and Multi-Racial/Other students) each comprised shares of admissions offers *smaller* than their relative shares of the applicant pools. SUF #59. So the Coalition cannot show that the new policy leaves Asian-American students worse off than non-Asian-American students. The statistics demonstrate just the opposite.

      **2.** **The Coalition cannot prove disparate impact by comparing this year's admission numbers to last year's.**

The Coalition cannot prove disparate impact by the theory—advanced in its failed renewed motion for preliminary injunction (ECF 59)—that Asian-American students were disparately impacted because the Asian-American students who applied for the Class of 2025

received a smaller share of offers than those who applied for the Class of 2024.

As the U.S. District Court for the District of Massachusetts recently explained in a similar case, "the comparator used by the Coalition [is] specious":

> The racial demographics . . . under the old plan were a disjunctive consequence year to year; there was no guarantee that any White or Asian student would even be admitted. To use a variable consequence as the baseline against which all future must comport is erroneous. White and Asian students are not "losing" seats simply because last year different White and Asian students were exceedingly privileged to win a high number of seats without any evidence that this year['s] students would have fared the same.

*Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. of City of Bos. ("Boston Parent I")*, No. CV 21-10330-WGY, 2021 WL 4489840, at *15 n.20 (D. Mass. Oct. 1, 2021); *see also Bos. Parent II*, 996 F.3d at 46 (noting that plaintiff "offer[ed] no analysis or argument for why" comparing the projected admissions rate of Asian-American students to the previous year's admissions rate is "apt for purposes of determining adverse disparate impact").

The Coalition's theory does not compare how the new policy affects Asian-American applicants to non-Asian-American applicants. Instead, it compares the Asian-American students who applied under the new policy in 2021 to the Asian-American students who applied under the old policy in 2020. It's as meaningless as comparing the numbers in Harvard's admitted class to Yale's admitted class. To accept the Coalition's comparison as meaningful, the Court would have to assume that the students of each of the five racial groups who applied in 2021 are identical to all the students of their respective racial groups who applied in 2020—an assumption that is tantamount to stereotyping all students based simply on their race. The Court should reject such a racially discriminatory and illogical assumption.

Even if the numerical differences between the Classes of 2024 and 2025 had any relevance, the Coalition has adduced no evidence that the differences are statistically significant.

A plaintiff who fails to "produce statistical evidence demonstrating a causal connection cannot make out a prima facie case of disparate impact." *Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc*., 576 U.S. 519, 543 (2015); *Boston Parent II*, 996 F.3d at 46 ("[a] party claiming a disparate impact generally does not even get to first base" without evidence of statistical significance).

Without evidence of disparate impact, the Coalition's Equal Protection claim fails.

**B.      The Coalition cannot prove that the Board acted with a racially discriminatory purpose.**

Even if the Coalition could demonstrate that the admissions policy has a disparate impact on Asian Americans (which it cannot), summary judgment would still be appropriate because the Coalition cannot show that the Board adopted the changes for a discriminatory purpose.

**1.      The admissions policy is not discriminatory merely because the Board was aware that it could have an impact on racial diversity.**

The Coalition has advanced the theory that the new admissions policy may be invalidated if the Board believed that the changes could, or would, have an impact on racial demographics. But that legal theory is foreclosed by Supreme Court precedent. *See Anderson*, 375 F.3d at 87 ("The Supreme Court has explained that the motive of increasing minority participation and access is not suspect.").

Justice Kennedy's concurring opinion in *Parents Involved in Community Schools v. Seattle School District No. 1*, 551 U.S. 701 (2007), explains that public schools may adopt facially race-neutral policies to affect the racial composition of a school. *Id*. at 787–89 (Kennedy, J., concurring in part and concurring in the judgment). He stated: "In the administration of public schools . . . it is permissible to consider the racial makeup of schools and to adopt general policies *to encourage a diverse student body, one aspect of which is its racial composition.*" *Id*. at 788 (emphasis added).

> [*School authorities*] concerned that the student-body compositions
> of certain schools interfere with the objective of offering an equal
> educational opportunity to all of their students . . . *are free to
> devise race-conscious measures to address the problem* in a
> general way and without treating each student in different fashion
> solely on the basis of a systematic, individual typing by race.

*Id.* at 788–89 (emphasis added).

Examples of such measures include "strategic site selection of new schools; drawing attendance zones with general recognition of the demographics of neighborhoods; allocating resources for special programs; recruiting students and faculty in a targeted fashion; and tracking enrollments, performance, and other statistics by race." *Id*. at 789. These measures have been considered "for generations," he said, and governmental actors "should be permitted to employ them with candor and with confidence that a constitutional violation does not occur whenever a decisionmaker considers the impact a given approach might have on students of different races." *Id*. *See also Boston Parent I*, 2021 WL 4489840, at *15 ("It ought be remembered that geographic and socioeconomic diversity are appropriate, validated educational goals in their own right, without any regard to racial demographics.").[1]

Thus, ever since *Parents Involved*, courts have understood that race-neutral student-assignment plans adopted to promote equality of access for all students are subject only to rational-basis review, even if adopted with the hope or goal of improving racial diversity. The Supreme Court confirmed that point in 2015 in *Inclusive Communities*, where Justice Kennedy

---

[1] In his plurality opinion in *Parents Involved*, Chief Justice Roberts criticized the school districts for failing to show they had seriously considered "workable race-neutral alternatives," 551 U.S. at 735—noting the record evidence of such alternatives that had not been considered or had been rejected without serious consideration. Such race-neutral alternatives included considering poverty or using a lottery to assign students to schools. *See* J.A. at *252a, *Parents Involved*, 551 U.S. 701 (2007) (No. 05-908) [available at 2006 WL 2468696].

explained that government officials may use "race-neutral tools" to "foster diversity and combat racial isolation" without running afoul of the Equal Protection Clause. 576 U.S. at 545.

> **2.** **The policy adopted by the Board is legally indistinguishable from the plans upheld across the country and the Coalition's own proposal for TJ admissions.**

Four federal circuits have followed Justice Kennedy's *Parents Involved* opinion to hold that race-neutral public-school student-assignment plans are subject only to rational-basis review, even if adopted with the hope or goal of improving racial diversity. *See Anderson*, 375 F.3d at 87 (1st Cir. 2004) ("Contrary to plaintiffs' arguments, the mere invocation of racial diversity as a goal is insufficient to subject the New Plan to strict scrutiny."); *Doe ex rel. Doe v. Lower Merion Sch. Dist.*, 665 F.3d 524, 553 (3d Cir. 2011) (upholding redistricting plan that was race neutral on rational-basis review, despite the school district's awareness of racial consequences); *Lewis v. Ascension Parish Sch. Bd.*, 806 F.3d 344, 357 (5th Cir. 2015) (agreeing that "a school zoning plan that assigns students to schools based on their home addresses is facially race neutral, and the rezoning body's consideration of demographic data in drawing the relevant geographic boundaries does not amount to making an express classification"); *Spurlock v. Fox*, 716 F.3d 383, 395 (6th Cir. 2013) (upholding geographic assignment plan); *see also Christa McAuliffe Intermed. Sch. PTO, Inc. v. de Blasio*, 364 F. Supp. 3d 253, 279–80 (S.D.N.Y.) (finding equal-protection challenge unlikely to succeed against race-neutral program designed to increase racial diversity at specialized public high schools), *aff'd*, 788 F. App'x 85 (2d Cir. 2019).

And this Court recently followed *Parents Involved* in a very similar case challenging the Loudoun County School Board's decision to change the admissions policy at its exclusive STEM school to allot 75% of the seats to qualified students based on the geographic location of the student's middle school. *Boyapati*, 2021 WL 943112, at *2. The plaintiff's claim of

"discriminatory intent" against Asian American students could not be inferred simply because school officials acted "to promote the racial and ethnic diversity of admitted students"; it was not a "reasonable inference that the school's plan was devised to discriminate against Asian students and not to promote socio-economic diversity." *Id.* at *9. Likewise, the district court and First Circuit in *Boston Parent* found that the Boston school system's zip-code-based student-assignment plan for its prestigious "Exam" schools did not trigger strict scrutiny despite that school board members expressed hope that the race-neutral plan would increase the number of historically underrepresented Black and Hispanic students. *Boston Parent I*, 2021 WL 4489840, at *10–11; *Boston Parent II*, 996 F.3d at 46–50. Indeed, "[t]o find such conduct subject to strict scrutiny would render any school admissions criteria subject to strict scrutiny if anyone involved in designing it happened to think that its effect in reducing the underrepresentation of a group was a good effect. Plaintiff cites no case so holding." *Boston Parent II*, 996 F.3d at 50. The Coalition cannot distinguish the Board's TJ admissions policy from the ones that have been upheld across the country.

Nor can the Coalition distinguish its own "Second-Look Proposal" for TJ admissions, which it repeatedly urged the Board to adopt, from the plan the Board adopted. Instead of eliminating the standardized tests and guaranteeing each middle school seats equivalent to the 1.5% of its eighth-grade population, the Coalition's proposal would have retained the standardized tests but guaranteed each middle school at least five applicants in the semifinalist round. The Coalition touted its Second-Look Proposal as "a concrete proposal…to materially increase the numbers of underrepresented minorities at [TJ], while maintaining the excellence of education at [TJ]." Ex. 18, at 2. The Second-Look Proposal was also facially race-neutral but the Coalition believed that "there is a disproportionate number of kids, who are Black and

Hispanic, who live in parts of the county that are historically underrepresented and thus its proposal "would result in disproportionately more Black and more Hispanic students benefiting.…" SUF #24. The Coalition's own plan was a facially race-neutral plan intended to increase the representation of disadvantaged groups, including some racial minorities—the same objective that it accuses the Board of having and the objective it is contending is unlawful. The Coalition cannot explain why, under its reading of the law, the Board could have chosen the Second-Look Proposal but not the race-neutral 1.5% Plan.

> **3.** **The Coalition cannot show that the Board adopted changes to the TJ policy to reduce the number of Asian-American students.**

The Coalition's case is doomed not only by the law but also by the facts. The Coalition has turned up no evidence to prove its assertion that the admissions policy changes were "specifically intended to reduce the percentage of Asian-American students." Compl. ¶ 2. It has argued that admissions are a "zero sum game" because measures that try to increase the representation of "underrepresented" groups necessarily mean decreasing access for other groups. ECF No. 25 at 24. Not so. "While the increase of a zero-sum resource to one group necessitates the reduction of that resource to others, the case law is clear -- the concern is action taken *because of* animus toward a group, not *in spite of* an action's necessary effect on a group or groups. *Boston Parent II*, 2021 WL 4489840, at *15 (citing *Feeney,* 442 U.S. 258). *See also Boyapati*, 2021 WL 943112, at *8 (assuming that Loudoun County's geography-based admissions policy would decrease Asian-American enrollment but finding no plausible allegation of intentional discrimination); *see also* FCSB 12(b) Br. 24–29, ECF No. 22.

The Coalition also has no evidence to back up its claim that the Board changed the TJ admissions policy because it would change the racial make-up of the school. ECF No. 69, at 8–9. Indeed, the undisputed evidence shows that no one at FCPS conducted "any analysis to

predict how the 1.5% plan would affect the racial makeup of students admitted to TJ under the new admissions process."  SUF #49.  The absence of such evidence undermines any claim that the 1.5% Plan was an effort at racial balancing or "specifically intended to reduce the percentage of Asian-American students."  Compl. ¶ 2.

Moreover, the comments offered by Board members at the December 17, 2020 meeting, at which the 1.5% plan was adopted, made clear that middle-school diversity at TJ was the objective:

- Member Keys-Gamarra noted, "I am glad to see that we have these percentages that will come from every middle school, but I think it's telling we're talking about 1.5 percent; because that tells the public that we have middle schools where we didn't even have 1.5 percent…."  Ex. 38, Transcript of December 17, 2020 Mtg., at 138:25–139:8.

- Member Cohen celebrated that "[a]ll middle schools will now be represented at TJ."  *Id.* at 116:13–15.

- Member Tholen felt that the motion would "thoughtfully ensure the increased geographic diversity of entrants" and would "build the strength of the TJ pipeline in every single one of our middle schools."  *Id.* at 109:23–110:7.

- Member Pekarsky thought the motion "will ensure that we are identifying highly-qualified academically-exceptional students in all FCPS schools and providing them the opportunity to enroll at [TJ]."  *Id.* at 110:17–23.

- Member Sizemore Heiser observed, "[I]t is important that TJ be the place where those who have that passion and aptitude for STEM can access it from all across the county."  *Id.* at 122:11–17.

As Member Corbett Sanders summarized it, the Board's "desire" was "to ensure that there is equity of access and equity of opportunity for students throughout Fairfax County at each individual middle school in Fairfax County to be able to take advantage of the wonderful opportunities at TJ."  *Id.* at 112:11–20.  That goal of ensuring County-wide geographic representation at TJ is entirely legitimate.

**4.      No procedural irregularities support the Coalition's theories.**

In *Arlington Heights*, the Supreme Court observed that "[d]epartures from the normal procedural sequence . . . *might* afford evidence that improper purposes are playing a role." 429 U.S. at 267 (emphasis added). Contrary to the Coalition's suggestion, Compl. ¶¶ 33–35, nothing about the process the Board followed in adopting the new admissions policy—consisting of successive proposals, presentations, and many hours of debate over the course of many months, SUF ##12–43—demonstrates an improper, discriminatory motive.

The Coalition complains that the Board eliminated the standardized-testing requirement at the October 6, 2020 work session, asserting that "School Board work sessions typically do not include votes." Compl. ¶ 33. But nothing in any Board policy or in Virginia's open-meeting laws precludes it. SUF #32. The Board has taken votes at previous work sessions. SUF #32. The Coalition is likewise mistaken to suggest, Compl. ¶¶ 33–34, that the Board had to take public comment before voting to drop standardized testing. That decision is not among the narrow category of school-board actions for which Virginia law requires a prior public hearing. *See* Va. Code Ann. § 22.1-79(8) (Supp. 2020). In any event, the Board already had input from the public about the TJ admissions policy and the standardized-testing requirement. SUF #33. Indeed, this discussion occurred against the backdrop of a nationwide, decades-long (and accelerating) debate over the value and drawbacks of standardized testing.

Even assuming for argument's sake that holding a vote at a School Board work session was uncommon, nothing supports the assumption that the School Board did so to harm or help a particular racial group. *All* TJ applicants would have needed to take the standardized tests the following month, and all under the complicating conditions and extraordinary precautions triggered by the COVID-19 pandemic. SUF #31. So the most obvious explanation for the timing of the decision was the desire to give families and staff sufficient time to change their

32

plans. *See* Ex. 23, at 64:11–65:1 ("[T]he decision on the test really is sensitive to really this week…because that testing normally happens in October and November."). "As between that 'obvious alternative explanation' . . . and the purposeful, invidious discrimination [plaintiff] asks us to infer, discrimination is not a plausible conclusion." *Ashcroft v. Iqbal*, 556 U.S. 662, 682 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 567 (2007)).

Finally, the Coalition's claim that the School Board "rushed" through—over the course of three months—changes to the admission process in order to obscure its racially discriminatory motives is disproved by the uncontested record. It is undisputed that Virginia legislation passed in May 2020 required Governor's Schools to examine their admissions processes and submit by October 2020 their plans for increasing equality of access for students from disadvantaged backgrounds. SUF #12. It is also undisputed that Secretary Qarni was particularly focused on TJ and made clear that he and/or the Governor would be recommending changes to the admissions processes at TJ. SUF ##12–16. It is also undisputed that FCPS was "attempting to 'get out ahead' of what they thought Secretary Qarni was going to demand that they do." SUF #15. Though the Coalition has pilloried Secretary Qarni's efforts as anti-Asian, SUF #14, the record establishes that FCPS was trying to comply with and anticipate State-level legislative and administrative actions, which conclusively proves a legitimate, non-discriminatory purpose.

The Coalition's legal theory that the Board "rushed" changes to TJ admission is also belied by its admission that the issue of TJ admissions was "taking up a disproportionate amount of the county's time." Ex. 5, Miller Dep., at 76:21–77:4. Indeed, the record shows that the Board devoted an inordinate amount of time to a subject that affected only a small segment of its 188,000+-student population, in the face of such pressing needs as how to return students to in-person learning during a global pandemic. *See generally* Pekarsky Dep., at 21–56 (describing

meetings and work sessions); Exs. 26, 28, 37; *see also, e.g.*, Ex. 23, Transcript of October 6, 2020 Work Session, at 197:11–16 (Sizemore-Heiser: "I do hope we get this done sooner than later…because it's taking away time [from] like things like getting back all of our kids into schools"); Ex. 38, Transcript of December 17, 2020 Board Meeting at 98:11–13 (Omeish: "[W]e've been hashing this out for many weeks and months."); *id.* at 100:7–9 (Anderson: "[W]e have been debating this issue for many months now."); *id.* at 118:5–10 (Meren: "I've learned a lot in these past months. I've read analysis, letters, reports, historical accounts of TJ and proposals, had conversations and I'm making the best decision I can tonight….")

     **5.**     **The Coalition has not shown that any School Board members' votes— let alone a majority's—were motivated by discriminatory intent.**

Finally, there is no evidence that *any* School Board member, let alone a majority of 12 members, voted to change the TJ admissions policy out of anti-Asian-American animus.

The Coalition identified only a single Board member—Ricardy Anderson—as having had the goal of racial balancing. Ex. 5, Miller Dep., at 35:7–12. It offered merely that Anderson had "requested that the racial demographics of TJ reflect that…of the rest of…the catchment area, in particular, Fairfax County." *Id.* at 35:9–12. But even if the Coalition could show that Anderson's vote was improperly motivated (which it cannot), it would not affect the Board's approval of the 1.5% Plan: she was the sole Board member to vote ***against*** it. SUF #47.

The Coalition has no evidence to substantiate the allegations in the Complaint that read discriminatory intent into statements by multiple Board members. *See, e.g.*, Compl. ¶¶ 45–47. Not one of the cited comments supports an inference of racism. At most, they show that some Board members were hopeful that the admissions policy changes would eliminate barriers to entry for historically disadvantaged groups at TJ—an objective that is permissible, *see* Part II.B.1 *supra*, and consistent with the Coalition's own goals, SUF ##23–25, 27.

Yet, even if *all* of the comments attacked in the Complaint showed each individual speaker's purported anti-Asian-American animus, the Coalition would still be without sufficient evidence to impugn the votes by the 12-member School Board, which were unanimous or near-unanimous. *See* SUF ##30, 47. As courts have regularly held in other contexts, an unconstitutional motive held by less than a majority of a multi-member municipal body is not attributable to the entire voting body. *See, e.g.*, *Matthews v. Columbia Cty.*, 294 F.3d 1294, 1297 (11th Cir. 2002) ("Because policymaking authority rests with the Commission as an entity, the County can be subject to liability only if the Commission itself acted with an unconstitutional motive. An unconstitutional motive on the part of one member of a three-member majority is insufficient to impute an unconstitutional motive to the Commission as a whole."); *Kawaoka v. City of Arroyo Grande*, 17 F.3d 1227, 1239 (9th Cir. 1994) (rejecting equal protection challenge to city plan based on racist comments by city council member; noting "the council adopted the plan unanimously and there is no evidence that any other council member acted with discriminatory intent or that the council as a whole took the action with discriminatory intent").[2] The Coalition falls well short of demonstrating racial bias by a majority of Board members.

## CONCLUSION

The Court should grant summary judgment in favor of the School Board.

Respectfully submitted,

FAIRFAX COUNTY SCHOOL BOARD

---

[2] *Cf. LaVerdure v. Cty. of Montgomery,* 324 F.3d 123, 125 (3d Cir. 2003) ("It is undisputed that only a majority of the three-member Board is authorized to establish policy on behalf of the County. . . .Therefore, whatever the contents of Marino's statements, because he was only one member of the Board, those comments do not constitute County policy."); *Jeffries v. Harleston*, 52 F.3d 9, 14 (2d Cir. 1995) ("[T]he nine votes [of 14 on CUNY Board of Trustees] based on legitimate grounds constitute a superseding cause breaking the causal chain between the tainted motives [of non-voting CUNY Chancellor and City College] and the decision").

By:        /s/ _____
         Sona Rewari (VSB No. 47327)
         Daniel Stefany (VSB No. 91093)
         HUNTON ANDREWS KURTH LLP
         2200 Pennsylvania Avenue, NW
         Washington, DC 20037
         Telephone: (202) 955-1500
         Facsimile: (202) 778-2201
         srewari@HuntonAK.com
         dstefany@HuntonAK.com

         Trevor S. Cox (VSB No. 78396)
         HUNTON ANDREWS KURTH LLP
         951 E. Byrd Street
         Richmond, VA 23219
         Telephone: (804) 788-7221
         Facsimile: (804) 788-8218
         tcox@HuntonAK.com

         *Counsel for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that on December 3, 2021, I electronically filed this document with the

Clerk of the Court using the CM/ECF system, which will send a notification of such filing (NEF)

to counsel of record for all Parties.

By:        /s/ _____
         Sona Rewari (VSB No. 47327)