

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

COALITION FOR TJ                    )
                                    )
                                    )
    VS.                             )    1:21-CV-296  CMH/JFA
                                    )
                                    )    ALEXANDRIA, VIRGINIA
                                    )    SEPTEMBER 17, 2021
FAIRFAX COUNTY SCHOOL BOARD         )
_____)

_____

**TRANSCRIPT OF MOTIONS HEARING**
**BEFORE THE HONORABLE CLAUDE M. HILTON**
**UNITED STATES DISTRICT JUDGE**
_____

**Proceedings reported by stenotype, transcript produced by**

**Julie A. Goodwin.**

2

1                        A P P E A R A N C E S

2

3    FOR THE PLAINTIFF:
          PACIFIC LEGAL FOUNDATION
4         By:  MR. CHRISTOPHER M. KIESER
          MS. ERIN E. WILCOX
5         930 G Street
          Sacramento, California 95814
6         916.419.7111
          ckieser@pacificlegal.org
7         ewilcox@pacificlegal.org

8         PACIFIC LEGAL FOUNDATION
          By:  MS. ALISON E. SOMIN
9         3100 Clarendon Blvd.
          Suite 610
10        Arlington, Virginia 22201
          202.557.0202
11        asomin@pacificlegal.org

12        PACIFIC LEGAL FOUNDATION
          By:  MR. GLENN E. ROPER
13        1745 Shea Center Drive
          Suite 400
14        Highlands Ranch, Colorado 80129
          720.344.4881
15        geroper@pacificlegal.org

16

17   FOR THE DEFENDANTS:
          HUNTON ANDREWS KURTH LLP
18        By:  MS. SONA REWARI
          2200 Pennsylvania Avenue, NW
19        Washington, DC 20037
          202.955.1974
20        srewari@huntonak.com

21        HUNTON ANDREWS KURTH LLP
          By:  MR. DANIEL R. STEFANY
22        951 East Byrd Street
          Riverfront Plaza - East Tower
23        Richmond, Virginia 23219
          804.788.8200
24        dstefany@hunton.com

25

Julie A. Goodwin, CSR, RPR

3

1                           A P P E A R A N C E S

2


3    ALSO PRESENT:
           MR. JEREMY SHUGHART, Director of Admissions
4          Fairfax County School Board
           Thomas Jefferson High School for Science and Technology
5

6


7    OFFICIAL U.S. COURT REPORTER:
           MS. JULIE A. GOODWIN, CSR, RPR
8          United States District Court
           401 Courthouse Square
9          Eighth Floor
           Alexandria, Virginia  22314
10         512.689.7587

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1   (SEPTEMBER 17, 2021, 10:03 A.M., OPEN COURT.)

2           THE COURTROOM DEPUTY:  Civil Action Number 21-CV-296,

3   *Coalition for TJ versus Fairfax County School Board, et al.*

4           Counsel, please note your appearances for the

5   record.

6           MR. KIESER:  Christopher Kieser for plaintiffs --

7   plaintiff.

8           MS. REWARI:  Good morning, Your Honor.  Sona Rewari

9   from Hunton Andrews Kurth for the defendant, and with me is

10  Daniel Stefany, also from my firm, and Mr. Jeremy Shughart from

11  the Fairfax County Public Schools.  Mr. Shughart has provided a

12  declaration in this case, and he is here to address any

13  questions the Court may have.

14          THE COURT:  All right.

15          MS. REWARI:  Thank you.

16          MR. KIESER:  And with me is Erin Wilcox, Alison Somin,

17  and Glenn Roper, also for plaintiff.

18          THE COURT:  All right.

19          This comes on on your motion.

20          MR. KIESER:  Yes.  Good morning, Your Honor, and I'll

21  be brief.  Chris Kieser for the Coalition for TJ.

22          When we were here in May with much the same body of

23  evidence, this Court recognized the school board's overhaul of

24  the admissions criteria for Thomas Jefferson High School was

25  designed to effect the racial composition of the school.  Since

Julie A. Goodwin, CSR, RPR

5

1   that hearing, and the denial of the first preliminary junction

2   motion, we learned an important new data point.  The first year

3   under the challenge plan, the Asian-American proportion of the

4   admitted class at TJ fell by more than a quarter.

5   Asian-Americans received almost 60 fewer seats at TJ, even

6   though FCPS doled out 60 additional offers.

7               The new data confirmed that not only was the plan

8   designed to effect the racial composition of the school, it

9   succeeded in doing so to the great detriment of atrium --

10  Asian-American students.  That purpose and effect means the

11  Coalition is likely to succeed on the merits of its equal

12  protection claim.

13              The Court declined to issue a preliminary

14  injunction last time, as far as we understand, because it -- it

15  was confident that -- Your Honor was confident we could reach a

16  final decision in this case before an injunction would be

17  necessary for the class of 2026.  But with the admissions

18  process scheduled to go into effect just -- begin in just over

19  a month, on October 25th, a preliminary injunction is necessary

20  now to preserve the status quo, the last uncontested status

21  between the parties.  It's far from guaranteed that a final

22  decision on the merits would come early enough to provide

23  effective relief for RA and the class of 2026, as the Coalition

24  recognizes that the board's interest in not disrupting the

25  established admissions process increase once the process

6

 1   begins.

 2            Preliminary relief now would avoid that problem.

 3   And the --

 4            THE COURT:  Now, I understand your concern, but

 5   this -- the final pretrial conference is set for the end of

 6   October.  I can give you a January trial date, so we can have

 7   this decided in January.

 8            MR. KIESER:  Your Honor, that -- that would be, of

 9   course -- I mean, we would not object to that, of course, but I

10   think even then at that point by January the board's interest

11   in -- in not overhauling the -- the entire admissions process

12   that started in October would perhaps make it difficult for the

13   Court to issue an order, a prohibitory injunction enjoining the

14   board's actions from last fall and essentially requiring the

15   board to go back to the 2024 -- the class of 2024 admissions

16   process when the current process had already started.  And

17   the -- and I would note that the current process has different

18   eligibility requirements, so there are some people who would be

19   eligible to apply under the old process who are not eligible.

20            THE COURT:  But if some decision is made in January,

21   that gives plenty of time for the process to be straightened

22   out, doesn't it?

23            MR. KIESER:  I mean, I -- I would recog -- I would

24   just note that as time goes on it makes -- it's very -- much

25   more difficult --

7

1          THE COURT:  Well, I'm sure they're going to argue

2     that, but I -- it seems to me in the posture we're in that kind

3     of falls on deaf ears.  I -- this is going to come up very

4     quickly.  And if it's determined that this process has been

5     discriminatory, it seems to me there's plenty of time to change

6     it.

7          MR. KIESER:  Well, Your Honor, we would submit that

8     the best time to change the process, at least for the class of

9     2026, would be before the process begins, and that is within

10    the next five weeks.  If we were to do it in January, the

11    logistical issues that the board mentions in their brief would

12    only increase, and the likelihood that the Court could order

13    effective relief by the end of January would be much less.

14    So I --

15         THE COURT:  But the board's on notice.  They

16    understand that we're trying this case, and we don't know what

17    the outcome is going to be yet, so they've got to be prepared

18    for that, don't they?

19         MR. KIESER:  I'm -- that's certainly true, Your Honor,

20    but that's -- the same situation has been -- the same situation

21    has existed since Your Honor denied the motion to dismiss in

22    May, and yet even with this preliminary injunction motion, they

23    make the same arguments about overhauling the admissions

24    process at a late date.  So I think those arguments continue

25    even though I think the board's been on notice --

Julie A. Goodwin, CSR, RPR

8

1    THE COURT:  Well, those arguments are always going to

2  be there, but it seems like that I'm in a -- in the same

3  position that I am -- that I was before.  I mean, what kind of

4  disruption is it going to cause for me to give a preliminary

5  injunction now?  I've been in the same position I was before,

6  it seems to me.

7    MR. KIESER:  Well, I would submit, Your Honor, that a

8  preliminary injunction now for the class of the 2026 process

9  that is yet to begin is much less disruptive than say had you

10  ordered a preliminary injunction in May for the old admissions

11  process -- for the admissions process from last year, which was

12  almost complete.

13    At this point, you could issue an order and --

14  and -- and there would be ample time to prepare to change the

15  process for anything you might order.  Whereas if you do it in

16  January, that might not be the case.  And if -- I think if the

17  Court -- as you recognized in May, that disruption increases as

18  time goes on.

19    So, we would submit that a preliminary injunction

20  now would minimize the disruption and allow the Court to order

21  a prohibitory injunction that goes into effect five weeks

22  before the -- the admissions process begins.  And that's --

23  that's our position on that.  I mean, I understand if that's --

24    THE COURT:  I understand your position.

25    MR. KIESER:  And I guess, you know, as far as the --

9

1   the remaining factors, I mean, we think that -- we demonstrated

2   that at least one Coalition member will suffer irreparable harm

3   because if the Coalition is likely to succeed on the merits,

4   then the -- the Coalition member's child will have to compete

5   on an unequal playing field, and that isn't -- is the equal

6   protection injury under *Parents Involved* and *Northeastern*

7   *Florida*, so that's sufficient to satisfy the irreparable harm

8   argument.

9          And then as far as the public interest and the

10  balance of the equities, this case is against the government

11  defendants, so those -- those -- and it's a constitutional

12  case, so those factors merge.  And generally speaking, the

13  Fourth Circuit in *Legend Night Club* and in *Newsome* has waived

14  the public interest in enforcing constitutional rights

15  significantly more than government arguments to -- that they

16  will be subject to hardship due to an injunction.

17         So we would submit that a preliminary injunction

18  is -- all four *Winter* factors are satisfied and the preliminary

19  injunction is -- is appropriate.

20         THE COURT:  All right.

21         MR. KIESER:  Thank you.

22         MS. REWARI:  Good morning.

23         Your Honor, as you've recognized, you expressly

24  ruled on this issue back in May, and there are really no

25  grounds for reconsideration that are presented in the papers.

10

1   There's a suggestion that the Court miscalculated the timetable

2   for this case.  And when we were here in May, there wasn't even

3   a scheduling order, so no one could have expected that this

4   case would be decided by October.

5              And the schedule even back in May was known because

6   Mr. Shughart supplied a similar declaration in May that

7   explained that historically the old process would start in

8   early September in order to be able to be completed in six

9   months.  And of course, then Your Honor issued a scheduling

10  order in early June, and it showed the discovery cutoff was

11  going to be October 15th.  The parties submitted a joint

12  discovery plan in which they sequenced discovery to be

13  completed by October 15th.  There was no request for expedited

14  discovery or, you know, request to change the schedule at that

15  time.

16             And we are now a month from the close of discovery,

17  and we don't have any new evidence here that would warrant

18  reconsideration other than the outcome of the last admission

19  cycle, which I'll address because it doesn't show a

20  disproportionate impact.  But that -- that is the only ground

21  that they have stated.

22             So, there's no way that anybody could have thought

23  this was going to be decided by October, even when we were here

24  in May.  And the -- the rationale that we have the admissions

25  results of the current process also doesn't support a

11

1   consideration.  The last time we were here the Coalition argued

2   for an injunction based on its own gloomy prediction that

3   Asian-American students would comprise only 31 percent of the

4   class of 2025, and that prediction came nowhere close to

5   reality.

6           The results are in, and the proportion of

7   Asian-American students in the class of 2025 is almost double

8   that prediction.  It was 54 percent, even though their

9   proportion of the applicant pool was lower than it was the year

10  before.  They're still the majority of students, and

11  Asian-American students have a larger share of the admitted

12  class than their share of the applicant pool.  So they have an

13  even weaker argument now than they did back in May as to why

14  the preliminary injunction would be warranted.

15          And last time the Coalition offered two

16  declarations from two parents:  One who had a child who was

17  applying as an 8th grader, and one who had a child that was a

18  7th grader.  And they have the same two parents' declarations

19  again.

20          Now, tellingly, the parent who had the 8th grader

21  is not saying that 8th grader didn't get in.  That parent is

22  now saying, I'm worried about my 7th grader a year from now not

23  getting in.  That child is not even eligible to apply for this

24  and so wouldn't be affected by an injunction.

25          The second parent, the one who had a 7th grader

1  last year, is now saying, well, my 8th grader is going to

2  apply.  But -- and he talks about the high qualifications of

3  his 8th grader, but there's no showing that that child is

4  unlikely to get in absent an injunction.  In fact, the school

5  attended by that child had the highest number of students

6  admitted in -- in the class of 2025, and so there is no changed

7  circumstance that would warrant reconsideration here.

8         And, you know, we are talking as if it would be

9  possible to completely revert to the 2019 process now.  And as

10  we pointed in our papers, and there's no dispute here, that the

11  old process was based on three standardized tests, two of which

12  are no longer available from the vendor.  No one can get them.

13  They're not being offered for 8th graders at all this year.

14         And so if the Court were to order a preliminary

15  injunction, someone would have to figure out what is the

16  process going to look like because we cannot use the 2019

17  process.  Are there going to be standardized tests?  What tests

18  will those be?  What scores will matter?  How will we use those

19  scores?  All of that is -- are matters of educational policy.

20  There's no expert to advise the Court on how to pick those.  Is

21  the board on an injunction supposed to now make those decisions

22  in spring, this news on thousands upon thousands of

23  unsuspecting 8th graders who are expecting for the Court -- for

24  the board to follow the old process?

25         Mr. Shughart's declaration explains that last time

13

1   the School Board went through this three years ago when they

2   had to switch tests because the tests they were using was

3   discontinued by the vendor.  The process took over a year.

4   There was significant, significant community engagement:  Lots

5   of committees, lots of groups, lots of parent input.  Lots of

6   school administrator, school teacher input.

7             And so the idea that we could have an injunction

8   today that would say, go pick some new tests, spring it on

9   students who haven't been preparing, who had no idea that a

10  standardized test could be coming, who are looking at the

11  regulation that's been on the books to the public for months

12  now saying that this is going to be the process, would be in a

13  public interest, I think strains credulity, Your Honor, because

14  this is not -- you know, they've said the balance of hardships

15  and public interests merge when the government is a defendant,

16  but in -- in many of those cases in terms of balancing the

17  hardships, you're looking at is this an action that affects one

18  person, the plaintiff, or the plaintiff's group, or are you

19  enjoining something that could have consequences for students

20  or for, you know, citizens beyond the people who are suing, and

21  this would have significant adverse consequences for the

22  children in Northern Virginia.

23            Fairfax County Public Schools is the defendant in

24  this case, but the school that we're talking about is a school

25  that is attended by students from five localities.  The

14

1  counties of Loudoun, Arlington, Prince William, the City of
2  Falls Church all send their students, and then we also have
3  private schools.

4         Mr. Shughart 's declaration noted that last year
5  we had 130 students from 130 schools apply to TJ admission, and
6  so this impact would impact all of those students who are
7  relying on the process that -- that is in the regulation.

8         And, you know, I understand that, as Your Honor
9  pointed out, if the Court were to find discrimination and enter
10 an injunction, all of these questions would have to be sorted
11 out.  But what is the sense in deciding them now and then
12 re-deciding them if there's a different conclusion a few months
13 from now?

14        You know, plaintiffs have read a lot into Your
15 Honor's comments from the bench.  Last time the same sentence
16 from your -- from the transcript is quoted five times in two
17 briefs.  And, you know, I've looked carefully at what Your
18 Honor said, and it's clear to me from the transcript that you
19 were addressing the allegations of -- of what is alleged in the
20 case and not making a pronouncement from the bench on a motion
21 to dismiss that -- that this is a --

22        THE COURT:  Well, you're correct about that.  I've
23 made no findings of fact in this case at all, other than the
24 findings that I made in regard to the temporary restraining
25 order that I looked at initially.

1          MS. REWARI:  Yes, and that's how I read your remarks,

2     and that's how we received your remarks.  And so we expect that

3     there will be a full decision on the merits in this case, and

4     if the -- Your Honor is able to take us in January, we're --

5     we're -- you know, we're happy to have it tried in January, but

6     creating two rounds of uncertainty for students thousands upon

7     thousands of students who are impacted by this.

8          And -- and I would also note that this is a process

9     that has lots of components.  Right?  There's elimination of

10    the hundred dollar application fee.  There's no -- there's

11    nothing about that that is racially discriminatory on its face.

12    There's no evidence that's -- that was intended to advantage or

13    disadvantage any group.

14          You have to be very cynical to say that that is a

15    proxy for race.  There's no evidence that that's a proxy for

16    race.  So you could have a process that -- that -- you know,

17    even if the Court were to rule adversely against the School

18    Board in January that says, you can keep that elimination of

19    the fee, there's nothing wrong with that, and that has a huge

20    impact.  This year's class has 25 percent of economically

21    disadvantage students, a number that's never been seen at TJ

22    which has been historically very, very low, and nothing like

23    the student population that you see in Northern Virginia.

24          So this has had a huge impact on the students who

25    are eligible.  And for the Court to now enjoin it would --

1   would have terrible consequences.

2          There's -- you know, there's another part of the

3   plan.  For example, there's also the lack of -- you know, the

4   absence of teacher recommendations.  Again, is that a proxy for

5   race?  There's no argument how that's a proxy for race.

6          There's a one -- there's -- the board chose a plan

7   that is guaranteed to provide seats for eligible candidates

8   from each middle school in Fairfax County.  For the first time

9   in at least 15 years, the TJ class of 2025 has students from

10  every single middle -- public middle school in Fairfax County,

11  26 of them.

12         Again, there's no argument, there's no evidence

13  that that is a proxy for race.  But in Mr. Dec --

14  Mr. Shughart's declaration shows that historically the lion's

15  share, more than 87 percent of the seats went to 8 out of 26

16  middle schools.  And while the plaintiffs have argued -- or

17  plaintiff has argued, well, Asian-American students are

18  clustered in just a few -- a few schools, we've provided

19  evidence in our papers that's not true.  The number of the

20  schools they pick look a lot like other schools in terms of the

21  number of Asian-American students, the proportion of

22  Asian-American students in the population that have

23  historically sent few, if any, students to TJ.

24         And, Your Honor, you received a brief from a number

25  of amici that echo this point, and, in fact, show that there

17

1   are large segments of the Asian-American, to the extent you're

2   going to call Asian-Americans a single community, there are

3   segments of that community or sub-groups within the

4   Asian-American community that have benefitted from these

5   changes, and they would support these changes.  So the idea

6   that the -- the plaintiff here represents the interest of

7   Asian-American students is one that we would not agree with.

8           There's -- there's also -- you know, we disagree on

9   the likelihood of success on the merits.  And I'm happy to

10  address it if the Court wants to, but, you know, failure to

11  meet any of the elements under *Winter* requires denial of the

12  injunction.  And I think the balance of hardships and the

13  public interest here strongly disfavor an injunction.

14          THE COURT:  All right.

15          MS. REWARI:  Thank you.

16          THE COURT:  Anything you want to respond to?

17          MR. KIESER:  Your Honor, I would make it just a couple

18  of points because I think on -- oh, sorry with the mask.

19          I think on the balance of equities and -- and the

20  public interest, we've -- we've sort of covered those points.

21  And -- and our position is still that, you know, in January

22  there may not be any way to -- to award effective relief for

23  the class of 2026 at TJ because of the fact that the process

24  will have gone all the way through at that point, or almost all

25  the way through.

1            And, you know, my friend on the other side talks

2    about, you know, the fact that they would have to find these

3    two new tests, but that -- that's going to be an issue in

4    January too, so -- and maybe even more difficult to do that in

5    January when you need to tell people by June whether they got

6    into TJ, so an injunction now would at least make the process a

7    little more smooth.  And at least -- I mean, as we've talked

8    about, they've been on notice since May, so it's been what now,

9    six months that there's been a possibility that this might be

10   enjoined at some point?  An injunction now would at least, you

11   know, give some clarity for the students who are applying

12   before the application process begins.

13           I just want to also address the disparate impact

14   point because I think under their -- their theory that the drop

15   from 73 percent to 54 percent isn't a disparate impact.  It is

16   essentially saying that you can benchmark a racial -- racially

17   balanced class and say, well, as long as they're still

18   performing above that, that racial balance, whether it be the

19   proportion of students in Fairfax County Public Schools as a

20   whole or the applicant pool, then -- then the process or the

21   board's actions were not discriminatory.  But as the --

22   especially as the order that we submitted as Exhibit 2 to the

23   reply brief, the *AFEF versus Montgomery County Board of*

24   *Education* explains, that's not the proper standard for

25   disparate impact under a -- in an *Arlington Heights* case.  It's

1   the effect of the actual decision.

2             So, here we have, you know, six years in a row

3   where there's only one year where the Asian-American proportion

4   of students at TJ was below 70 percent, and now it's 54

5   percent.  That's a significant drop regardless of previous

6   projections.  I mean, I think everyone would acknowledge that

7   it's very -- it was very difficult to project the outcome of

8   what would happen here because of the holistic factors that go

9   into evaluation, and so the 54 percent, which is in line with

10  the superintendent's prediction for his Merit Lottery Proposal

11  still represents a more than a quarter decline in the --

12  compared to the previous two years, class of 2024 and the class

13  of 2023.  And any -- and their -- under their theory,

14  essentially as long as Asian-Americans were doing better than

15  the -- than the racial balance of the applicant pool, then

16  there could be no discriminatory intent.  And I don't think

17  that that's the proper reading of *Arlington Heights*, *Feeney*,

18  and *McCrory*.

19             But if this comes down to the -- the balance of the

20  equities, I think our position is essentially the same as

21  before that, that effective relief has to happen now, and in

22  January there's no guarantee that there could be effective

23  relief for this -- this class.  I mean, the Court could order

24  relief for the -- for the subsequent classes at that point

25  and -- and we would certainly hope that the Court could order

20

1  relief for 2026 of that -- the class of 2026 at that time, but

2  we would just submit that it would be more difficult to do so.

3  And so then an injunction now would solve that problem.

4           Thank you, Your Honor.

5      THE COURT:  All right.  I understand your position,

6  but I believe I'm in the same position that I am before.  I

7  believe that the -- my entering of a preliminary injunction at

8  this time may cause more harm than good and might cause more

9  harm than leaving things alone.  It certainly looks like it

10 would to me.

11          I mean, we can try this case in January and get a

12 decision.  It seems to me that that's plenty of time to get

13 corrected whatever needs to be corrected, if that's warranted

14 from the findings after the trial of the case.

15          So your motion for a preliminary injunction will be

16 denied.

17          All right.

18     MR. KIESER:  Your Honor, we did want to talk quickly

19 about the pretrial, about the date for the pretrial conference.

20     THE COURT:  Go ahead.

21     MR. KIESER:  We have a conflict for the current date,

22 and I think we've -- we talked about October 28th as a possible

23 change for that.  Would that be possible to move it back to

24 October 28th?

25     THE COURT:  Well, I'll do it on a Friday for you.

Julie A. Goodwin, CSR, RPR

21

1    What's the date of the conflict?

2            MR. KIESER:  It's currently the 21st.  We can move it

3    to the -- yeah, we can move it to the --

4            MS. REWARI:  Your Honor, excuse me.  I'm sorry.  I'm

5    scheduled to attend the Boyd-Graves Conference in Virginia on

6    the 29th, so I wouldn't be able to do the 29th.

7            THE COURT:  Well, let me look here just a minute.

8    Maybe we can -- does that include the 28th too?

9            MS. REWARI:  No, it does not, Your Honor.

10           THE COURT:  What about October -- are you available on

11   the 22nd, Friday the 22nd?

12           MR. KIESER:  No, ours is the 20th through the 22nd.

13   We're -- we have a firm-wide retreat that we all have to be

14   there.

15           THE COURT:  Oh.

16           MR. KIESER:  So it's the 20th through the 22nd.

17           THE COURT:  Well, I can do it for you -- well, you

18   can't do it on the 28th though.  You want to do it the 25th or

19   the 26th?

20           MR. KIESER:  We can do the 28th.

21           MS. REWARI:  Yes, Your Honor, I can do the 28th as

22   well.  I just can't do the 29th.

23           THE COURT:  Oh, you can do the 28th too.  Okay.

24           MS. REWARI:  Yes, yes, I can do the 28th.

25           THE COURT:  All right.  We'll move it to the 28th --

22

1          MR. KIESER:  Okay.  Thank you.

2          THE COURT:  -- at 10:00 o'clock.

3          MR. KIESER:  Thank you, Your Honor.

4          MS. REWARI:  Thank you.

5          THE COURT:  All right.  Anything else?

6          MR. KIESER:  Not at this time, no.

7          THE COURT:  All right.  Thank you.

8          We'll adjourn until Monday morning at 10:00

9   o'clock.

10          THE LAW CLERK:  All rise.

11          (PROCEEDINGS CONCLUDED AT 10:31 A.M.)

12                         -oOo-

13

14  UNITED STATES DISTRICT COURT   )
    EASTERN DISTRICT OF VIRGINIA   )

15

16          I, JULIE A. GOODWIN, Official Court Reporter for
    the United States District Court, Eastern District of Virginia,

17  do hereby certify that the foregoing is a correct transcript
    from the record of proceedings in the above matter, to the best

18  of my ability.
          I further certify that I am neither counsel for,

19  related to, nor employed by any of the parties to the action in
    which this proceeding was taken, and further that I am not

20  financially nor otherwise interested in the outcome of the
    action.

21          Certified to by me this 5TH day of OCTOBER, 2021.

22

23          ___/s/_____
            JULIE A. GOODWIN, RPR

24          Official U.S. Court Reporter
            401 Courthouse Square

25          Eighth Floor
            Alexandria, Virginia  22314

                                        Julie A. Goodwin, CSR, RPR