**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

| | |
|---|---|
| COALITION FOR TJ, | No. 1:21-cv-00296-CMH-JFA |
| Plaintiff, | |
| v. | |
| FAIRFAX COUNTY SCHOOL BOARD, | |
| Defendant. | |

**PLAINTIFF'S MEMORANDUM
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ......................................................................................... iii

STATEMENT OF UNDISPUTED MATERIAL FACTS .............................................1

    A.   Background and Parties ................................................................................1

    B.   Fall 2020 TJ Admissions Changes................................................................2

          1.   Admissions process before the fall 2020 changes ...............................2

          2.   Admissions process after the fall 2020 changes ..................................3

    C.   Impact of Admissions Changes ....................................................................4

    D.   Facts Surrounding Admissions Changes ......................................................5

SUMMARY JUDGMENT STANDARD .....................................................................11

ARGUMENT ..............................................................................................................11

I.    The Coalition Has Standing To Represent Its Members ....................................11

II.   The Board's Undisputed Actions Violated the Equal Protection Clause ...........12

    A.   Standard of Decision..................................................................................13

    B.   The Board's Admissions Changes Were Motivated by a Racial Purpose .....................14

          1.   The Board's actions have had—and will have—a significant
disparate impact on Asian-American applicants to TJ ...........................14

               a.   A before-and-after admissions data comparison demonstrates
a clear impact against Asian-American students................................14

               b.   The 1.5% middle school allocation disparately harms
Asian-American students ...............................................................15

               c.   The holistic review system for the final unallocated seats
exacerbates the disparate impact to Asian-American students...........16

          2.   The historical background leading up to the Board's decision
shows the changes were motivated by an impermissible racial purpose ...............19

          3.   The sequence of events leading up to the Board's decisions and its
departure from typical procedure show the Board was acting for
an explicit racial purpose.........................................................................21

4.   The legislative and administrative history—particularly the comments of Board members and high-level FCPS employees—demonstrate the changes were motivated by a racial purpose ....................................................27

C.   The Board's Actions Do Not Satisfy Strict Scrutiny .......................................................33

1.   The Board lacks a compelling interest for its race-based decisions.......................33

2.   The Board's actions are not narrowly tailored to further any interest other than racial balancing...........................................................34

III.   The Proper Remedy Is Invalidation of the Board's Actions..............................................35

CONCLUSION.....................................................................................................................35

CERTIFICATE OF SERVICE ................................................................................................37

# TABLE OF AUTHORITIES

## Cases

*ACLU v. Mote*,
 423 F.3d 438 (4th Cir. 2005) ................................................................11

*Adarand Constructors, Inc. v. Pena*,
 515 U.S. 200 (1995)......................................................................13, 33

*Anderson v. Liberty Lobby, Inc.*,
 477 U.S. 242 (1986)............................................................................11

*Ass'n for Educ. Fairness v. Montgomery Cty. Bd. of Educ.*,
 No. 8:20-02540-PX, 2021 WL 4197458 (D. Md. Sept. 15, 2021) ......................15, 21, 32, 34

*Boyapati v. Loudoun Cty. Sch. Bd.*,
 No. 1:20-cv-01075, 2021 WL 943112 (E.D. Va. Feb. 19, 2021) ......................................12, 15

*Doe ex rel. Doe v. Lower Merion Sch. Dist.*,
 665 F.3d 524 (3d Cir. 2011)...........................................................32, 34

*Fisher v. Univ. of Tex. at Austin*,
 570 U.S. 297 (2013) (Scalia, J., concurring) ..............................................13, 33–34

*Gratz v. Bollinger*,
 539 U.S. 244 (2003)............................................................................16

*Grutter v. Bollinger*,
 539 U.S. 306 (2003)......................................................................16, 33

*Hunt v. Wash. State Apple Advert. Comm'n*,
 432 U.S. 333 (1977)............................................................................11

*Jones v. Shooshan*,
 855 F. Supp. 2d 594 (E.D. Va. 2012) ..................................................1

*Kitzmiller v. Dover Area Sch. Dist.*,
 No. 04CV2688, 2005 WL 4147867 (M.D. Pa. Sept. 22, 2005)................................6

*Lewis v. Ascension Parish Sch. Bd.*,
 662 F.3d 343 (5th Cir. 2011) (Jones, J., concurring).......................................32–33

*Md. Highways Contractors Ass'n, Inc. v. Maryland*,
 933 F.2d 1246 (4th Cir. 1991) ................................................................11

*Metric/Kvaerner Fayetteville v. Fed. Ins. Co.*,
 403 F.3d 188 (4th Cir. 2005) ................................................................11

*Marks v. United States*,
    430 U.S. 188 (1977)..................................................................................................34

*Miller v. Johnson*,
    515 U.S. 900 (1995)..........................................................................................12–13, 33

*Missouri v. Jenkins*,
    515 U.S. 70 (1995)....................................................................................................13

*N.C. State Conf. v. McCrory*,
    Nos. 1:13CV658, 1:13CV660, 1:13CV861,
    2015 WL 12683665 (M.D.N.C. Feb. 4, 2015).......................................................32

*N.C. State Conference of NAACP v. McCrory*,
    831 F.3d 204 (4th Cir. 2016) ........................................13–15, 21–22, 26–27, 32, 35

*Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*,
    551 U.S. 701 (2007)...........................................................................................12, 33–35

*Pers. Adm'r of Mass. v. Feeney*,
    442 U.S. 256 (1979)..............................................................................................13, 32

*Regents of Univ. of Cal. v. Bakke*,
    438 U.S. 265 (1978)..................................................................................................34

*Smith v. Town of Clarkton*,
    682 F.2d 1055 (4th Cir. 1982) ................................................................................35

*Students for Fair Admissions, Inc. v. Univ. of N.C.*,
    No. 1:14-CV-954, 2018 WL 4688388 (M.D.N.C. Sept. 29, 2018) ........................12

*United Food and Com. Workers Union Local 751 v. Brown Grp., Inc.*,
    517 U.S. 544 (1996)..................................................................................................12

*United States v. Garcia*,
    855 F.3d 615 (4th Cir. 2017) ....................................................................................1

*Vill. of Arlington Heights v. Metro. Housing Dev. Corp.*,
    429 U.S. 252 (1977)...........................................................................................13–14, 22, 27

## Statute

2020 Va. Acts ch. 1289, https://budget.lis.virginia.gov/get/budget/4186/HB30/...........................5

## Rule

Fed. R. Evid. 801(c)(2) ...........................................................................................................6

Fed. R. Evid. 801(d)(2)(D) ......................................................................................................6

**Other Authorities**

FCPS School Board Meeting 12-17-2020,
    https://www.youtube.com/watch?v=1EjeA3EUzoY&ab_channel=FairfaxCou
    ntyPublicSchools..................................................................................................................10

O'Connell, Michael, *Hundreds Gather Outside Fairfax Police HQ for Peaceful
    Protest*, Patch, June 3, 2020, https://patch.com/virginia/reston/hundreds-
    gather-outside-fairfax-police-hq-peaceful-protest ....................................................6

Sullivan, Patricia, et al., *Thousands gathered across city to
    protest death of George Floyd*, Wash. Post, June 7, 2020,
    https://www.washingtonpost.com/dc-md-va/2020/06/06/dc-protests-saturday-
    george-floyd/..........................................................................................................5

## STATEMENT OF UNDISPUTED MATERIAL FACTS

**A.    Background and Parties**

1.      Thomas Jefferson High School for Science & Technology (TJ) is a high school in Fairfax County, Virginia. It is designated an academic-year Governor's School. ECF No. 95 (Stipulated Facts ¶ 1). It is the nation's best public high school according to US News & World Report. Answer ¶ 22. In 2020-21, the racial makeup of TJ's student body was 71.97% Asian American, 18.34% white, 3.05% Hispanic, and 1.77% Black. Wilcox Dec.[1] Ex. 57.[2]

2.      TJ is part of Fairfax County Public Schools (FCPS). FCPS is operated by the Fairfax County School Board (Board), a public body comprised of twelve elected members. According to FCPS, the racial makeup of FCPS students is: 36.8% white, 27.1% Hispanic, 19.8% Asian American, and 10% Black. Ex. 58.

3.      Throughout 2020, Board members were: Ricardy Anderson, Karen Keys-Gamarra, Karen Corbett Sanders, Megan McLaughlin, Melanie K. Meren, Karl Frisch, Elaine Tholen, Stella Petarsky, Tamara Derenak Kaufax, Abrar Omeish, Rachna Sizemore Heizer, and Laura Jane Cohen. Stipulated Facts ¶¶ 2, 4. FCPS' superintendent was Scott Brabrand, TJ's admissions director was Jeremy Shughart, and TJ's principal was Ann Bonitatibus. Ex. 43 (Brabrand Dep. 9:4–9); Ex. 44 (Shughart Dep. 9:11–13); Ex. 45 (Bonitatibus Dep. 8:13–18).

4.      The Coalition for TJ has more than 200 members, including 17 members of its core team and ten members of its leadership team. Nomani Dec. ¶¶ 6, 8, 12, 13.

5.      The Coalition was founded in August 2020 to oppose changes to admissions at TJ.

---

[1] Non-confidential exhibits are attached to the declaration of Erin Wilcox and labeled by number. For the remainder of the brief, they will be cited simply by their Exhibit number.
[2] The Court may take judicial notice of data contained on government websites, as well as FCPS press releases, Board meeting minutes and other public documents. *United States v. Garcia*, 855 F.3d 615, 621 (4th Cir. 2017); *Jones v. Shooshan*, 855 F. Supp. 2d 594, 604 (E.D. Va. 2012).

*Id.* ¶ 5. The Coalition was concerned that the admissions changes would discriminate against Asian-American students. *Id.* The leadership and core teams decided to pursue this case by unanimous consensus. *Id.* ¶ 47.

6.    Coalition members include Asian-American parents with children who have applied to TJ or plan to do so in the near future. Among these are Dipika Gupta (whose son, A.G., is in eighth grade at Carson Middle School and has applied to TJ) and Ying McCaskill (whose daughter, S.M., is in seventh grade at Carson and plans to apply to TJ). Gupta Dec. ¶¶ 3, 9, 11; McCaskill Dec. ¶¶ 3, 6, 8. Another member is Harry Jackson, whose daughter, V.J., an eighth grader at Carson, identifies as Black but is half Asian American. Jackson Dec. ¶¶ 3, 5–6, 8.

**B.    Fall 2020 TJ Admissions Changes**

7.    Students must apply to TJ in order to be admitted. Students residing in five participating school divisions are eligible to apply to TJ: Fairfax County, Loudoun County, Prince William County, Arlington County, and Falls Church City. Stipulated Facts ¶¶ 5–6.

8.    In the fall of 2020, the Board altered the TJ admissions process. *Id.* ¶¶ 9–14.

**1.    Admissions process before the fall 2020 changes**

9.    Before the Board's fall 2020 changes, applicants to TJ were required to (a) reside in one of the five participating school divisions; (b) be enrolled in 8th grade; (c) have a minimum core 3.0 grade point average (GPA); (d) have completed or be enrolled in Algebra I; and (e) pay a $100 application fee, which could be waived based on financial need. *Id.* ¶ 9.

10.    Applicants who satisfied those criteria were administered three standardized tests—the Quant-Q, the ACT Inspire Reading, and the ACT Inspire Science. Those applicants who achieved certain minimum scores on the tests advanced to a "semifinalist" round. Students were selected for admission from the semifinalist pool based on a holistic review that considered GPA,

test scores, teacher recommendations, and responses to three writing prompts and a problem-solving essay. *Id.*

### 2.    Admissions process after the fall 2020 changes

11.    The Board's fall 2020 changes to admission at TJ removed the exam requirement and altered the minimum requirements to apply. *Id.* ¶ 13. Following those changes, to be eligible for TJ, students must: (a) maintain a 3.5 GPA; (b) be enrolled in a full-year honors Algebra I course or higher; (c) be enrolled in an honors science course; and (d) be enrolled in at least one other honors course or the Young Scholars program. *Id.*

12.    The Board also changed the evaluation process, moving from a multi-stage process to a one-round holistic evaluation that considers GPA, a Student Portrait Sheet, a Problem Solving Essay, and certain "Experience Factors," which include an applicant's (a) attendance at a middle school deemed historically underrepresented at TJ; (b) eligibility for free and reduced price meals; (c) status as an English language learner; and (d) status as a special education student. Ex. 56.

13.    Applicants are scored using a rubric that assigns points for each part of the application: (a) up to 300 points for GPA; (b) up to 300 points for the Student Portrait Sheet; (c) up to 300 points for the Problem Solving Essay; and (d) additional points for each Experience Factor—90 points for free and reduced price lunch eligibility, 45 for attendance at an underrepresented middle school, 45 for status as an English language learner, and 45 for status as a special education student. Ex. N[3] (Shughart Dep. 162:1–165:15).

14.    In addition to the changes to the eligibility criteria and the evaluation criteria, the new process guarantees seats for students at each public middle school in a participating school

---

[3] Exhibits designated confidential by Defendant—and filed along with the motion to seal—are labeled by letter. For the remainder of the brief they are referenced by their letter label.

division equivalent to 1.5% of the school's eighth grade class size, with seats offered in the first instance to the highest-evaluated applicants from each school. Stipulated Facts ¶ 14.

15.     After the guaranteed seats are filled, about 100 unallocated seats remain for students who do not obtain an allocated seat. *Id.* The highest-evaluated remaining students are offered admission. *Id.* Private school and home school students may compete only for these unallocated seats. Ex N. (Shughart Dep. 177:10–178:19).

### C.     Impact of Admissions Changes

16.     For the Class of 2025—the first year under the new system—the admitted class size increased by 64 students. Nevertheless, TJ admitted 56 fewer Asian-American students than it had the prior year. Exs. 50 & 51.

17.     For the previous five years, Asian-American students never made up less than 65% of the admitted class. Exs. 51–55. For the Class of 2024, Asian-American students earned about 73% of the seats. Ex. 51. Following the admissions changes, the proportion of Asian-American students admitted for the Class of 2025 fell to about 54%. Ex. 50.

18.     For the Class of 2025, 48.59% of eligible applicants to TJ were Asian American. Stipulated Facts ¶ 20. But among FCPS middle schools designated as "underrepresented"— Glasgow, Holmes, Hughes, Key, Poe, Sandburg, South County, Stone, Twain, and Whitman, *see* Ex. 56—23.9% of the eligible applicants who did not withdraw their applications were Asian American. Ex. A.[4]

---

[4] After the parties agreed to a protective order, the Board produced five years' worth of individual data on TJ admissions including the Class of 2025 (application year 2020-21) and Class of 2024 (application year 2019-20), which is attached as Exhibit A to the motion to seal. The data presented here on applicants from FCPS underrepresented schools comes from the "20-21" individual data in this exhibit. Data is limited to FCPS schools because the individual data produced does not include attending middle school for non-FCPS applicants.

19.     For the past five years, six FCPS middle schools have sent the most Asian-American students to TJ—Carson, Cooper, Frost, Kilmer, Longfellow, and Rocky Run. Ex. N. (Shughart Dep. 170:13–171:10, 181:1–182:8, & Dep. Ex. 16). For the Class of 2025, 66.3% of the eligible TJ applicants from those six schools who did not withdraw their application were Asian American. Ex. A.[5] Under the new admissions system, guaranteed admissions from these schools are capped at 1.5% of the class. Stipulated Facts ¶ 14. None of these schools are designated as underrepresented. Ex. 56. Asian-American students from these six schools received 102 offers for the Class of 2025, compared to 204 for the Class of 2024. Ex. A; Ex. N. (Dep. Ex. 16).[6]

**D.      Facts Surrounding Admissions Changes**

20.     In March 2020, the Virginia General Assembly enacted a requirement that Governor's Schools develop diversity goals and submit a report to the Governor by October 1, 2020. 2020 Va. Acts ch. 1289, item 145.C.27(i).[7] The report must include the status of the school's diversity goals, including a description of "admission processes in place or under consideration that promote access for historically underserved students; and outreach and communication efforts deployed to recruit historically underserved students." *Id.*

21.     On May 25, 2020, George Floyd was murdered by a police office in Minneapolis. Nationwide protests followed, including in Fairfax County and the greater metropolitan Washington D.C. area.[8]

_____

[5] The data was compiled from the "20-21" school year individual data in this exhibit.

[6] The Class of 2024 data here was compiled from Ex. N (Dep. Ex. 16). The Class of 2025 data comes from the "20-21" individual data in Exhibit A.

[7] The entire bill is available here: https://budget.lis.virginia.gov/get/budget/4186/HB30/. The relevant provision is located on page 183.

[8] Both national and local media documented the aftermath of the George Floyd murder. The Washington Post documented protests here: https://www.washingtonpost.com/dc-md-va/2020/06/06/dc-protests-saturday-george-floyd/ (last visited Dec. 2, 2021). Local media noted

22.     On June 1, 2020, the Class of 2024 TJ admissions statistics were made public, showing that the number of Black students admitted was too small to report. Ex. 51.

23.     A few days later, Bonitatibus wrote in a June 7 message to the TJ community that "recent events in our nation with black citizens facing death and continued injustices remind us that we each have a responsibility to our community to speak up and take actions that counter racism and discrimination in our society." Ex. 45 (Bonitatibus Dep. 40:2–12 & Dep. Ex. 2 at 1). She went on to comment that the TJ community did "not reflect the racial composition in FCPS" and that if TJ did reflect FCPS's racial demographics, it "would enroll 180 black and 460 Hispanic students, filling nearly 22 classrooms." *Id.* (Dep. Ex. 2 at 2).

24.     In June emails, Corbett Sanders called the admissions results "unacceptable" and promised "intentful action." Ex. O at 2; Ex. 32 at 1.[9] In an email to Brabrand, Corbett Sanders wrote that the Board and FCPS "needed to be explicit in how we are going to address the under-representation" of Black and Hispanic students. Ex. 36 at 3–4. And at a June 18 Board meeting, Keys-Gamarra said "in looking at what has happened to George Floyd, we now know that our shortcomings are far too great . . . so we must recognize the unacceptable numbers of such things as the unacceptable numbers of African Americans that have been accepted to T.J." Ex. 5 at 6.

25.     In the summer of 2020, Keys-Gamarra, Brabrand, Bonitatibus, and Shughart all attended at least one meeting of a state-level task force on diversity, equity, and inclusion at

---

protests in Fairfax County. *See* https://patch.com/virginia/reston/hundreds-gather-outside-fairfax-police-hq-peaceful-protest (last visited Dec. 2, 2021).

[9] This brief cites many communications between Board members, Board members and FCPS staff, and FCPS staff among themselves. Most of these are not offered for the truth of the matters asserted, but to show the intent or state of mind of relevant individuals. See Fed. R. Evid. 801(c)(2). In any event, communications of Board members and FCPS officials acting in their capacity as employees are not hearsay under Federal Rule of Evidence 801(d)(2)(D). *See Kitzmiller v. Dover Area Sch. Dist.*, No. 04CV2688, 2005 WL 4147867, at *2 (M.D. Pa. Sept. 22, 2005).

Governor's Schools. Answer ¶ 39; Ex. 44 (Shughart Dep. 68:3–15). The task force discussed "solutions" for admissions to Virginia's Governor's Schools. Ex. 19 at 1. Among the solutions discussed was a potential state plan to require each school's diversity to be within 5% of the system it represents within four years. *Id.*

26.     Brabrand testified that he "perceived that there was State-level dynamics, one, reflected by the October 1 report, and, two, by the Secretary of Education's task force that simple status quo, a report with just, we're just doing the same thing we've always done was not going to be received well." Ex. 43 (Brabrand Dep. 55:6–56:9). Corbett Sanders and Omeish stressed the reporting deadline in emails. Ex. 16 at 1; Ex. 26 at 1.

27.     FCPS staff developed a proposal for a "Merit Lottery" for TJ admissions, which they presented to the Board on September 15. Ex. 7. The proposal stated that TJ "should reflect the diversity of FCPS, the community and Northern Virginia." *Id.* at 3.

28.     The proposal discussed the use of "regional pathways" that would cap the number of offers each region in FCPS (and the other participating jurisdictions) could receive. *Id.* at 12– 16. It included the results of Shughart's modeling, Ex. 44 (Shughart Dep. 109:5–21), which showed the projected racial effect of applying the lottery with regional pathways to three previous TJ classes, Ex. 7 at 18–20. Each of the three classes would have admitted far fewer Asian-American students under the proposed lottery system. *Id.*

29.     At an October 6 Board work session, FCPS staff proposed using a holistic review to admit the top 100 applicants, but otherwise retain the lottery and regional pathways. Ex. 46 at 11–12. The presentation introduced consideration of "Experience Factors," and the presentation noted as an "advantage" of the proposal that it "statistically should provide some increase in admittance for underrepresented groups." *Id.* at 9, 12, 14.

30.     The Board also took several votes, which it typically does not do during work sessions. Answer ¶ 33. One vote unanimously directed Brabrand to eliminate the TJ admissions examination. Another required that the diversity plan submitted to the state "shall state that the goal is to have TJ's demographics represent the NOVA region." Ex. 3 at 3. The public description of the work session did not provide notice that votes would be taken, Ex. 48, and no public comment was permitted before either vote. Answer ¶ 33.

31.     During closed session on October 6, staff presented to the Board the details of the revised merit lottery proposal. This included a points system, with points for: GPA, a Student Portrait Sheet, a Problem Solving Essay, and various "Experience Factors," including attendance at an "underrepresented" middle school. Ex. N (Shughart Dep. 150:4–152:12 & Dep. Ex. 12).

32.     After the work session, Brabrand emailed Shughart stating that Board members sought modeling to determine whether points for experience factors would "change who got in." *Id.* (Shughart Dep. at 156:1–17 & Dep. Ex. 13). FCPS staff thereafter discussed tweaks to the scoring system—particularly the weighting of the Experience Factors. Shughart sought a review of the weighting to determine whether it "would be enough to level the playing field for our historically underrepresented groups." Asian-Americans are not among this group, while Black and Hispanic students are. Ex. N (Shughart Dep. 138:2–20; 146:2–5).

33.     In response to Shughart, Lidi Hruda—director of FCPS' Office of Research and Strategic Improvement, *see* Ex. N (Shughart Dep. 137:1–18)—wrote that certain parts of the application process had "historically favored White and Asian applicants," so "only the Experience Factors" can "bring more diversity into play and acceptance of historically underrepresented students." *Id.* (Shughart Dep. 136:11–137:9 & Dep. Ex. 11 at 6).

34.     At the October 8 regular Board meeting, by a 6-6 vote, the Board rejected a motion

that would have directed Brabrand to "engage stakeholders regarding changes to TJ admissions for the 2021 freshman class prior to bringing the updated plan to the Board in December" and "allow for more thorough community input and dialogue on TJ admissions." Ex. 4 at 4–5.

35.     Consistent with this vote, multiple Board members expressed concern with the speed of the process and the adequacy of public engagement. Tholen wrote in her October newsletter to constituents that "the outreach to date has been one-sided and did not solicit input from all of our communities." Ex. 29 at 7. Meren wrote in an October 6 email that she was "not okay with the rushed situation we are in." Ex. 41 at 1. And Sizemore Heizer wrote on October 4 that "personally I think we need to wait to implement anything til [sic] next school year." Ex. 28

36.     Beginning in November, FCPS staff presented an entirely holistic plan for the Board to consider alongside the revised merit lottery. Exs. 2 & 6.

37.     Board discussion of the new holistic plan was originally scheduled for November 17, but Corbett Sanders and Derenak Kaufax complained to Brabrand via email that they had only received the white paper containing analysis and modeling the night before. Ex. 25; Ex. 20 at 1. Accordingly, the discussion was postponed until December 7, when staff presented it to the Board alongside the revised merit lottery. Exs. 2 & 6. The holistic plan retained the use of regional pathways, which capped the number of offers from each region. Ex. 6 at 12–14.

38.     Following the December 7 work session, Board members exchanged several draft motions in anticipation of the December 17 regular meeting. *See* Ex. 17 at 1, Exs. 12, 18. However, on December 16, Keys-Gamarra emailed Brabrand to express concern that there were "no posted motions for us to vote on." Ex. 21. McLaughlin wrote that "it is unacceptable that no motions/amendments/follow-ons were posted (nor provided to the full Board) until 4:30pm, which

was 30 minutes before the Board went into Closed Session."[10] Ex. 24.

39.     At the December 17 meeting, the Board voted down the revised merit lottery proposal, 4-8. Ex. 1 at 4. The Board ultimately voted 10-1-1 (with McLaughlin abstaining and Anderson, who had supported the lottery, voting no) for a version of the proposed holistic plan. *Id.* at 4–5. The Board's enacted plan rejected the proposed regional pathways in favor of guaranteed admission for 1.5% of each eighth grade class. *Id.* Because it was a variation on staff's proposed holistic plan, the public did not see the 1.5% plan until motions were posted just before the Board meeting.

40.     Board member communications show a consensus that, in their view, the racial makeup of TJ was problematic and should be changed. Ex. O at 2 & Ex. 32 at 1 (Corbett Sanders); Ex. 5 at 6 (Keys-Gamarra); Ex. 40 at 1 (Cohen); Ex. 49 at 1. Ex. 61 at 1 (Anderson); Ex. 30 at 6 (Tholen); Exs. 13 & 36 (Omeish); Ex. 37 (Sizemore Heizer); Ex. 15 (Petarsky); Ex. 30 (McLaughlin).

41.     Board member text messages show that some members perceived anti-Asian American sentiment in the process to change admission. Exs. J & L. Some Board member communications expressly acknowledge that the admissions changes would discriminate against Asian-American students. Ex. J.

42.     Some Board members also expressed the belief that the process of revising TJ admissions had been shoddy and rushed along—with McLaughlin writing in emails that "this is not how the Board should conduct its business" and "[i]n my 9 years, I cannot recall a messier execution of Board-level work." Exs. 22 & 24. In an email after the final vote, she said she had

---

[10]   McLaughlin said much the same thing in the December 17 meeting. *See* https://www.youtube.com/watch?v=1EjeA3EUzoY&ab_channel=FairfaxCountyPublicSchools (at 2:17:02) (last visited Dec. 2, 2021).

abstained largely because of the substandard process. Ex. 24.

43.    After the vote, several Board members were not sure whether the 1.5% guarantee would be based on the school a student actually attended or the one she was zoned to attend. Exs. 8, 9, 11. Brabrand insisted that the Board had voted for attending school, which produced the "geographic distribution the Board wanted." Ex. 9 at 1.

## SUMMARY JUDGMENT STANDARD

Summary judgment "is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *ACLU v. Mote*, 423 F.3d 438, 442 (4th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986)). "A genuine issue of material fact is one 'that might affect the outcome of the suit under the governing law.'" *Metric/Kvaerner Fayetteville v. Fed. Ins. Co.*, 403 F.3d 188, 197 (4th Cir. 2005) (quoting *Anderson*, 477 U.S. at 248).

## ARGUMENT

### I.    The Coalition Has Standing To Represent Its Members

An association may sue on behalf of its members when "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977); *see also Md. Highways Contractors Ass'n, Inc. v. Maryland*, 933 F.2d 1246, 1251 (4th Cir. 1991). The Coalition satisfies these requirements.

The Coalition is a membership organization with more than 200 members. Nomani Dec. ¶ 6, 13. Its leadership and core teams chose to pursue this case by unanimous consensus. *Id.* ¶ 47. It

has members with children in seventh and eighth grade who have applied, or plan to apply, to TJ. Gupta Dec. ¶¶ 3, 9, 11; McCaskill Dec. ¶¶ 3, 6, 8; Jackson Dec. ¶¶ 3, 5–6, 8. These members would have standing to sue in their own right because the challenged policy renders their children unable to compete on a level playing field for a racial purpose. *See infra* Part I.B.1.; *see Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 719 (2007); *Boyapati v. Loudoun Cty. Sch. Bd.*, No. 1:20-cv-01075, 2021 WL 943112, at *6 (E.D. Va. Feb. 19, 2021).

The remaining *Hunt* factors are also not in dispute. The Coalition was formed precisely to oppose the Board's effort to change admissions at TJ. Nomani Dec. ¶ 5. And because the Coalition seeks only prospective injunctive relief, individual participation of members as parties is not necessary. *United Food and Com. Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 546 (1996); *see also Students for Fair Admissions, Inc. v. Univ. of N.C.*, No. 1:14-CV-954, 2018 WL 4688388, at *5–6 (M.D.N.C. Sept. 29, 2018). In short, there is no dispute of material fact on the Coalition's standing to bring this action on behalf of its members.

## II.   The Board's Undisputed Actions Violated the Equal Protection Clause

Throughout this process, Board members and high-level FCPS officials were remarkably honest about their desire to remake TJ admissions because they were dissatisfied with the racial composition of the school. The only way to accomplish their goal to achieve racial balance was to decrease enrollment of the only racial group "overrepresented" at TJ—Asian Americans. Rather than using an explicit racial quota, the Board employed proxies that disproportionately burden Asian-American students. It is no surprise that Asian Americans received far fewer offers to TJ after the Board's overhaul.

A case like this is the reason strict scrutiny applies to government actions "not just when they contain express racial classifications, but also when, though race neutral on their face, they

are motivated by a racial purpose or object." *Miller v. Johnson*, 515 U.S. 900, 913 (1995). The record leaves no doubt the Board harbored such a purpose. Strict scrutiny therefore applies, and the Board cannot show that its actions meet this most demanding standard of judicial scrutiny. Therefore, the Coalition is entitled to summary judgment on its equal protection claim.

### A.     Standard of Decision

Determining racial purpose "demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Vill. of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 266 (1977). Relevant factors include: (1) the "impact of the official action;" (2) the "historical background of the decision;" (3) the "specific sequence of events leading up to the challenged decision;" and (4) the "legislative or administrative history . . . especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports." *Id.* at 266–68. Impermissible racial intent need only be a "motivating factor"—it need not be the 'dominant' or 'primary' one." *Id.* at 265–66. And the Board members need not harbor racial animus to act with discriminatory intent. *See N.C. State Conference of NAACP v. McCrory*, 831 F.3d 204, 233 (4th Cir. 2016). To trigger strict scrutiny, the Board need only pursue a policy "at least in part 'because of,' not merely 'in spite of,' [the policy's] adverse effects upon an identifiable group." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979).

Once strict scrutiny applies, the burden shifts to the Board to prove that the changes are narrowly tailored to further a compelling government interest. *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227 (1995). "This most exacting standard 'has proven automatically fatal' in almost every case." *Fisher v. Univ. of Tex. at Austin*, 570 U.S. 297, 316 (2013) (Scalia, J., concurring) (quoting *Missouri v. Jenkins*, 515 U.S. 70, 121 (1995) (Thomas, J., concurring)).

**B.      The Board's Admissions Changes Were Motivated by a Racial Purpose**

Here, no dispute of material fact exists regarding any of the *Arlington Heights* factors—

nor as to the ultimate question that the Board acted with discriminatory intent.

> **1.      The Board's actions have had—and will have—a significant disparate impact on Asian-American applicants to TJ**

Under *Arlington Heights*, disparate impact is the starting point for determining whether the

Board acted with discriminatory intent. By any measure, the Board's overhaul of TJ admissions

has had, and will have, a substantial disparate impact on Asian-American applicants to TJ.

> **a.      A before-and-after admissions data comparison demonstrates a clear impact against Asian-American students**

A simple comparison of publicly available data for the Class of 2025 with earlier classes

tells much of the story. As depicted in the table below,[11] the number and proportion of Asian-

American students offered admission to TJ plummeted following the challenged changes.

| Class | Offers to Asian-American students | Asian American proportion of offers (rounded) |
|-------|-----------------------------------|-----------------------------------------------|
| 2025  | 299                               | 54%                                           |
| 2024  | 355                               | 73%                                           |
| 2023  | 360                               | 73%                                           |
| 2022  | 316                               | 65%                                           |
| 2021  | 367                               | 75%                                           |
| 2020  | 335                               | 69%                                           |

This is more than sufficient for the Court to weigh the first *Arlington Heights* factor in favor of

finding of discriminatory intent. The proper method for determining the "impact of the official

action," 429 U.S. at 266, is a simple before-and-after comparison. *See McCrory*, 831 F.3d at 231

---

[11] Source: Exs. 50–55.

(finding impact sufficient to support an inference of discriminatory intent where "African Americans disproportionately used each of the removed mechanisms" to vote); *see also Boyapati*, 2021 WL 943112, at \*8; *Ass'n for Educ. Fairness v. Montgomery Cty. Bd. of Educ.*, No. 8:20-02540-PX, 2021 WL 4197458, at \*16 (D. Md. Sept. 15, 2021).

    **b.**  **The 1.5% middle school allocation disparately harms Asian-American students**

   But there is much more evidence of disparate impact here. The undisputed evidence demonstrates precisely how the Board's actions *caused*—and will continue to cause—such a substantial racial impact. Namely, the Board instituted a system that does not treat all applicants to TJ equally. *Cf. Ass'n for Educ. Fairness*, 2021 WL 4197458, at \*16–17 (noting that MCPS' alleged use of "peer grouping" and "local norming" in magnet program admission disparately impacted higher-scoring Asian-American students).

   As explained above, the new process sets aside seats for students at each middle school amounting to 1.5% of the school's eighth-grade class. The highest-evaluated students at each school—so long as they meet the minimum admissions requirements—gain admission to TJ. Stipulated Facts ¶¶ 13–14. Those applicants who do not attain one of the allocated seats at their school are relegated to compete for about 100 total unallocated seats. Stipulated Facts ¶ 14. The set-aside plainly harms students who attend schools with proportionately more students interested in and eligible for TJ admissions. Ex. N (Shughart Dep. 170:13–176:17) (admitting that applicants from Carson, which had 400 eligible students and 286 TJ applicants (231 of whom were Asian American) for the Class of 2024, would have faced stiffer competition for the school's allocated seats under the challenged plan than Whitman's 19 applicants for its allocated seats). Not coincidentally, those schools are the ones disproportionately responsible for sending Asian-American students to TJ.

The 1.5% set-aside effectively targets students at the six schools previously most likely to send Asian-American students to TJ. *See supra* Undisputed Facts ¶ 19. Five of these six schools (all but Frost) had the highest proportions of students eligible to apply among FCPS middle schools. Ex. N (Shughart Dep. 173:21–174:10 & Dep. Ex. 17). The racial effect of the seat guarantee is clear—as the tables in the following section show, for both the Classes of 2024 and 2025, far more applicants from these schools were Asian American than the proportion of Asian Americans in the applicant pool. The set-aside disproportionately forces Asian-American students to compete against more eligible and interested applicants (often each other) for the allocated seats at their middle schools.

> **c.    The holistic review system for the final unallocated seats exacerbates the disparate impact to Asian-American students**

Yet the set-aside is only part of the equation. When applicants outside the top 1.5% are thrown into the unallocated pool, students are again treated unequally. This became publicly known when FCPS announced consideration of Experience Factors in the holistic evaluation. One of these factors is whether a student attends a middle school deemed historically underrepresented at TJ. Unsurprisingly, none of the six major FCPS feeder schools qualify, so students at these schools are placed at a significant disadvantage in the unallocated pool compared to their peers at underrepresented schools.

Moreover, the Experience Factors are not merely ephemeral tiebreakers, but have discrete point values assigned as part of the holistic evaluation. *Compare Grutter v. Bollinger*, 539 U.S. 306, 337 (2003), *with Gratz v. Bollinger*, 539 U.S. 244, 271 (2003) (noting the difference between a holistic review involving "individualized consideration to applicants of all races" and one that awarded points based on a "single characteristic" that "ensured a specific and identifiable contribution to a university's diversity"). As Shughart testified, a student's GPA is worth 300

points in the evaluation, with each GPA point being a quarter of that total. Ex. N (Shughart Dep. 162:1–163:6, 164:10–165:15).[12] Applicants may then earn a maximum of 300 points each for the Student Portrait Sheet and the Problem-Solving Essay, accounting for 600 additional base points. *Id.* (Shughart Dep. 162:11–163:20). The "Experience Factors" allow an applicant to earn up to 225 additional points—90 for a student who qualified for free or reduced-price lunch in the past three years, 45 for receiving English Language Learner services, 45 for special education students, and 45 for attending an underrepresented middle school. *Id.* (Shughart Dep. 163:7–164:6).[13] Thus, an otherwise similarly situated student with a 3.5 GPA who attends a school designated as "underrepresented" would actually receive more points than a student at a different middle school with a 4.0 GPA—all else being equal.[14] And as Shughart testified, each point makes a difference in a student's chances for admission. Ex. N. (Shughart Dep. 159:5–11, 159:18–160:8).

---

[12] Shughart's testimony indicates that each GPA point is worth one quarter of the total points available. That is consistent with a version of the rubric Shughart considered in November, which explicitly noted that each GPA point was worth 50 admissions points. Ex. N (Dep. Ex. 14). Thus, under the 300-point maximum actually implemented, a student with a 4.0 GPA would receive 300 out of a possible 300 points, a student with a 3.0 GPA would—if he were eligible to apply— receive 225 points, and so on.

[13] The Board produced the scoring rubric Shughart testified to, but it appears to have been attached to a privileged document that was withheld. *See* Ex. B. Shughart confirmed the correct point weightings at his deposition, as noted above.

[14] The student with the 3.5 GPA would receive 37.5 fewer GPA points than the student with the 4.0 (263.5 versus 300), but would receive 45 "Experience Factor" points for attending an underrepresented school, resulting in 8.5 more total points.

The tables below[15] show the extent of the adverse impact on Asian-American students.

| Class | Total offers extended | Asian-American offers from top six feeder schools | Total offers from top six feeder schools | Asian-American offers from underrepresented schools (FCPS only) | Total offers from underrepresented schools (FCPS only) |
|---|---|---|---|---|---|
| 2025 | 550 | 102 | 132 | 29 | 80 |
| 2024 | 486 | 204 | 243 | 5 | 18 |

| Class | Total applicants[16] from top six feeder schools | Asian-American applicants from top six feeder schools | Proportion of applicants from top six feeder schools who were Asian American | Proportion of all applicants who were Asian American |
|---|---|---|---|---|
| 2025 | 912 (829) | 596 (550) | 65.4% (66.3%) | 50.6% (48.6%) |
| 2024 | 829 (808) | 601 (594) | 72.5% (73.5%) | 56.0% (57.7%) |

| Class | Total applicants from underrepresented schools (FCPS only) | Asian-American applicants from underrepresented schools (FCPS only) | Proportion of applicants from underrepresented schools who were Asian American (FCPS only) | Proportion of all applicants who were Asian American |
|---|---|---|---|---|
| 2025 | 572 (473) | 128 (113) | 22.4% (23.9%) | 50.6% (48.6%) |
| 2024 | 388 (366) | 111 (108) | 28.6% (29.5%) | 56.0% (57.7%) |

The first table shows that students from the six feeder schools received only *half* as many offers for the Class of 2025 as they had for the Class of 2024. And while slightly more Asian-American students from underrepresented FCPS middle schools received offers the latter year, the increase

---

[15] Sources: Individual data (Ex. A), Ex. N (Shughart Dep. Exs. 15 & 16), & Exs. 50 & 51.

[16] The numbers not in parentheses count all applicants, regardless of eligibility or later decision to withdraw. Those in parentheses count only the applicants who did not withdraw their application, and, for the Class of 2025, only those who were eligible to apply.

did not even put a dent in the drastic impact on the six feeder schools. The second and third tables show that applicants from the six feeder schools were disproportionately Asian American in both years, but Asian Americans were disproportionately *underrepresented* among applicants from FCPS middle schools receiving the 45-point underrepresented school bonus.

Any way one slices the admissions data, it is clear that Asian-American students are disproportionately harmed by the Board's decision to overhaul TJ admissions. And in the future, Asian-American applicants will be disproportionately deprived of a level playing field in competing for both allocated and unallocated seats. The first *Arlington Heights* factor weighs heavily in favor of a finding of discriminatory intent.

### 2.   The historical background leading up to the Board's decision shows the changes were motivated by an impermissible racial purpose

Placing the Board's actions in historical context leaves little doubt that its decision to overhaul the TJ admissions process was racially motivated. In a November 2020 white paper presented to the Board, staff noted "over the past ten years, the admissions process has undergone a series of changes that were intended to impact issues of diversity and inclusion" but "these changes have not made a significant impact on the diversity of the applicants or admitted students." Ex. 42 at 4.[17] The supposed ineffectiveness of this decade-long tinkering provides the scaffolding for understanding how 2020 events jumpstarted the Board's drastic admissions changes.

There were two specific triggering events that accelerated the Board's process and timeline. *First*, the Virginia General Assembly passed a budget bill in March that required Governor's Schools to submit a report to the Governor on the existence of and progress towards diversity goals, including a description of "admission processes in place or under consideration that promote

---

[17] Not all of these changes were made by the Board. Ex. 44 (Shughart Dep. 32:11–35:12); Ex. 42 at 4–5.

access for historically underserved students; and outreach and communication efforts deployed to recruit historically underserved students." *See supra* Undisputed Facts ¶ 20. And *second*, the murder of George Floyd in Minneapolis on May 25, 2020, was shortly followed by the release of the Class of 2024 admissions data on June 1, showing that the number of Black students admitted was too small to be reported. *See* Ex. 51.

The Board and FCPS reacted by jumpstarting TJ admissions changes. On June 7, Bonitatibus sent a statement to the TJ community that referenced the George Floyd murder and lamented that TJ does "not reflect the racial composition in FCPS," specifically noting the number of Black and Hispanic students TJ would have if it so reflected. Ex. 45 (Dep. Ex. 2). Around the same time, Corbett Sanders in a series of emails stated that she was "angry and disappointed" about the TJ admissions results and expected "intentful action forthcoming," Ex. 32 at 1, because "in seeing the numbers when they were released, we know that the current approach is unacceptable," Ex. O at 2. She relayed a similar message to Brabrand, writing that the Board and FCPS "needed to be explicit in how we are going to address the under-representation" of Black and Hispanic students. Ex. 36 at 3–4. Cohen told a constituent that the number of Black students admitted was "completely unacceptable" and that the Board was "committed to examining and bettering" the admissions process. Ex. 40 at 1. And later that month, Keys-Gamarra said at a Board meeting "in looking at what has happened to George Floyd, we now know that our shortcomings are far too great . . . so we must recognize the unacceptable numbers of such things as the unacceptable numbers of African Americans that have been accepted to T.J." Ex. 5 at 6.

Over the summer of 2020, Keys-Gamarra, Brabrand, and Shughart participated in state-level task force meetings on admissions to Governor's Schools, Complaint ¶ 39; Answer ¶ 39; Ex. 44 (Shughart Dep. 68:3–15), after which Brabrand told the Board there was talk about the state

creating a four-year timeline for diversity Governor's schools to be within 5% of diversity in their local districts. Ex. 19 at 1. The looming specter of a Richmond takeover pushed the Board to act quickly to change TJ admissions with an explicit eye towards its racial composition. As Brabrand testified, he "believed this October 1 requirement to submit a report meant we needed to look at our admissions process at TJ." Ex. 43 (Brabrand Dep. 46:10–15); *see also id.* (Brabrand Dep. 53:17–54:4) (there was no specific timeline to address TJ admissions before the reporting requirement). In August, he told Corbett Sanders via email that "whatever the board decides to do or not do in September will ultimately influence what the Governor and the Secretary of Education decide in January." *Id.* (Dep. Ex. 3). By this, Brabrand meant potential state legislative or administrative action in 2021 if the Board failed to make adequate changes. *See id.* (Brabrand Dep. 55:6–56:9) ("State-level dynamics" meant that the "status quo . . . was not going to be received well"). Omeish summed it up best in a September email, writing that she had "come to understand that the Virginia Department of Education plans to intervene if we do not." Ex. 26 at 1.

In short, the impetus to overhaul TJ admissions came from several sources, *all* of which confirm that the Board and high-level FCPS actors "set out to increase and (by necessity) decrease the representation of certain racial groups [at TJ] to align with districtwide enrollment data." *Ass'n for Educ. Fairness*, 2021 WL 4197458, at *17. Board members promised action on TJ admissions that would specifically address the school's racial makeup. After the summer state task force, FCPS officials scrambled to meet a perceived deadline from Richmond to overhaul admissions with race in mind. The background of the decision weighs strongly in favor of a finding of a discriminatory motive.

### 3. The sequence of events leading up to the Board's decisions and its departure from typical procedure show the Board was acting for an explicit racial purpose

*Arlington Heights* requires consideration of "the 'specific sequence of events leading up to

21

the challenged decision.'" *McCrory*, 831 F.3d at 227 (quoting *Arlington Heights*, 429 U.S. at 267). "In doing so, a court must consider '[d]epartures from the normal procedural sequence,' which may demonstrate 'that improper purposes are playing a role.'" *Id.* (quoting *Arlington Heights*, 429 U.S. at 267). Here, there are several indications that (1) the process for changing TJ admissions was unreasonably hurried and (2) there was a noticeable lack of public engagement and transparency—even among Board members. While the Board does not appear to have broken any procedural rules as such, the evidence shows that, for such a significant set of actions, the procedure was remarkably rushed and shoddy. All this suggests that the Board sought to move quickly because, as Board member Omeish put it in a November email, the Board was "currently incurring reputational/political risks" meaning that "now is better timing." Ex. 14 at 3.

After they participated in the state task force, Brabrand, Shughart, and other staff developed a "Merit Lottery" proposal for TJ admissions. Brabrand presented the proposal at a Board work session on September 15, 2020. Ex. 7. The presentation detailed a proposal to select TJ students via a lottery with "regional pathways" for five separate FCPS regions and the remaining jurisdictions that TJ serves. *Id.* at 12–16. The presentation focused on the projected racial effect, presenting the results of modeling Shughart had run, *see* Ex. 44 (Shughart Dep. 109:5–21), to demonstrate the effect of applying the lottery to three previous TJ classes—namely, a drastic drop in Asian-American students at TJ, Ex. 7 at 18–20. Brabrand's PowerPoint indicated that a final decision on implementing the lottery could be made as early as the October 8, 2020, regular Board meeting. *Id.* at 22.

The Board threw a wrench in these plans. Three days after the September 15 work session, Corbett Sanders told Brabrand in an email that "the plan released on Monday has caused confusion in the community because of the over-reliance on the term lottery vs. merit." Ex. 16 at 2. The

confusion wasn't limited to the public—McLaughlin reported that even *she* did not receive the proposal until two hours before the work session and there was no prior stakeholder input. Exs. E, F, G. Once it became clear that most of the Board members were opposed to a lottery for various reasons, Brabrand told the Board on September 27 that staff would prepare and present an alternative admissions proposal. Ex. 16 at 7. Corbett Sanders expressed hope that, unlike with the first proposal, "[i]deally we will be able to look at the plan in advance of the meeting." *Id.*

There was also the issue of the October state reporting deadline. Corbett Sanders emailed Brabrand on September 19 that "it is not the timing of the work session that is energizing the community. It is the timing of looking at TJ." *Id.* at 1. She suggested that "we make it clear that we are responding to a statutory mandate." *Id.* And in an earlier email to Brabrand, she suggested that he "[c]larify that we have a statutory requirement to submit a plan to the state by 9 October."[18] Ex. 16 at 2. Yet other Board members questioned whether the Board had to overhaul admissions in such a short timeframe—McLaughlin told a constituent that "Brabrand has created a false urgency that FCPS must drastically overhaul the TJ Admissions process within a three week decision-making window." Ex. 23 at 2; *see also* Ex. 27 (Tholen forwarded to Board colleague Pekarsky an email from a member of the community who said she had talked to the Virginia Department of Education and was told that the plan submitted to the state could be "aspirational" and "general" and there was "no mandate for Governor's Schools to produce a more diverse population"); Ex. C (October 8 text from McLaughlin to Board member Rachna Sizemore Heizer said that Brabrand "incorrectly told the Board (and the public) that we needed to make a rushed/unvetted decision by October 12th").

---

[18] Brabrand wrote in an email that he sought and received from the Virginia Secretary of Education an extension of this deadline until October 9. Ex. 39 at 1.

Nevertheless, the Board pressed on. At an October 6 work session, the Board viewed a presentation from Brabrand that proposed a revised merit lottery—it would have set aside seats for the 100 highest-evaluated applicants and selected the remaining seats via lottery among the students who met the minimum requirements after holistic review.[19] Ex. 46 at 11–12. Yet the Board also took several votes at the work session, something it has acknowledged it does not typically do. *See* Answer ¶ 33. Among these, it unanimously voted to remove the longstanding admissions exam without any public notice that such a vote would occur. Ex. 3 at 2; Ex. 48.[20] Then, while some Board members were expressing concern at a process that was moving too fast, Ex. 28, the Board at its regular meeting two days later rejected a motion that would have directed Brabrand to engage stakeholders and allow for more community input before presenting a final plan. Ex. 4 at 4–5. Tholen lamented to her constituents that the motion had failed and that "the outreach to date has been one-sided and did not solicit input from all of our communities." Ex. 29 at 7.

After the October 6 work session, with support for any sort of lottery waning,[21] the Board sought an entirely holistic proposal. Ex. 42 at 41 (listing as a "next step" for staff[22] to "[b]ring to

---

[19] The Board received the details of the holistic scoring method proposed along with this "Hybrid Merit Lottery" proposal in closed session, before the main presentation was presented in public view. Ex. N (Shughart Dep. 149:17–150:13 & Dep. Ex. 12). The proposal included 50 bonus points for attendance at an underrepresented middle school in a system with 1,100 base points.

[20] Notably, in response to Coalition leader Asra Nomani's later concern that adoption of a new admissions process might be voted on at a work session too, Board member Tholen said that the Board was trying to "move away" from work session votes and that she hoped there wouldn't be such a vote. Ex. 47.

[21] A text message between Board members McLaughlin and Sizemore Heizer indicates that there never was a majority on the Board in favor of a lottery at any time. Ex. H As the next subsection describes, Board members had varying reasons for rejecting both presented forms of lottery admissions.

[22] Shughart explained that "next steps" were "questions that board members proposed to staff to follow up on." Ex. 44 (Shughart Dep. 97:17–98:5).

the board a holistic admissions approach that does not contain a lottery as an option for the board to consider as an alternative plan"). On November 16, FCPS staff released a white paper detailing a holistic option alongside the hybrid merit lottery. Ex. 42. The white paper included voluminous racial modeling and discussion of efforts to obtain racial diversity at TJ. *Id.* at 4–5, 25–31. These plans were initially to be discussed at a November 17 work session, but multiple Board members protested that the white paper was posted far too late for proper consideration. Ex. 25; Ex. 20 at 1.

The TJ discussion was ultimately postponed until December 7, when Brabrand presented the hybrid merit lottery and the new holistic plan at another work session. Exs. 2 & 6. The holistic method involved consideration of GPA, the Student Portrait Sheet, the Problem Solving Essay, and the Experience Factors, including attendance at an underrepresented middle school, with regional caps as in the Merit Lottery. Ex. 6 at 12–14. Thereafter, Board member confusion persisted—members were exchanging draft motions almost right up until the Board met to make a final decision on December 17. *See* Ex. 17 at 1, Exs. 12, 18. In the early morning of December 16, Keys-Gamarra emailed Brabrand and expressed concern that there were "no posted motions for us to vote on." Ex. 21. McLaughlin chastised the Board both during the December 17 meeting and afterward, noting the failure to post any motions to the public or for the full Board until a half hour before the closed session began. Ex. 24.

At the December 17 meeting, the Board voted down the hybrid merit lottery proposal by a vote of 4-8. Ex. 1 at 4. Then it voted on a motion to direct Brabrand to implement the holistic proposal, except replacing the regional pathways with guaranteed admission to "the top 1.5% of the 8th grade class at each public middle school who meet the minimum standards." *Id.* at 4–5. The 1.5% plan had not been presented publicly in any meeting before it was voted on. The vote passed by a margin of 10-1-1, with Anderson (who had voted for the lottery) voting no and

McLaughlin abstaining. *Id.* at 5. McLaughlin later wrote that she abstained at least in part because of the problematic process—she later wrote that "this is not how the Board should conduct its business" and that she could not "recall a messier execution of Board-level work" in her nine years on the Board. Exs. 22 &24.

Even after the vote, Board members were not sure whether the top 1.5% was to be selected by a student's *base school* or *attending school*—a question with significant ramifications because some FCPS schools have Advanced Academic Program (AAP) Level IV centers that draw in students from other middle school zones to attend them. *See* Ex. 10; Ex. 43 (Brabrand Dep. 134:8– 135:5). Multiple Board members questioned staff on this topic after the Board voted to implement the holistic plan. Exs. 8, 9, 11. But Brabrand insisted that the Board had voted for *attending school*, which "represented the geographic distribution the Board wanted." Ex. 9 at 1.[23] In the rush to overhaul admissions, some Board members were confused about what they had done.

All in all, the evidence shows the process was rushed, not transparent, and more concerned with simply doing *something* to alter the racial balance at TJ than with public engagement. In weighing this factor in favor of discriminatory intent, the Fourth Circuit in *McCrory* specifically noted the testimony of "legislators" who "expressed dismay at the rushed process." 831 F.3d at 228. "This hurried pace, of course, strongly suggests an attempt to avoid in-depth scrutiny." *Id.* The panel made sure to note that "unusual procedures" can weigh in favor of a finding of discriminatory intent even when the legislative body breaks no rules. *Id.* Here, the decision to vote on eliminating the TJ admissions examination at a work session without public notice was one

---

[23] Brabrand noted that if base schools were used, "some base schools [sic] kids would never have any kids who physically attend the school get in." Ex. 9 at 1. An email from Shughart demonstrated this point using AAP center school Carson and non-center school Franklin, which saw many of its zoned students attend the Center at Carson. Ex. 11 at 1–2.

such "unusual" procedure. And the same can be said for the lack of public engagement—the Board held full public meetings on renaming Mosby Woods Elementary School and Lee High School, *see* Exs. 59 & 60, but the public did not even see the proposed plan that the Board actually adopted for TJ admissions until 30 minutes before the final meeting. Such a process supports an inference of improper motive and tilts this factor in favor of a finding of discriminatory intent.

4. **The legislative and administrative history—particularly the comments of Board members and high-level FCPS employees--demonstrate the changes were motivated by a racial purpose**

Finally, "the legislative history leading to a challenged provision 'may be highly relevant, especially where there are contemporaneous statements by members of the decisionmaking body, minutes of its meetings, or reports.'" *McCrory*, 831 F.3d at 229 (quoting *Arlington Heights*, 429 U.S. at 268). Here, emails and text messages between Board members and high-ranking FCPS officials leave no material dispute that—at least in part—the purpose of the Board's overhaul of admissions was to change the racial makeup to TJ to the detriment of Asian-Americans.

Most obviously, the discussion of TJ admissions changes was infected with talk of racial balancing from its inception. This was apparent from the first proposal FCPS staff released after Brabrand attended the state task force and told the Board about a potential state plan to require demographic balance at Governor's Schools. Ex. 19 at 1. The second slide of the initial merit lottery presentation, entitled "Leading with Equity at the Center," declared that TJ "should reflect the diversity of FCPS, the community and Northern Virginia." Ex. 7 at 3. The subsequent slides—comparing historical TJ admissions data by race with the racial makeup of FCPS and focusing on the racial effect of implementing a lottery—make clear that "diversity" primarily meant racial diversity. *Id.* at 4–5, 8–10, 18–20.[24]

---

[24] *See also* Ex. 44 (Shughart Dep. 101:22–105:7) (acknowledging that "diversity" includes racial diversity and that TJ previously did not reflect the diversity of Northern Virginia).

While a majority of the Board did not support Brabrand's lottery proposal, the dissenters nonetheless *embraced* racial balancing. For example, McLaughlin, who vehemently opposed the lottery, proposed her own plan based on her experience as a university admissions officer. Ex. 30 at 1–3. Referencing that "[t]he Supreme Court has ruled that Diversity is a 'compelling state interest,'" *id.* at 2, her proposal was designed to mimic those universities that use holistic admissions to "ensure their ACCEPTED Student Pools reflect both the demographic diversity and the high-achievement of their APPLICANT Pools." *Id.* at 1. To "help the Acceptance Pool more closely reflect the Applicant Pool's demographic diversity," *id.* at 2–3, the proposal set aside seats for "[d]emographically diverse students." *Id.* Tholen responded to McLaughlin's plan with similar skepticism of a lottery, stating that a lottery "seems to leave too much to chance" and asking: "will chance give us the diversity we are after?" *Id.* at 6. In short, some Board members' opposition to the lottery was at least in part due to a fear that a lottery *might not go far enough* to achieve racial balancing. *See* Ex. D. (McLaughlin text: "Using a lottery means random selection. How does that guarantee an increase in racial/SES diversity?").

At the next work session on October 6, the Board adopted a resolution requiring that FCPS' annual diversity report to the state "shall state that the goal is to have TJ's demographics represent the NOVA region." *Id.* It passed 11-0-1, with only Meren abstaining.[25] *Id.* This was more than an aspirational goal to be achieved by encouraging Black and Hispanic students to apply to TJ— Board members sought to use geography to obtain their desired racial outcome. Corbett Sanders

---

[25] Brabrand's public-facing email account responded to a parent email on October 8 saying that "[t]he Superintendent and the School Board believe that TJHSST should reflect the diversity of FCPS and our community. We recognize that the admissions process needs to be addressed in a comprehensive way." Ex. 34 at 3. And although she had abstained from the vote, Meren favorably cited an email that said "[t]he merit lottery proposal is intended to make student body of TJHSST more representative of our county demographics." Ex. 33.

advised Brabrand in late September that "it will be important to better communicate why a geographic distribution of students across the county will result in a change in demographics to include more students that are FRM [qualify for free or reduced-price meals], ELL [English language learners], black, Hispanic, or twice exceptional." Ex. 30 at 4. The day before the work session, she emailed a constituent that she was "urging the superintendent to modify his plan to take into account geographic diversity as well as students on Free and Reduced Lunch which should result in greater diversity in the demographics." Ex. 31 at 1; *see also* Ex. 15 (Corbett Sanders and Petarsky on October 6 saying all agree on the goal of diversity, and specifically that admissions should take into account "inclusion in under-represented populations"). And Sizemore Heizer wrote to Brabrand to suggest that he frame his plan as "increasing diversity through redefining merit." Ex. 37. Omeish used more aggressive language, writing that she planned to "support the proposal towards greater *equity*, to be clearly distinguished from *equality*." Ex. 38.[26]

The administrative history concurrent with the legislative history—here, the development of various proposals by FCPS staff—shows that staff did what the Board wanted, and that geographic diversity was understood to be a proxy for race. As early as May 27, 2020, staff sent the Board a proposal to revise TJ admissions to include three separate "pathways" with varying standards. Ex. N (Shughart Dep. 42:12–45:10 & Dep. Ex. 2). Pathway 1 would admit 350 students based on GPA and test scores, while Pathway 2 would admit 100 students based half on GPA and test scores and half on other factors, including the applicant's zip code and whether he or she was eligible for free or reduced price meals. *Id.* at 6–7. Pathway 3 was designed to admit students

---

[26] Omeish also agreed with an FCPS staff member that TJ did not "really have a pipeline issue because we have enough Black and Hispanic 8th grade Level 4 students (the most rigorous program we have in elementary and middle school) to fill an entire TJ class," so "the best way to create more diversity is to change the admissions process and test specifically." Ex. 13.

nominated from underrepresented middle schools who hadn't already gained admission. The proposal recommended evaluating these students under the metrics used to select Pathway 2 students because "[u]sing only Pathway 1 options would ensure regional diversity only and not racial/ethnic diversity." *Id.* at 9; *see also id.* (table noting that were three students selected from each underrepresented school using only the Pathway 1 statistics, 27 of those 30 students would have been white or Asian American).

Once the Board expressed dissatisfaction with the initial lottery plan, FCPS staff picked up where it had left off, developing a holistic proposal that uses "Experience Factors," including attendance at an underrepresented middle school. On September 27, Shughart asked Lidi Hruda to review the Experience Factors and "provide us a review of our current weighting and whether or not this would be enough to level the playing field for our historically underrepresented groups." *Id.* (Shughart Dep. 136:11–137:9 & Dep. Ex. 11 at 1). Hruda responded that "[i]t is hard to know what exactly will level the playing field but my gut says that you may need to double all the points (and the total) so the applicants can receive up to 200 points overall for these experience factors." *Id.* (Dep. Ex. 11 at 6).

They left no doubt that race was the primary factor. Hruda wrote that several portions of the TJ application had "historically favored White and Asian candidates," which leaves "only the Experience Factors to help shift the landscape and bring more diversity into play and acceptance of historically underrepresented students." *Id.* A scoring rubric including 200 points for Experience Factors—following Hruda's advice—was presented to the Board at the October 6 closed session before the vote to eliminate the admissions exam. *See id.* (Shughart Dep. 150:4–152:12 & Dep. Ex. 12). After that session, Brabrand emailed Shughart and FCPS Chief Operating Officer Marty

30

Smith asking "would 200 points change who got in – that is the modeling they[27] are asking about . . . [c]an we go back and look at points – would 200 points be a game changer[?]" *Id.* (Shughart Dep. at 156:1–17 & Dep. Ex. 13). Shughart said he would have to go back and look at old data, but noted that "200 points or 50 points would make a difference. I don't know how that impacts our diversity." *Id. (*Dep. Ex. 13 at 1). The undisputed evidence demonstrates that staff took the mandate from the Board and developed a procedure that was meant to disadvantage Asian-American students in service of racial balance.

Board member text messages reinforce the racial motive. In conversations with each other, Omeish and Petarsky recognized that Asian-Americans are "discriminated against in this process," "there has been an anti [A]sian feel underlying some of this" and that Brabrand had "made it obvious" with "racist" and "demeaning" references to "pay to play," referring to test prep for the TJ admissions exam. Exs. J & L; *see also* Ex. M (Brabrand "[c]ame right out of the gate blaming" Asian Americans); *Cf.* Complaint ¶ 50; Answer ¶ 50. Petarsky wrote that one of Brabrand's proposals would "whiten our schools and kick our [sic] Asians. How is that achieving the goals of diversity?" Ex. J. Sizemore Heizer said in a text that Brabrand was "trying to be responsive to the times – BLM and a super progressive board." Ex. I. Another Board member said in a text "the Asians hate us," Ex. M, while two Board members acknowledged that Asian Americans are "discriminated against in this process," Ex. J.

* * *

All of this is far more than usually exists in an *Arlington Heights* record. The *McCrory*

---

[27] Shughart "assume[d]" that "they" referred to the Board members. *Id.* (Shughart Dep. 159:7–160:17). That bolsters the obvious inference that the email referred to them, given that the email chain began at approximately 7:00 p.m. on October 6 and the closed session lasted from 5:00 p.m. until 7:15 p.m. *See* Ex. 3 at 1.

court did not consider *any* contemporary comments of legislators in determining whether North Carolina's omnibus election bill was racially motivated. *See McCrory*, 831 F.3d at 229.[28] It weighed the fourth factor in favor of intent based solely on "the General Assembly's requests for and use of race data in connection with" passing the law. *Id.* at 230. The Fourth Circuit reasoned that because the legislators sought racial data and then went ahead and enacted provisions that would disproportionately impact Black voters, but not those that would disproportionately impact white voters, the General Assembly acted with discriminatory intent. *See id.* Even aside from all the statements confirming that the Board's goal was to bring about racial balance at TJ, the Board's requests for and consideration of racial data would be enough to demonstrate discriminatory intent under *McCrory*. *See* Ex. N (Shughart Dep. Ex. 13 (Board members asking about modeling for holistic process); Ex. 42 at 25–31.

That does not mean "that any member of the [Board] harbored racial hatred or animosity toward [Asian Americans]." *McCrory*, 831 F.3d at 233. Discriminatory intent does not require racial animus. What matters is that the Board acted "at least in part 'because of,' not merely 'in spite of,' [the policy's] adverse effects upon an identifiable group." *Feeney*, 442 U.S. at 279. That's the case here—the Board's policy was designed to increase Black and Hispanic enrollment, which would "(by necessity) decrease the representation" of Asian-Americans at TJ. *Ass'n for Educ. Fairness*, 2021 WL 4197458, at *17; *see also Doe ex rel. Doe v. Lower Merion Sch. Dist.*, 665 F.3d 524, 553 (3d Cir. 2011) (discriminatory intent exists when a facially neutral policy was "developed or selected because it would assign benefits or burdens on the basis of race"); *Lewis v. Ascension Parish Sch. Bd.*, 662 F.3d 343, 354 (5th Cir. 2011) (Jones, J., concurring) ("[t]o allow

---

[28] In that case, the challengers were unable to obtain any communications between legislators or between legislators and staff due to legislative privilege. *N.C. State Conf. v. McCrory*, Nos. 1:13CV658, 1:13CV660, 1:13CV861, 2015 WL 12683665, at *6 (M.D.N.C. Feb. 4, 2015).

a school district to use geography as a virtually admitted proxy for race, and then claim that strict scrutiny is inapplicable because" it is facially race-neutral "is inconsistent with the Supreme Court's holdings"). Therefore, strict scrutiny applies.

### C.      The Board's Actions Do Not Satisfy Strict Scrutiny

The burden then shifts to the Board to demonstrate that actions were narrowly tailored to further a compelling interest. *Adarand*, 515 U.S. at 227. Strict scrutiny applies to facially neutral actions "motivated by a racial purpose or object" in the same manner as when they contain "express racial classifications." *Miller*, 515 U.S. at 913. For good reason, the Board has not yet argued its actions would satisfy strict scrutiny. They would not.

#### 1.      The Board lacks a compelling interest for its race-based decisions

The Supreme Court has recognized only two interests as sufficiently compelling to justify race-based action—remedying past intentional discrimination and obtaining the benefits of diversity in higher education. *Parents Involved*, 551 U.S. at 720–23. No remedial interest exists here. And in *Parents Involved*, the Court refused to extend the diversity rationale to K-12 schools, writing instead that *Grutter* had "relied upon considerations unique to institutions of higher education," and that lower courts that had applied it "to uphold race-based assignments in elementary and secondary schools" had "largely disregarded" *Grutter*'s limited holding. *Id.* at 724–25.

The Board's main problem is its focus on the goal to have TJ reflect the demographics of the surrounding area—described primarily in racial terms. Far from a compelling interest, racial balancing for its own sake is "patently unconstitutional." *Fishe*r, 570 U.S. at 311 (quoting *Grutter*, 539 U.S. at 330). The Board cannot transform racial balancing into a compelling interest "simply by relabeling it 'racial diversity.'" *Id.* (quoting *Parents Involved*, 551 U.S. at 732 (plurality opinion)). The school districts in *Parents Involved* tried "various verbal formulations" to deflect

from their intent to racially balance schools through race-based transfers. *See* 551 U.S. at 725, 732 (plurality opinion). The Board here did not even bother with such "verbal formulations." Board members and high-level FCPS actors did not disguise their desire for TJ to represent the racial demographics of Fairfax County or Northern Virginia as a whole. Whether accomplished overtly or via proxies, racial balancing is not a compelling interest.[29]

### 2. The Board's actions are not narrowly tailored to further any interest other than racial balancing

Even if the Board could identify a compelling interest that might justify its racially discriminatory changes to the TJ admissions process, it still must prove that the changed admissions policy is "necessary" to accomplish that interest. *Fisher*, 570 U.S. at 312 (quoting *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 305 (1978)). The plan must be a "last resort" to accomplish the purportedly compelling interest. *Parents Involved*, 551 U.S. at 790 (Kennedy, J., concurring in part and concurring in the judgment). Yet even Board members thought that perhaps more could be done to encourage racial diversity at TJ short of a discriminatory admissions policy.

---

[29] Justice Kennedy's *Parents Involved* concurrence, which discussed a possible diversity interest for K-12 schools, is (1) not binding and (2) unhelpful to the Board. It is not binding because, "[u]nder *Marks v. United States*, '[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.'" *Ass'n for Educ. Fairness*, 2021 WL 4197458, at *18 (quoting *Marks*, 430 U.S. 188, 193 (1977)). "[C]learly the 'narrowest grounds' reached by the majority in *Parents Involved* were that the challenged policy had not been narrowly tailored to achieve its stated ends." *Id.* So Justice Kennedy's opinion on diversity as a compelling interest is not controlling. *See id.*

But even if it were, that opinion would not help the Board. Justice Kennedy's opinion countenances generic race-conscious policies like "strategic site selection of new schools; drawing attendance zones with general recognition of the demographics of neighborhoods; allocating resources for special programs; recruiting students and faculty in a targeted fashion; and tracking enrollments, performance, and other statistics by race." 551 U.S. at 789 (Kennedy J., concurring in part and concurring in the judgment). The Board's use of a racial proxy to limit enrollment of one racial group at a competitive high school is different in kind. It veers from mere race consciousness or race awareness to the assignment of "benefits or burdens on the basis of race." *Doe*, 665 F.3d at 553.

Texts between Board members Petarsky and Omeish show they believed that changing the process was secondary to improving outreach and awareness of TJ and implementing universal screening. Ex. K. Omeish said "[w]e could have even kept the tests," while Petarsky lamented that "[w]e have an application problem. We haven't bothered to ask why people don't apply." *Id.* These steps and others—like further increasing the size of TJ or providing free test prep—could have been implemented before the Board defaulted to a system that does not treat applicants equally in hopes of engineering a particular racial outcome. Since overhauling the process was not the "last resort" for the Board to accomplish its goals, the Board's actions were not narrowly tailored.

## III.   The Proper Remedy Is Invalidation of the Board's Actions

The Fourth Circuit has repeated that "once a plaintiff has established the violation of a constitutional or statutory right in the civil rights area, . . . court[s] ha[ve] broad and flexible equitable powers to fashion a remedy that will fully correct past wrongs." *McCrory*, 831 F.3d at 239 (quoting *Smith v. Town of Clarkton*, 682 F.2d 1055, 1068 (4th Cir. 1982)). More directly, "the proper remedy for a legal provision enacted with discriminatory intent is invalidation." *Id*. In this case, that means the ultimate remedy must be an injunction prohibiting the Board and its agents from implementing the challenged actions—including the removal of the admissions exam and the overhaul of the process to include the 1.5% seat guarantee by middle school and consideration of Experience Factors in holistic review.

## CONCLUSION

For the reasons stated, the Coalition respectfully asks the Court to grant its motion for summary judgment, enter the declaratory and injunctive relief requested in the Complaint, and grant all other relief to which the Coalition may be entitled.

Dated: December 3, 2021.

ERIN E. WILCOX*,
 Cal. Bar No. 337427
CHRISTOPHER M. KIESER*,
 Cal. Bar No. 298486
Pacific Legal Foundation
555 Capitol Mall, Suite 1290
Sacramento, California 95814
Telephone: (916) 419-7111
Facsimile: (916) 419-7747
EWilcox@pacificlegal.org
CKieser@pacificlegal.org


*Pro Hac Vice

Respectfully submitted,

s/ Alison E. Somin
ALISON E. SOMIN, Va. Bar No. 79027
Pacific Legal Foundation
3100 Clarendon Blvd., Suite 610
Arlington, Virginia 22201
Telephone: (202) 557-0202
Facsimile: (916) 419-7747
ASomin@pacificlegal.org

GLENN E. ROPER*,
Colo. Bar No. 38723
Pacific Legal Foundation
1745 Shea Center Dr., Suite 400
Highlands Ranch, Colorado 80129
Telephone: (916) 503-9045
Facsimile: (916) 419-7747
GERoper@pacificlegal.org

Counsel for Plaintiff

36

**CERTIFICATE OF SERVICE**

I hereby certify that on the day of December 22, 2021, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system. Counsel for Defendants are registered with the Court's CM/ECF system and will receive a notification of such filing via the Court's electronic filing system.

s/ Alison E. Somin
ALISON E. SOMIN, Va. Bar No. 79027
Pacific Legal Foundation
3100 Clarendon Blvd., Suite 610
Arlington, Virginia 22201
Telephone: (202) 557-0202
Facsimile: (916) 419-7747
ASomin@pacificlegal.org
*Counsel for Plaintiff*