**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

COALITION FOR TJ,                                  No. 1:21-cv-00296-CMH-JFA

                              Plaintiff,

              v.

FAIRFAX COUNTY SCHOOL BOARD,

                              Defendant.

**PLAINTIFF'S OPPOSITION TO CROSS-MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. ii

PRELIMINARY STATEMENT ........................................................................................... 1

STATEMENT OF DISPUTED FACTS ............................................................................... 1

ARGUMENT ......................................................................................................................... 14

    I.    The Coalition Has Standing ...................................................................................... 14

    II.   The Coalition Is Entitled to Summary Judgment on Its Equal Protection Claim .............. 18

        A.    The Board's overhaul of TJ admissions has a disparate
             impact on Asian-American applicants ............................................................... 20

        B.    The Board acted with discriminatory intent ..................................................... 25

        C.    The Board's out-of-circuit authority does not require a different result ......................... 33

CONCLUSION ...................................................................................................................... 35

CERTIFICATE OF SERVICE ............................................................................................. 37

INDEX OF EXHIBITS

# TABLE OF AUTHORITIES

## Cases

*Anderson ex rel. Dowd v. City of Boston*,
   375 F.3d 71 (1st Cir. 2004) ........................................................................33–34

*Ass'n for Educ. Fairness v. v. Montgomery Cty. Bd. of Educ.*, No. 8:20-02540-PX,
   2021 WL 4197458 (D. Md. Sept. 15, 2021) ..................................1, 19–23, 27–28, 35

*Baron Fin. Corp. v. Natanzon*,
   509 F. Supp. 2d 501 (D. Md. 2007) .....................................................................15

*Boston Parent Coalition for Academic Excellence Corp. v.*
   *School Committee of City of Boston*,
   996 F.3d 37 (1st Cir. 2021) .........................................................................34–35

*Boyapati v. Loudoun County School Board*,
   No. 1:20-cv-01075, 2021 WL 943112 (E.D. Va. Feb. 19, 2021) ...........................22

*Doe ex rel. Doe v. Lower Merion Sch. Dist.*,
   665 F.3d 524 (3d Cir. 2011) .........................................................................19, 34

*Fisher v. Univ. of Tex. at Austin*,
   570 U.S. 297 (2013) ....................................................................................23, 33

*Gratz v. Bollinger*,
   539 U.S. 244 (2003) ...........................................................................................23

*Group Health Plan, Inc. v. Philip Morris, Inc.*,
   86 F. Supp. 2d 912 (D. Minn. 2000) ..................................................................16

*Grutter v. Bollinger*,
   539 U.S. 306 (2003) ...........................................................................................23

*Heap v. Carter*,
   112 F. Supp. 3d 402 (E.D. Va. 2015) ................................................................16

*Hunt v. Cromartie*,
   526 U.S. 541 (1999) ...........................................................................................18

*Hunt v. Wash. State Apple Advertising Comm'n*,
   432 U.S. 333 (1977) ...........................................................................................15

*Lewis v. Ascension Par. Sch. Bd.*,
   662 F.3d 343 (5th Cir. 2011) ....................................................................27–28, 34

*Lewis v. Ascension Parish Sch. Bd.*,
   806 F.3d 344 (5th Cir. 2015) ..............................................................34

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992)......................................................................14–15

*Miller v. Johnson*,
   515 U.S. 900 (1995)..............................................................20, 23, 27

*N.C. State Conf. of NAACP v. McCrory*,
   831 F.3d 204 (4th Cir. 2016) .......................1, 18–19, 21, 23, 25, 30–33

*Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*,
   551 U.S. 701 (2007)...........................................................................23, 28

*Pers. Adm'r of Mass. v. Feeney*,
   442 U.S. 256 (1979)...........................................................................1, 19

*Regents of Univ. of Cal. v. Bakke*,
   438 U.S. 265 (1978)..............................................................................23

*Ricci v. DeStefano*,
   557 U.S. 557 (2009)..............................................................................27

*Small Sponsors Working Grp. v. Pompeo*,
   No. 1:19-2600-STA-jay, 2020 WL 2561780 (W.D. Tenn. May 20, 2020) ............................15

*Spurlock v. Fox*,
   716 F.3d 383 (6th Cir. 2013) ..........................................................33–34

*Students for Fair Admissions, Inc. v. Univ. of N.C.*,
   No. 1:14CV954, 2018 WL 4688388 (M.D.N.C. Sept. 29, 2018)....................................15–16

*Students for Fair Admissions, Inc. v. Univ. of N.C.*,
   No. 1:14CV954, 2019 WL 4773908 (M.D.N.C. Sept. 30, 2019)...........................................15

*United States v. Aramony*,
   166 F.3d 655 (4th Cir. 1999) .............................................................15

*Vill. of Arlington Heights v. Metro. Housing Dev. Corp.*,
   429 U.S. 252 (1977)...........................................................................18–19

*Washington v. Davis*,
   426 U.S. 229 (1976).............................................................................18

## PRELIMINARY STATEMENT

The Fairfax County School Board overhauled the process for admission to Thomas Jefferson High School for Science & Technology because it sought to change the racial composition of the school—to make TJ's racial makeup more closely reflect that of Fairfax County Public Schools and the surrounding area. To the detriment of Asian-American students, there is no doubt that the Board succeeded. Asian-American students, who had earned 73 percent of the seats in the two years before the changes were implemented, earned just 54 percent of the seats in the first year under the new process. These facts are not disputed. The outcome of this case therefore hinges on a question of law—whether the Board's motivation, combined with its chosen means that, although facially race-neutral, specifically target Asian-American students to make it disproportionately harder for them to get in, constitutes discriminatory intent.

The Board's arguments rely heavily on the mistaken premise that racially discriminatory intent must involve direct evidence of racial animus. The Fourth Circuit says otherwise. *N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 222–23, 233 (4th Cir. 2016). The Coalition need only prove that the racial effect was *a reason* the Board did what it did, rather than a mere side effect. *See Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). Because the record leaves no doubt that the Board "set out to increase and (by necessity) decrease the representation of certain racial groups" at TJ, *Ass'n for Educ. Fairness v. v. Montgomery Cty. Bd. of Educ.*, No. 8:20-02540-PX, 2021 WL 4197458, at *17 (D. Md. Sept. 15, 2021), the Coalition is entitled to summary judgment. The Board's cross-motion should be denied.

## STATEMENT OF DISPUTED FACTS

9.     The admissions process in place before 2020 prevented talented students (including Asian Americans) deserving of admission from accessing TJ because of where they attended middle

school. Ex. 5, Miller Dep., at 95:3–97:21.

**Response:**        The cited excerpt does not show that "[t]he admissions process in place before 2020 prevented talented students (including Asian Americans) deserving of admission from accessing TJ because of where they attended middle school." It demonstrates only that (1) the Coalition responded to the proposal for use of a lottery system for TJ admissions with a plan that would have allowed each middle school to nominate students to be "second-look" semifinalists within the context of the previous process; and (2) the Coalition's position was that FCPS had failed certain students by not investing in STEM enrichment at their K-8 schools, *see* Board Ex. 5, Miller Dep. 97:7–16. The admissions process before 2020 also did not "prevent" any student from "accessing TJ because of where they attended middle school." Instead, that process selected semifinalists solely on the basis of GPA and admissions examination scores. Board Ex. 2, Regulation 3355.13 at 5. In a second round of review, semifinalists were evaluated holistically, with no explicit preference for attending any particular middle school. *Id.*, Regulation 3355.13 at 5–6. The holistic evaluation was conducted without a point system to judge various parts of the application. Coalition Ex. 61, Shughart Dep. 140:9–13. By contrast, the challenged admissions policy has only one round and assigns a point value to each component of the holistic review, including "Experience Factors" such as attendance at a middle school deemed historically underrepresented at TJ. Coalition Ex. N, Shughart Dep. 162:1–165:15.

11.        On May 27, 2020, the School Board was briefed by staff regarding potential changes to the admissions process projected to take effect for the 2022–2023 application year. Ex. 8, Brabrand Dep., at 70:12–14, 71:3–7; Ex. 9, May 27, 2020 TJ Admissions Proposal; Ex. 10, Executive Summary of Proposal. The presentation to the Board noted that "[t]alented students enrolled in each middle school have traits important to the mission and goals of [TJ] and could contribute to

the school's learning environment," and that the changes would "more directly account for the fact that many students who want to enroll" at TJ "and who could be successful at" TJ "may have different academic, curricular, and personal experiences and differing arrays of strengths and interests." Ex. 9 at 2.

**Response:**      It is true that the Board received this proposal on May 27, 2020. *See also* Coalition Ex. N (Shughart Dep. Ex. 2).[1] But the proposal said more than that FCPS sought "talented students" from each middle school to attend TJ. In the course of discussing three proposed pathways for admission, the proposal rejected using GPA and test scores to evaluate students for the third pathway because that approach "would ensure regional diversity only and *not racial/ethnic diversity*." Board Ex. 9 at 5–6 (Bates numbers FCSB-TJ000021831–32) (emphasis added). The proposal also included a table showing that using only GPA and test scores to select the top students at underrepresented middle schools would have selected 15 white students, 12 Asian-American students, three Hispanic students, and zero Black students from these middle schools. Board Ex. 9 at 6 (Bates number FCSB-TJ000021832).

14.      In Summer 2020, Secretary Qarni convened a working group to examine barriers to access at Governor's Schools and ways to improve equity of access. Ex. 8, Brabrand Dep., at 58:4–14. Several FCPS staff members, including Dr. Brabrand, were invited to their meetings. Id. at 58:4–59:16. Though the Coalition decried the working group as "Anti-Asian," Qarni, who himself is Asian, vehemently disagreed, pointing out that "[m]any children from Asian working-class

---

[1] Exhibit 2 to the Shughart deposition, which contains both the full May 27, 2020 proposal and an executive summary, was filed under seal as part of Coalition Exhibit N. The Coalition inadvertently left this deposition exhibit off the list of confidential exhibits it sought to file under seal. However, Exhibits 9 and 10 to the Board's brief contain these same documents. The reference to the May 27, 2020, proposal in the Coalition's opening brief also refers to Board Exhibit 9. *See* Coalition Opening Br. at 29–30.

families are also not benefiting from Governor Schools." Ex. 13 at 4.

**Response:**    There is evidence of anti-Asian bias emanating from the working group. Working group meeting minutes produced by the Board in this case document that at least one attendee of the working group—State Delegate Mark Keam—compared the TJ admissions examinations to poll taxes and literacy tests and complained about the "unethical ways parents push their kids into TJ" when they are "not planning to stay in America." Coalition Ex. 67 at 4.

34.    Two days after the October 6 work session, the Coalition alerted the Board and school administrators to purportedly "egregious issues" uncovered by its "data team"—that the proposed increase of the minimum GPA from 3.0 to 3.5 would "maliciously eliminat[e] more Black and Hispanic students" and "deprive [them] of admission to TJ." Ex. 25, Coalition Email to School Board. The Coalition faulted Dr. Brabrand, noting that he had admitted that FCPS "staff did not study the racial demographics within Fairfax County to determine who would qualify" before proposing to raise the minimum GPA from 3.0 to 3.5. *Id.*

**Response:**    The Board presents snippets of the email out of context. In its entirety, the cited email is a criticism of FCPS staff for failing to analyze the consequences of its proposal. It criticized Brabrand and his staff for "the hasty, ill-conceived nature of this whole Merit Lottery excercise [sic]." Board Ex. 25 at 2. The email's criticism of the proposal excluding Black and Hispanic students was followed by the assertion that the proposal "would make the White demographic the largest of all applicant pools across all pathway regions, promoting segregation, and denying opportunity to Black and Hispanic students in AAP centers in the Northern region of the county, which we are certain Dr. Brabrand could not really intend." Board Ex. 25 at 1.

36.     On October 9, FCPS submitted the report on diversity goals required by the General Assembly. Ex. 27, Report. The report indicated TJ's "long-term diversity goal is to increase the broad diversity that represents all participating jurisdictions," with diversity "broadly defined to include a wide variety of factors," including "race, ethnicity, gender, English Language Learners (ELLs), geography, [and] socioeconomic status." *Id.* at 2. The report indicated TJ's "short-term primary goal is to achieve a" talented student population "that is representative of the applicant population, with additional emphasis to increase the number of students in historically underrepresented groups applying to [TJ]." *Id.* The report was completed by FCPS staff, and the Board did not take any votes on what the report should include. Ex. 24, Pekarsky Dep., at 61:1–66:2.

**Response:**     The final sentence of the Board's assertion is incorrect. The Board voted at the October 6 work session to "require the Superintendent to bring to the board the annual diversity plan prior to submitting it to the State. The Plan shall state that the goal is to have TJ's demographics represent the NOVA region. The plan shall include actions detailing how outreach and supports will be extended to increase applications from underserved populations." Board Ex. 22 at 3. The Board therefore did direct staff to include certain details in the Report—including the overall goal of aligning the demographics of TJ with those of Northern Virginia.

39.     The Superintendent issued the proposals in a Powerpoint presentation and "White Paper" that were shared with the Board and the public on November 17, 2020. See Exs. 29 and 30. Dr. Brabrand's staff did not do any modeling of the demographic results under the Holistic Review Proposal. Ex. 8, Brabrand Dep., at 106:5–107:3.

**Response:**     This assertion is incomplete and misleading. On September 27, Shughart emailed Lidi Hruda of FCPS' Office of Research and Strategic Improvement. Coalition Ex. 61, Shughart

Dep. Ex. 11.[2] Attaching a draft TJ admissions proposal, Shughart asked Hruda to "look specifically at the table for 'Experience Factors' and provide us a review of our current weighting and whether or not this would be enough to level the playing field for historically underrepresented groups." *Id.*, Shughart Dep. Ex. 11 at 1; *see also* Coalition Ex. N, Shughart Dep. 137:19–138:20. Board members sought modeling at the Board's October 6 Closed Session, but afterwards Shughart explained that it would not be possible to do precise modeling on the racial effect of the Experience Factor bonus points because the previous evaluation system did not include points. *See* Coalition Ex. N, Shughart Dep. at 156:1–17 & Shughart Dep. Ex. 13; *see also* Board Ex. 30 at 41 (November white paper) (staff responding to Board request for modeling, noting that "[m]odeling of the hybrid approach's impact on diversity is unavailable because ratings on the components of the approach used last year or proposed for this year do not exist").

48.     In adopting the 1.5% Plan, the Board made clear that racial balancing and racial targets would be prohibited. The motion that carried expressly provided: "The admission process must use only race-neutral methods that do not seek to achieve any specific racial or ethnic mix, balance, or targets." *Id.* at 4.

**Response:**     The carried motion includes the cited language—and the Coalition admits that the 1.5% Plan and Holistic Review the Board adopted are facially race-neutral. But the Board itself voted on October 6 to require the Superintendent and his staff to include in the annual diversity Report to the State that "the goal is to have TJ's demographics represent the NOVA region." Board

---

[2] The cited portions of Exhibit 11 to Shughart's deposition appear at pages 48 and 49 of Exhibit N, initially filed under seal but now on the public record. *See* ECF No. 122-13. The Coalition inadvertently filed only a portion of that exhibit, which is why the filed document is missing the red exhibit tag. The full version of Exhibit 11 is attached to this brief as part of Coalition Exhibit 61. Although it was marked confidential, the Board has consented to its filing on the public record.

Ex. 22 at 3. The actual Report submitted to the State lists as a short-term goal to achieve a student body "that is representative of the applicant population, with additional emphasis to increase the number of students in historically underrepresented groups applying to [TJ]." Board Ex. 27 at 2. Historically underrepresented groups did not include Asian-American students. And the Superintendent's public-facing email account responded to a parent email on October 8 saying that "[t]he Superintendent and the School Board believe that TJHSST should reflect the diversity of FCPS and our community. We recognize that the admissions process needs to be addressed in a comprehensive way." Coalition Ex. 34 at 3.

49.      No one at FCPS conducted any analysis to predict how the 1.5% Plan would affect the racial makeup of students admitted to TJ. Ex. 3, Shughart Decl., ¶ 10(g). See also Ex. 8, Brabrand Dep., at 134:2–7 (Q: . . . Did you or your staff ever consider the racial impact of the decision to guarantee that 1.5 percent of schools feeds to TJ? . . . A: No.").

**Response:**      *See supra* Response to Paragraph 39. Additionally, on request, the Board in September received comprehensive racial data on TJ admissions by FCPS middle school for the past ten admissions cycles. *See* Coalition Ex. 68.[3]

50.      Minutes and video recordings of each of the School Board meetings in which TJ admissions was discussed are available online at https://www.fcps.edu/school-board/schoolboard-meetings. The September 15, October 6, December 7, and December 17 meetings have also been transcribed for the Court's benefit. See Exs. 15, 23, 34, 38. No School Board member made any statements at any School Board meeting expressing intent to change any element of the admissions process at TJ in order to decrease the number of Asian-American students or even discussed Asian-

---

[3] The Board marked this document confidential in discovery but has consented to its filing on the public record.

American representation at TJ. *See id.*

**Response:**     The assertion in the final sentence is misleading. The transcripts—like the remainder of the record—show that at all four meetings, Board members and FCPS staff discussed changing the TJ admissions process to alter the racial demographics of the school. Perhaps the most revealing comments were by Board members who referred to "students of color" in a context clearly excluding Asian-American students. *See* Board Ex. 34 (December 7 transcript) 176:3–5 (Keys-Gamarra: "my sons were recommended to want to go to TJ and given the reputation it has for isolating students of color, they simply did not want to go"); Board Ex. 23 (October 6 transcript) 103:16–18 (Sizemore Heizer: "we are missing diverse students of color who have aptitude, passion and skills for STEM"); *see also* Board Ex. 15 (September 15 transcript) 73:20–75:21 (Meren: arguing that TJ students are "hurting" because of lack of diversity and relaying anecdote of a Black student who told her that she bleached her skin to fit in at TJ); *id.* 86:4–10 (Brabrand: "TJ has – has developed a reputation. And there is a reputation that is the – the great side of it, but there's also that underside, and that many more students of color don't feel welcome. Don't feel respected or questioned why they're there."). In a similar vein, Board member Meren responded to Bonitatibus by noting "you have mentioned that the school is diverse, but at the same time it seems – you know, it's not to the extent to which you or the division and the community think." Board Ex. 15 81:1–5. Board members were also clear that they sought to use geography to address the issue. Board Ex. 38 (December 17 transcript) 138:10–139:17 (Keys-Gamarra); *id.* 112:4–114:22 (Corbett Sanders); Board Ex. 34 17:7–21 (Meren); Board Ex. 23 58:17–19 (Omeish). One Board member even sought from staff an answer on specific "targets." Board Ex. 23 44:12–45:6 (Keys-Gamarra). The transcripts as a whole show a process consumed with race. *See also* Board Ex. 23 138:21–139:20 (member Pekarsky asking Shughart why white students were projected to benefit

the most from the Merit Lottery, not "the students we're trying to capture"); Board Ex. 15 at 117:8–119:24 (Frisch); *id*. 121:24–122:17 (Cohen).

61.     The Coalition cannot identify any applicant who was denied admission to TJ on the basis of their race under the new policy. Ex. 40, Nomani Dep., at 183:19–184:2.

**Response:**     This was beyond the scope of the 30(b)(6) designation served on the Coalition before the deposition. *See* Coalition Ex. 62. Therefore, Ms. Nomani was answering only in her personal capacity.

64.     The Coalition "came together" in August 2020. Ex. 40, Nomani Dep., at 14:12–19. It does not have a charter, articles of incorporation, or bylaws. *Id.* at 20:4–8, 41:18. It is not registered with any federal or state agency. *Id.* at 20:9–21:4.

**Response:**     This is a misrepresentation of Ms. Nomani's testimony on behalf of the Coalition. She did not testify that *the Coalition* "came together," but that the initial organizers "came together, just a few people, and then others joined." Board Ex. 40, Nomani Dep. 14:12–22.[4] Further, she testified multiple times that the Coalition was formally founded in August 2020. *See id.*, Nomani Dep 14:12–13 (the Coalition "is a grassroots organization that we began in August 2020"); 17:13 (the Coalition was "formed in August 2020"); 28:3–4 ("in August 2020, I cofounded the Coalition for TJ"); 36:1–2 (the Coalition's mission "was adopted immediately upon our organizing as a group, in August 2020").

65.     The Coalition claims to have over 200 members. *Id.* at 62:2–5; *id.* at 82:1. The Coalition counts as "members" those who have completed a form on the "Contact Us" tab of its website and

---

[4] "Nomani Dep." refers to the deposition of Asra Nomani as designee for the Coalition under Rule 30(b)(6).

are joined to its messaging platform. *Id.* at 78:2–9.

**Response:**      This is a misrepresentation of Ms. Nomani's testimony on behalf of the Coalition. Ms. Nomani testified that the "Contact Us" tab of the Coalition's website has two sections—one that says "sign up for regular updates" and one that says "Get Involved!" Coalition Ex. 63, Nomani Dep. 186:11–187:15. The former simply signs someone up to receive the Coalition's newsletter, while the latter is how people join the Coalition. *Id.*; *see also id.*, Nomani Dep. Ex. 4. Ms. Nomani testified that the Coalition asks on the form for the applicant to share their personal story "because we wanted to make it clear that when you're signing up to this part of the form, you are signing up for our organization." Board Ex. 40, Nomani Dep. 78:18–79:2. There is also an item on the form where a prospective member needs to indicate which programs of the Coalition he or she is interested in working with—as Ms. Nomani testified, "[i]f you observe the second item, it's 'What programs are you interested in working with?' And so it's from that answer that we were, then, able to identify volunteers who would be able to work on our sub-teams, or if they wished to work on our leadership team, they could." *Id.*, Nomani Dep. 79:2–8.

66.      The online contact form is not labeled as a "membership application." *Id.* at 78:10–13; Ex. 42, Coalition for TJ "Contact Us" form. The form does not ask individuals to provide any address (home or business, in Virginia or not), phone number, school affiliation, or even whether they are parents of affected children. Ex. 40, Nomani Dep., at 83:1–17. The Coalition also does not collect racial information about its members. *Id.* at 93:6–7.

**Response:**      Incorporate Response to Paragraph 65.

67.      The sole requirement for membership in the Coalition is "supporting the mission of the organization." *Id.* at 80:12–14. That mission, as described in deposition and on its website, is "to

advocate for diversity and excellence at" TJ. *Id.* at 35:16–18. Yet, the Coalition reported a different mission to United Charitable last fall, when applying to become a fiscally sponsored program of that 501(c)(3): "to conduct original research, journalism, and advocacy about significant public issues relegated [sic] to education, contribute to sound public policy decisions and protect gifted and STEM education and the legal defense of the rights of students." Ex. 43, Letter from United Charitable; Ex. 40, Nomani Dep., at 144:7–16.

**Response:**    The first sentence is a misrepresentation of Ms. Nomani's testimony on behalf of the Coalition. Ms. Nomani never testified that the "sole requirement" for membership is supporting the Coalition's mission—but rather that it was "criteria" for membership. Board Ex. 40, Nomani Dep. 80:12–14. There were also at least two other criteria for membership—one could not be a minor or an elected official. Board Ex. 40, Nomani Dep. 81:5–13. The Coalition did not accept as members a student and a member of a different regional school board who tried to join the Coalition. Coalition Ex. 63, Nomani Dep. 89:14–90:3. Another "requirement" to join the Coalition is that the prospective member must fill out the online form—Ms. Nomani testified that she directed individuals to the online form when they came up to her in person and asked to join the Coalition. *Id.*, Nomani Dep. 189:10–16.

With respect to what the Coalition told United Charitable, Ms. Nomani testified on behalf of the Coalition that United Charitable required the Coalition to describe "program activities," not just provide their mission. *Id.*, Nomani Dep. 145:3–6. She also testified that there is a connection between the two supposedly different missions. *See id.*, Nomani Dep. 144:17–145:10 ("So what we have on our website is sort of a shortcut to this [the United Charitable description], sort of. But, really, if you think about it, the diversity in excellence that we're promoting is captured in this mission statement.").

11

68.     The Coalition has no formal membership approval process. *Id.* at 76:5–88:3.

**Response:**     The Board is simply wrong in this assertion—and fails to cite to any specific testimony in the 13-page range of deposition testimony cited. On the contrary, Ms. Nomani testified on behalf of the Coalition about its "membership approval process." She testified that the membership team within the Coalition reviews the forms submitted by prospective members. Board Ex. 40, Nomani Dep. 80:15–18. The membership team looks for people who support the Coalition's mission. *Id.*, Nomani Dep. 80:19–81:4. Those who oppose the mission would not be accepted as members. Coalition Ex. 63, Nomani Dep. 187:16–188:16. Neither would minors or elected officials. Board Ex. 40, Nomani Dep. 81:5–13. Of prospective members, Nomani testified "[w]e would have them submit their name, email, and where they heard about us, plus their personal story about why they were advocating for diversity excellence at TJ. And then, also, the question about what programs they're interested in working with." Coalition Ex. 63, Nomani Dep. 187:16–188:4. That information "would be reviewed by the members of our membership sub-team to look at, to see if the individual was consistent with our mission." *Id.*, Nomani Dep. 188:4–7. The membership team would then send the individual "an invitation to join [the Coalition's] Telegram channel, which would then be membership into our organization." *Id.*, Nomani Dep. 188:7–9.

69.     The Coalition could not identify any members of its leadership team who are parents of seventh- and eighth-grade students planning to apply to TJ. *Id.* at 53:16–58:9.

**Response:**     This was beyond the scope of the 30(b)(6) designation served on the Coalition before the deposition. *See* Coalition Ex. 62. Ms. Nomani did identify Harry Jackson and Himanshu Verna as leadership team members who are parents of K-8 students, Board Ex. 40, Nomani Dep. 56:7-10; 56:18–20, but could not recall what specific grade their children were presently in, *id.*,

Nomani Dep. 58:1–9. But because Ms. Nomani was not required to be prepared to answer questions about the children of leadership team members, this testimony is not the Coalition's. Moreover, the Board has been on notice since April 22, 2021, that Coalition member Ying Y. McCaskill has a child who plans to apply for the TJ Class of 2027. ECF No. 16-2 ¶¶ 8–10. And at the time of the Coalition's deposition, Srinivas Akella was still a Coalition member and had an eighth-grade child who is seeking admission for the Class of 2026. ECF No. 59-1 ¶¶ 4–6; *see* Board Ex. 40, Nomani Dep. 15:19–16:7. Mr. Akella resigned his membership in the Coalition after the close of discovery. *See* ECF No. 88.

70.     The Coalition has no officers. [Nomani Dep.] at 18:18–21, 41:13–15. It is led by unelected volunteers who "self-nominated" themselves by "just rais[ing] their hands." *Id.* at 52:11–21.

**Response:**     This is a misrepresentation of Ms. Nomani's testimony on behalf of the Coalition. It is true that the Coalition has no formal "officers," but Ms. Nomani testified that none were necessary: "You know, we are all adults and we're all parents, very successful professionals, most folks in their lives, so we didn't need a hierarchy of a president, vice president. We were a very horizontal organization and very grassroots oriented." Board Ex. 40, Nomani Dep. 18:16–21. She testified that the Coalition's leaders "knew early on that we didn't need to add title to our names in order to have a hierarchy within the organization. So we're a very horizontal organization. We have people who have emerged to be leaders within our organization, but we do not have titles that are traditional in organizational structures, like president, vice president, secretary." *Id.*, Nomani Dep. 41:1–15. The Board also takes Ms. Nomani's testimony about the leaders "just rais[ing] their hands" out of context. As she testified for the Coalition, "what happened is that parents just volunteered among this group. They just self – they just raised their hands, self-nominated to be leaders in our organization. And these are folks with busy lives with both their children and work,

13

and they just decided to volunteer." *Id.*, Nomani Dep. 52:10–16. Consistent with the grassroots structure of the Coalition, these individuals were "volunteers that emerged as leaders." *Id.*, Nomani Dep. 52:19–21.

71.     The Coalition has never put any decisions to a vote, either by its unelected leaders or its members. *Id.* at 44:15–18, 51:2–6. The Coalition's leadership meetings have no agendas. *Id.* at 132:9–12.

**Response:**     Both of these assertions are misleading. As Ms. Nomani testified for the Coalition, the leadership team has thus far been able to reach decisions by consensus. Coalition Ex. 63, Nomani Dep. 185:10–186:9. Specifically, she testified: "So we typically don't have a majority – we don't typically go to take a vote because we respect each other and really want to hear out people's point of view and come to a consensus that the group can fall behind." *Id.*, Nomani Dep. 186:5–9. As for agendas, she testified that "at the beginning, we did have an agenda or two but found we didn't need it in order to do our business." Board Ex. 40, Nomani Dep. 132:17–19.

## ARGUMENT

### I.     The Coalition Has Standing

In May, this Court found that "as far as the standing issue is concerned, I'm satisfied that this is a voluntary association with members that set out to accomplish or be involved in some common purpose and that they do have every right to bring this lawsuit." Coalition Ex. 64 (Transcript of May 21 hearing) 33:20–23. The Board acknowledges that finding, but argues that it has uncovered facts in discovery that call it into question. Board Br. at 19. Yet at both the pleading stage and in conjunction with the motion for preliminary injunction, the Coalition did not rest on "general factual allegations of injury resulting from the defendant's conduct," but instead "set forth by affidavit . . . specific facts" to support the Court's jurisdiction. *Id.* at 18–19 (quoting *Lujan v.*

*Defenders of Wildlife*, 504 U.S. 555, 561 (1992)). Those facts are the same now as then. *Compare* Complaint ¶ 13 *and* McCaskill Dec. at ECF No. 16-2 *with* McCaskill Dec. at ECF No. 100; *compare* Nomani Dec. at ECF No. 25-2 *with* Nomani Dec. at ECF No. 99. And just as the Court previously ruled,[5] these facts compel the conclusion that the Coalition is a membership organization entitled to maintain this lawsuit on behalf of its members.

The Board asserts that a membership organization must possess a list of several attributes in order to sue on behalf of its members consistent with Article III. Board Br. at 19. Yet its authority for that proposition—a lone district court case from Tennessee—is exceedingly thin. That case, *Small Sponsors Working Grp. v. Pompeo*, No. 1:19-2600-STA-jay, 2020 WL 2561780 (W.D. Tenn. May 20, 2020), is wrong on the law anyway, as the court conflated the inquiry for traditional membership organizations with the indicia-of-membership test that applies to organizations without members. *Id.* at *5 (erroneously citing *Hunt v. Wash. State Apple Advertising Comm'n*, 432 U.S. 333, 344 (1977), for the factors it thought determine whether an organization is a membership organization). The attributes the Board lists are generally considered in order to determine whether an organization *without members* can qualify as a membership organization for purposes of standing, but they do not override evidence that an organization actually does have members. *See Students for Fair Admissions, Inc. v. Univ. of N.C.*, No. 1:14CV954, 2018 WL

---

[5] Because the Court decided a question of law at an earlier stage of the case—holding that the Coalition is a voluntary membership association entitled to sue on behalf of its members even though the members do not pay dues, the Coalition does not have bylaws, and the Coalition is not a registered nonprofit—that decision is law of the case and "shall 'continue to govern' this issue in subsequent stages in this case." *Students for Fair Admissions, Inc. v. Univ. of N.C.*, No. 1:14CV954, 2019 WL 4773908, at *5 n.9 (M.D.N.C. Sept. 30, 2019) (quoting *United States v. Aramony*, 166 F.3d 655, 661 (4th Cir. 1999)). That is true even where—as in *Students for Fair Admissions*—the issue involved is standing and it was initially decided at the pleading stage. *See id.* (citing *Baron Fin. Corp. v. Natanzon*, 509 F. Supp. 2d 501, 519 n.33 (D. Md. 2007)). In simply repeating the argument it raised in the motion to dismiss under the same facts, the Board does not provide any compelling reason to deviate from the law of the case.

4688388, at *4 (M.D.N.C. Sept. 29, 2018) ("Courts apply the indicia-of-membership test for associational standing purposes in cases where an organization lacks traditional voluntary membership or any actual members . . . .").[6] Here, the record indicates that the Coalition has over 200 members, most of whom are parents of TJ students or prospective students. ECF No. 99 (Nomani Dec. ¶ 13); Board Ex. 40, Nomani Dep. 62:2–5; Coalition Ex. 63, Nomani Dep. 189:22–190:14. Coalition members know that they are members, Coalition Ex. 63, Nomani Dep. 188:17–189:2, and the Coalition screens individuals who seek to join, Board Ex. 40, Nomani Dep. 80:15–81:13. As a result, Coalition leaders are not aware of any member who supports the challenged TJ admissions overhaul. ECF No. 99 (Nomani Dec. ¶¶ 34–35). Indeed, members have left the Coalition when they came to believe the Coalition's approach to the issue of TJ admissions did not reflect their own view.[7] Coalition Ex. 63, Nomani Dep. 90:4–91:21.

Further, many of the Board's supposedly undisputed facts designed to undermine the Coalition's standing are wildly misleading. The Board says the Coalition "has no officers," but the record is clear that the Coalition nonetheless has a defined leadership structure. As Ms. Nomani testified, the Coalition is "a very horizontal organization. We have people who have emerged to be leaders within our organization, but we do not have titles that are traditional in organizational structures, like president, vice president, secretary." Board Ex. 40, Nomani Dep. 41:3–15; *see also* ECF No. 99 (Nomani Dec. ¶¶ 9–11). The Board's characterization of the leaders as "self-

---

[6] Two other cases, *Heap v. Carter*, 112 F. Supp. 3d 402, 408 (E.D. Va. 2015), and *Group Health Plan, Inc. v. Philip Morris, Inc.*, 86 F. Supp. 2d 912, 918 (D. Minn. 2000), applied the indicia-of-membership test because the organizations in question either did not have members or had not adequately alleged they had members. Neither case is on point here for the same reason as the Court found previously and as the Coalition explained in its opposition to the Board's motion to dismiss, ECF No. 25 at 7–8.

[7] For that matter, the Coalition recently filed a notice with the Court noting that a parent member who had submitted two declarations in support of the Coalition's motions for preliminary injunction has resigned his membership in the Coalition. ECF No. 88.

nominated" by "just rais[ing] their hands" is also misleading—Ms. Nomani testified that members of the Coalition's leadership "were volunteers that emerged as leaders" of the grassroots organization through their efforts and dedication to the Coalition's mission. Board Ex. 40, Nomani Dep. 52:19–21. Another of the Board's assertions, that the Coalition has never put any decision to a vote, misunderstands how the Coalition operates. Ms. Nomani testified that at any point, the Coalition's leadership *could* have put a decision to a vote, but it has never done so because the leaders have been able to operate through consensus. Coalition Ex. 63, Nomani Dep. 185:5–186:9.[8] Such collegial agreement among Coalition leadership is hardly a reason to question its standing. The Board also wrongly claims that the Coalition has no membership approval process—ignoring undisputed evidence, as noted above, that the Coalition *does* screen individuals who seek to join. Board Ex. 40, Nomani Dep. 80:15–81:13. The Board has no contrary evidence to show that the Coalition's members aren't traditional members of an organization advocating for its members' interests.

Ultimately, the Board seeks to make the standing inquiry unnecessarily complex. The Coalition has standing because it is a membership organization formed to advocate for a particular purpose[9] and it has brought this lawsuit to vindicate its members' constitutional rights.[10] The Court

---

[8] Indeed, the list that the Coalition maintains of its organizational structure specifies that leadership can adopt policy decisions "by majority vote." Coalition Ex. 63, Nomani Dep. Ex. 3.

[9] The Board tries to muddle the question of the Coalition's mission, but the record is clear that the Coalition formed in response to the potential changes to TJ admissions, and particularly the worry that any changes would discriminate against Asian-American students. ECF No. 99 (Nomani Dec. ¶¶ 5–6).

[10] The Board claims that "the Coalition's sworn testimony could not support" the allegation that the Coalition includes current parents of seventh and eighth graders. Board Br. at 22–23. But the identities of all Coalition members—much less the grades their children attend—were well outside the scope of the Board's Rule 30(b)(6) deposition notice to the Coalition. Coalition Ex. 62. What is more, Coalition member Ying McCaskill, *see* Complaint ¶ 13, previously filed a declaration in support of the Coalition's first motion for a preliminary injunction stating that she had an eighth grade student at Carson Middle School and a sixth grade student zoned to attend there, both of

should not deviate from its prior finding that the Coalition is entitled to represent its members' interests in this case.

## II.     The Coalition Is Entitled to Summary Judgment on Its Equal Protection Claim

In *Arlington Heights*, the Supreme Court devised a method designed to help courts assess a contemporaneous factual record—and reasonable inferences drawn from it—to determine whether a facially race-neutral enactment was intended to discriminate on the basis of race. *See Vill. of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 266 (1977). The Court identified four particularly relevant factors. Disparate impact, of course, is an "important starting point." *Id.* Also important are the "historical background of the decision," the "specific sequence of events leading up to the challenged decision," and the "legislative or administrative history . . . especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports." *Id.* at 267–68. These factors are "nonexhaustive"—they are simply tools for a Court to use to determine whether a policy was adopted for a discriminatory purpose. *McCrory*, 831 F.3d at 220 ("Discriminatory purpose 'may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the law bears more heavily on one race than another.'" (quoting *Washington v. Davis*, 426 U.S. 229, 242 (1976))).

This "sensitive inquiry into such circumstantial and direct evidence of intent as may be available," *Arlington Heights*, 429 U.S. at 266, is necessary because "[o]utright admissions of impermissible racial motivation are infrequent and plaintiffs often must rely upon other evidence," *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999). It is also rare that anyone—much less a multimember

---

whom were planning to apply to TJ, *see* ECF No. 16-2 ¶¶ 4–6, 8–10. She was also mentioned twice in the 30(b)(6) deposition as a member of the Coalition, *see* Board Ex. 40, Nomani Dep. 16:8; Coalition Ex. 63, Nomani Dep. 48:7, and is one of the Coalition members who filed a declaration in support of the Coalition's motion for summary judgment, ECF No. 100.

decisionmaking body—would make "a decision motivated solely by a single concern." *Arlington Heights*, 429 U.S. at 265. But because "racial discrimination is not just another competing consideration," it is enough to show that race was just one of many motivating factors. *Id.* at 265–66; *see also McCrory*, 831 F.3d at 220 ("Challengers need not show that discriminatory purpose was the 'sole[ ]' or even a 'primary' motive for the legislation, just that it was '*a* motivating factor.'" (quoting *Arlington Heights*, 429 U.S. at 265–66)).

Perhaps most importantly, a finding that a decisionmaking body acted with a discriminatory purpose "does not mean" or "suggest" that "any member" of that body "harbored racial hatred or animosity toward any minority group." *McCrory*, 831 F.3d at 233. Instead, a body acts with a discriminatory purpose when it chooses a particular course of action "at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). Put another way, a finding of discriminatory purpose is justified where—considering "the totality of the circumstances," *McCrory*, 831 F.3d at 233— the court finds the challenged policy was "developed or selected because it would assign benefits or burdens on the basis of race." *Doe ex rel. Doe v. Lower Merion Sch. Dist.*, 665 F.3d 524, 553 (3d Cir. 2011). In the context of admissions to a competitive K-12 school, that means a discriminatory purpose exists where a school district "set[s] out to increase and (by necessity) decrease the representation of certain racial groups . . . to align with districtwide enrollment data." *Ass'n for Educ. Fairness*, 2021 WL 4197458, at *17.

Considering the record as a whole, there is no doubt that by overhauling TJ admissions, the Board meant to increase the representation of Black and Hispanic students. Nor is there any doubt that the Board's means for accomplishing that goal were to implement a system targeting Asian-American students for disfavored treatment through proxies that would guarantee the

Board's desired racial result. It is also undisputed that Asian-American students suffered adverse impact "by necessity" as a result. *Ass'n for Educ. Fairness*, 2021 WL 4197458, at *17. That is sufficient to trigger strict scrutiny—just the same as if the Board had adopted an explicit racial classification. *Miller v. Johnson*, 515 U.S. 900, 913 (1995); *Ass'n for Educ. Fairness*, 2021 WL 4197458, at *15. Because the Board declines to justify its admissions overhaul under strict scrutiny, the Coalition is entitled to summary judgment.

The Board's brief reinforces the propriety of summary judgment in this case. Although the Board ignores key portions of the undisputed record, the record now before the Court tells a clear story of intent to alter TJ's racial makeup at the expense of Asian-American students. The documents the Board produced in discovery speak for themselves. The Board's only argument is that they do not add up to discriminatory intent as a matter of law—that the Coalition instead must show that the Board displayed some sort of hatred or animus towards Asian Americans to prevail. The parties disagree on the application of the law to this set of facts, not on the existence of the facts themselves. Not only should the Board's motion be denied, the Coalition's should be granted.

## A.     The Board's overhaul of TJ admissions has a disparate impact on Asian-American applicants

The evidence that the Board's overhaul of TJ admissions had—and will have— a disparate impact against Asian-American students is overwhelming. The Board's argument to the contrary—that the proper comparison is between the proportion of *applicants* who were Asian American and the proportion of students *offered admission* who were Asian American—has no basis in law and, if accepted, would permit discrimination against "overrepresented" groups to promote racial balancing. The Board also ignores the undisputed evidence, in the form of admissions data from the Classes of 2024 and 2025, that the 1.5% per middle school set-aside and

the holistic system with a point-bonus for attendance at an "underrepresented" middle school both act as proxies to disfavor Asian-American applicants. *See* Coalition Opening Br. at 15–19.

First, the Board is wrong that the previous admissions results are an improper comparator for a disparate impact analysis. Tellingly, the Board does not cite any Fourth Circuit precedent for this proposition—and the Fourth Circuit's most significant *Arlington Heights* decision in recent years says the opposite. *McCrory*, 831 F.3d 204, was a challenge to several facially race-neutral election provisions that the plaintiffs argued were intended to reduce Black voting strength, including a reduction in days of early voting, repeal of same-day registration, and a prohibition on the counting of ballots cast in the wrong precinct. To assess disparate impact for the purposes of *Arlington Heights*, the Fourth Circuit did not look to whether a significant number of Black voters could still vote during the new early voting period, register before the election, or cast a ballot in their proper precinct. Instead, *McCrory* found disparate impact based on evidence that, previously, "African Americans disproportionately used each of the removed mechanisms." 831 F.3d at 231. "*[R]emoving* voting tools that have been disproportionately used by African Americans," the panel said, "meaningfully differs from not initially implementing such tools." *Id.* at 232. Just as in *McCrory*, judging the "impact of the official action" under *Arlington Heights* typically requires a comparison between the old system (whether it be the old set of voting laws or the old admissions process) and the new system in order to compare which racial groups were most affected by the enactment. *See id.* at 230.

Multiple district courts in the Fourth Circuit have likewise relied on year-over-year comparisons to demonstrate disparate impact in the admissions context. Assessing a similar claim that the Montgomery County Board of Education sought to racially balance its magnet middle school programs at the expense of Asian-American students, the district court wrote that "no real

dispute exists that the field test criteria disproportionately affected Asian American students . . . since the field test was implemented, the acceptance rate for Asian American students has dropped at each of the programs." *Ass'n for Educ. Fairness*, 2021 WL 4197458, at *16. In other words, the Maryland district court simply compared the effect of the prior admissions policy on Asian Americans to the effect of the challenged policy on Asian Americans. This Court should do the same. *See also Boyapati v. Loudoun Cty. Sch. Bd.,* No. 1:20-cv-01075 (AJT/IDD), 2021 WL 943112, at *8 (E.D. Va. Feb. 19, 2021) (comparing magnet admission rates of Asian-American students under old policies versus newly adopted policies for the purposes of disparate impact analysis within an intentional discrimination claim).

While *Association for Education Fairness* and *Boyapati* were decided at the pleading stage, both cases hold—consistent with the Fourth Circuit's *McCrory* decision—that the *legal* standard for determining disparate impact within the context of an intentional discrimination claim is a simple before-and-after comparison. And by that straightforward measure, there is no doubt that the impact of the TJ admissions overhaul on Asian Americans—and *only* Asian Americans—was significant. The Board does not—and cannot—argue otherwise. Despite an overall increase in the class size at TJ, the raw number of Asian-American students invited to attend for the Class of 2025 went down significantly. It was just 84% of the number for the Class of 2024 and 83% of the number invited for the Class of 2023. Coalition Exs. 50–52. The other three major racial groups experienced a substantial increase—offers to white students increased by 43% after the Board's overhaul, while offers to Hispanic students increased by 287.5% and offers to Black students increased from fewer than ten to 39. Coalition Exs. 50–51. Asian-American students alone saw a substantial decrease—compared not only to the previous year, but to the previous several years.

The Board ascribes significance to the fact that Asian Americans earned more seats than

the group's proportion of the applicant pool. But racial balance cannot be the baseline for assessing the impact of admissions changes.[11] Far from it, racial balancing is "patently unconstitutional." *Fisher v. Univ. of Tex. at Austin*, 570 U.S. 297, 311–12 (2013). Were the Board permitted to use the racial makeup of the applicant pool as the baseline for determining whether its admissions overhaul had a disparate impact on Asian Americans, it would have a license to discriminate against any "overrepresented" group until that group received only its allotted portion of the offers to attend TJ. The Board could thus avoid strict scrutiny while achieving almost the same results as if it had enacted an unconstitutional racial quota. *Cf. Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 288–90 (1978) (controlling opinion of Powell, J.); *Gratz v. Bollinger*, 539 U.S. 244 (2003). The *Arlington Heights* inquiry exists precisely to ensure that strict scrutiny applies "not just when [enactments] contain express racial classifications, but also when, though race neutral on their face, they are motivated by a racial purpose or object." *Miller*, 515 U.S. at 913. Racial purpose does not depend on a group's over-or-underrepresentation relative to the population or the applicant pool. *See Ass'n for Educ. Fairness*, 2021 WL 4197458, at *8 (Asian-American proportion of the admitted students at magnet programs after challenged changes remained above Asian-American proportion of the district population); *cf. McCrory*, 831 F.3d at 232 (criticizing the district court for "the almost dispositive weight the court gave to the fact that African American aggregate turnout increased by 1.8% in the 2014 midterm election as compared to the 2010 midterm election").

---

[11] The term "racial balancing" refers to any particular race-based target—whether that be the applicant pool or the overall population pool. Typically, in cases involving schools with competitive admissions, racial balance is assessed relative to the applicant pool. *See Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 729–30 (2007) (plurality opinion); *Grutter v. Bollinger*, 539 U.S. 306, 391 (2003) (Kennedy, J., dissenting). Adopting the Board's position would allow a school district to conduct racial balancing through proxies until each racial group was reduced to its share of the applicant pool.

What is more, here we know how the Board used weighted proxies to depress Asian-American admissions. First, the limitation of allocated seats to 1.5% of each middle school's eighth grade class makes it more difficult for students from schools with proportionally more students eligible for and interested in TJ to obtain admission. *See* Coalition Opening Br. at 15–18. This first cut proxy disproportionately prevents Asian-American students at a few middle schools from competing for the set-aside seats. Then, those students who miss the 1.5% cut because of the competitiveness of the students from their school are placed in the unallocated pool, where they compete against private school and home school students, *see* Coalition Ex. N., Shughart Dep. 177:10–178:19, as well as against students from middle schools designated as underrepresented, who receive a 45-point bonus in the holistic review, Coalition Ex. 61, Shughart Dep. 191:1–15. Again, Asian-American students are specifically targeted and disadvantaged by this racial proxy by virtue of the large proportion of Asian-American applicants from middle schools who do not receive the bonus. As the Coalition detailed in its opening brief,[12] only 23.9% of applicants for the Class of 2025 from the group of FCPS middle schools designated as underrepresented were Asian American, compared to 50.6% of all applicants who were Asian American.[13] At the top six TJ

---

[12] As the Board notes, the Coalition does not intend to propound expert testimony to prove disparate impact. No expert testimony is necessary. The Coalition simply presents the data the Board has given it, compiling the number of Asian-American applicants from each middle school—the same exercise Shughart performed to compile the data in his declaration. Indeed, multiple paragraphs of the Board's Statement of Undisputed Facts rely on similar presentations of data. *See* ¶ 10 (deriving from chart of admissions statistics by middle school the fact that "students at just eight of FCPS's 26 middle schools accounted for 86.53% of FCPS students offered admission to TJ" in the previous four admissions cycles); ¶¶ 53–59 (presenting admissions statistics ultimately derived from individual data). And FCPS itself presumably performs that same process before it releases its public press release and compiles the charts showing the number of students who applied and were admitted from each middle school, *see* Coalition Ex. N (Shughart Dep. Exs. 15 & 16).

[13] "Applicants" here is used in the same way the Board uses it—counting only those applicants who met the minimum eligibility requirements and did not withdraw their applications before a decision could be made. *See* ECF No. 95 ¶¶ 19–20. The Coalition's opening brief did make a slight

feeder schools—where most of the Asian-American students admitted to TJ for the Class of 2024 attended—66.3% of the applicants were Asian American. Students at these schools suffer a double penalty in the admissions process, leading to the aggregate disparate impact against Asian-American students.[14]

The Fourth Circuit has warned against requiring "too much" to demonstrate disparate impact for purposes of the *Arlington Heights* multifactor analysis. *McCrory*, 831 F.3d at 231. The Board's argument invites the Court to do just that. Instead, it is clear from the undisputed evidence that the Board's overhaul of TJ admissions had—and will have—a disparate impact on Asian-American applicants.

## B.     The Board acted with discriminatory intent

There are two main problems with the Board's brief—it ignores critical portions of the record and it misunderstands the prevailing law. Each of the Board's arguments suffers from one or both of these defects. Looking at the entirety of the record and applying the correct legal standard, there is no dispute of material fact that would preclude a finding that the Board acted with discriminatory intent when it overhauled TJ's established admissions process.

---

transposition error—the proportion of eligible, not withdrawn applicants who were Asian American was actually 50.59%, not 48.59%. *Compare id.* ¶ 20, *with* Coalition Opening Br. ¶ 18 and p. 19. The latter number is the proportion of total applicants (without regard to eligibility or later withdrawal). ECF No. 95 ¶ 20. This correction actually amplifies the disparate impact on Asian-American applicants.

[14] The Coalition focused on the "underrepresented school" bonus—and the effect on the six FCPS feeder schools specifically—to show how the double proxy the Board enacted through the 1.5% Plan harms Asian-American students. But Asian-American students are also disadvantaged by the other "Experience Factors." For example, according to the individual data produced by the Board, just 131 of the 1535 Asian-American applicants for the Class of 2025 (8.5%) were classified as receiving free and reduced price meals, compared to 256 of the 1499 applicants of other races (17.1%). *See* Coalition Ex. A (20-21 Experience data). And considering all applicants (not just FCPS), just 187 of the 687 (27.2%) applicants from underrepresented schools were Asian American, while 1,348 of the 2,347 (57.4%) applicants not from underrepresented schools were Asian American. *See id.*

*First*, the Board says that discriminatory intent is not established merely because the "Board believed that the changes could, or would, have an impact on racial demographics." Board Br. at 26. The Board is attacking a straw man. The Coalition argues that the Board pursued its overhaul of admissions precisely *because* it would have the Board's desired racial effect. The Coalition does not argue—as the Board seems to think—that the Board was merely *cognizant* of subsidiary racial effect. And as the Coalition noted extensively in its opening brief, the evidence of the Board's racial intent is overwhelming. Among other things, individual Board members promised "intentful action" to correct the "unacceptable" number of Black and Hispanic students admitted to TJ, declared that the Board must pursue "equity" rather than "equality," and suggested the admissions plan be framed as "increasing diversity through redefining merit." Coalition Ex. 32 at 1; Ex O; Ex. 38; Ex. 37. Staff presentations focused heavily on the racial effect of proposed plans and declared that TJ "should reflect the diversity of FCPS, the community, and Northern Virginia." Board Ex. 7 at 3 (September presentation). The Board passed, by a vote of 11-0-1, a resolution requiring staff to report to the State a goal "to have TJ's demographics represent the NOVA region." Board Ex. 22 at 3. And the Superintendent, through his public-facing email account, declared that "[t]he Superintendent and the School Board believe that TJHSST should reflect the diversity of FCPS and our community. We recognize that the admissions process needs to be addressed in a comprehensive way." Coalition Ex. 34 at 3. Changing the racial demographics of TJ was not some far off hope of the Board, but rather *the* reason changes were initiated in the first place.

To be sure, the mere mention of diversity—even racial diversity—as a goal is not sufficient to establish discriminatory intent. An aspirational goal *on its own* is not discriminatory intent. After all, there are many ways the Board could seek to change the racial demographics of the students

at TJ without discriminating against students. The Board itself recognized this, as it passed a motion on October 8 to direct Brabrand "to establish a plan for student talent development and put into action means for student potential identification and outreach" that was "intended to address the systemic issues that impact diversity at TJ." Board Ex. 26. If this plan ultimately succeeds, no one—least of all the Coalition—would argue the Board intended to discriminate against anyone. Such a plan does not treat students differently and is instead an "affirmative effort[] to ensure that all groups have a fair opportunity" to compete for seats at TJ. *Ricci v. DeStefano*, 557 U.S. 557, 585 (2009).

But the Board chose a different tack. It didn't want to wait to see if its efforts to improve the pipeline to TJ would bear fruit. Instead, it found an "immediate need to change the admissions process." Board Ex 26. And the means the Board chose were not designed to provide equality of opportunity—indeed, students are not treated equally under the challenged process. That unequal process employs various proxies to ensure the racial effect the Board desired would come about *immediately*, and at the expense of identifiable students. *See* Coalition Ex. 64 at 28:16–22. It is this sort of tinkering for the purposes of racial balancing that constitutes discriminatory intent. *See Ass'n for Educ. Fairness*, 2021 WL 4197458, at *16–17 (discriminatory intent is present where a school district "voice[s] a goal of changing the racial composition" at a competitive school and adopts a policy that uses proxies to ensure that one group—Asian Americans—would have to compete against each other for limited seats). If the Board could evade strict scrutiny by using a thinly veiled racial proxy to accomplish the same goal as a quota, the promise of the Equal Protection Clause would be hollow. The entire point of the *Arlington Heights* inquiry is to find discrimination lurking behind facially-neutral policies. *See Miller*, 515 U.S. at 913. Simply put, "[t]o allow a school district to use geography as a virtually admitted proxy for race, and then claim

that strict scrutiny is inapplicable because" it is facially race-neutral "is inconsistent with the Supreme Court's holdings." *Lewis v. Ascension Par. Sch. Bd.*, 662 F.3d 343, 354 (5th Cir. 2011) (Jones, J., concurring).

The Board's reliance on Justice Kennedy's concurrence in *Parents Involved* is telling. The opinion is neither binding nor precedential. *See Ass'n for Educ. Fairness*, 2021 WL 4197458, at *18–19.[15] And even if it were, it does not support the Board's attempt at racial balancing through proxies. Justice Kennedy "approve[d] the possibility of a school board's adopting generic measures to increase racial diversity in primary and secondary schools." *Lewis*, 662 F.3d at 355. Notably, none of the measures he discussed, *see* 551 U.S. at 789 (Kennedy, J., concurring), involve treating students differently with the intent to bring about a racial result. On the contrary, Justice Kennedy's concurrence specifically warned against "mechanisms" that would "lead to different treatment based on a classification that tells each student he or she is to be defined by race." *Id.* The Board's reading would allow it to adopt an express racial proxy without having to justify it under strict scrutiny. Justice Kennedy's concurrence did not countenance that sort of racial gamesmanship. The record here is clear that the Board went "beyond permissible race-conscious considerations" and decreed an overhaul to TJ admissions "designed to achieve a new racial equilibrium" at TJ. *Ass'n for Educ. Fairness*, 2021 WL 4197458, at *19. In the end, the problem is not with the mere *desire* for more Black and Hispanic students at TJ—a desire the Coalition itself shares. It is about the means the Board chose to accomplish its goal. As the Court said in May, "it's not the statement" about diversity that is bothersome, but "what [the Board is] doing and how it affects the Asian composition of the school." Coalition Ex. 64 at 29:2–4. On a full

---

[15] Judge Xinis' opinion in *Association for Education Fairness* details the split of authority on this question. *See Ass'n for Educ. Fairness*, 2021 WL 4197458, at *18 (citing cases).

record, it is now clear that the means were designed to immediately limit Asian American enrollment to achieve the Board's vision of racial diversity.

*Second*, the Board again misses the mark when it argues that discriminatory intent is lacking because it never ran any precise modeling of the finally-approved plan before it went into effect. Board Br. at 30–31. While it's apparently true that FCPS never ran any specific simulation of the racial effect of the adopted changes, that wasn't because the Board lacked interest in the racial result. Board members asked about modeling a holistic system, including how the Experience Factors as bonus points would affect "who got in," but Shughart explained that he lacked recent data using a points-based system from which he could conduct such modeling. Coalition Ex. N, Shughart Dep Ex. 13; Coalition Ex. 61, Shughart Dep. 156:18–157:17. Staff provided a similar answer in public in response to a Board member "next step" inquiry seeking "statistical modeling of what the merit lottery or 'holistic' review would mean for admissions numbers when using the middle school approach," writing that "[m]odeling of the hybrid approach's impact on diversity is unavailable because ratings on the components of the approach used last year or proposed for this year do not exist." Board Ex. 30 at 41 (November white paper).

Nevertheless, the Board had abundant data with which to predict with reasonable certainty the effects of the changes. FCPS staff produced comprehensive racial modeling of the Merit Lottery and the Hybrid Merit Lottery plans Brabrand presented to the Board. Board Ex. 7 at 18–20 (September presentation), Board Ex. 30 at 25–31 (November white paper). The September presentation opened with a pie chart showing the current racial breakdown of FCPS and historical TJ admissions data by race, inviting the Board members to compare the modeling with the demographics of FCPS as a whole. Board Ex. 7 at 4–5. Upon the Board's request, staff also calculated potential caps in admission for each FCPS middle school under a hypothetical school-

29

based Hybrid Merit Lottery. Board Ex. 30 at 24 (November white paper). In September, the Board requested and received data on the racial composition of TJ applicants, semifinalists, and admits broken down by race from each FCPS middle school. Coalition Ex. 68. The 1.5% plan was substituted in place of staff's proposed "regional pathways," *see* Coalition Opening Br. at 25, and the Board members knew who would benefit and who would suffer under a school-based plan. The Board chose it accordingly. *Cf. McCrory*, 831 F.3d at 230 (weighing the North Carolina General Assembly's requests for racial data on voting mechanisms in favor of a finding of discriminatory intent).

*Third*, the Board points out that several Board members discussed geographic diversity in the course of enacting the changes. Board Br. at 31. While certain Board members professed an interest in geographic diversity, the record as a whole shows that the Board's interest in geography was subservient to its interest in race. *See, e.g.*, Coalition Ex. 30 at 4; Ex. 31 at 1. One Board member even called the admissions overhaul "antiracist work" in a draft statement after the final vote—making no mention of geography. Coalition Ex. 66; *see also* Board Ex. 38 at 103:3–6 (Keys-Gamarra); 119:9–10 (Meren). Staff's preferred "regional pathways" proposal professed an interest in geographic diversity, but the November white paper touting it showed the robust racial effect focusing on geography could have. *See* Board Ex. 30 at 25 n.12, 27–29. The same is true of the initial proposal to the Board in a May closed session, which specifically recommended against a particular criterion because it "would ensure regional diversity only and not racial/ethnic diversity." Board Ex. 9 at 5–6. The 1.5% middle school allocation and the 45-point underrepresented school bonus simply replaced the "regional pathways," allowing the Board to achieve its racial balancing goal through a geographic proxy. *See supra* response to Board Statement of Undisputed Fact ¶ 50. Ultimately, it does not matter whether the Board was genuinely

interested in geographic diversity, because it is clear the Board sought to use geography as a proxy to reach its desired racial result.

*Fourth*, the Board attempts to downplay the procedural irregularities that occurred throughout the process of overhauling TJ admissions. As the Coalition's opening brief described in detail, the record is replete with concerns by Board members that various aspects of the process were rushed,[16] the Board and FCPS staff pushed ahead without adequate public engagement,[17] and that the entire process was, as member McLaughlin put it, "embarrassing." Coalition Ex. 22; *see also* Board Ex. 38 at 128:11–18 (McLaughlin's meeting comments). The fact that some supporters of the final plan made comments suggesting that they did not view the process as rushed does not change the result. After all, in *McCrory*, the court found the procedural process sufficiently irregular even where an *opponent* of the bill was quoted as saying "the legislators had 'a good and thorough debate.'" 831 F.3d at 228 (citation omitted). Here, in contrast, some *supporters* of the changes thought the process was rushed and shoddy. And the fact that the Board did not break state law or its own rules by holding the vote to eliminate the admissions exam at a work session is irrelevant—"a legislature need not break its own rules to engage in unusual procedures." *Id.*[18]

---

[16] The Board seems to agree with the Coalition that the decision to push to change TJ admissions in the fall of 2020 was prompted by pressure from the state. The parties disagree, however, on the import of this fact. Because the state pressure was to change the *racial composition* of TJ, the fact that the Board responded to state pressure and overhauled admissions *supports* an inference that the Board acted *because of*, not *in spite of*, race.

[17] In its Statement of Undisputed Facts, the Board points to public engagement done *before* the October 6 work session. Board Statement of Undisputed Facts ¶ 33. But it points to no such engagement after that date, aside from public comment held on the day of the final vote. *Id.* ¶ 43. The Board's failure to detail additional steps taken to engage the public after the proposal had shifted away from a Merit Lottery—and the admissions exams had been eliminated—supports the concerns of some Board members that public engagement was lacking. *See, e.g.*, Coalition Ex. 29 at 7.

[18] The Board's attempt to argue that holding the vote at a work session was not unusual is unavailing given it has already admitted that it does not typically follow this procedure. Answer ¶ 33.

*Fifth*, the Board asserts that specific evidence of "racial bias" on the part of a majority of the Board is necessary for the Coalition to prevail on its discriminatory intent claim. Tellingly, it offers no Fourth Circuit authority in support of this claim, and it flies counter to *McCrory* where the court found that the North Carolina General Assembly acted with discriminatory intent without citing a racially-tinged comment from any member who voted for the law. *See id.* at 229–30.[19]

The Board's argument here highlights its mistaken view of discriminatory intent. The Coalition's theory has never been that the Board members are racist or that they exhibited outright prejudice against Asian-American students—that is neither here nor there.[20] The Coalition need not prove that the Board sought to hurt Asian-American students *because* they are Asian American—after all, *McCrory* did not hold that the General Assembly targeted Black voters because it wanted to hurt Black voters, but instead because the General Assembly wanted to "entrench itself" and Black voters "were unlikely to vote for the majority party." 831 F.3d at 233. Just as most Black North Carolinians could still vote under the law challenged in *McCrory*, Asian Americans can of course still get into TJ. But the Board targeted Asian-American students, making it harder for them to gain admission, *because it wanted to change the racial makeup of TJ*. "[E]ven absent any evidence of race-based hatred," that is discriminatory intent. *See id.* at 222–23 ("[I]ntentionally targeting a particular race's access to the franchise because its members vote for

---

[19] The *McCrory* court mentioned in a footnote the racially charged comments of a witness before the House Rules Committee—not a member of the House—and noted that "[t]hese statements do not prove that any member of the General Assembly necessarily acted with discriminatory intent. But the sheer outrageousness of these public statements by a party leader does provide some evidence of the racial and partisan political environment in which the General Assembly enacted the law." *Id.* at 229 n.7. The record here similarly reflects an "environment" that lent itself to changes designed to alter TJ's racial demographics to the detriment of Asian-American students.

[20] Notably, however, some Board members agreed that "there has been an anti [A]sian feel underlying some of this" and that Brabrand had made "racist" and "demeaning" references to "pay to play," referring to test prep for the TJ admissions exam. Coalition Exs. J & L; *cf.* Complaint ¶ 47.

a particular party, in a predictable manner, constitutes discriminatory purpose. This is so even absent any evidence of race-based hatred and despite the obvious political dynamics."); *cf. id.* at 232 (noting that "African Americans disproportionately cast provisional out-of-precinct ballots, which would have been counted absent [the new law]" and "thousands of African Americans were disenfranchised because they registered during what would have been the same-day registration period but because of [the new law] could not then vote"). That is true even if the Board harbored "benign" intentions. *See Fisher*, 570 U.S. at 307 ("It is therefore irrelevant that a system of racial preferences in admissions may seem benign.").[21]

### C.   The Board's out-of-circuit authority does not require a different result

In an attempt to bolster its argument, the Board represents that "[f]our federal circuits have followed Justice Kennedy's *Parents Involved* opinion to hold that race-neutral public-school student-assignment plans are subject only to rational-basis review, even if adopted with the hope or goal of improving racial diversity." Board Br. at 28. But these cases don't help as much as the Board might hope. All four of the cited cases—*Spurlock v. Fox*, 716 F.3d 383 (6th Cir. 2013); *Anderson ex rel. Dowd v. City of Boston*, 375 F.3d 71 (1st Cir. 2004); *Lewis*; and *Doe*—addressed large-scale school assignment plans that bear little resemblance to zero-sum admissions to one of the nation's best high schools. And the claims in those cases suffered from obvious defects—none of the plans were designed with the intent to distribute benefits and burdens on the basis of race. In *Spurlock*, for example, the school board sought a plan to reduce underutilization of schools and

---

[21] The Board curiously suggests that the content of a Coalition proposal for TJ admissions is relevant in determining whether the *Board* acted with discriminatory intent. It presents no authority for this proposition. And as Glenn Miller testified on behalf of the Coalition, the Coalition's "Second Look" proposal was not the Coalition's "optimal position." Coalition Ex. 65, Miller Dep. 133:3–12. The Coalition instead preferred "some variation of what was originally in place, with the standardized test." *Id.*, Miller Dep. 133:11–12. It proposed the "Second Look" solution as an attempt at "compromise" in response to the Merit Lottery proposal. *Id.*, Miller Dep. 132:17–133:3.

the "members' intent in considering racial data was to understand the demographic consequences of various potential reforms so as to adopt measures that would have the least possible effect on increasing racial isolation and exacerbating the racial achievement gap." 716 F.3d at 399. In *Anderson*, the school district "resisted pressure to adhere to strict racial balancing, even with RIL funds potentially on the table, and adopted the race-neutral New Plan" that reduced the number of seats reserved at a given school for students residing within walking distance from 100% to 50%. 375 F.3d at 87–88. What is more, the plaintiffs failed to argue that there had been a citywide disparate impact on white students. *Id.* at 88. In *Lewis*, the Fifth Circuit initially suggested that the school district might have acted with discriminatory intent in implementing a geography-based plan, *see* 662 F.3d at 350–52; after remand and a new appeal, the court found no disparate impact, *see Lewis v. Ascension Parish Sch. Bd.*, 806 F.3d 344, 362 (5th Cir. 2015). And the *Doe* court found that the assignment plan lacked a disparate impact on any racial group and indeed that the decisionmakers had tried to *avoid* having such an impact. 665 F.3d at 553. Even so, one judge on the panel would have applied strict scrutiny because, under *Parents Involved*, "consideration of the racial composition of individual neighborhoods to determine school assignments may be just as problematic as the consideration of the race of individual students." *Id.* at 559 (Roth, J., concurring).

That leaves the First Circuit's decision on a request for an emergency stay in *Boston Parent Coalition for Academic Excellence Corp. v. School Committee of City of Boston*, 996 F.3d 37 (1st Cir. 2021). Like this case, Boston Parent Coalition involved an overhaul of competitive school admissions designed to change the racial composition of those schools, at the expense of overrepresented groups. But the panel adopted a narrow reading of *Arlington Heights* and *Feeney* that is contrary to *McCrory*—and that this Court should reject. To be sure, "motive" must be

34

"assessed within the context of the means employed and the results achieved." *Id.* at 50. But there, as here, the motive for racial balancing was coupled with a plan that treated students unequally and caused a substantial disparate impact on Asian Americans. To hold that such a plan was not enacted with discriminatory intent would permit racial balancing by proxy so long as the decisionmakers never say that they want to *decrease* enrollment of any racial group. As Judge Xinis explained, admissions to competitive schools like TJ are a zero-sum game, so any policy intentionally designed to disproportionately favor students of one racial group will "by necessity" disfavor students in another. *Ass'n for Educ. Fairness*, 2021 WL 4197458, at *17. The Court should reject any rule that does not recognize this reality.

\* \* \*

In the end, the question of discriminatory intent in this case is just as straightforward as it was when the Court denied the Board's motion to dismiss last May. Then, in response to the Board's counsel, the Court stated "while you say . . . the policy itself states that it's going to be race-neutral, everybody knows that the policy is not race-neutral, and it's designed to affect the racial composition of the school." Coalition Ex. 64 at 27:23–28:1. The Court added that "I'm sure that you can change the numbers as to the – how they affect each school and each geographical area, and you could probably come up with whatever you intended to do." *Id.* at 28:17–19. With a full record, it is now clear that that is exactly what happened. Therefore, the Board acted with discriminatory intent. Because the Board does not attempt to justify its discrimination under strict scrutiny, the Coalition is entitled to summary judgment.

**CONCLUSION**

The Coalition respectfully asks the Court to grant its motion for summary judgment and deny the Board's motion for summary judgment.

Dated: December 23, 2021.

ERIN E. WILCOX*,
  Cal. Bar No. 337427
CHRISTOPHER M. KIESER*,
  Cal. Bar No. 298486
Pacific Legal Foundation
555 Capitol Mall, Suite 1290
Sacramento, California 95814
Telephone: (916) 419-7111
Facsimile: (916) 419-7747
EWilcox@pacificlegal.org
CKieser@pacificlegal.org

*Pro Hac Vice

Respectfully submitted,

s/ Alison E. Somin
ALISON E. SOMIN, Va. Bar No. 79027
CALEB J. KRUCKENBERG*,
Pa. Bar No. 322264
Pacific Legal Foundation
3100 Clarendon Blvd., Suite 610
Arlington, Virginia 22201
Telephone: (202) 557-0202
Facsimile: (916) 419-7747
ASomin@pacificlegal.org
CKruckenberg@pacificlegal.org

GLENN E. ROPER*,
Colo. Bar No. 38723
Pacific Legal Foundation
1745 Shea Center Dr., Suite 400
Highlands Ranch, Colorado 80129
Telephone: (916) 503-9045
Facsimile: (916) 419-7747
GERoper@pacificlegal.org

Counsel for Plaintiff

36

# CERTIFICATE OF SERVICE

I hereby certify that on the day of December 23, 2021, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system. Counsel for Defendants are registered with the Court's CM/ECF system and will receive a notification of such filing via the Court's electronic filing system.

s/ Alison E. Somin
ALISON E. SOMIN, Va. Bar No. 79027
Pacific Legal Foundation
3100 Clarendon Blvd., Suite 610
Arlington, Virginia 22201
Telephone: (202) 557-0202
Facsimile: (916) 419-7747
ASomin@pacificlegal.org
*Counsel for Plaintiff*

37

**Index to Exhibits**

| Ex. No. | Description |
|---------|-------------|
| 61 | Excerpts from Deposition Transcript of Jeremy Shughart, Oct. 14, 2021, with Exhibit 11 |
| 62 | Defendant's Notice of Deposition of Plaintiff, September 27, 2021 [Fed. R. Civ. P. 30(b)(6)] |
| 63 | Excerpts from Deposition Transcript of Asra Nomani as Rule 30(b)(6) designee for the Coalition for TJ, Oct. 18, 2021, with Exhibits 3 and 4 |
| 64 | Excerpts from Transcript of Motions Hearing, May 21, 2021 |
| 65 | Excerpts from Deposition Transcript of Glenn Miller as Rule 30(b)(6) designee for the Coalition for TJ, Oct. 18, 2021 |
| 66 | Email from Melanie Meren Re: My TJ statement, Dec. 18, 2020 [FCSB-TJ000013294] |
| 67 | Working group minutes titled "Governor's Schools - Diversity/Equity/Inclusion Group, Aug. 7, 2020 [FCSB-TJ000025433–FCSB-TJ000025437] |
| 68 | Redacted email from John Foster at FCPS to School Board Members Re: TJ School Data Request, Sept. 25, 2020 [FCSB-TJ000021437] |