IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| COALITION FOR TJ, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 1:21-cv-00296-CMH-JFA |
| | ) | |
| FAIRFAX COUNTY SCHOOL BOARD, | ) | |
| | ) | |
| Defendant. | ) | |


**BRIEF IN OPPOSITION TO PLAINTIFF'S
<u>MOTION FOR SUMMARY JUDGMENT</u>**

Sona Rewari (VSB No. 47327)
Daniel Stefany (VSB No. 91093)
HUNTON ANDREWS KURTH LLP
2200 Pennsylvania Avenue, NW
Washington, DC 20037
Telephone: (202) 955-1500
Facsimile: (202) 778-2201
srewari@HuntonAK.com
dstefany@HuntonAK.com

Trevor S. Cox (VSB No. 78396)
HUNTON ANDREWS KURTH LLP
951 E. Byrd Street
Richmond, VA 23219
Telephone: (804) 788-7221
Facsimile: (804) 788-8218
tcox@HuntonAK.com


*Counsel for Defendant*

December 23, 2021

## **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................. 1

COUNTER-STATEMENT OF MATERIAL FACTS ("CMF")..................................... 2

ARGUMENT .................................................................................................... 14

I.     The Coalition Lacks Members with Standing. ..................................................14

II.    The Coalition's Equal Protection Claim Fails on the Merits............................16

    A.     The Coalition has not demonstrated disparate impact. ...........................17

        1.     Disparate impact must be measured against the applicant pool—
                not the previous results of a prior system involving different
                students. ................................................................................. 17

        2.     The 1.5% Plan had no disparate impact on Asian applicants. ................. 20

        3.     The Coalition fails to establish disparate impact based on the use
                of underrepresented schools...................................................... 22

    B.     The School Board did not act with discriminatory purpose. .................................24

        1.     A motive of increasing minority access is constitutional, and the
                "zero sum" nature of admissions does not change that fact..................... 25

        2.     The illogic of the Coalition's reasoning is underscored by Supreme
                Court precedent endorsing race-neutral means to achieve diversity. ....... 28

        3.     The *Arlington Heights* factors all cut against the Coalition's case........... 29

CONCLUSION.................................................................................................... 35

CERTIFICATE OF SERVICE ................................................................................ 37

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ass'n for Educ. Fairness v. Montgomery Cty. Bd. of Educ.*,
No. 8:20-cv-02540-PX, 2021 WL 4197458 (D. Md. Sept. 15, 2021) ....................................27

*Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. of City of Bos.*,
No. 21-10330-WGY, 2021 WL 4489840 (D. Mass. Oct. 1, 2021) ................................19, 28

*Brnovich v. Democratic Nat'l Comm.*,
141 S. Ct. 2321 (2021)........................................................................................................34

*Center for Sustainable Economy v. Jewell*,
779 F.3d 588 (D.C. Cir. 2015) ............................................................................................16

*Deal v. Mercer Cty. Bd. of Educ.*,
911 F.3d 183 (4th Cir. 2018) ..............................................................................................16

*DePriest v. Milligan*,
823 F.3d 1179 (8th Cir. 2016) ............................................................................................18

*Anderson ex rel. Dowd v. City of Bos.*,
375 F.3d 71 (1st Cir. 2004).......................................................................................2, 25, 26

*In re Emp. Discrimination Litig. Against State of Ala.*,
198 F.3d 1305 (11th Cir. 1999) ....................................................................................18, 19

*Fisher v. Univ. of Tex. at Austin*,
570 U.S. 297 (2013).......................................................................................................29, 33

*Garcia v. Johanns*,
444 F.3d 625 (D.C. Cir. 2006) ............................................................................................21

*Grp. Health Plan, Inc. v. Philip Morris, Inc.*,
86 F. Supp. 2d 912 (D. Minn. 2000)....................................................................................15

*Grutter v. Bollinger*,
539 U.S. 306 (2003)............................................................................................................29

*Hayden v. Cty. of Nassau*,
180 F.3d 42 (2d Cir. 1999)......................................................................................26, 27, 28

*Hazelwood Sch. Dist. v. United States*,
433 U.S. 299 (1977)............................................................................................................18

*Heap v. Carter,*
    112 F. Supp. 3d 402 (E.D. Va. 2015) ..............................................................15, 16

*Hunt v. Wash. State Apple Adv. Comm'n,*
    432 U.S. 333 (1977)..........................................................................................14, 15

*Jana-Rock Constr., Inc. v. N.Y. State Dep't of Econ. Dev.,*
    438 F.3d 195 (2d Cir. 2006)....................................................................................28

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992)...................................................................................................14

*Mandala v. NTT Data, Inc.,*
    975 F.3d 202 (2d Cir. 2020).....................................................................................18

*Moore v. Hughes Helicopters, a Div. of Summa Corp.,*
    708 F.2d 475 (9th Cir. 1983) ...................................................................................18

*N.Y. City Transit Auth. v. Beazer,*
    440 U.S. 568 (1979).....................................................................................................18

*North Carolina State Conference of NAACP v. McCrory,*
    831 F.3d 204 (4th Cir. 2016) ......................................................................... *passim*

*Pers. Adm'r of Massachusetts v. Feeney,*
    442 U.S. 256 (1979)........................................................................................ *passim*

*Pollack v. U.S. Dep't of Just.,*
    577 F.3d 736 (7th Cir. 2009) ...................................................................................16

*Raso v. Lago,*
    135 F.3d 11 (1st Cir. 1998)...........................................................................26, 27, 28

*Rothe Dev., Inc. v. United States Dep't of Def.,*
    836 F.3d 57 (D.C. Cir. 2016)........................................................................26, 27, 29

*Spurlock v. Fox,*
    716 F.3d 383 (6th Cir. 2013) ...................................................................................26

*Staub v. Proctor Hosp.,*
    562 U.S. 411 (2011)....................................................................................................34

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.,*
    980 F.3d 157 (1st Cir. 2020), *petition for cert. filed* (U.S. Mar. 1, 2021) ..............16

*Sylvia Dev. Corp. v. Calvert Cty., Md.,*
    48 F.3d 810 (4th Cir. 1995) ...........................................................................30, 31

*Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc*,
576 U.S. 519 (2015)........................................................................................26

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
429 U.S. 252 (1977)................................................................... *passim*

*Wards Cove Packing Co. v. Antonio*,
490 U.S. 642 (1989)........................................................................................33

**Statutes**

2020 Va. Acts ch. 1289..........................................................................................7

Va. Code Ann. § 2.2-3707 (Supp. 2020) .................................................9, 11

Va. Code Ann. § 22.1-73 (2016)...........................................................................9

**Other Authorities**

J. Harvie Wilkinson III, *The Seattle and Louisville School Cases: There is No
Other Way*, 121 Harv. L. Rev. 158, 170 (2007).....................................26

**INTRODUCTION**

The Coalition for TJ's motion for summary judgment confirms that its Equal Protection claim is both factually unsupported and legally defective.  To prevail on that claim, the Coalition must demonstrate both that TJ's new race-neutral admissions policy disparately impacts Asian applicants, and that the School Board adopted the new policy "because of" the disparate impact. The Coalition's summary judgment brief  ("PSJ") (ECF 122) establishes neither element.

But first, the record now conclusively establishes the Coalition's lack of standing to sue. Indeed, the three new declarations offered by the Coalition (two by parents who are not true members, one by the parent of a Black student) merely prove that the Coalition lacks both standing *and* a coherent theory of racial discrimination.  To the extent that the Coalition has any real members at all, they do not include any parents of TJ-eligible Asian students.  This case can and should be dismissed for lack of standing.

On the merits, the Coalition's claim fails at the threshold because it cannot establish disparate impact.  Despite a plethora of contrary authority, the Coalition seeks to establish a disparate impact *exclusively* by a "simple before and after comparison" of results under the new admissions process to results under the prior process.  PSJ at 14.   But as explained in the School Board's summary judgment opening brief ("DSJ") (ECF 111), using such a baseline for disparate impact analysis indefensibly requires this Court to presume that a certain group of applicants will always "outperform" another by virtue of their race.  *See* DSJ at 24–26.  The Court should reject that repugnant assumption, and instead analyze disparate impact by comparing the demographics of the admission pool against the applicant pool in the Class of 2025.  That comparison establishes as a matter of law that Asian applicants—who *outperformed* their share of the applicant pool—are not disparately impacted by the admissions policy.

The Coalition also cannot prove a discriminatory purpose.  Its case rests on the fiction

1

that any action taken to increase access for an underserved racial group is equivalent to an action taken to harm all other racial groups. But it is well-settled that the "motive of increasing minority participation and access is not suspect," *Anderson ex rel. Dowd v. City of Bos.*, 375 F.3d 71, 87 (1st Cir. 2004), and it defies both precedent and common sense to suggest that any attempt to eliminate barriers for underserved populations amounts to unconstitutional discrimination against those who already enjoy unhindered access. The distinction in the law is clear, and it is critical. Action taken "because of" adverse effects on an identifiable group is suspect; action "in spite of" such effects is not. *Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 279 (1979). The Coalition's attempt to ignore this critical distinction exposes a flaw to its claim: there is not a shred of record evidence, under any of the *Arlington Heights* factors, to support the inference that the Board reformed the admissions policy "because of" the hypothetical adverse effects the reforms might have on Asian students. *Id*.

The Coalition's motion for summary judgment should therefore be denied, and summary judgment should be entered for the School Board.

## COUNTER-STATEMENT OF MATERIAL FACTS ("CMF")

1.      Disputed in part. During the 2020–21 school year, 4.88% of TJ's student body identified as a racial group "Other" than White, Asian, Black, or Hispanic/Latino. PSJ Ex. 57.

2.      Disputed in part. As required by federal and state law, FCPS collects and reports the racial identification data that enrolling parents select for their respective students, based on the racial groups categories specified by law. The proportions of White, Hispanic/Latino, Asian, and Black students stated in paragraph 2 are based on this self-reported information provided by parents of FCPS students, and not "according to FCPS," and also pertain only to Fall 2020 student enrollment numbers. *See* PSJ Ex. 58. Plaintiff has omitted Multiracial, American Indian, and Native Hawaiian students, who comprised 5.9%, 0.3%, and 0.1%, respectively, of the

180,076 students enrolled in FCPS in Fall 2020.  *Id.*

3.      Undisputed except the spelling of Stella Pekarsky's last name.

4.      Disputed.  The Coalition's count of 200 "members" is based on individuals who have merely filled out a "Contact Us" form that does not purport to be a membership application.  DSJ Ex. 40, Nomani Dep., at 78:2–13; DSJ Ex. 42.  The Coalition's core team has 13 members, and leadership team has seven members.  *See* DSJ Ex. 44,[1] Nomani Dep. at 44:20–46:6 (confirming that Coalition's leadership team and core team members are identified on the "organizational document" marked Exhibit 3); DSJ Ex. 45, (organizational document); DSJ Ex. 46, Coalition's Responses to RFP Nos. 6 & 7 (referring to same organizational document as sufficient to show identities of core and leadership team members).

5.      Disputed.  The Coalition was formed "to advocate for diversity and excellence at [TJ]" and "to oppose … efforts by the Virginia Governor's Office to replace [TJ's] merit-based admissions with race-based policies."  DSJ Ex. 47, Coalition Email Describing Itself.  Some of Coalition's core team were the ones who decided to file suit.  DSJ Ex. 48, Miller Dep. at 19:1–13.  The Coalition has never put any decisions to a vote, even by its leadership and core teams, so it cannot say that this or any other decision was "unanimous."  DSJ Ex. 40, Nomani Dep., at 44:15–18, 51:2–6.

6.      Disputed.  The Coalition's leadership team does not include any parents of Asian students who are seventh- or eight-grade students planning to apply to TJ, and the persons whom it calls general "members" are not members at all.  *Id.* at 53:16–58:9; *see also* CMF ¶ 4.  The Coalition does not collect racial information about its "members," nor does it ask members

---

[1] To simplify matters for the Court, the School Board continues its exhibit numbering from its opening brief.  DSJ Exs. 44–52 are being filed contemporaneously with this response brief.

where they reside, whether they have children, or what grades their children attend.  DSJ Ex. 40, Nomani Dep., at 83:1–17, 93:6–7.  It did not identify Gupta or McCaskill as persons having relevant knowledge, far less identify them as "members" of the Coalition. DSJ Ex. 49, Rule 26(a)(1) Disclosures.  McCaskill submitted two previous declarations, but did not claim in either that he was a member of the Coalition.[2]  *See* ECF 16-2 & 59-2. Neither McCaskill nor Gupta appears as the author or recipient of even a single document, message, or email produced by the Coalition in this case.[3]  Whether or not Jackson is a member of the Coalition, he is not "Asian," and his daughter identifies as Black.  DSJ Ex. 44, Nomani Dep., at 92:18–21.

7–8.    Undisputed.

9.    Undisputed except that the eligibility criteria have changed over the years, and those described in paragraph 9 applied to "[a]pplicants seeking to enter TJ in the ninth grade in Fall 2020."  ECF 95, Stip. Facts ¶ 9.

10.    Disputed in part.  Advancement to the "semifinalist" round was based on "percentile rankings," not "minimum scores."  *Id.*  Students were selected for admission after a "holistic" review that was "based on the selection criteria identified in Regulation 3355.13."  *Id.*

11.    Disputed in part.  The Fall 2020 changes removed the standardized tests, but not the written exams.  *Id.* ¶¶ 11, 13.  These changes apply only to applicants seeking to enter TJ in the 9th grade, and the eligibility criteria continue to require applicants to reside in one of the five participating jurisdictions.  *Id.* ¶ 13.

---

[2] McCaskill's first declaration averred that the admissions process would discriminate against his then eighth-grade child applying to TJ.  ECF 16-2, ¶¶ 6-7.  That child subsequently received an offer to TJ, as his current declaration concedes.  ECF 100, ¶ 5.

[3] The only time Gupta is even *referenced* in a document produced by the Coalition is from one of the Telegram "chat" transcripts, in which a "core" member of the Coalition asks who she is—and gets no reply.  *See* DSJ Ex. 50 ("Does anyone know Dipika Gupta ….").

12.     Disputed in part.  The prior process included one more stage than does the current process—the stage during which applicants took three standardized tests—so the Coalition's descriptors of the prior process as "multi-stage" and the current process as "one-round" are incorrect.  *See* DSJ Ex. 3(A), FCPS Regulation 3355.13; DSJ Ex. 3(B), FCPS Regulation 3355.14.  The current process takes into account exactly four "Experience Factors," which are whether:  (1) whether the applicant qualifies for Free or Reduced-price Meals (FRM), (2) is an English Language Learner (ELL), (3) has an Individualized Education Plan (IEP), or (4) attends a historically underrepresented school.  ECF 95, Stip. Facts ¶ 13.

13.     Disputed in part.  Applicants are given 45 points if they currently have an IEP, are receiving ELL services 1 through 6, or attend a historically underrepresented middle school.  PSJ Ex. B; PSJ Ex. N, Shughart Dep., at 162:13–164:1.

14.     Disputed in part.  The process does not guarantee "seats for students at each public middle school;" rather, seats are allocated to each school based on the school's 8th-grade student population, and each school must have a sufficient number of students both apply and meet the eligibility criteria in order to exhaust its allocation.  ECF 95, Stip. Facts ¶ 14.

15.     Undisputed.

16.     Disputed in part.  The Board increased the size of the admitted freshman class from approximately 486 to 550 students, and the Class of 2025 offers reflects this increase.  *Id.*  In 2020, 355 students who identify as Asian were offered admission; in 2021, 299 students who identify as Asian were offered admission.  PSJ Exs. 50 & 51.

17.     Disputed in part.  Each year's applicants are a distinct group of eighth-grade students and necessarily are different from the students who applied the previous year, so the proportion of Asian students offered admission to the Class of 2025 did not "fall."  *See* DSJ Ex.

3(A), FCPS Regulation 3355.13; DSJ Ex. 3(B), FCPS Regulation 3355.14.

18.    Disputed in part.  With 27.2% of applicants from underrepresented schools, Asian students represented the second largest racial group, and were just 0.7% shy of tying the largest racial group (White students), of applicants from the schools that were considered historically underrepresented for Class of 2025 admissions.  DSJ Ex. 51, Shughart Decl. II ¶ 10 & Ex. B. Asians were the *largest* racial group of all applicants who received points for the ELL (49.2%) and FRM (33.9%) experience factors—the latter of which counted for double the points of any other experience factor.  *Id.* ¶ 10 & Ex. B.  At 31.3%, Asians were the second-largest racial group (second only to White students) to receive points for the Special Education experience factor.  *Id.* ¶ 10 & Ex. B.

19.    Disputed.  Cooper had a total of two Asian students admitted to TJ in three of the five admission cycles prior to the Class of 2025, so it was not among the top six middle schools in terms of Asian students admitted to TJ.  *Id.* ¶ 5.  Cooper had very few students of any race admitted to TJ during those three years.  *Id.*  The other five schools selected by Plaintiff were the schools with the most students—of any race—admitted during the five years prior to the Class of 2025.  *Id.*  ¶ 4.  For example, the same schools identified by Plaintiff were the "top feeder" schools for Hispanic students during the same five-year period.  *Id.* ¶ 6.  And they also include the "top feeder" schools for White and Black students. *Id.* ¶¶ 7-8.  No school was "guaranteed" admission under the prior process, nor is any school "capped" in how many students it may have admitted to TJ under the current process.  ECF 95, Stip. Facts ¶ 14.  Four of Plaintiff's six "top feeders"—Carson, Cooper, Longfellow, and Rocky Run—received 88.6% (78 of 88) of the unallocated seats offered to all FCPS students in 2021.  DSJ Ex. 51, Shughart Decl. II ¶ 12.  By contrast, only two of the 10 FCPS "underrepresented" middle schools exceeded their allocations

and, even then, received just 7.95% (7 of 88) of unallocated seat offers.  *Id.*  Of the 299 Asian

students who received offers in 2021, 108, not 102, were students at the six schools identified in

paragraph 19.  PSJ Ex. A.

20.     Disputed in part.  The General Assembly enacted the requirement on May 21, not

March, 2020.  *See* 2020 Va. Acts ch. 1289. It required each Academic Year Governor's School

to, among other things, "set diversity goals for its student body and faculty" and to submit a

report to the Governor "by October 1 of each year," not just 2020.  *Id.*, Item 145.C.27(i).

21.     The cause of George Floyd's death is neither disputed nor material in this case.

22-23.  Undisputed.

24.     Disputed in part.  Corbett Sanders stated that "a priority for the Board has been to

ensure greater equity of access to TJ," that the Board had "asked for the process to be revised to

ensure that opportunities for TJ were available to our African American, Hispanic and students

with disabilities," and that "in seeing the numbers when they were released, we know the current

approach is unacceptable.  PSJ Ex. O.  She told Senator Surovell that she "believe[d] there will

be intentful action forthcoming" to address the fact that TJ had the smallest proportion of

disadvantaged students among all 19 Governor's Schools every year for the previous five years.

PSJ Ex. 32.

25.     Disputed in part.  According to a hearsay account of an August meeting of the

task force, there was "talk about the state creating a 4 year timeline to see diversity in the

Governor's schools within 5% of diversity of the systems they represent."  PSJ Ex. 19.

26.     Disputed in part.  Neither Corbett Sanders nor Omeish "stressed the reporting

deadline in emails."  *See* PSJ Exs. 16 & 26.  The emails cited by the Coalition show that Corbett

Sanders stressed the need for clearer communication to the community about "what we are

doing," and the need to incorporate into the plan submitted to the state what she saw as the "4 pillars of what must be done to create a diverse and inclusive environment at TJ which preserves its commitment to excellence in the sciences." PSJ Ex. 16 at 3. Omeish's email said nothing whatsoever about the report to the Governor, far less the October 1 deadline. PSJ Ex. 26.

27. Undisputed.

28. Disputed in part. The September 15, 2020 presentation to the Board showed projections of how the demographics, including racial makeup and proportions of Economically Disadvantaged (FRM) and ELL students, of TJ classes of 2015, 2019, and 2024 would have looked under a regional pathway lottery system as compared to the results under the existing holistic system. PSJ Ex. 7 at 18–20. The slides showed that Asian students would have still constituted the largest racial group of admitted students. *Id.*

29. Disputed in part. The revised—or hybrid merit lottery—proposal presented to the Board by FCPS staff differed from the original proposal in more than one respect: it proposed to use a holistic review to identify the top 100 applicants, and to fill the remaining 400 seats by a regional lottery system that distributed seats proportionally to each region based on enrollment. PSJ Ex. 46 at 11. Staff advised the Board that the hybrid approach "ensures that the students with the strongest applications are admitted into [TJ] while allowing for the advantages of the Merit Lottery approach: a higher probability of traditionally disadvantaged students gaining admittance along with the concomitant increase in applications anticipated by this approach." PSJ Ex. N at Shughart Dep. Ex. 12. The slide presentation noted that the revised proposal "statistically should provide some increase in admittance for underrepresented groups," but that was in contrast to the original proposal which "statistically should provide the greater increase in admittance for underrepresented groups among the two proposals." PSJ Ex. 46 at 7, 14. It also

8

noted among the "concerns" about the revised proposal was that it "may continue to admit more students from a few top performing middle schools" while the full lottery would "provide[] the greatest geographic diversity among FCPS students." *Id.* The October 6 presentation did not include any projections of what the racial demographics of TJ's classes would look like under the hybrid merit lottery proposal. *Id.*

30.     Disputed in part. The Board was not precluded by its own internal policy or Virginia law from taking a vote on the admission process at a work session. *See* Va. Code Ann. § 2.2-3707 (Supp. 2020); Va. Code Ann. § 22.1-73 (2016). The Board has taken votes on other topics at work sessions. DSJ Ex. 8, Brabrand Dep. at 126:14–18. Work sessions do not include a public comment portion, and the Board had received public comment, through a variety of means, regarding TJ admissions in advance of the October 6 work session. DSJ Ex. 24, Pekarsky Dep., at 25:5–8.

31.     Disputed in part. Staff presented the Board with a draft of a scoring system under which each of the three evaluative components—GPA and responses to the Student Portrait Sheet and Problem-Solving Essay— would be assigned points (up to a maximum number for each components), and a fixed number of "bonus" points would be given for each of four Experience Factors, namely Economically Disadvantaged/FRM, ELL, Special Education, or Historically Underrepresented Middle School (which would apply only to FCPS students). *See* PSJ Ex. N at Shughart Dep. Ex. 12.

32.     Disputed. Brabrand's email to Shughart on October 6, 2020, stated nothing about "experience factors," and did not state that "Board members sought modeling to determine whether points for experience factors would 'change who got in.'" *See* PSJ Ex. N at Shughart Dep. Ex. 13. Shughart also did not "thereafter" ask for a "review of the current weighting" to

see whether it would be "enough to level the playing field for our historically underrepresented groups"; that request was made to the director of the Office of Research and Strategic Improvement on September 27, 2020—before the October 6 closed meeting.  *See* PSJ Ex. N at Shughart Dep. Ex. 11.  Also, the "historically underrepresented" groups referenced in his email included some Asian students:  those who are FRM/economically disadvantaged, who are English Language Learners, or who have Individualized Education Plans.  PSJ Ex. N at Shughart Dep. 138:9–17.

33.    Disputed in part.  Hruda's email also discussed students facing challenges of "living in poverty and special ed."  PSJ Ex. N at Shughart Dep. Ex. 11.  She also advised that "it is hard to know what will level the playing field," and pointed out that "the experience factors include some things that some more privileged students are likely to get points on."  *Id.*

34.    Undisputed.

35.    Disputed.  The three examples of Board members' comments cited in paragraph 35 express a variety of views and demonstrate that Board members were giving thoughtful consideration to TJ admissions, providing their own ideas for solutions, and were not making rushed decisions.  *See* PSJ Exs. 28; 29 at 7; 41 at 1–2.

36.    Undisputed.

37.    Disputed in part.  The Board was scheduled to discuss TJ admissions—including both the Holistic Review and the Hybrid Merit Lottery Proposals—at a work session on November 17, 2020.  *See* PSJ Ex. 6.  The "white paper" that was posted by FCPS staff on November 16 did not contain any "analysis" or "modeling" of the Holistic Review Proposal.  *See* DSJ Ex. 30.  FCPS staff did not even do any modeling of the demographic results under the Holistic Review Proposal.  DSJ Ex. 8, Brabrand Dep., at 106:5–107:3.

38.     Disputed in part.  Virginia law does not require motions to be posted in advance of public meetings.  *See* Va. Code Ann. § 2.2-3707.  The Board follows Robert's Rules of Order, and allows motions to be brought at any time during a meeting.  DSJ Ex. 24, Pekarsky Dep., at 50:12–21.  A single Board member expressed frustration that motions were not posted until 4:30 pm, and that Board member—McLaughlin—also abstained from voting on the motion by which the Board adopted the 1.5% Plan.  *See* PSJ Ex. 24; DSJ Ex. 37 at 4–5.

39.     Disputed in part.  The Board did not adopt either of the two proposals presented by FCPS staff, and its 1.5% Plan does not provide "guaranteed admission for 1.5% of each eighth grade class."  Instead, the Board directed the Superintendent to ensure that each public middle school would have seats in the TJ freshman class equivalent to 1.5% of its 8th-grade class size, with seats offered in the first instance to the top applicants from that school.  DSJ Ex. 3, Shughart Decl. ¶ 10(f); DSJ Ex. 37 at 4–5.  The 1.5% proposal was not presented as part of the Superintendent's PowerPoint presentation because it was developed by Board members, and not FCPS staff.  DSJ Ex. 3, Shughart Decl. ¶ 10(g).

40.     Disputed.  No Board members expressed the view that the "racial makeup" of TJ was "problematic," nor did the Board reach any "consensus" on such a view.  None of the Board member communications cited by the Coalition even mentions the "racial makeup" of TJ.  Rather, some just express concern about "the equity in admissions issues for TJ."  PSJ Ex. 32 at 1 (Corbett Sanders); *accord* PSJ Ex. O at 2 (Corbett Sanders: desire to "ensure that opportunities for TJ were available to our African American, Hispanic, and students with disabilities."). Others cite the low numbers of Black students admitted to TJ in the Class of 2025 as a "symptom of a bigger problem" in "how we identify and support all students who have the potential to have their educational experiences improved by advanced academic opportunities."  PSJ Ex. 40

(Cohen); *see* PSJ Ex. 5 at 6 (Keys-Gamarra: the "unacceptable numbers of African Americans that have been accepted to T.J. … is a manifestation of problems within our system and we have to have greater access and opportunity to advanced academics…"); PSJ Ex. 13 (Omeish: agreeing "100% with" FCPS Chief Academic Officer's thoughts on "how we're using the TJ admissions test – it clearly disadvantages historically underrepresented subgroups").[4]  And some simply talk about increasing "diversity" broadly.  *See* PSJ Ex. 30 (Tholen:  "I do not see how a lottery will help us get the best freshman class at TJ…. Will chance give us the diversity we are after?  Will the students that will really thrive at TJ get in?  I agree that the process needs adjustment so that we can increase diversity but this lottery seems too sweeping."); PSJ Ex. 15 (Corbett Sanders:  proposing that Board "We all support this goal" to "increase the diversity of the admissions at TJ").[5]

41.    Disputed.  No Board members expressed anti-Asian sentiment, or expressed that

---

[4] The Coalition also cited its Exhibit 13 as purported evidence of Omeish's communications regarding TJ's racial make-up, but that exhibit does not include any communications involving Omeish at all.  *See* PSJ Ex. 13.  The Board member whose emails are contained in that exhibit—Corbett Sanders—also did not complain about the "racial makeup of TJ."  Corbett Sanders noted "the decrease year over year" in the number of Black students offered admission to TJ and asked that the Board be updated on how the Superintendent would be responding "to the Legislature's requirement to provide a diversity plan by October 1, 2020."  PSJ Ex. 36 at 5.

[5] The Coalition also cites communications expressing no view on whether or why the admissions policy needed changing, *see* PSJ Ex. 37 (Sizemore Heiser:  urging changes in FCPS's external communications about potential changes to TJ admissions "to fit what we are actually doing"), as well as communications by the two Board members who did not vote in favor of the 1.5% Plan.  *See* PSJ Ex. 30 (McLaughlin); PSJ Ex.60 (Anderson).  But even the latter communications say nothing about a need to change the "racial makeup" of TJ, and at most, speak to the need to improve the admissions process to increase access for students of all backgrounds.  *See* PSJ Ex. 30 (outlining ideas for a holistic process "to ensure a level playing field for all students regardless of background or circumstance"); PSJ Ex. 61 at 1 (Anderson:  "we haven't engaged our community in this assessment and examination robustly enough to lead to actionable steps that address the reasons our students of color and of socio-economic disadvantage are consistently locked out of opportunity—including but not limited to admissions to TJ").

any of their colleagues harbored such sentiment.  Nor did any Board members indicate that they believed that the changes adopted by the Board on October 6 and December 17 would discriminate against Asians.  The two text message exchanges cited by the Coalition as "evidence" of this baseless claim were between two Board members and show just the opposite: that two Board members were particularly sensitive to the perspective and experience of Asian constituents.  *See* PSJ Exs. J–M; DSJ Ex. 52, Pekarsky Decl. ¶¶ 4-7, 10.

42.    Disputed.  "Board members" did not express the view that the Board had "rushed along" or done "shoddy" work in changing the TJ admissions process.  Both cited emails are written by a single Board member—McLaughlin—who abstained from the December 17 vote by which the Board adopted its 1.5% Plan.  *See* PSJ Exs. 22 & 24.  Before the vote, many Board members discussed the time and effort devoted to considering TJ admissions in the months leading to the decision and expressed readiness to make an informed decision.[6]

43.    Disputed.  The emails cited by the Coalition show, at best, confusion by constituents, not Board members.  The motion passed by the Board on December 17 stated clearly the "top 1.5% of the eighth grade class *at each public middle school*," so there was no

---

[6] *See* DSJ Ex. 38, Tr. of Dec. 17, 2020 Board Mtg., at 98:11–13 (Omeish:  "[W]e've been hashing this out for many weeks and months."); *id.* at 100:7–9 (Anderson:  "[W]e have been debating this issue for many months now."); *id.* at 109:1–6 (Tholen:  "I …thank the many advocates for the hours of discussion and research on this"); *id.* at 111:3–9 (Pekarsky: "I want to thank the many community advocates who have shared their thoughts and comments during this process, and I encourage my fellow board members to support this motion tonight so our students and their families know what their path forward is for next year."); *id.* at 112:9–24 (Corbett Sanders:  "I approach the work before us with a lot of thought and a lot of deliberation. ... I've spent a lot of time speaking with advocates and researching best practices and admissions policies across the country."); *id.* at 118:5–10 (Meren:  "I've learned a lot in these past months. I've read analysis, letters, reports, historical accounts of TJ and proposals, had conversations and I'm making the best decision I can tonight…."); *id.* at 121:21–122:1 (Sizemore Heiser:  "I have listened very thoughtfully to … everybody, done the research, read hundreds of pages of documents and really sat and thought about what is the best path forward.").

ambiguity that applicants would be considered to be "at" the middle school they actually attend, and not one they do not attend.  PSJ Ex. 1 at 4.  If any confusion existed about whether students who attend another schools are nevertheless members "of the eighth grade class at" another public middle school, it would be immaterial.

## ARGUMENT

### I.   The Coalition Lacks Members with Standing.

The Coalition has failed to carry its burden of establishing "specific facts," "by affidavit or other evidence," sufficient to establish associational standing.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (quoting Fed. R. Civ. P. 56(e)).  Indeed, the Coalition's brief confirms that it *cannot* satisfy that burden.  It is neither a "traditional voluntary membership organization" nor its functional equivalent; instead, it is just an alter ego of a band of individuals who oppose the Board's policy changes, but who are without "standing to sue in their own right" because they are not parents of Asian students affected by the policy changes.  *Hunt v. Wash. State Apple Adv. Comm'n*, 432 U.S. 333, 343–45 (1977).

Though the Coalition claims to have two "tiers" of membership—a "general" tier and a "leadership" tier—the "general" tier are not members in any legally meaningful sense of the word.  These "general members" paid no dues, cast no votes, played no role in the filing of this lawsuit, and took no affirmative action to become "members."  ECF 99, Nomani Decl., ¶¶ 17, 27, 47.  The only thing these "members" did was to fill out an online "Contact Us" form that nowhere informed them that doing so would make them "members" of the Coalition.  DSJ Ex. 40, Nomani Dep. at 78:10–1; DSJ Ex. 42, "Contact Us" form.  Counting the "general members" as part of the Coalition does not make it a "traditional membership organization," or demonstrate any—much less all—the indicia of such an organization.  *Heap v. Carter*, 112 F. Supp. 3d 402, 418 (E.D. Va. 2015); *see also* DSJ at SUF ##64–71; *id.* at 18–23.

14

The fact that the Coalition has some "leaders" calling the shots also does not confer standing.  For starters, as explained in the Board's opening brief, *see* DSJ. at 19–23, the "leadership team" still looks nothing like a "traditional membership organization" or its "functional equivalent," *Heap*, 112 F. Supp. 3d at 418.  Indeed, the most that can be said about the Coalition's leadership is that it "serv[es] in the entity," *id.*, and exercises "control over the organization," *Grp. Health Plan, Inc. v. Philip Morris, Inc*., 86 F. Supp. 2d 912, 918 (D. Minn. 2000), which still leaves most *Heap* elements unsatisfied.  *See* DSJ at 20–23.

Even if the Coalition's leadership could somehow meet the indicia of a traditional membership organization, none of the Coalition's leadership has "standing to sue in their own right." *Hunt*, 432 U.S. 343.  The Coalition's Rule 30(b)(6) designee admitted she could not identify anyone on the leadership team with children eligible to apply to TJ.  DSJ Ex. 40, Nomani Dep. at 53:16–58:9.  In a desperate move to circumvent this fatal admission, the Coalition has offered three brand-new declarations—but even those cannot salvage the Coalition's claim.  Two declarations are by individuals who are *not members* of the Coalition's leadership team, Gupta and McCaskill.  *See* PSJ at 12; *see also* ECF Nos. 100, 101.  Neither was a member of the leadership team at the outset of this case, *see* DSJ Ex. 45 (Coalition org. chart), an essential requirement.[7]  Even now, both Gupta and McCaskill claim only to be general "members."  ECF 100 ¶ 3; ECF 101 ¶ 3.  But as demonstrated above, the Coalition cannot prove standing by appending a meaningless "general membership" tier, so these declarations do not satisfy its burden to show standing.

---

[7] *See Deal v. Mercer Cty. Bd. of Educ*., 911 F.3d 183, 187 (4th Cir. 2018) ("The standing inquiry asks whether a plaintiff had the requisite stake in the outcome of a case 'at the outset of the litigation.'" (citation omitted)); *Pollack v. U.S. Dep't of Just*., 577 F.3d 736, 743 n.2 (7th Cir. 2009) ("[A] plaintiff must establish standing at the time suit is filed and cannot manufacture standing afterward.").

While the third declaration *is* from a member of the Coalition's "leadership" team—Jackson—his declaration sinks the Coalition's case on *both* standing and the merits.  Jackson avers that he has a child eligible to apply to TJ, and that the child identifies as Black.  ECF 102, ¶ 6.  He then avers that, if left in place, the TJ admissions policy "will discriminate" against that child.  *Id.* ¶ 8.  Jackson's declaration thus disproves any notion that the Coalition serves the "specialized segment of the community" that it claims.  *Heap*, 112 F. Supp. 3d at 418.  It also torpedoes the Coalition's claim that the TJ admissions process unlawfully *helps* Black and Hispanic students and *harms* Asian students.

The Coalition's Equal Protection claim fails for lack of standing.[8]

## II.    The Coalition's Equal Protection Claim Fails on the Merits.

The claim is equally defective on the merits.  Though unmentioned in its brief, the Coalition's burden in challenging a race-neutral admissions program is well-settled.  It must establish as a matter of law *both* (1) that the new TJ admissions process has a discriminatory impact on Asian applicants *and* (2) that the adverse impact was intentional—*i.e.*, that it was enacted with "invidious discriminatory purpose."  *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66 (1977).  The Coalition can show neither.

---

[8] In contrast, other organizations with similar missions have formalized their governance and membership control.  *See Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 980 F.3d 157, 164, 184 (1st Cir. 2020) (plaintiff is a "validly incorporated 501(c)(3) nonprofit organization," with actual voting members, bylaws, and a defined mission to oppose Harvard's affirmative-action policy), *petition for cert. filed* (U.S. Mar. 1, 2021) (No. 20-1199); *Center for Sustainable Economy v. Jewell*, 779 F.3d 588, 598 (D.C. Cir. 2015) (standing found because "all" of [its] current members [were] voting members entitled to elect its Board, no new voting members [could] join the organization unless approved by the present voting membership, and Board membership [was] limited to individuals who 'have demonstrated a commitment to the mission and purposes of' [the organization]") (internal citations omitted).

**A.      The Coalition has not demonstrated disparate impact.**

The Coalition's evidence of disparate impact relies exclusively on a comparison of the statistics for Asian applicants under the prior admissions policy and the first year of results under the current TJ admissions policy.  Utilizing this "before-and-after" comparison, the Coalition asserts there has been a "substantial disparate impact" on Asian applicants attributable to two elements of the new TJ admissions process: (1) the 1.5% Plan, and (2) the use of underrepresented schools as one of four "experience factors" considered as part of the holistic review of each applicant.  The Coalition's arguments are factually and legally wrong.

**1.      Disparate impact must be measured against the applicant pool—not the previous results of a prior system involving different students.**

The Coalition's "before and after" theory of disparate impact makes no sense in the context of a challenge to an admissions policy.  And this pervasive, fundamental error in the Coalition's analysis is fatal to its ability to show any disparate impact.

The Coalition is flat wrong to suggest that its "before-and-after" approach follows the analysis in *North Carolina State Conference of NAACP v. McCrory*, 831 F.3d 204, 232 (4th Cir. 2016).  The Fourth Circuit did not even discuss the baseline in *McCrory*, much less engage in the "simple 'before-and-after' comparison" the Coalition claims.  PSJ at 14.  Just the opposite, the court there merely observed the "undisputed facts" that African Americans comprised a disproportionate number of the population impacted by the law compared *to the general voting population*, and concluded that disparate impact had been shown.  *McCrory*, 831 F.3d at 232.

The "substantive elements of proof" for a claim of intentional discrimination "are the same" under both Title VII and the Equal Protection Clause.  *DePriest v. Milligan*, 823 F.3d 1179, 1185 (8th Cir. 2016).  Title VII case law makes crystal-clear that the appropriate baseline for assessing disparate impact is the expected racial composition of the resulting work force in

the absence of the challenged practice or criterion—not what the work force had looked like under a prior practice.  *In re Emp. Discrimination Litig. Against State of Ala.*, 198 F.3d 1305, 1312 (11th Cir. 1999) (courts must ask "what should the racial composition of the job force look like absent the offending employment practice").  In examining hiring practices, courts thus look to the demographics of the hiring pool—not the demographics of previous hiring classes produced under different hiring policies.[9]  The same logic applies to admissions cases, where the appropriate comparator is the applicants who do not share the trait that is claimed to be the subject of discrimination.  Only by comparing apples to apples—the applicants in a given year versus the accepted students in the same year—can a court determine whether and to what extent a given practice disproportionately harms a particular racial group, *i.e.*, whether it "has the effect of denying the members of one race equal access[.]"  *N.Y. City Transit Auth. v. Beazer*, 440 U.S. 568, 584 (1979).

As explained in the Board's opening brief, *see* DSJ at 24–26, the Coalition's disparate impact analysis requires this Court to adopt the opposite reasoning.  In equating Asian applicants to the Class of 2025 with Asian applicants from prior years, who were admitted based on different criteria and eligibility, the Coalition reduces consideration of all applicants to their respective races.  It assumes both that, year over year, all applicants of a given race will perform exactly the same as other applicants of that race, and that Asian students will always significantly outperform students of other races, under any admissions criteria.  It is both illogical and racially

---

[9] *Hazelwood Sch. Dist. v. United States*, 433 U.S. 299, 308 (1977); *see also Mandala v. NTT Data, Inc*., 975 F.3d 202, 210 (2d Cir. 2020) ("[T]he relevant comparison is between 'the racial composition of the at-issue jobs and the racial composition of the qualified population in the relevant labor market.'"); *Moore v. Hughes Helicopters, a Div. of Summa Corp*., 708 F.2d 475, 482 (9th Cir. 1983) ("Disparate impact should always be measured against the actual pool of applicants or eligible employees unless there is a characteristic of the challenged selection device that makes use of the actual pool of applicants or eligible employees inappropriate.").

offensive to argue that "Asian students are … 'losing' seats simply because last year different … Asian students were exceedingly privileged to win a high number of seats."  *Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. of City of Bos.*, No. 21-10330-WGY, 2021 WL 4489840, at *15 n.20 (D. Mass. Oct. 1, 2021).

Moreover, if the goal in assessing disparate treatment is to identify what the racial composition of the admitted students pool "*should* . . . look like," *In re Emp. Discrimination Litig. Against State of Ala.*, 198 F.3d at 1312 (emphasis added), it simply makes no sense to use racially-skewed statistics as the baseline.  As the Coalition itself has conceded, the prior TJ admissions process's reliance on standardized testing screened out deserving candidates who lacked access to test preparation and other resources, and it is undisputed that a disproportionate number of those candidates were Black and Hispanic.  DSJ, Ex. 5, Miller Dep. 98:7–100:20.  Thus, in relying on prior years' numbers, the Coalition is asking this Court to assess disparate impact using, *as a baseline for comparison*, a system that the Coalition itself contends disproportionately excluded students of other racial groups.  *Id.*  Further, the Coalition urges the Court adopt, *as a baseline*, the assumption that Asian applicants will outperform other applicants simply by virtue of their race—*i.e.*, in a perfect world, the accepted students' class "should" look disproportionately Asian.  This "before and after" comparison theory is both disingenuous and morally offensive, and this Court should renounce it.

Rather, the only logical comparator in assessing disparate impact is the Class of 2025 applicant pool.  As explained in the Board's opening brief, that analysis establishes as a matter of law that the new TJ admissions policy does not adversely impact Asian applicants.  Under the new policy, Asian applicants for the Class of 2025 received more offers of admission (54.36%) than any other racial group, and constituted one of only two racial groups that "outperformed"

their share of the applicant pool (48.59% of the pool, 54.36% of admitted students).  ECF 95,

Stip. Facts ¶ 20.  Moreover, Asian applicants also comprised the highest percentage of students

that benefited from experience factors in the initial round of offers for the Class of 2025—

comprising a near-majority of applicants to receive points for ELL status (49%), a plurality of

applicants to receive points for FRM status (34%), the second-highest group of students to

receive points for Special Education status (31%), and the second-highest group of students to

receive points for attending a historically underrepresented school (27%).  DSJ Ex. 51, Shughart

Decl. I ¶ 10 & Ex. B.  That is far from a disparate impact.

### 2.   The 1.5% Plan had no disparate impact on Asian applicants.

The Coalition's specific arguments alleging disparate impact fare no better.  In

challenging the 1.5% Plan, the Coalition's argument boils down to the assertion that Asian

students who want to attend TJ are clustered at six middle schools, so the 1.5% Plan makes it

harder for Asian students at those schools to gain admission because they must "compete against

more eligible and interested applicants (often each other) for the allocated seats at their middle

schools."  PSJ at 15–16.  But even if the Coalition could show that to be true (which it cannot),

that still would not show disparate impact.  What it would need to establish disparate impact is

evidence showing that the 1.5% Plan disproportionately burdens Asian applicants as a group

versus non-Asian applicants.

The Coalition provides no such analysis.  Having failed to procure expert testimony, the

Coalition provides no statistical evidence regarding what Asian enrollment would be in the

absence of the 1.5% Plan, holding all other variables constant.  *Cf., e.g.*, *Garcia v. Johanns*, 444

F.3d 625, 635 (D.C. Cir. 2006) (observing that "it is impossible—as a statistical mater—to draw

meaningful conclusions" from a disparate impact analysis that does not control for variables).

Nor does the Coalition say anything whatsoever about how the 1.5% Plan impacts other racial

groups—*i.e.*, what makes the 1.5% Plan's impact on Asians *disparate*, as opposed to merely an impact felt across all demographics.  Indeed, all that the Coalition's arguments establish is that certain schools sent more students (of all races) to TJ than other schools under the prior system. That fact is undisputed.  But it is also irrelevant.

Rather than conduct a meaningful disparate impact analysis using the admissions statistics for the Class of 2025, the Coalition simply cherry-picks six of the eight schools that sent the most students to TJ in previous years (under different admissions criteria and eligibility requirements); argues that those schools have high Asian enrollment; and—without further data or analysis—concludes that Asian applicants are disparately impacted.[10]  However, even setting aside the flawed nature of the previous-year comparison, the Coalition's six-school analysis makes little sense.  Of the six, only two—Carson and Rocky Run—have markedly high numbers of Asian students.  The Asian student populations at the other four are indistinguishable from other middle schools that have historically *not* sent many students to TJ.  DSJ Ex. 51, Shughart Decl. II ¶ 9 & Ex. A.  For example, Lanier (24.0%), Franklin (26.3%), and Liberty (27.9%) all have higher or comparable Asian enrollment to Frost (24.5%), Kilmer (25.5%), and Longfellow (27.7%), *see id.*, and yet are omitted from the Coalition's analysis.

The explanation for these omissions is simple:  the demographics and applicant numbers from those schools do not support the Coalition's narrative.  Specifically, while it may be true that Asian applicants enrolled at Carson face stiffer competition for the initial 1.5% seats for admission due to a high percentage of eligible applicants, it is likewise true that Asian applicants

---

[10] The Coalition's focus on these six schools is brand-new, reflecting a failure of facts to satisfy its previous narrative that the 1.5% Plan unfairly burdens *four* middle schools that historically sent high numbers of students to TJ.  *See* ECF 1, Compl. ¶ 49; ECF 59, Br. in Supp. of Prelim. Inj., at 7; DSJ Ex. 48, Miller Dep. at 49:5-19, 133:18-134:5.

at schools with lower percentages of eligible students (*e.g.*, Liberty) face comparatively less competition.  But the Coalition fails to even engage with this issue.  As a result, and at most, the Coalition's arguments tend to show that Asian applicants at certain middle schools benefit from the 1.5% Plan, while Asian applicants at other middle schools do not.

But the same is true for *all* racial groups.  Every racial group has a markedly above-average representation in at least two of FCPS's 26 middle schools—which is all that the Coalition has shown.  In the 2020–2021 school year, for example, Glasgow and Poe had enrollments that were 53.3% and 61.3% Hispanic; Cooper and Irving had enrollments that were 52.4% and 50.1% White; and Hayfield and South County had enrollments that were 25% and 21.2% Black.  DSJ Ex. 51, Shughart Decl. II, Ex. A.  These numbers substantially exceed each group's representation across FCPS as a whole (27.1% Hispanic, 36.8% White, 10% Black).[11] Under the Coalition's "cluster" theory, the 1.5% Plan disproportionately impacts some members of every racial group, because each racial group has members who are "clustered" in some middle schools and the 1.5% Plan applies to all middle schools.  But, of course, a practice that burdens some members of every race is not discrimination against any race.  The Coalition's real complaint—as Jackson's declaration makes evident—is that the 1.5% Plan expands middle-school representation at TJ.  The Coalition struggles in vain to shoehorn that grievance into the rubric of a race-discrimination claim.  The facts just don't support it.

### 3. The Coalition fails to establish disparate impact based on the use of underrepresented schools.

The Coalition next claims that the "holistic review" for unallocated seats "exacerbates" the purported disparate impact on Asian students by allocating points to students who apply from

---

[11] FCPS-wide demographic information is reported at *https://www.fcps.edu/about-fcps* (last accessed Dec. 20, 2021).

historically underrepresented schools.[12]  The Coalition offers no rigorous analysis to support this claim, resorting instead to a simple comparison to prior years' admissions numbers.  Again, the Coalition's analysis holds no water.

The Coalition's arguments with respect to underrepresented schools suffer from the same flaw that forecloses its disparate impact arguments as a whole—reliance on the wrong baseline for comparison.  But the Coalition's focus on underrepresented schools is particularly misplaced. In the first year of the admissions process, there were ten FCPS schools that qualified as historically underrepresented.  DSJ Ex. 51, Shughart Decl. II ¶ 11.  When offers were made to students last June, *eight* of those ten schools did not exceed their total 1.5% allotment—meaning that no students from those schools received an offer for an unallocated seat, and the 45-point bump for underrepresented students made no impact at all.  *Id.*  The other two schools designated as underrepresented—Glasgow and Twain—exceeded their allotment by just seven students. These seven offers comprise 7.95% of the 88 unallocated-seat offers made to FCPS students.  *Id.* By comparison, 78 unallocated-offers were extended to students from the same six "feeder" schools that the Coalition claims are being disproportionately harmed by the use of the underrepresented school experience factor.  *Id.* ¶ 12.  So the applicant's attendance at an underrepresented school only had an impact on less than 8% of offers.  *Id.*

That is not enough for the Coalition to meet its burden.  To demonstrate that the underrepresented-school experience factor is impermissible, the Coalition must show a *racially* disproportionate impact.  The Coalition has not done so, and for good reason: *Over half of the*

---

[12] The Collation apparently finds no fault with the allocation of additional points for the other experience factors, namely, eligibility Special Education services, ELL services, or FRM status. That is unsurprising.  Asian applicants received more points for experience factors than any other racial demographic, and comprised a near-majority (49.2%) of those applicants who received a bump for ELL status.  DSJ Ex. 51, Shughart Decl. II ¶ 10 & Ex. B.

*students* who received offers from Glasgow and Twain (the only two underrepresented schools that exceeded their 1.5% allocation) identify as *Asian. Id*. ¶ 12.

The Coalition's claim that Asian applicants are disproportionately disadvantaged is disproved by the record evidence.

### B.    The School Board did not act with discriminatory purpose.

The Coalition's Equal Protection claim independently fails because it cannot show an "invidious discriminatory purpose." *Arlington Heights*, 429 U.S. at 265.  The Coalition has failed to present any evidence that the Board, or any of its members, voted to change the TJ admission policy "because of" any potential adverse effect on Asian students.  *Feeney*, 442 U.S. at 279.  Tellingly, the Coalition does not even try.

Rather than offer any evidence of *actual* discriminatory purpose, the Coalition spends most of its brief marshalling evidence to prove the unremarkable conclusion that the Board was motivated, at least in part, by the desire "to increase Black and Hispanic enrollment" at TJ.  PSJ at II.B, 32.  But such a purpose, even if assumed true, is not suspect—particularly where, as here, even by the Coalition's lights, the prior system disproportionately impacted Black and Hispanic applicants.  DSJ Ex. 5, Miller Dep. 98:7–100:20.

The Coalition fails to grasp this point.  It simply *assumes* that if any members of the Board desired to increase access for underserved racial groups, strict scrutiny must apply.  PSJ, II.2–4.  Not so.  Even if the Coalition could show that a majority of the Board shared this desire (which it has not done), that would not help its Equal Protection claim. Eliminating inequitable barriers to access is a laudable goal, not a constitutionally suspect one.  *See Anderson*, 375 F.3d at 87 ("The Supreme Court has explained that the motive of increasing minority participation and access is not suspect.").  Nor does that goal become suspect whenever it concerns a finite resource, such as school admissions.  And the aspiration of creating a system that does *not*

disproportionately burden any racial groups—such that the demographics of the accepted students pool tends to reflect that of the applicant pool in any given year—is not "racial balancing," no matter how many times the Coalition abuses that term to say so.

> 1. **A motive of increasing minority access is constitutional, and the "zero sum" nature of admissions does not change that fact.**

The Coalition's brief confirms that its Equal Protection claim rises and falls on the theory that any action adopted to increase access for underserved racial minorities is constitutionally suspect, at least with respect to admissions, because any such action necessarily hurts the groups who are not underserved. Indeed, the Coalition itself sums up its case in precisely that way: "[T]he Board's policy was designed to increase Black and Hispanic enrollment, which would (by necessity) decrease the representation of Asians at TJ. Therefore, strict scrutiny applies." PSJ at 32 (citations omitted). But even if the Coalition could prove its premise—that the Board changed the TJ admissions process in part to increase access for Black and Hispanic students— its conclusion does not follow. Strict scrutiny does not apply to actions taken with the purpose of increasing access for underserved racial minorities, even in the context of school admissions.

As a general matter, it is well-settled that "the motive of increasing minority participation and access is not suspect." *Anderson*, 375 F.3d at 87. Justice Kennedy's concurrence in *Parents Involved* makes clear that school boards may consciously "adopt general policies to encourage a diverse student body, one aspect of which is its racial composition." 551 U.S. at 788. Any doubt about the precedential value of this aspect of Justice Kennedy's concurrence, *see* PSJ at 34 n.29, is dispelled by the fact that its key language was embraced by the majority in *Texas Department of Housing & Community Affairs v. Inclusive Communities Project, Inc*, 576 U.S. 519 (2015). There the Supreme Court quoted *Parents Involved* for the proposition that "[s]chool boards may pursue the goal of bringing together students of diverse backgrounds and races through other

means, including strategic site selection of new schools; [and] drawing attendance zones with general recognition of the demographics of neighborhoods." *Id.* at 545.[13]

In other words, not every motivation connected to race constitutes an "invidious discriminatory purpose" under an *Arlington Heights* analysis.[14]  And the analysis is no different because, as the Coalition likes to say, admissions is a "zero-sum" game.  The Supreme Court has made clear that there is intentional discrimination under the Equal Protection clause only where action is taken "because of,' not merely 'in spite of,' its *adverse* effects upon an identifiable group." *Feeney*, 442 U.S. at 279 (emphasis added).  The Coalition's zero-sum logic collapses that distinction entirely, automatically transforming every "in spite of" case into a "because of" case.  A multitude of Circuit Court cases—as well as every Supreme Court case on higher admissions ever authored—rightly forecloses that reasoning.[15]

The Coalition cannot credibly argue that school admissions are uniquely "zero-sum."

---

[13] In any event, courts and scholars disagree with the Coalition's persistent assertion that Justice Kennedy's concurrence is not controlling. *See, e.g.*, J. Harvie Wilkinson III, *The Seattle and Louisville School Cases: There is No Other Way*, 121 HARV. L. REV. 158, 170 (2007); *Spurlock v. Fox*, 716 F.3d 383, 395 (6th Cir. 2013).

[14] *See, e.g.*, *Rothe Dev., Inc. v. United States Dep't of Def.*, 836 F.3d 57, 72 (D.C. Cir. 2016) ("Policymakers may act with an awareness of race … without thereby subjecting the resultant policies to the rigors of strict constitutional scrutiny"); *Hayden v. Cty. of Nassau*, 180 F.3d 42, 50–51 (2d Cir. 1999) ("A desire to reduce the adverse impact on black applicants … is not analogous to an intent to discriminate against non-minority candidates."); *Raso v. Lago*, 135 F.3d 11, 16 (1st Cir. 1998) ("Benign intentions do not immunize government action, but they substantially narrow the inquiry.").

[15] In support of its zero-sum logic, the Coalition relies heavily on Judge Xinis's non-binding decision in *Ass'n for Educ. Fairness v. Montgomery Cty. Bd. of Educ.*, No. 8:20-cv-02540-PX, 2021 WL 4197458 (D. Md. Sept. 15, 2021).  But that decision came on a motion to dismiss, and cannot be divorced from that procedural posture.  *See id.* at *17 (holding that whether the district sought "to racially balance the middle magnet programs" is "not capable of resolution at this stage").  Nevertheless, to the extent Judge Xinis's opinion could be read to embrace the broader idea that improving access for minorities is the same as hurting others, it should be rejected as contrary to binding precedent for the reasons explained in this section.

Societal resources are rarely infinite, so that argument has been made, and rejected, in a variety of contexts.  The D.C. Circuit in *Rothe* considered a challenge to a race-neutral law that was allegedly passed to increase access and opportunity for minority-owned businesses to receive government contracts.  836 F.3d at 72.  The Second Circuit's decision in *Hayden* involved a challenge to a new admissions test for county police officers, which was "designed with race in mind … to minimize the discriminatory impact on minority candidates."  180 F.3d at 46.  And the First Circuit's decision in *Rago* concerned a challenge to a HUD decree whose undisputed purpose was "to increase minority opportunities for apartments" in a specific subdivision.  135 F.3d at 16.  All three cases involved a "zero sum" environment:  a government contract can be awarded to only one bidder, job openings for police officers are finite, and housing in a specific subdivision is necessarily limited.  Nevertheless, strict scrutiny did not apply in any of the cases.

The challengers in *Hayden* made the very argument that the Coalition presses here:  that "designing the police officers' entrance exam to mitigate the negative impact on minority candidates (thereby improving their chances for selection) is akin to an intent to discriminate against [non-minority candidates.]"  *Hayden*, 180 F.3d at 50–51.  The Second Circuit flatly rejected that theory, deeming it "wholly insufficient to state a claim that the County intended to discriminate against appellants[,] because it does not demonstrate that the County designed the 1994 exam 'because of' some desire to adversely affect appellants."  *Id.* (quoting *Feeney*, 442 U.S. at 279).  It explained that, "where an exam that discriminates against a group or groups of persons is reviewed, studied and changed in order to eliminate, or at the very least, alleviate such discrimination, *there is a complete absence of intentional discrimination*."  *Id*. (emphasis added).

The same logic holds here.  The Coalition concedes that the prior admissions process had a disparate impact on certain students from underrepresented areas of the county, and that those

27

students were disproportionately Black and Hispanic.  DSJ Ex. 5, Miller Dep. 98:7–100:20.  The

Coalition complains that the Board acted in part to alleviate that disproportionate impact, but

such motivation—even if it could be proven—shows "a complete absence of intentional

discrimination."  *Hayden*, 180 F.3d at 51.[16]  "While the increase of a zero-sum resource to one

group necessitates the reduction of that resource to others, the case law is clear—the concern is

action taken because of animus toward a group, not in spite of an action's necessary effect on a

group or groups."  *Bos. Parent Coal.*, 2021 WL 4489840, at *15 (citing *Feeney*, 442 U.S. 258).

       2.      **The illogic of the Coalition's reasoning is underscored by Supreme Court precedent endorsing race-neutral means to achieve diversity.**

Decades of Supreme Court jurisprudence involving college admissions show why the

Coalition is flat wrong to argue that a race-neutral admissions policy is subject to strict scrutiny

if the policy was adopted with even a partial goal of increasing enrollment of students from

underserved racial minorities.  Indeed, all the Supreme Court admissions cases have *presumed*,

as part of the analysis, that schools can pursue "the educational benefits of diversity," and can do

so using facially race-neutral methods.  *Grutter v. Bollinger*, 539 U.S. 306, 340 (2003); *see also*

*Rothe*, 836 F.3d at 72 ("The Supreme Court's ensuing affirmative action decisions confirm that

point by countenancing, and characterizing as 'race neutral,' alternatives designed to advance the

same ends as affirmative action programs but that do not rely on racial criteria.").  The disputes

in these cases instead have centered around whether these goals can be pursued using *express*

---

[16] *See also Jana-Rock Constr., Inc. v. N.Y. State Dep't of Econ. Dev.*, 438 F.3d 195, 211 (2d Cir. 2006) ("[T]o equate a 'desire to eliminate the discriminatory impact' on some disadvantaged groups with 'an intent to discriminate against' other groups 'could seriously stifle attempts to remedy discrimination.'"); *Raso*, 135 F.3d at 16 ("[T]he plaintiffs are mistaken in treating 'racial motive' as a synonym for a constitutional violation.  Every antidiscrimination statute aimed at racial discrimination, and every enforcement measure taken under such a statute, reflect a concern with race.  That does not make such enactments or actions unlawful or automatically 'suspect' under the Equal Protection Clause.").

racial classifications—*i.e.,* explicitly considering race—and the law currently holds that a university can use race in making admission decisions, so long as race remains but one of many "plus factors" in the calculus.  *Fisher v. Univ. of Tex. at Austin*, 570 U.S. 297, 305 (2013).

The strict scrutiny given to race-based policies requires courts to examine whether there has been "good faith consideration of workable race-neutral alternatives that will achieve the diversity the university seeks" before approving admissions policies that explicitly consider race. *Grutter*, 539 U.S. at 340; *see also Fisher*, 570 U.S. at 298 ("The reviewing court must ultimately be satisfied that no workable race-neutral alternatives would produce the educational benefits of diversity.").  Notably, one such "race-neutral" method that the Court has assumed is lawful is the implementation of "percentage plans … that guarantee admission to all students above a certain class-rank threshold in every … school."  *Grutter*, 539 U.S. at 340.

Supreme Court jurisprudence endorses the use of race-neutral alternatives to bypass the rigors of strict scrutiny.  So the Coalition's theory that strict scrutiny applies to "race-neutral alternatives" makes no sense.

### 3.    The *Arlington Heights* factors all cut against the Coalition's case.

The Coalition fares just as poorly when it attempts to find facts showing "invidious discriminatory purpose was a motivating factor" in the challenged decision.  *Arlington Heights*, 429 U.S. at 266.  Aside from the specific disparate impact caused by the challenged action, those factors include:

> (1) evidence of a "consistent pattern" of actions by the decisionmaking body disparately impacting members of a particular class of persons; (2) historical background of the decision, which may take into account any history of discrimination by the decisionmaking body or the jurisdiction it represents; (3) the specific sequence of events leading up to the particular decision being challenged, including any significant departures from normal procedures; and (4) contemporary statements by decisionmakers on the record or in minutes of their meetings.

*Sylvia Dev. Corp. v. Calvert Cty., Md.*, 48 F.3d 810, 819 (4th Cir. 1995) (citing *Arlington Heights*, 429 U.S. at 266–68).

None of these factors supports an Equal Protection claim here.  At best, the Coalition can only show that some Board members desired to eliminate the barriers to access for groups that included racial minorities—evidence that is insufficient for the reasons described above.  What the Coalition needs, but lacks, is evidence of *invidious* discriminatory intent, *i.e.*, "discriminatory animus."  *Id.* ("[E]ven when a facially neutral statute has a 'racially disproportionate impact,' a discriminatory animus must nevertheless be proved to establish an equal protection violation.").

i.       The history of (non)discrimination against Asian students

The first and second *Arlington Heights* factors ask if the historical background indicates a prior history of discrimination or pattern of engaging in actions that disproportionately burden the plaintiffs' racial group.  *Id.*  Here, the answer to both questions is obviously "no."  There is no evidence of a history of discrimination within Fairfax County against Asian students, nor any pattern or practice of actions by the Board that disproportionately harm Asians.  *Id.*  Indeed, the Coalition has not attempted to argue otherwise.[17]  For that reason alone, this is not *McCrory*, in which North Carolina's "long history of race discrimination generally and race-based vote suppression in particular" informed the court's analysis, and where the record was "replete" with evidence of a continued pattern "in which the North Carolina legislature ha[d] attempted to suppress and dilute the voting rights of African Americans."  *McCrory*, 831 F.3d at 223.  The first and second factors cut clearly against the Coalition.

---

[17] On historical background, the Coalition notes only the school system's previous unsuccessful attempts at increasing access for underrepresented minorities at TJ.  PSJ at 19.

ii.    <u>The sequence of events leading to the December 17, 2020 vote</u>
<u>disproves the Coalition's claim of a rushed process.</u>

Neither the events leading up to the Board's votes nor the process the Board followed

suggests invidious discrimination.  At most, the sequence of events noted by the Coalition—from

the May 2020 budget bill requiring Governor's Schools to submit annual reports regarding

diversity goals, through the December 17, 2020 vote enacting the 1.5% Plan—suggests the

Board was responding to state-level concerns that the old admissions process disproportionately

excluded some students, including Black and Hispanic students.  But as already explained, that

concern was appropriate, not suspect.  Likewise, to the extent the Board made changes to "get

ahead" of directives it anticipated from the Governor's office, as the Coalition suggests, that is a

legitimate, non-discriminatory purpose—not something that aids the Coalition's case.

The Coalition's arguments that the Board's actions were rushed and lacked transparency

likewise also do not withstand scrutiny.  The Board member comments cited by the Coalition to

show that the process to change TJ admissions was rushed or had not been fully vetted by the

public, *see* PSJ at 22–23, come from Board meetings in early *October*—shortly after the

Superintendent first presented his initial merit lottery proposal.  But the Board did not enact a

new TJ admissions policy in October, nor make any of the changes that the Coalition challenges

in this case.[18]  Instead, the Board directed staff to return with revised admissions proposals for

the Board's consideration.  DSJ, SUF #30.  What followed were more than ten weeks of

deliberation, town halls, back-and-forth between FCPS staff and Board members, robust

---

[18] As set forth in the Coalition's summary judgment brief, the Coalition challenges only the
adoption of the 1.5%-per-school allotment and the use of underrepresented schools as an
experience factor within the holistic review criteria.  PSJ at 15–16.  The Coalition has not argued
that the elimination of either the standardized test or admissions fee (the two changes to the
admissions process adopted on October 6, 2020) disparately impacts Asians, and thus cannot
state a claim under the Equal Protection Clause with respect to those changes.

community feedback, and multiple additional presentations—all *before* the Board voted to enact a new admissions plan for TJ on December 17, 2020. *See id.*, SUF ##33–43. By that point, multiple Board members had expressed the sentiment that the process had already taken too *much* of their time. *See* CMF ¶ 43 & n.5; DSJ at 33–34 (quoting Board members). The Coalition *itself* accused the Board of spending too much time on TJ. DSJ, SUF #25.

In contrast to the post-*Shelby County* voting-rights bill at issue in *McCrory*, which was revealed to the public and passed without amendments *in three days*, 831 F.3d at 228, the Board's deliberations over TJ admissions lasted many months and dozens of hours of public meetings. Indeed, the October 6 meeting *alone* took more time (four-and-a-half hours) than the voting rights bill took in moving through the North Carolina House (two hours). *Id.*; DSJ, SUF #29. There is no fair comparison between the process followed by the Board and *McCrory*.

iii.   Board members' contemporaneous statements do not evince any invidious discriminatory purpose.

Finally, the fourth *Arlington Heights* factor—the contemporary statements by Board members—also does not support any inference of invidious discriminatory intent. The Board has provided transcripts of the key meetings during the discussion of TJ admissions, and videos are available for viewing by this Court. *See* DSJ, SUF #14, Exs. 15, 23, 34, 38. There is not one statement in the record suggesting that even a single Board member voted to change the TJ admissions policy out of a desire to harm Asian students. Nothing.

Unable to identify even a single comment evincing animus towards Asian applicants, the Coalition instead attempts to spin statements that indicate a desire to make TJ more diverse as evidence of an intent to engage in unlawful racial balancing. But no Board member statement in the record evinces such a purpose, and the record as a whole refutes any suggestion that the new admissions policy constitutes racial balancing.

32

For starters, the Coalition's invocation of "racial balancing" does not jibe with its meaning. "Outright racial balancing"—*i.e.*, structuring admissions to ensure "some specified percentage of a particular group merely because of its race or ethnic origin"—is "patently unconstitutional." *Fisher*, 570 U.S. at 311 (internal citations omitted). Aspiring to an admissions process that puts all racial groups on a level playing field, where the demographics of admitted students resemble the demographics of qualified applicants, is *not* racial balancing, and is not unconstitutional. It is just another way of aiming to develop an admissions system that does not disparately impact any racial groups. *See Wards Cove Packing Co. v. Antonio*, 490 U.S. 642, 650 (1989) (explaining that disparate impact must be measured by comparing "the racial composition of the qualified persons in the labor market and the persons holding at-issue jobs").

The Coalition's accusations of racial balancing are also off-base because its evidence of purported balancing concerned variations of a lottery proposal that the Board rejected. *See* PSJ 27–31. Instead, the Board adopted a race-blind 1.5% Plan structured around geographic and middle-school diversity. *See* DSJ at 31 (summarizing Board member comments in support of the 1.5% Plan); SUF #49. Moreover, the Board's plan *expressly directs* that the "admissions process must use only race-neutral methods that do not seek to achieve any specific racial or ethnic mix, balance, or targets." PSJ Ex. 1, Minutes of Dec. 17, 2020 Mtg., at 3. Then, to effectuate that instruction—and make "racial balancing" impossible—the admissions regulation was amended to require that every applicant's "name, race, ethnicity, [and] sex" "not be provided to admissions evaluators." DSJ Ex. 3, FCPS Regulation 3355.14, at 4. If that were not enough, the Coalition itself has admitted to this Court—in defending why its own predictions for the demographics of the Class of 2025 so wildly missed the mark—that it was simply not possible to accurately predict the racial outcomes that the Board's new policy would produce. *See* DSJ Ex.

33

39, Tr. of 9/17/21 Hr'g at 19:6–9 ("[E]veryone would acknowledge that … it was very difficult to project the outcome of what would happen because of the holistic factors that go into evaluation of the applicants.").

The remainder of the statements highlighted by the Coalition contradict its narrative.

- The staff (not Board) comments regarding the appropriate weighting of experience factors confirm that the goal in designing a new admissions process was to achieve a "level" playing field, not one that disproportionately hinders any particular race.  PSJ at 30.[19]

- The quotes from emails lifted by the Coalition regarding "diversity" confirm that Board members did *not* view diversity or the problem of underrepresentation at TJ through an exclusively racial lens, but instead also had in mind socioeconomic and geographic diversity, among other attributes.  *See, e.g.*, PSJ Ex. 30.

- The Board member text messages cited by the Coalition refute any suggestion of Asian animus by the Board, instead confirming that Board members were sensitive to how the Superintendent's remarks were alienating some Asians, agreed with the Coalition's views on the lottery proposal, and were opposed to any measures that they believed would reduce the proportion of Asians.  *See* DSJ Ex. 52, Pekarsky Decl., ¶¶ 4-6.

Finally, the Coalition's contention that the Board's "consideration of racial data … would be enough to demonstrate discriminatory intent under *McCrory*," PSJ at 32, grossly distorts the record in this case and the Fourth Circuit's analysis in *McCrory*.  In *McCrory*, the Fourth Circuit found it notable that legislators had requested and received a racial breakdown of "DMV-issued ID ownership, absentee voting, early voting, same-day registration, and provisional voting," and

_____

[19] Even if such comments demonstrated that FCPS staff were motivated by racial animus—which they do not—the Coalition still would be foreclosed from arguing that the *Board*'s actions were controlled by staff.  The Supreme Court has flatly rejected the "application to legislative bodies" of such a "'cat's paw' theory," under which a plaintiff in an employment discrimination case "typically seeks to hold the plaintiff's employer liable for 'the animus of a supervisor who was not charged with making the ultimate [adverse] employment decision.'"  *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2350 (2021) (quoting *Staub v. Proctor Hosp.*, 562 U.S. 411, 415 (2011)).

then, "relying on this racial data … enacted legislation restricting all—and only—practices disproportionately used by African Americans." 831 F.3d at 230. This sequence provided some support for the "because of" inference of racial animus necessary to support a claim of intentional discrimination. *Id*. There is nothing remotely resembling such evidence here.

The Board did not receive a racial breakdown of the TJ-eligible students at each middle school before enacting the 1.5% Plan, nor any modeling of any kind illustrating how the Board's plan would impact any particular racial group. DSJ, SUF #49. The Board likewise did not receive any breakdown of the intersectionality of race and any of the experience factors adopted as part of the holistic review process, much less a breakdown that it acted upon in selecting which criteria to use for that review. *See* DSJ Ex. 52, Pekarsky Decl., ¶ 9. There is simply nothing analogous about the record before this Court and the record considered in *McCrory*.

In sum, like the other *Arlington Heights* factors, examination of the contemporaneous statements of Board members reveals no evidence that the Board changed TJ admissions "*because* of" an expected adverse impact on Asian applicants. *Feeney*, 442 U.S. at 279. Moving the goal posts, the Coalition tries instead to prove that increasing access to TJ for underserved students, including underserved racial minorities, was one of the Board's considerations in enacting the changes. But such a goal is worthy—not suspect—and proving such a motivation falls far short of an Equal Protection Clause violation. Just as it fails to show disparate impact, the Coalition fails to show even a triable issue on discriminatory purpose.

## <u>CONCLUSION</u>

The Court should deny the Coalition's motion for summary judgment and instead grant summary judgment in favor of the School Board.

Respectfully submitted,

35

FAIRFAX COUNTY SCHOOL BOARD

By: _____/s/ Sona Rewari_____
     Sona Rewari (VSB No. 47327)
     Daniel Stefany (VSB No. 91093)
     HUNTON ANDREWS KURTH LLP
     2200 Pennsylvania Avenue, NW
     Washington, DC 20037
     Telephone: (202) 955-1500
     Facsimile: (202) 778-2201
     srewari@HuntonAK.com
     dstefany@HuntonAK.com

     Trevor S. Cox (VSB No. 78396)
     HUNTON ANDREWS KURTH LLP
     951 E. Byrd Street
     Richmond, VA 23219
     Telephone: (804) 788-7221
     Facsimile: (804) 788-8218
     tcox@HuntonAK.com

     *Counsel for Defendant*

## **CERTIFICATE OF SERVICE**

I hereby certify that on December 23, 2021, I electronically filed this document with the

Clerk of the Court using the CM/ECF system, which will send a notification of such filing (NEF)

to counsel of record for all Parties.

By:       /s/ Sona Rewari

Sona Rewari (VSB No. 47327)

**INDEX OF EXHIBITS TO DEFENDANTS' BRIEF IN OPPOSITION
TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

| SMJ Ex. # | DESCRIPTION |
|:---:|:---:|
| 44 | Transcript of Deposition of Asra Nomani (supplemental excerpts) |
| 45 | Organizational Chart (Coalition Dep. Ex. 3) |
| 46 | Coalition's Responses to RFP Nos. 6 & 7 |
| 47 | 08.10.2020 Email from A. Nomani to M. Barakat |
| 48 | Transcript of Deposition of Glenn Miller (supplemental excerpts) |
| 49 | Coalition's Rule 26(a)(1) Disclosures |
| 50 | Telegram Chat Excerpt |
| 51 | Declaration of Jeremy Shughart (II), Dated December 21. 2021 |
| 52 | Declaration of Stella Pekarsky |