1

```
 1                 UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF VIRGINIA
 2                      ALEXANDRIA DIVISION

 3
     COALITION FOR TJ                   )
 4                                      )
                                        )
 5        VS.                           )    1:21-CV-296  CMH/JFA
                                        )
 6                                      )    ALEXANDRIA, VIRGINIA
                                        )    JANUARY 18, 2022
 7   FAIRFAX COUNTY SCHOOL BOARD,       )
     ET AL.                             )
 8   _____)

 9

10

11

12

13   _____

14        TRANSCRIPT OF MOTIONS FOR SUMMARY JUDGMENT
           BEFORE THE HONORABLE CLAUDE M. HILTON
15            UNITED STATES DISTRICT JUDGE
     _____

16

17

18

19

20

21

22

23

24   Proceedings reported by stenotype, transcript produced by

25   Julie A. Goodwin.
```

Julie A. Goodwin, CSR, RPR

1                        A P P E A R A N C E S

2

3    FOR THE PLAINTIFF:
         PACIFIC LEGAL FOUNDATION
4        By:  MS. ERIN E. WILCOX
         MR. CHRISTOPHER M. KIESER
5        930 G Street
         Sacramento, California 95814
6        916.419.7111
         ewilcox@pacificlegal.org
7        ckieser@pacificlegal.org

8
         PACIFIC LEGAL FOUNDATION
9        By:  MS. ALISON E. SOMIN
         3100 Clarendon Blvd.
10       Suite 610
         Arlington, Virginia 22201
11       202.557.0202
         asomin@pacificlegal.org

12

13

14   FOR THE DEFENDANTS:
         HUNTON ANDREWS KURTH LLP
15       By:  MS. SONA REWARI
         2200 Pennsylvania Avenue, NW
16       Washington, DC 20037
         202.955.1500
17       srewari@huntonak.com

18       HUNTON ANDREWS KURTH LLP
         By:  MR. DANIEL R. STEFANY
19       951 East Byrd Street
         Riverfront Plaza - East Tower
20       Richmond, Virginia  23219
         804.788.8200
21       dstefany@hunton.com

22

23   OFFICIAL U.S. COURT REPORTER:
         MS. JULIE A. GOODWIN, CSR, RPR
24       United States District Court
         401 Courthouse Square
25       Alexandria, Virginia  22314
         512.689.7587

3

1    (JANUARY 18, 2022, 10:00 A.M., OPEN COURT.)

2            THE COURTROOM DEPUTY:  Civil Action Number 21-CV-296,

3    *Coalition for TJ versus Fairfax County School Board*.

4            Will counsel please note your appearances for the

5    record.

6            MR. KIESER:  Christopher Kieser for plaintiff.

7            THE COURT:  All right.  Good morning.

8            MS. REWARI:  Good morning, Your Honor, Sona Rewari.

9    Here with me is Daniel Stefany.  We're here for the defendant.

10            THE COURT:  All right.  Good morning.

11            MR. KIESER:  And at counsel's table with me are Erin

12    Wilcox and Alison Somin.

13            THE COURT:  All right.  Good morning.

14            MS. REWARI:  Your Honor, this is here on the parties'

15    cross-motions for summary judgment.  The Coalition's arguments

16    in its briefs are heavy on rhetoric but light on the facts.

17    There is zero evidence in the record that any of the changes to

18    TJ admissions were intended to target Asian students.  There is

19    also zero evidence that the changes have burdened Asian

20    students differently than their non-Asian peers.

21            The plan applies to all students at all schools.

22    No one is treated differently because of their race.  The plan

23    uses four factors that have no demonstrated correlation to

24    race.  That's not a racial proxy.  It's called the race neutral

25    alternative, which is exactly what the Supreme Court has said

4

1  schools should be trying instead of using race.

2          There is zero evidence that anyone knew or

3  predicted what the first TJ class would look like.  No one

4  could.  That's why the predictions in the Coalition's complaint

5  were so far off base.

6          Scrapping an old process and trying something

7  different in the hope that all racial groups will have equal

8  access is not racial balancing.  The board adopted a plan that

9  expressly prohibits racial balancing, and that was effectuated

10  by a regulation that directs admissions evaluators will not be

11  given the race, ethnicity, or gender of applicants, making

12  racial balancing literally impossible.

13          The Coalition's zero sum theory that trying to

14  improve access for minorities is race discrimination against

15  the existing majority is just plain wrong, and the implications

16  of accepting such an erroneous view of the law are just

17  breathtaking.  It would invalidate countless laws and measures

18  taken to promote equality of access, and it would calcify

19  systems that produce inequitable results, and it would paralyze

20  schools and other institutions from trying to do better by

21  everyone.  And that's not a Chicken Little sky is falling

22  argument.  Even in the microcosm of TJ admissions, the

23  implications of the Coalition's argument are just staggering.

24          Before the fall of 2020, applicants to TJ had to

25  pay a $100 fee and take a battery of three standardized tests.

5

1  The results of that process were lopsided by almost every

2  measure.  Nearly 87 percent of FCPS students who got in came

3  from the same eight middle schools.  The other 18 middle

4  schools hardly got any students in.  A small sliver of

5  students, around one to two percent, qualified for free and

6  reduced meals.  And that's in comparison to the whole school

7  division where almost 30 percent of students were free and

8  reduced lunch eligible.

9          An equally tiny proportion of students were English

10  language learners in a county that has a large proportion of

11  English language learner students, and even fewer receive

12  special education services.  The proportion of females was also

13  low, around 41 percent.  And the numbers of Black and Hispanic

14  students were extremely low.

15          The numbers were so low that the Coalition itself

16  called them unacceptable.  And the Coalition itself said the

17  numbers, the Black and Hispanic students at TJ, should be

18  increased.  But the legal position the Coalition has taken in

19  this case is that those unacceptable numbers must be accepted

20  because under its zero sum theory of admissions doing anything

21  to try to increase access to TJ for Black and Hispanic students

22  necessarily equates to discrimination against Asian students,

23  who are the largest racial group at TJ.

24          You don't have to be a constitutional scholar to

25  know that that is wrong.  Common sense tells you that is wrong.

1          It's worth considering the implications of that
2    theory, though, because if the Coalition is right, then schools
3    are stuck with whatever systems they have in place, and schools
4    are required by law to track racial data, to track outcomes,
5    and performance of students.  So even if what they see that
6    what they're doing is disadvantaging some racial groups, they
7    can't do anything about it.  They can't any -- do anything to
8    mitigate that impact.

9          If the application fee for TJ was $1,000 and
10   Fairfax thought, well, maybe that fee is discouraging Black and
11   Hispanic students from applying or preventing them from
12   applying, under the Coalition's theory the School Board could
13   not change that fee, because the change would have been
14   motivated by a desire to increase the number of Black and
15   Hispanic students getting into the school.

16         And that example is not far from reality.  TJ had
17   an admissions process that uses standardized tests that you had
18   to ace in order to make it to the second round.  Some families
19   spent thousands of dollars on prep courses for the test.  The
20   Coalition admits, and the data confirms it, that the test had a
21   disproportionate impact on Black and Hispanic students and
22   economically disadvantaged students, yet the Coalition claimed
23   in its interrogatory answer that eliminating the standardized
24   test was discrimination towards Asian students.

25         Now, it's backed off that argument in its summary

1    judgment papers, but that example just illustrates the point.
2    The theory that trying to mitigate adverse impacts on
3    minorities is tantamount to discrimination against the majority
4    just has no limit.
5            Now, if you ask plaintiff, they'll say, oh, no,
6    well, there's lots of alternatives.  But if you give -- if they
7    give you any specifics, I would submit any specific example
8    will trip the same wire.  Any idea that is intended to increase
9    the numbers of Black and Hispanic students under their theory,
10   no matter the means chosen, runs into the same zero sum
11   problem.  It's a classic catch-22.  Kurt Vonnegut could not
12   have written this any better.
13           Sure, you can try to increase the number of Black
14   and Hispanic students, but if you want to increase the number
15   of Black and Hispanic students, you can't do it.  And that's
16   why the Coalition has no solution in this case.  There's no
17   proposed injunction.  There's no expert to tell you what an
18   admission system that complies with the zero sum theory would
19   look like.
20           Yes, it did have a proposal before the lawsuit was
21   filed, and that proposal looks an awful lot like what the
22   school board actually did here.  The Coalition expressly urged
23   the school board over and over again to adopt their proposal
24   and said, do this because it will increase the number of Black
25   and Hispanic students.  But under its legal theory that it's

8

1    saying in this case, that proposal also would have run into the

2    same zero sum problem.

3         So, it's not offering that idea.  It's not offering

4    any ideas of what an admission system should look like.  And if

5    they're right, there is no solution because there's no way to

6    conduct selective admissions for TJ under their theory.

7         Remember, when this lawsuit was filed, it was filed

8    with the request to return to the old admissions process.  But

9    last year the vendor discontinued two of the three standardized

10   tests, so they're not available.

11        Now, if the current policy is invalidated, then

12   what will this new system look like?  What should it look like?

13   The Coalition can't tell you.

14        And what are the guiding principles for such a

15   system?  It has no answers.  But if the Coalition is right and

16   the current system is invalidated, then you can't have

17   selective admissions at TJ because you can't pick any

18   admissions system with an intention to make the level playing

19   field for all races and you can't pick a system that you know

20   will have a specific racial effect.  That means that you can't

21   use standardized tests because, as the Coalition has admitted,

22   standardized tests have a disproportionate impact on Black and

23   Hispanic students and advan -- therefore, advantage White and

24   Asian students.

25        You can't do a lottery because, as you know from

9

1  the law of probabilities, that the results will approximate the

2  applicant pool, and the Coalition doesn't agree with that.  You

3  can't use a race blind system that considers factors other than

4  race, which is exactly what TJ is doing currently.

5          So what does that leave?  It leaves nothing.

6          And the last point I will say on the practical

7  implication is that if Arlington or Alexandria were to open

8  their own TJ tomorrow, they could implement exactly what

9  Fairfax is doing and use that same admissions plan under the

10  Coalition's theory.  Why?  Because there's no last year to

11  compare it to.  You would not look at year one results of this

12  hypothetical new school with the baseline assumption that

13  Asians should get a proportion of seats that far exceeds their

14  share of the applicant pool.  That's the assumption the

15  Coalition rests its entire case on, and it's unacceptably

16  wrong.

17          Plaintiff's claim fails as a matter of law because

18  the undisputed facts show that this group does not have

19  standing, and plaintiff cannot carry its burden to prove its

20  equal protection claim.  There are no material facts in

21  dispute.  Both sides have supplied the Court with voluminous

22  evidence.  Most of it is in the form of public meeting minutes,

23  transcripts, and presentations.

24          The testimony that is in the record from the

25  superintendent, the admissions director, the chair of the

Julie A. Goodwin, CSR, RPR

1   school board, it's uncontested.  There is no witness who's

2   going to come in and tell you something differently than what

3   is already in the record, and the Coalition has not even tried

4   to controvert that testimony.  So there's nothing further the

5   Court needs to hear to decide this case, and summary judgment

6   is appropriate.

7                I just want to expand on the standing issue, Your

8   Honor.  Plaintiff's argument on standing boils down to this.

9   We don't have to show that we are a true membership

10  organization because we have members, but that's assuming the

11  conclusion.  If you're claiming associational standing, you are

12  claiming that you are the representative of your constituents

13  who have standing in their own right.  And a traditional

14  membership organization meets associational standing because it

15  is the representative of its members.

16               In a traditional membership organization, the

17  members are the ones who run the organization.  They make the

18  decisions.  They select leaders who make the decisions.  They

19  serve in the leadership roles.  They finance the organization,

20  all of which go to show that the members in the organization

21  are one in the same.

22               Just using the label of members is not enough.  In

23  *Heap versus Carter*, the plaintiff organization also alleged it

24  maintained an active membership.  In *Sorenson Communications*

25  *versus FCC*, which are both cited in our papers, the association

1 plaintiff also claimed to have members.  But the Court looked

2 behind that assertion because the organization didn't look

3 anything like a traditional membership organization, and

4 neither does the Coalition.  It looks nothing like it.

5         Unlike the plaintiffs in some other cases, you can

6 look at the *Harvard* case or the *Boston* case, which are also

7 admissions cases, the Coalition has no formal existence.  It's

8 not registered with any government agency.  It has no articles

9 of incorporation.  It has no bylaws.  It has no officers.

10 Sure, there are some individuals who are calling the shots for

11 the Coalition, but none of those individuals have standing in

12 their own right.

13         Exhibit 45 lists the members of the core and

14 leadership teams.  None of those individuals have children who

15 are TJ eligible, other than Mr. Jackson.  And his declaration,

16 as we pointed out, sinks their case both on standing and on

17 merits because his daughter identifies as Black.  And even so,

18 Mr. Jackson says that the new admissions policy will

19 discriminate against his Black child, which is contrary to the

20 theory that the Coalition is arguing in this case.  And it just

21 reveals really what the argument here, the grievance here, is

22 about giving all middle schools a fair chance of getting their

23 best students into TJ.  It's not about race.

24         Now, the Coalition claims it has general members

25 too who are parents of Asian students, but those are just

12

1    supporters.  They have none of the hallmarks of membership.

2    You can contrast the Coalition to the organization in *Hunt*

3    where the commission was totally a creature of the parties it

4    purported to represent.  They alone elected the Commissioners,

5    they alone served as Commissioners, and they funded the

6    Commission.

7              These supporters of the Coalition calls their

8    general members, don't do any of that.  They didn't elect the

9    leaders.  They don't get to serve on the leadership.  They

10   don't get to vote.  They don't fund the organization.  There's

11   no indicia of control whatsoever for this general membership.

12   And so the Coalition lacks standing to represent these parents,

13   and the two declarations that they've offered from Ying

14   McCaskill and Dipika Gupta can't establish standing.

15             And I would also point out that Ms. McCaskill is --

16   you know, she's not a member of the core or the leadership

17   team, and for that reason alone she's irrelevant.  But Ms.

18   McCaskill doesn't even have a child in 8th grade.  She has a

19   7th grader, and there's no allegation that the 7th grader even

20   meets the -- the criteria to apply to TJ.

21             Ms. McCaskill had an 8th grader when this lawsuit

22   was filed and that 8th grader was admitted to TJ.  And so the

23   only child that -- that they're alleging Ms. McCaskill has that

24   would have -- might attend TJ one day, there's no allegation

25   that child is eligible.

Julie A. Goodwin, CSR, RPR

1            And we have laid out the -- our arguments on the

2    equal protection claim.  I don't want to repeat them for the

3    Court.  I'm happy to address any questions, but our -- I think

4    the bottom line is they have to prove both a disparate impact

5    and a discriminatory purpose, and there isn't evidence of a

6    discriminatory impact and there isn't evidence of a

7    discriminatory purpose.

8            If the Court has any questions, I'm happy to

9    address them, but I don't -- I don't want to make you listen to

10   everything that's -- we've already argued in our brief.

11            THE COURT:  All right.  Thank you.

12            MR. KIESER:  Good morning, Your Honor.

13            THE COURT:  You can take off your mask.

14            MR. KIESER:  Oh, I am so sorry.

15            Good morning, Your Honor.  Chris Kieser for the

16   Coalition for TJ.

17            I want to address point by point what my friend on

18   the other side was arguing, so I'm going to start with their

19   position that there's no evidence in the record of

20   discriminatory intent.  And I think that -- that betrays a

21   misunderstanding of the legal -- the legal standard here.

22            There's no requirement that there be animus shown

23   in the record against Asian-Americans.  The requirement is that

24   the admissions -- the board changed the admissions process

25   because it would have a particular racial result, and as the

14

1    District of Maryland recently recognized in the *Association for*

2    *Education Fairness* case, when you -- when you change the

3    admissions process using proxies that are intended to effect

4    the racial composition of the school, so -- and into the

5    detriment or to the -- for the advancement of particular races

6    any the detriment of others, that is discriminatory intent.

7              Further, there are several -- the entire record

8    demonstrates that racial balancing was at the forefront of what

9    was going on here.  The impetus to change the process started

10   when the -- TJ's principal used the occasion of the release of

11   admissions data to send a message to the TJ community

12   reflecting that the racial composition of -- lamenting that the

13   racial composition of FCPS did not -- or TJ did not reflect

14   FCPS.  Then two board members followed up and called the

15   admissions data unacceptable on racial grounds.  They promised

16   intentful action.  Then from the beginning, staff presentations

17   to the board were always couched as ways to improve the racial

18   balance of TJ, always to the detriment of Asian-Americans.

19             My friends on the other side say that the -- that

20   the board didn't have any data to predict the result of the

21   actual admissions process that was -- that was implemented.

22   But over the course of several proposals, data was produced to

23   the board, voluminous data and modeling, all showing that every

24   proposal that staff produced to the board would have a

25   disparate impact on Asian-American students.

Julie A. Goodwin, CSR, RPR

15

1          The Merit Lottery, for instance, was regionally

2    weighted so that Asian-American students would not -- would not

3    gain as many seats as they would under even a pure lottery

4    system.  And in a May white paper, the staff presented a three

5    pathway system to the board, and the third pathway was

6    explicitly -- students selected to the third pathway for

7    being students at underrepresented middle schools were

8    specifically selected or were the proposed -- proposal was to

9    specifically select them using a -- the analysis for the second

10   pathway, rather than the first, specifically because they were

11   concerned with racial diversity and not just geographic

12   diversity, as the board now claims.

13          The board then voted overwhelmingly in October to

14   direct FCPS staff to include a diversity report that they had

15   to submit to the governor to state that their goal was to have

16   TJ represent the demographics of Northern Virginia.  Board

17   member e-mail showed a consensus that the primary reason TJ

18   admissions had to be changed was because of the racial balance,

19   and some board members emphasized that it had to be done

20   immediately and that they had to prefer equity over equality,

21   meaning treating each individual the same.

22          Board text messages also understand that some

23   board -- or show understanding among some board members that

24   the process had been anti-Asian, and that Superintendent

25   Brabrand had blamed Asian-Americans from the beginning, that

16

1    the Asian-American community in Fairfax County hates the school

2    board, and that the process discriminates against

3    Asian-American students.

4              Staff e-mail show that when the scoring system was

5    developed it was designed so that Asian-American applicants

6    would disproportionately not obtain the bonus points for the

7    experience factors that -- that would increase their -- the

8    total points for their application.  Documents demonstrate the

9    board received substantial racial data, and that includes race

10   data by middle school which would have enabled the board to

11   understand the racial impact of the 1.5 percent plan.  Even the

12   board transcripts that the board says in their brief contain no

13   statements demonstrating race -- that this is a race-based

14   action, show that the -- several of the board members, they

15   didn't consider Asian-Americans to be students of color.  And

16   they found that at TJ, even though a school is 80 percent

17   non-White, they found that TJ was unwelcoming for students of

18   color.

19             And all -- a clear majority of the board members in

20   those transcripts also, as we cite in our response brief,

21   demonstr -- show that the reason they're doing -- that the

22   reason they were doing this was not simply to obtain geographic

23   diversity, but to change the racial makeup of the school and

24   that would have a detrimental effect on the Asian-American

25   students.

1      I think next my friend on the other side said that

2  the -- that these are not racial proxies because they do not

3  hurt Asian-Americans specifically.  I think I would point the

4  Court there to -- to paragraph 10 of Mr. Shughart's

5  declaration, which is Exhibit 51 to their summary judgment

6  brief.  He -- the -- includes these four charts on the

7  percentage of applicants who -- for the class of 2025 who would

8  get the bonus points for each of the four experience factors.

9  And it's clear here that the percentage of Asian-Americans

10  who -- who get each one of these bonus factors is substantially

11  lower than the percentage of Asian-Americans in the applicant

12  pool for the class of 2025.  And that shows that the -- that

13  the experience factors have a disparate impact on

14  Asian-American students.

15      And then of course the 1.5 percent plan was --

16  targeted schools that had substantial Asian-American admissions

17  to TJ in the past several years.  And you only have to look at

18  a couple of these middle schools such as Carson, Longfellow,

19  Rocky Run.  These schools had students who are 60 to 70 or even

20  80 percent of the students who apply were Asian-American, and

21  they're the ones who now because their school had so many

22  applicants to TJ who were eligible were now thrown into this

23  unallocated pool where they're also forced to compete in the

24  unallocated pool against students who receive these bonus

25  points.  So there's no wonder why the percentage of

1    Asian-Americans dropped from 73 percent in -- for the class of

2    2024 to 54 percent for the class of 2025.  These -- these

3    criteria were specifically designed to make that happen.

4              The next thing I want to -- want to go -- want to

5    respond to is their point that the -- there's nothing that a

6    school board could do to increase equality of access for Black

7    and Hispanic students if we win.  That's simply not true.

8    Their main point about the application fee, like if it were

9    $1,000 and they reduced it to zero, that would be race

10   discrimination, if they did it because they wanted to increase

11   the number of Black and Hispanic students who would apply.

12   That's just wrong.  The -- if the application fee were zero for

13   everyone that would treat each student equally in the

14   application process.  And that's not racial discrimination,

15   even if you suggest that you're doing it because you want to

16   increase the number of Black and Hispanic students who would

17   apply.

18             The problem with this process is that it doesn't

19   treat each student equally.  It treats students differently

20   based on factors that are intended to correlate with race, such

21   as the middle school they attend, whether they are -- whether

22   they qualify for any of the other experience factor bonuses.

23   That's the problem here.

24             And the reason it -- it's the means and the --

25   the -- and the motive combined, so the motive was to create

1    racial balance at the -- to the detriment, of course, of

2    Asian-American students who were the only racial group

3    performing above the -- their share of the applicant pool

4    before this process was changed.

5         And the means chosen were racial proxies designed

6    to make it more difficult for similarly situated Asian students

7    to get into TJ.  That is the discriminatory intent that we have

8    argued.  There -- as *McCrory*, the Fourth Circuit's *McCrory*

9    decision clearly states, there's no requirement that racial

10   animus be at play.  In that case, there was no comment by any

11   legislator suggesting that the election law challenged in that

12   case was passed to discriminate against Black voters, yet the

13   Fourth Circuit applied *Arlington Heights* and found that the

14   legislator -- the legislature passed the law to entrench itself

15   and targeted Black voters because they did not vote for the

16   majority party.

17        The same can be said for this case, that the

18   pursuit was a racial balance, and because Asian-Americans were

19   the majority, the system that was passed targeted them to

20   reduce their proportion of the -- of the admitted pool in order

21   to obtain the racial balance the board wanted.

22        The -- I think -- I think that they also argue

23   there that there's -- that there's no -- that if a new school

24   were to start today that were analogous to TJ that there would

25   be no equal protection claim.  And I don't think that's true

1    either.  It's not necessarily just the comparison between 2025

2    and 2024 that drives the disparate impact here, but it's also

3    the use of these -- these proxy factors with the intent to

4    create racial balance to the detriment of Asian-American

5    students.

6              If you have that, even in year one, I think -- I

7    think that the comparison certainly amplifies the disparate

8    impact in this case, but if you had what we have here even in

9    year one, I think there would still be a claim.  I just think

10   that the board's position that -- our position -- the board's

11   position that -- that anything that you might do to attempt to

12   increase access is simply wrong, and I think that's -- that's

13   just an overreaction.

14             For instance, even the board -- board members

15   recognized that there was something to be done regarding the

16   pipeline to TJ and increasing the -- the quality of the K

17   through 8 schools so that eventually each middle school would

18   be able to -- equally comp -- students from each middle school

19   would be able to equally compete and send a lot of students to

20   TJ.  The board even moved a proposal, as the -- as the board

21   cites in their brief on October 22nd, to -- to address those

22   pipeline issues.  So -- and some board members in text messages

23   they -- they understood that.

24             You know, they asked:  Why aren't we asking why

25   people don't apply?  Why are we trying to fix the access

21

1  problem instead of overhauling the admissions process?

2        So, there's -- there's two separate issues there.

3  You can address access without discriminating on the basis of

4  race.  And the racial proxy here, you know, is -- is equivalent

5  to -- and that's why *Arlington Heights* exists because not all

6  racial discrimination will be overt, and some -- so there -- if

7  a factor is adopted in order to produce a particular racial

8  result, that is discriminatory intent under the law.  And I

9  think the District of Maryland opinion in *Association for*

10  *Education Fairness* lays that out very well.

11        I think her friend on the other side next said

12  that -- that the Coalition didn't have a plan to replace the

13  old admissions -- the old admissions process, or hasn't

14  presented the Court with a plan.  That's not the Coalition's

15  job to -- to create a plan for TJ admissions that would be

16  constitutional.  If the -- the Court can enjoin the current

17  process and then the board can go back and create a new

18  process.  It's not our -- we don't -- we don't claim to, you

19  know, have that authority or I don't think we need to present a

20  new process.

21        And with respect to the second look proposal that

22  the other side referenced in -- in respect to the Coalition's

23  hope that it would increase diversity, I mean, the Coalition

24  actually does want more Black and Hispanic students at TJ.

25  It's the means that were chosen and the -- and the way it

22

 1  was -- the way it was done that discriminates against

 2  Asian-American students.  It's not the overall hope that more

 3  Black and Hispanic students would attend TJ, which I think we

 4  all share.

 5          So, the second look proposal, as Mr. Miller

 6  testified in the 30(b)(6) deposition, was intended as a

 7  compromise or an attempted sort of bridge the gap between the

 8  Coalition's position and the proposed Merit Lottery that was

 9  proposed by Superintendent Brabrand in September.  There is

10  no -- there's nothing in the record to suggest that the second

11  look proposal would -- and in fact, Mr. Miller testified that

12  the second look proposal was not the Coalition's preferred

13  outcome.  It was the Coalition's attempt to engage the board

14  and move the discussion toward the center.  So there's

15  no -- this -- our legal position is not inconsistent with the

16  Coalition's actions while the -- while the admissions changes

17  were in progress.

18          I think -- we'll move on to -- we can move on to

19  standing just for -- just for a little bit, unless the Court

20  has -- well, unless the Court has other questions for us.  But

21  as far as the membership organization question goes, I think

22  the board has it backwards.  The cases they cite, including

23  *Heap*, are cases where -- and even in *Heap* itself there was

24  no -- no -- there were no alleged members, even in the

25  complaint in that case, even though there was a general

23

1  allegation of being a membership organization.

2         Here, we have a complaint where members are

3  included, and then Ms. McCaskill who actually, I believe, is a

4  member of --

5         Isn't that a member of the core team?

6         MS. WILCOX:  (Nods head.)

7         MR. KIESER:  (Continuing) Her -- her -- she also goes

8  by the name Julia, but that's -- and which is -- which was --

9  is evident in some of the papers we produced, but she's on

10  the -- on the -- on the core team.  But I don't -- we don't

11  believe that that matters.

12        The Coalition has -- in the record it has members,

13  and most importantly, I think, Your Honor decided in May with

14  much the same evidence before -- before you that the Coalition

15  was a membership organization entitled to bring this lawsuit.

16  Before you then you had the declarations of Ms. McCaskill and

17  of Ms. Nomani on behalf of the Coalition where -- and

18  Ms. Nomani did -- said in that declaration that the Coalition

19  did not have incorporation documents and that there was --

20  there were no dues and other formalities.  And Your Honor still

21  found that I believe under the preliminary injunction it --

22  with it not -- not under the plausibility standard or the

23  motion to dismiss, but found that we had standing.

24        The facts are no different now.  There's nothing in

25  the record that changes the fact that the Coalition is a

24

1    membership organization, and we don't have to prove that we're

2    the functional equivalent of a membership organization because

3    we are a membership organization.

4            And there -- there -- the questions that the --

5    that the board raises about the -- the membership simply I

6    think amount to misrepresentations of Ms. Nomani's deposition

7    testimony.  She -- I mean, for instance, she test -- testified

8    that the Coalition has a membership team that vets members,

9    does not allow -- doesn't allow everyone who clicks the Get

10   Involved button to become a member, but it actually does -- has

11   projected people before.  People have left the Coalition

12   because the Coalition doesn't represent them.  Members have

13   produced declarations saying that they're members.  There's

14   no -- never been any confusion over who was -- who are the

15   members of the Coalition.  And -- and that's why I think the

16   Court held back in May that the -- that the Coalition is a

17   membership organization entitled to bring this lawsuit.

18           Unless you have any further questions, we will -- I

19   don't want to keep repeating what's in our brief, so.

20           THE COURT:  All right.  Let me ask you this.  I mean,

21   do you agree that there are no material facts in dispute?  Is

22   this case ready for me to decide?

23           MR. KIESER:  Yes, Your Honor.  I think the record

24   we've produced with -- with all the documents attached to both

25   the summary judgment briefs, that -- to us, that demonstrates

25

1    that we -- that we are entitled to summary judgment.  And I

2    don't believe that testimony -- for instance, testimony from

3    the board members would add anything because even under

4    *Arlington Heights* and *McCrory*, post-enactment statements by

5    legislators are not considered relevant to discriminatory

6    intent.  So, what we have here is --

7                  THE COURT:  All right.

8                  MR. KIESER:  -- is the record that the case should be

9    decided on in our view.

10                 THE COURT:  All right.  Thank you.

11                 MS. REWARI:  I was very glad to hear Mr. Kieser agree

12   that if the application fee were reduced to zero that that

13   would not -- in the example that I gave, that would not be

14   discrimination because reducing the application fee or using

15   experience factors or using middle school, there's no

16   difference.  Because in order to have to call any of these

17   things a racial proxy, you have to show a very high correlation

18   between the factor and race.  To call it a proxy is to say that

19   using that factor tells you something about the person's race.

20   And middle school attendance does not tell you anything about

21   FCPS student's race in this case.  We've shown that.

22                 And using free and reduced lunch eligibility does

23   not tell you that that student is Black or Hispanic or Asian.

24   The data shows that the majority of students -- excuse me --

25   the largest racial group of students that had that factor were

1  Asian, and for every factor there were -- Asian students were

2  either the largest or the second largest.  So this idea that

3  these experience factors are any different than going from

4  $1,000 fee to a zero fee or a $100 fee to a zero fee, it's

5  any -- there -- there's no difference.

6          The plaintiff has to show an invidious

7  discriminatory intent, and it has to show that that invidious

8  discriminatory intent was a substantial motivating factor.  And

9  we agree that they -- they don't have to go so far as to show

10  hatred of Asian-Americans, but they do have to show a desire to

11  harm Asian-Americans.  That evidence is necessary because

12  motive to increase access for minorities and to level the

13  playing field is not suspect.

14          The Supreme Court in *Feeney* has recognized that

15  there's an important distinction between action taken because

16  of an adverse impact on a group and action taken in spite of

17  such an adverse effect.

18          The Coalition needs to proffer evidence that the

19  board changed the admissions process because it wanted to harm

20  Asian students.  It doesn't have it.  No such evidence exists.

21          They talked about the text messages.  The text

22  messages are between two board members who are being sensitive,

23  were sympathizing, were talking -- making pro-Asian comments

24  about hardworking immigrants, families who put education first,

25  and saying they're being discriminated against in this process

Julie A. Goodwin, CSR, RPR

27

1   too in the sense that the old process hurts poor Asian families

2   as well.

3          The point we're making, it's not about race.

4   There's no evidence to the contrary that there was any desire

5   to harm Asian-Americans on -- or any board member.

6          Now, the Coalition was just trying to move the goal

7   post.  They came into this lawsuit saying this was about

8   harming Asians.  Now they say, oh, no, actually that's not the

9   standard.  All we have to do is to show the board wanted to

10   change the racial makeup of the school, nevermind that it

11   doesn't have evidence that that was motivating a majority of

12   the board.

13          But even assuming the Coalition had such evidence,

14   it would not be enough.  Trying to give all racial groups equal

15   access is not an invidious discriminatory purpose.  Wanting a

16   racial effect is not the standard.  This is just another way to

17   say the zero sum theory that we've talked about, their zero sum

18   argument collapses any distinction that the Supreme Court drew

19   in *Feeney* and turns every in spite of case into a because of

20   case.

21          That's not the law.  It has no limiting principle.

22   Every action, every policy, every law that tries to equalize

23   access and opportunity to create a level playing field for all

24   races would violate the equal protection clause under their

25   theory, because it can always be said that leveling the playing

1  field to remove disadvantages that keep some groups out

2  technically will have an adverse effect on the groups that are

3  not hobbled by the same disadvantages.

4         Now, if this argument was being made by White

5  applicants, I think the wrongness of it would just be even

6  starker.  *Hayden versus Nassau County*, which we cited in our

7  papers, in that case this argument was made by White applicants

8  who claimed that changing the police department entrance exam

9  to minimize the adverse impact on Black applicants necessarily

10 discriminated against White and Latino applicants.

11        The Second Circuit said that the theory was wholly

12 insufficient to even state a claim under *Feeney*.  Trying to

13 create a process that mitigates adverse impact and improves

14 Black applicants chances of selection is just not akin to

15 intentional discrimination against Whites.  The touchstone of

16 equal protection clause is unequal treatment of racism.

17        They keep saying, well, students are not treated

18 the same.  They're not treated differently because of race.

19 Yes, students are given additional points if they -- if they

20 are -- come from a family that has to get assistance with

21 meals.  And you know what?  That's an educational judgment the

22 school board is making that a 4.0 from a student who has to

23 worry about meals is different than a 4.0 from a student who

24 doesn't.  That's an educational judgment, and they're free to

25 make that judgment.

1          Government actors are free to use race neutral

2    means to improve racial and gender representation.  There's no

3    evidence that that factor tells you the race of a student.  The

4    Supreme Court said this in *Parents Involved* that government

5    actors can use race neutral means to change the racial

6    composition of schools.  And Justice Kennedy's concurrence

7    explains that public schools may adopt policies to effect the

8    racial composition of a school as long as the policies do not

9    treat students differently on the basis of race.

10          This policy doesn't.  It's fully in line with all

11   the examples that Justice Kennedy gave, and it's no different

12   than the examples that Justice Roberts listed.  I mean, he

13   noted considering poverty as -- or using the lottery as

14   examples of race neutral alternatives the schools can consider.

15          I mean, the one percent plan in *Fisher* was not even

16   challenged as racially discriminatory.  They were challenging

17   the use of racial classification.  The other part of *Fisher* is

18   what's at issue.  The one percent plan is not even an issue in

19   *Fisher*.

20          And the Coalition can't explain to you why the one

21   and a half percent plan is any different from any of these

22   examples in *Parents Involved*.  All they -- they are left to

23   argue is, well, you're treating students differently.  But

24   they're not being treated differently on the basis of race, and

25   there isn't evidence that what you're using to treat students

30

differently has a strong correlation to race.  And that is what they would have to show.  The challenge, the use of only one experience factor, and that was underrepresented schools.  And we showed in the papers that that factor advantaged Asian students.

I mean, there are only two schools where that factor helped -- could have potentially helped students get unallocated seats.  And the students that came from those two schools were 55 -- more than 50 percent Asian.  13 out of 25 students were Asian from those schools.

So, they don't have the data to show you that, and there's no -- you can't even draw a distinction between our case and the *Anderson* from the First Circuit that we have cited.  And every circuit that has had this question, the First Circuit, the Third Circuit, the Fifth Circuit, and the Sixth Circuit have all said that you can do race neutral methods to change the racial composition of schools.

Judge Trenga just recently held this in *Boyapati* that was decided just last year.  No Court of Appeals has declined to follow the principles of *Parents Involved*.

Zero sum logic is just not limited to school admissions.  They try to act like, well, there's something unique about it.  But societal resources are finite by their very nature, and under their theory none of these societal problems can ever be solved because you can never do it.  And

1   the attempt to compare this case to *McCrory* is just -- it's

2   almost laughable.

3              I mean, *McCrory* involved a law that limited the

4   ways of voters in North Carolina could cast their ballots.  The

5   facts, they have -- rang every bell under *Arlington Heights*.

6   None of those bells are even tinkling here.

7              There was a long history of discrimination against

8   Blacks in that case.  No such history of discrimination against

9   Asians in Fairfax County.

10             The law only applied to the voting mechanisms that

11  were disproportionately used by Black voters.  The legislatures

12  had that data in hand when they picked -- cherry picked just

13  those mechanisms to target.  There's no evidence like that.  In

14  fact, they admit in their brief that it's true that FCPS never

15  ran any specific simulation of the racial effect of the adopted

16  changes.

17             In *McCrory*, the bill was unveiled to the public and

18  voted into law along strict party lines in just three days

19  without any amendments.  Here, it took three months, and the

20  superintendent's lottery proposal where we started was nothing

21  like where the board ended up.  The board rejected the lottery

22  and asked for -- asked for non-lottery, and then it didn't even

23  go with the superintendent's non-lottery idea.

24             So, the purpose of this plan is obvious.  It's to

25  give the top students from every part of Fairfax County and the

1  participating divisions a meaningful opportunity to attend TJ

2  and to recognize the challenges such as poverty, English --

3  learning English as a foreign language, disabilities, and where

4  you go to school should be recognized as challenges the student

5  has overcome to get there.  And there's no case in which a

6  court has applied strict scrutiny to a policy that was adopted

7  to secure equal treatment of all applicants, regardless of

8  race.  So we would ask the Court grant summary judgment in

9  favor of the school board.

10          THE COURT:  All right.  Very well.  I've obviously got

11  to look at this further.

12          Both of -- you both agree that there's no dispute

13  in these facts, so this case will be taken off the trial docket

14  for next week.  And I'll get an answer to you-all as quickly as

15  I can.

16          MS. REWARI:  Thank you, Your Honor.

17          THE COURT:  We'll adjourn until tomorrow morning at

18  10:00 o'clock.

19          THE LAW CLERK:  All rise.

20          (PROCEEDINGS CONCLUDED AT 10:44 A.M.)

21                          -oOo-

22

23

24

25

Julie A. Goodwin, CSR, RPR

33

1  UNITED STATES DISTRICT COURT    )

2  EASTERN DISTRICT OF VIRGINIA    )

3

4          I, JULIE A. GOODWIN, Official Court Reporter for

5  the United States District Court, Eastern District of Virginia,

6  do hereby certify that the foregoing is a correct transcript

7  from the record of proceedings in the above matter, to the best

8  of my ability.

9          I further certify that I am neither counsel for,

10  related to, nor employed by any of the parties to the action in

11  which this proceeding was taken, and further that I am not

12  financially nor otherwise interested in the outcome of the

13  action.

14          Certified to by me this 28TH day of JANUARY, 2022.

15

16

17

18                    __/s/_____
                      JULIE A. GOODWIN, RPR
19                    Official U.S. Court Reporter
                      401 Courthouse Square
20                    Eighth Floor
                      Alexandria, Virginia  22314
21

22

23

24

25

Julie A. Goodwin, CSR, RPR

34

1                                    <u>**INDEX**</u>

2

3    **January 18, 2022**

4                                                               <u>**PAGE**</u>

5
Argument by Ms. Rewari.................................    3
6
Argument by Mr. Kieser................................   13
7
Further Argument by Ms. Rewari........................   25
8
Reporter's Certification..............................   33
9                                -*-*-*-

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                        ̲J̲u̲l̲i̲e̲ ̲A̲.̲ ̲G̲o̲o̲d̲w̲i̲n̲,̲ ̲C̲S̲R̲,̲ ̲R̲P̲R̲