IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

```
_____
COALITION FOR TJ,              )
                              )
               Plaintiff,      )
                              )
V.                            )    Civil Action No. 1:21cv296
                              )
FAIRFAX COUNTY SCHOOL BOARD,   )
                              )
               Defendant.      )
_____)
```

## MEMORANDUM OPINION

This matter comes before the Court on Plaintiff The Coalition for TJ's (hereinafter "Coalition") and Defendant Fairfax County School Board's (hereinafter "Board") Cross-Motions for Summary Judgment.

Thomas Jefferson High School for Science & Technology (hereinafter "TJ") is a high school in Fairfax County, Virginia, designated as an academic-year Governor's School. In 2020-21, the racial makeup of TJ's student body was 71.97% Asian American, 18.34% white, 3.05% Hispanic, and 1.77% Black.

TJ is part of Fairfax County Public Schools (hereinafter "FCPS"). FCPS is operated by the Board, a public body comprised of twelve elected members. According to FCPS, the county-wide racial makeup of FCPS students is: 36.8% white, 27.1% Hispanic,

19.8% Asian American, and 10% Black.

In 2020, Board members were: Ricardy Anderson, Karen Keys-Gamarra, Karen Corbett Sanders, Megan McLaughlin, Melanie K. Meren, Karl Frisch, Elaine Tholen, Stella Petarsky, Tamara Derenak Kaufax, Abrar Omeish, Rachna Sizemore Heizer, and Laura Jane Cohen. FCPS' superintendent was Scott Brabrand, TJ's admissions director was Jeremy Shughart, and TJ's principal was Ann Bonitatibus.

The Coalition for TJ has more than 200 members, including seventeen members of its core team and ten members of its leadership team. The Coalition was founded in August 2020 to oppose changes to admissions at TJ. The Coalition was concerned that admissions changes at TJ would discriminate against Asian-American students, and the leadership and core teams decided to pursue this case by unanimous consensus.

Coalition members include Asian-American parents with children who have applied to TJ or plan to do so in the near future. Among these are Dipika Gupta (whose son, A.G., is in eighth grade at Carson Middle School and has applied to TJ) and Ying McCaskill (whose daughter, S.M., is in seventh grade at Carson and plans to apply to TJ). Another member is Harry Jackson, whose daughter, V.J., an eighth grader at Carson, identifies as Black but is half Asian American.

Students must apply to TJ in order to be admitted. Students

residing in five participating school divisions are eligible to apply to TJ: Fairfax County, Loudoun County, Prince William County, Arlington County, and Falls Church City. In the fall of 2020, the Board altered the TJ admissions process.

Before the Board's fall 2020 changes, applicants to TJ were required to (a) reside in one of the five participating school divisions; (b) be enrolled in 8th grade; (c) have a minimum core 3.0 grade point average (GPA); (d) have completed or be enrolled in Algebra I; and (e) pay a $100 application fee, which could be waived based on financial need.

Applicants who satisfied those criteria were administered three standardized tests: the Quant-Q, the ACT Inspire Reading, and the ACT Inspire Science. Those applicants who achieved certain minimum scores on the tests advanced to a "semifinalist" round. Students were selected for admission from the semifinalist pool based on a holistic review that considered GPA, test scores, teacher recommendations, and responses to three writing prompts and a problem-solving essay.

The Board's fall 2020 changes to admission at TJ removed the standardized tests requirement and altered the minimum requirements to apply. To be eligible for TJ under the new policy, students must: (a) maintain a 3.5 GPA; (b) be enrolled in a full-year honors Algebra I course or higher; (c) be enrolled in an honors science course; and (d) be enrolled in at least one

3

other honors course or the Young Scholars program.

The Board also changed the evaluation process, moving from a multi-stage process to a one-round holistic evaluation that considers GPA, a Student Portrait Sheet, a Problem Solving Essay, and certain "Experience Factors," which include an applicant's (a) attendance at a middle school deemed historically underrepresented at TJ; (b) eligibility for free and reduced price meals;(c) status as an English language learner; and (d) status as a special education student.

In addition to the changes to the eligibility and the evaluation criteria, the new process guarantees seats for students at each public middle school in participating school division equivalent to 1.5% of the school's eighth grade class size, with seats offered in the first instance to the highest-evaluated applicants from each school. After the guaranteed seats are filled, about 100 unallocated seats remain for students who do not obtain an allocated seat. The highest-evaluated remaining students are offered admission.

For the Class of 2025—the first year under the new system—the admitted class size increased by 64 students. Nevertheless, TJ admitted 56 fewer Asian-American students than it had the prior year. For the previous five years, Asian-American students never made up less than 65% of the admitted class. For the Class of 2024, Asian-American

4

students earned approximately 73% of the seats. Following the admissions changes, the proportion of Asian-American students admitted for the Class of 2025 fell to about 54%. For the Class of 2025, 48.59% of eligible applicants to TJ were Asian American.

In May 2020, the Virginia General Assembly enacted a requirement that Governor's Schools develop diversity goals and submit a report to the Governor by October 1, 2020. 2020 Va. Acts ch. 1289, item 145.C.27(i). The report must include the status of the school's diversity goals, including a description of admission processes in place or under consideration that promote access for historically underserved students; and outreach and communication efforts deployed to recruit historically underserved students.

On May 25, 2020, George Floyd was murdered by a police officer in Minneapolis. Nationwide protests followed, including in Fairfax County and the greater metropolitan Washington D.C. area.

On June 1, 2020, the Class of 2024 TJ admissions statistics were made public, showing that the number of Black students admitted was too small to report. On June 7, Bonitatibus wrote a message to the TJ community that "recent events in our nation with black citizens facing death and continued injustices remind us that we each have a responsibility to our community to speak

up and take actions that counter racism and discrimination in our society." She went on to comment that the TJ community "did not reflect the racial composition in FCPS" and that if TJ did reflect FCPS's racial demographics, it "would enroll 180 black and 460 Hispanic students, filling nearly 22 classrooms."

In June emails, Corbett Sanders promised intentional action. In an email to Brabrand, Corbett Sanders wrote that "the Board and FCPS need to be explicit in how we are going to address the under-representation of Black and Hispanic students." At a June 18 Board meeting, Keys-Gamarra said that "in looking at what has happened to George Floyd, we now know that our shortcomings are far too great . . . so we must recognize the unacceptable numbers of such things as the unacceptable numbers of African Americans that have been accepted to T.J."

In the summer of 2020, Keys-Gamarra, Brabrand, Bonitatibus, and Shughart all attended at least one meeting of a state-level task force on diversity, equity, and inclusion at Governor's Schools. The task force discussed solutions for admissions to Virginia's Governor's Schools. Among the solutions discussed was a potential state plan to require each school's diversity metrics to be within 5% of the system it represents within four years.

Brabrand testified that he perceived that there was "State-level dynamics, one, reflected by the October 1 report, and,

two, by the Secretary of Education's task force that simple status quo, a report with just, we're just doing the same thing we've always done was not going to be received well." Corbett Sanders and Omeish stressed the reporting deadline in emails.

FCPS staff then developed a proposal for a "Merit Lottery" for TJ admissions, which they presented to the Board on September 15. The proposal stated that "TJ should reflect the diversity of FCPS, the community and Northern Virginia." The proposal discussed the use of "regional pathways" that would cap the number of offers each region in FCPS (and the other participating jurisdictions) could receive. It included the results of Shughart's modeling, which showed the projected racial effect of applying the lottery with regional pathways to three previous TJ classes. Each of the three classes would have admitted far fewer Asian-American students under the proposed lottery system.

At an October 6 Board work session, FCPS staff proposed using a holistic review to admit the top 100 applicants, but otherwise retain the lottery and regional pathways. The presentation introduced consideration of "Experience Factors," and noted an "advantage" of the proposal was that it "statistically should provide some increase in admittance for underrepresented groups."

The Board also took several votes, which it typically

does not do during work sessions. One vote unanimously directed Brabrand to eliminate the TJ admissions examination. Another required that the diversity plan submitted to the state "shall state that the goal is to have TJ's demographics represent the NOVA region." The public description of the work session did not provide notice that votes would be taken, and no public comment was permitted before either vote. At the October 8 regular Board meeting, by a 6-6 vote, the Board rejected a motion that would have directed Brabrand to engage stakeholders regarding changes to TJ admissions for the 2021 freshman class prior to bringing the updated plan to the Board in December, and allow for more thorough community input and dialogue on TJ admissions.

Following this vote, multiple Board members expressed concern with the speed of the process and the adequacy of public engagement. Tholen wrote in her October newsletter to constituents that "the outreach to date has been one-sided and did not solicit input from all of our communities." Meren wrote in an October 6 email that she "was not okay with the rushed situation we are in." Sizemore Heizer wrote on October 4 that "personally I think we need to wait to implement anything [un]til next school year."

Beginning in November, FCPS staff presented an entirely holistic plan for the Board to consider alongside the revised

merit lottery. Board discussion of the new holistic plan was
originally scheduled for November 17, but Corbett Sanders and
Derenak Kaufax complained to Brabrand via email that they had
only received the white paper containing analysis and modeling
the night before. The discussion was postponed until December 7,
when staff presented it to the Board alongside the revised merit
lottery. The holistic plan retained the use of regional
pathways, which capped the number of offers from each region.

Following the December 7 work session, Board members
exchanged several draft motions in anticipation of the December
17 regular meeting. However, on December 16, Keys-Gamarra emailed
Brabrand to express concern that "there were no posted motions
for us to vote on." McLaughlin wrote that "it is unacceptable
that no motions/amendments/follow-ons were posted nor provided to
the full Board until 4:30 p.m.," which was 30 minutes before the
Board went into Closed Session.

At the December 17 meeting, the Board voted down the revised
merit lottery proposal. The Board ultimately voted 10-1-1 (with
McLaughlin abstaining and Anderson, who had supported the
lottery, voting no) for a version of the proposed holistic plan.
The Board's enacted plan rejected the proposed regional pathways
in favor of guaranteed admission for 1.5% of each eighth-grade
class. Because it was a variation on staff's proposed holistic
plan, the public did not see the 1.5% plan until motions were

posted just before the Board meeting.

Board member communications show a consensus that, in their view, the racial makeup of TJ was problematic and should be changed. Some Board members also expressed the belief that the process of revising TJ admissions had been shoddy and rushed along, with McLaughlin writing in emails that "this is not how the Board should conduct its business" and "in my 9 years, I cannot recall a messier execution of Board-level work." In an email after the final vote, she said she had "abstained largely because of the substandard process."

After the vote, several Board members were not sure whether the 1.5% guarantee would be based on the school a student actually attended or the one she was zoned to attend. Brabrand insisted that the Board had voted for "attending school," which "produced the geographic distribution the Board wanted."

Summary judgment "is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" ACLU v. Mote, 423 F.3d 438, 442 (4th Cir. 2005) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986)). "A genuine issue of material fact is one 'that might affect the outcome of the suit under the governing law.'" Metric/Kvaerner Fayetteville v. Fed.

Ins. Co., 403 F.3d 188, 197 (4th Cir. 2005) (quoting Anderson, 477 U.S. at 248). There are no material facts in dispute and the parties agree that this case is ripe for summary judgment.

An association may sue on behalf of its members when "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Hunt v. Wash. State Apple Advert. Comm'n, 432 U.S. 333, 343 (1977); see also Md. Highways Contractors Ass'n, Inc. v. Maryland, 933 F.2d 1246, 1251 (4th Cir. 1991). The Coalition satisfies these requirements.

The Coalition is a membership organization with more than 200 members. Its leadership and core teams chose to pursue this case by unanimous consensus. It has members with children in seventh and eighth grade who have applied, or plan to apply, to TJ. These members would have standing to sue in their own right because the challenged policy renders their children unable to compete on a level playing field for a racial purpose. See Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1, 551 U.S. 701, 719 (2007).

The remaining Hunt factors are also not in dispute. The Coalition was formed precisely to oppose the Board's effort to change admissions at TJ. Because the Coalition seeks only

11

prospective injunctive relief, individual participation of members as parties is not necessary. United Food and Com. Workers Union Local 751 v. Brown Grp., Inc., 517 U.S. 544, 546 (1996). The Coalition has standing to bring this action on behalf of its members.

Throughout this process, Board members and high-level FCPS officials expressed their desire to remake TJ admissions because they were dissatisfied with the racial composition of the school. A means to accomplish their goal of achieving racial balance was to decrease enrollment of the only racial group "overrepresented" at TJ—Asian Americans. The Board employed proxies that disproportionately burden Asian-American students. Asian Americans received far fewer offers to TJ after the Board's admissions policy overhaul.

Strict scrutiny applies to government actions "not just when they contain express racial classifications, but also when, though race neutral on their face, they are motivated by a racial purpose or object." Miller v. Johnson, 515 U.S. 900, 913 (1995). The record demonstrates that the Board harbored such a purpose. Strict scrutiny therefore applies, and the Board cannot show that its actions meet this demanding standard of judicial scrutiny.

Determining racial purpose "demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be

available." <u>Vill. of Arlington Heights v. Metro. Housing Dev.</u>
<u>Corp.</u>, 429 U.S. 252, 266 (1977). Relevant factors include: (1)
the impact of the official action; (2) the historical background
of the decision; (3) the specific sequence of events leading up
to the challenged decision; and (4) the legislative or
administrative history . . . especially where there are
contemporary statements by members of the decision-making body,
minutes of its meetings, or reports. <u>Id</u>. at 266-68.
Impermissible racial intent need only be a motivating factor. It
need not be the dominant or primary one. <u>Id</u>. at 265-66. The Board
members need not harbor racial animus to act with discriminatory
intent. <u>See N.C. State Conference of NAACP v. McCrory</u>, 831 F.3d
204, 233 (4th Cir. 2016). To trigger strict scrutiny, the Board
need only pursue a policy at least in part because of, not
merely in spite of, the policy's adverse effects upon an
identifiable group. <u>Pers. Adm'r of Mass. v. Feeney</u>, 442 U.S.
256, 279 (1979).

Once strict scrutiny applies, the burden shifts to the
Board to prove that the changes are narrowly tailored to further
a compelling government interest. <u>Adarand Constructors, Inc. v.</u>
<u>Pena</u>, 515 U.S. 200, 227 (1995). "This most exacting standard 'has
proven automatically fatal' in almost every case." <u>Fisher v.</u>
<u>Univ. of Tex. at Austin</u>, 570 U.S. 297, 316 (2013) (Scalia, J.,
concurring) (quoting <u>Missouri v. Jenkins</u>, 515 U.S. 70, 121

13

(1995) (Thomas, J., concurring)).

Here, no dispute of material fact exists regarding any of the <u>Arlington Heights</u> factors, nor as to the ultimate question that the Board acted with discriminatory intent. Under <u>Arlington Heights</u>, disparate impact is the starting point for determining whether the Board acted with discriminatory intent. The Board's overhaul of TJ admissions has had, and will have, a substantial disparate impact on Asian-American applicants to TJ.

A comparison of publicly available data for the Class of 2025 with earlier classes tells much of the story. As depicted in the table below, the number and proportion of Asian-American students offered admission to TJ fell following the challenged changes.

| Class | Offers to Asian-American students | Asian American proportion of offers (rounded) |
|-------|-----------------------------------|-----------------------------------------------|
| 2025  | 299                               | 54%                                           |
| 2024  | 355                               | 73%                                           |
| 2023  | 360                               | 73%                                           |
| 2022  | 316                               | 65%                                           |
| 2021  | 367                               | 75%                                           |
| 2020  | 335                               | 69%                                           |

The proper method for determining the "impact of the official action," <u>Arlington Heights</u>, 429 U.S. at 266, is a

14

simple before-and-after comparison. See McCrory, 831 F.3d at 231(finding impact sufficient to support an inference of discriminatory intent where African Americans disproportionately used each of the removed mechanisms to vote).

This case presents substantial evidence of disparate impact. The undisputed evidence demonstrates precisely how the Board's actions caused, and will continue to cause, a substantial racial impact. The Board instituted a system that does not treat all applicants to TJ equally. The new process sets aside seats for students at each middle school amounting to 1.5% of the school's eighth-grade class. The highest-evaluated students at each school—so long as they meet the minimum admissions requirements—gain admission to TJ. Those applicants who do not attain one of the allocated seats at their school are relegated to compete for about 100 total unallocated seats. The set-aside disproportionately forces Asian-American students to compete against more eligible and interested applicants (often each other) for the allocated seats at their middle schools.

The set-aside is only part of the equation. When applicants outside the top 1.5% are thrown into the unallocated pool, students are again treated unequally. This became publicly known when FCPS announced consideration of "Experience Factors" in the holistic evaluation. One of these factors is whether a student attends a middle school deemed "historically underrepresented at

15

TJ." None of the six major FCPS TJ feeder schools qualify, so students at these schools are placed at a significant disadvantage in the unallocated pool compared to their peers at underrepresented schools.

It is clear that Asian-American students are disproportionately harmed by the Board's decision to overhaul TJ admissions. Currently and in the future, Asian-American applicants are disproportionately deprived of a level playing field in competing for both allocated and unallocated seats.

Placing the Board's actions in historical context leaves little doubt that its decision to overhaul the TJ admissions process was racially motivated. In a November 2020 white paper presented to the Board, staff noted that over the past ten years, the admissions process has undergone a series of changes that were intended to impact issues of diversity and inclusion, but these changes have not made a significant impact on the diversity of the applicants or admitted students. The supposed ineffectiveness of this decade-long tinkering provides the basis for understanding how 2020 events effected the Board's admissions changes.

Two specific triggering events accelerated the Board's process and timeline. First, the Virginia General Assembly passed a budget bill in March that required Governor's Schools to submit a report to the Governor on the existence of and progress

towards diversity goals, including a description of admission processes in place or under consideration that promote access for historically underserved students; and outreach and communication efforts deployed to recruit historically underserved students. Second, the murder of George Floyd on May 25, 2020, shortly followed the release of the Class of 2024 admissions data on June 1, showing that the number of Black students admitted was too small to be reported.

The Board and FCPS reacted by pushing TJ admissions changes. On June 7, Bonitatibus sent a statement to the TJ community that referenced the George Floyd murder and lamented that TJ "does not reflect the racial composition in FCPS," specifically noting the number of Black and Hispanic students TJ would have if it truly reflected FCPS. Around the same time, Corbett Sanders stated in a series of emails that she was "angry and disappointed" about the TJ admissions results and expected "intentful action forthcoming." She relayed a similar message to Brabrand, writing that "the Board and FCPS needed to be explicit in how we are going to address the under-representation of Black and Hispanic students." Cohen told a constituent that the number of Black students admitted was "completely unacceptable," and that the Board was "committed to examining and bettering" the admissions process. Later that month, Keys-Gamarra said at a Board meeting "in looking at what has happened to George Floyd,

17

we now know that our shortcomings are far too great . . . so we must recognize the unacceptable numbers of such things as the unacceptable numbers of African Americans that have been accepted to TJ."

Over the summer of 2020, Keys-Gamarra, Brabrand, and Shughart participated in state-level task force meetings on admissions to Governor's Schools, after which Brabrand told the Board there "was talk about the state creating a four-year timeline for diversity, requiring Governor's schools to be within 5% of diversity in their local districts." The looming specter of a Richmond takeover pushed the Board to act quickly to change TJ admissions with an explicit eye towards its racial composition. As Brabrand testified, he believed this October 1 requirement to submit a report meant "we needed to look at our admissions process at TJ." In August, he told Corbett Sanders via email that "whatever the Board decides to do or not do in September will ultimately influence what the Governor and the Secretary of Education decide in January." Omeish wrote in a September email that she had "come to understand that the Virginia Department of Education plans to intervene if we do not."

The impetus to overhaul TJ admissions came from several sources, all of which confirm that the Board and high-level FCPS actors set out to increase and decrease the representation of certain racial groups at TJ to align with districtwide enrollment

data. Board members promised action on TJ admissions that would specifically address the school's racial makeup. After the summer state task force, FCPS officials scrambled to meet a perceived deadline from Richmond to overhaul admissions with race in mind.

Arlington Heights requires consideration of "the 'specific sequence of events leading up to the challenged decision.'" McCrory, 831 F.3d at 227 (quoting Arlington Heights, 429 U.S. at 267). "In doing so, a court must consider '[d]epartures from the normal procedural sequence,' which may demonstrate that 'improper purposes are playing a role.'" Id. (quoting Arlington Heights, 429 U.S. at 267). Here, there are several indications that (1) the process for changing TJ admissions was unreasonably hurried and (2) there was a noticeable lack of public engagement and transparency—even among Board members. While the Board does not appear to have broken any procedural rules, the evidence shows that, for such a significant set of actions, the procedure was remarkably rushed and shoddy. All this suggests that the Board sought to move quickly because, as Board member Omeish put it in a November email, the Board was "currently incurring reputational/political risks" meaning that "now is better timing."

After they participated in the state task force, Brabrand, Shughart, and other staff developed a "Merit Lottery" proposal

for TJ admissions. Brabrand presented the proposal at a Board
work session on September 15, 2020. The presentation detailed a
proposal to select TJ students via a lottery with regional
pathways for five separate FCPS regions and the remaining
jurisdictions that TJ serves. The presentation focused on the
projected racial effect, presenting the results of modeling
Shughart had run to demonstrate the effect of applying the
lottery to three previous TJ classes. Namely, a drastic drop in
Asian-American students at TJ. Brabrand's PowerPoint indicated
that a final decision on implementing the lottery could be made
as early as the October 8, 2020, regular Board meeting.

The Board disrupted these plans. Three days after the
September 15 work session, Corbett Sanders told Brabrand in an
email that the plan released on Monday "has caused confusion in
the community because of the over-reliance on the term lottery
vs. merit." Once it became clear that most of the Board members
were opposed to a lottery for various reasons, Brabrand told the
Board on September 27 that staff would prepare and present an
alternative admissions proposal. Corbett Sanders expressed hope
that, unlike the first proposal, "[i]deally we will be able to
look at the plan in advance of the meeting."

There was also the issue of the October state reporting
deadline. Corbett Sanders emailed Brabrand on September 19 that
"it is not the timing of the work session that is energizing the

community. It is the timing of looking at TJ." She suggested
that "we make it clear that we are responding to a statutory
mandate." In an earlier email to Brabrand, she suggested that he
"clarify that we have a statutory requirement to submit a plan to
the state by 9 October." Yet other Board members questioned
whether the Board had to overhaul admissions in such a short
timeframe. McLaughlin told a constituent that "Brabrand has
created a false urgency that FCPS must drastically overhaul the
TJ Admissions process within a three week decision-making
window." Tholen forwarded to Board colleague Pekarsky an email
from a member of the community who said she had talked to the
Virginia Department of Education and was told that the plan
submitted to the state could be "aspirational" and "general" and
there was "no mandate for Governor's Schools to produce a more
diverse population."

Nevertheless, the Board pursued admissions policy changes.
At an October 6 work session, the Board viewed a presentation
from Brabrand that proposed a revised merit lottery. It would
have set aside seats for the 100 highest-evaluated applicants and
selected the remaining seats via lottery among the students who
met the minimum requirements after holistic review. The Board
also took several votes at the work session, something it has
acknowledged it does not typically do. Among these, it
unanimously voted to remove the longstanding admissions exam

without any public notice that such a vote would occur. Then, while Board members expressed concern at a process that was moving too fast, the Board, at its regular meeting two days later, rejected a motion that would have directed Brabrand to engage stakeholders and allow for more community input before presenting a final plan. Tholen lamented to her constituents that the motion had failed and "the outreach to date has been one-sided and did not solicit input from all of our communities."

After the October 6 work session, with support for any sort of lottery waning, the Board sought an entirely holistic proposal. A next-step for the staff was to bring to the Board a holistic admissions approach that did not contain a lottery as an alternative plan. On November 16, FCPS staff released a white paper detailing a holistic option alongside the hybrid merit lottery. The white paper included voluminous racial modeling and discussion of efforts to obtain racial diversity at TJ. These plans were initially to be discussed at a November 17 work session, but multiple Board members protested that the white paper was posted far too late for proper consideration.

The TJ discussion was ultimately postponed until December 7, when Brabrand presented the hybrid merit lottery and the new holistic plan at another work session. The holistic method involved consideration of GPA, the Student Portrait Sheet, the

Problem Solving Essay, and the "Experience Factors," including attendance at an underrepresented middle school, with regional caps similar to those in the Merit Lottery. Thereafter, Board members exchanged draft motions almost right up until the Board met to make a final decision on December 17. In the early morning of December 16, Keys-Gamarra emailed Brabrand and expressed concern that there were "no posted motions for us to vote on." McLaughlin chastised the Board both during the December 17 meeting and afterward, noting the failure to post any motions to the public or for the full Board until a half hour before the closed session began.

At the December 17 meeting, the Board voted down the hybrid merit lottery proposal by a vote of 4-8. Then it voted on a motion to direct Brabrand to implement the holistic proposal, except replacing the regional pathways with guaranteed admission to the top 1.5% of the 8th grade class at each public middle school who meet the minimum standards. The 1.5% plan had not been presented publicly in any meeting before it was voted on. The vote passed by a margin of 10-1-1, with Anderson (who had voted for the lottery) voting no and McLaughlin abstaining. McLaughlin later wrote that she abstained at least in part because of the problematic process. She later wrote that "this is not how the Board should conduct its business," and that she "could not recall a messier execution of Board-level work in her

23

nine years on the Board."

After the vote, Board members were unsure whether the top 1.5% was to be selected by a student's base school or attending school—a question with significant ramifications because some FCPS schools have Advanced Academic Program (AAP) Level IV centers that draw in students from other middle school zones to attend them. Multiple Board members questioned staff regarding this topic after the Board voted to implement the holistic plan. Brabrand insisted that the Board had voted for "attending school," which represented the "geographic distribution the Board wanted." In the rush to overhaul admissions, some Board members were confused about what they had done.

The evidence shows the process was rushed, not transparent, and more concerned with simply doing something to alter the racial balance at TJ than with public engagement. The decision to vote on eliminating the TJ admissions examination at a work session without public notice is an unusual procedure. The same can be said for the lack of public engagement. The Board held full, public meetings on renaming Mosby Woods Elementary School and Lee High School, but the public did not even see the proposed plan that the Board actually adopted for TJ admissions until 30 minutes before the final meeting.

"The legislative history leading to a challenged provision 'may be highly relevant, especially where there are

contemporaneous statements by members of the decisionmaking body, minutes of its meetings, or reports.'" McCrory, 831 F.3d at 229 (quoting Arlington Heights, 429 U.S. at 268). Here, emails and text messages between Board members and high-ranking FCPS officials leave no material dispute that, at least in part, the purpose of the Board's admissions overhaul was to change the racial makeup to TJ to the detriment of Asian-Americans.

The discussion of TJ admissions changes was infected with talk of racial balancing from its inception. This was apparent from the first proposal FCPS staff released after Brabrand attended the state task force and told the Board about a potential state plan to require demographic balance at Governor's Schools. The second slide of the initial merit lottery presentation declared that TJ should reflect the diversity of FCPS, the community and Northern Virginia. The subsequent slides, comparing historical TJ admissions data by race with the racial makeup of FCPS and focusing on the racial effect of implementing a lottery, make clear that diversity primarily meant racial diversity.

While a majority of the Board did not support Brabrand's lottery proposal, the dissenters nonetheless embraced racial balancing. McLaughlin, who opposed the lottery, proposed her own plan based on her experience as a university admissions officer. Referencing that the Supreme Court has ruled that diversity is a

compelling state interest, Mclaughlin's proposal was designed to mimic those universities that use holistic admissions to ensure their accepted student pools reflect both the demographic diversity and the high-achievement of their applicant pools. To help the acceptance pool more closely reflect the applicant pool's demographic diversity, the proposal set aside seats for demographically diverse students. Tholen responded to McLaughlin's plan with similar skepticism of a lottery, stating that a lottery "seems to leave too much to chance" and asking: "will chance give us the diversity we are after?" Some Board members opposition to the lottery was at least in part due to a fear that a lottery might not go far enough to achieve racial balancing.

At the next work session on October 6, the Board adopted a resolution requiring that FCPS' annual diversity report to the state "shall clarify that the goal is to have TJ's demographics represent the NOVA region." It passed 11-0-1, with only Meren abstaining. This was more than an aspirational goal to be achieved by encouraging Black and Hispanic students to apply to TJ. Board members sought to use geography to obtain their desired racial outcome. Corbett Sanders advised Brabrand in late September that "it will be important to better communicate why a geographic distribution of students across the county will result in a change in demographics to include

more students that are FRM [qualify for free or reduced-price meals], ELL [English language learners], black, Hispanic, or twice exceptional." The day before the work session, she emailed a constituent that she was "urging the superintendent to modify his plan to take into account geographic diversity as well as students on free and reduced lunch, which should result in greater diversity in the demographics." Sizemore Heizer wrote to Brabrand to suggest that he frame his plan as "increasing diversity through redefining merit." Omeish used more aggressive language, writing that she planned to "support the proposal towards greater equity, to be clearly distinguished from equality."

Even aside from the statements confirming that the Board's goal was to bring about racial balance at TJ, the Board's requests for and consideration of racial data demonstrate discriminatory intent under McCrory. This does not mean "that any member of the [Board] harbored racial hatred or animosity toward [Asian Americans]." McCrory, 831 F.3d at 233. Discriminatory intent does not require racial animus. What matters is that the Board acted at least in part because of, not merely in spite of, the policy's adverse effects upon an identifiable group. Feeney, 442 U.S. at 279. That is the case here—the Board's policy was designed to increase Black and Hispanic enrollment, which would, by necessity, decrease the representation of Asian-Americans at

27

TJ. Ass'n for Educ. Fairness, 2021 WL 4197458, at *17; see also
Doe ex rel. Doe v. Lower Merion Sch. Dist., 665 F.3d 524, 553
(3d Cir. 2011) (discriminatory intent exists when a facially
neutral policy was "developed or selected because it would assign
benefits or burdens on the basis of race"); Lewis v. Ascension
Parish Sch. Bd., 662 F.3d 343, 354 (5th Cir. 2011) (Jones, J.,
concurring) ("[t]o allow a school district to use geography as a
virtually admitted proxy for race, and then claim that strict
scrutiny is inapplicable because" it is facially race-neutral
"is inconsistent with the Supreme Court's holdings"). Therefore,
strict scrutiny applies.

The burden then shifts to the Board to demonstrate that the
Board's actions were narrowly tailored to further a compelling
interest. Adarand, 515 U.S. at 227. Strict scrutiny applies to
facially neutral actions "motivated by a racial purpose or
object" in the same manner as when they contain "express racial
classifications." Miller, 515 U.S. at 913. The Board has not
argued that its actions satisfy strict scrutiny.

The Supreme Court has recognized only two interests as
sufficiently compelling to justify race-based action remedying
past intentional discrimination and obtaining the benefits of
diversity in higher education. Parents Involved, 551 U.S. at
720-23. No remedial interest exists here. In Parents Involved,
the Court refused to extend the diversity rationale to K-12

28

schools, writing instead that Grutter had "relied upon considerations unique to institutions of higher education," and that lower courts that had applied it "to uphold race-based assignments in elementary and secondary schools" had "largely disregarded" Grutter's limited holding. Id. at 724-25.

The Board's main problem is its focus on the goal to have TJ reflect the demographics of the surrounding area, described primarily in racial terms. Far from a compelling interest, racial balancing for its own sake is "patently unconstitutional." Fisher, 570 U.S. at 311 (quoting Grutter, 539 U.S. at 330). The Board cannot transform racial balancing into a compelling interest "simply by relabeling it 'racial diversity.'" Id. (quoting Parents Involved, 551 U.S. at 732 (plurality opinion)). The school districts in Parents Involved tried various verbal formulations to deflect from their intent to racially balance schools through race-based transfers. See Id. at 725, 732 (plurality opinion). The Board here did not even bother with such "verbal formulations." Board members and high-level FCPS actors did not disguise their desire for TJ to represent the racial demographics of Fairfax County or Northern Virginia as a whole. Whether accomplished overtly or via proxies, racial balancing is not a compelling interest.

Even if the Board could identify a compelling interest that might justify its racially discriminatory changes to the TJ

29

admissions process, it still must prove that the changed
admissions policy is "necessary" to accomplish that interest.
Fisher, 570 U.S. at 312 (quoting Regents of Univ. of Cal. v.
Bakke, 438 U.S. 265, 305 (1978)). The plan must be a "last
resort" to accomplish the purportedly compelling interest.
Parents Involved, 551 U.S. at 790 (Kennedy, J., concurring in
part and concurring in the judgment). These steps and others,
like further increasing the size of TJ or providing free test
prep, could have been implemented before the Board defaulted to a
system that treats applicants unequally in hopes of engineering a
particular racial outcome. Since overhauling the process was not
the last resort for the Board to accomplish its goals, the
Board's actions were not narrowly tailored.

The Fourth Circuit has repeated that "once a plaintiff has
established the violation of a constitutional or statutory right
in the civil rights area, . . . court[s] ha[ve] broad and
flexible equitable powers to fashion a remedy that will fully
correct past wrongs." McCrory, 831 F.3d at 239 (quoting Smith v.
Town of Clarkton, 682 F.2d 1055, 1068 (4th Cir. 1982)). The
proper remedy for a legal provision enacted with discriminatory
intent is invalidation.

For the foregoing reasons, Plaintiff The Coalition for TJ
is entitled to summary judgment, and the Defendant Fairfax
County School Board's Motion for Summary Judgment should be

denied. An appropriate Order shall issue.

CLAUDE M. HILTON
UNITED STATES DISTRICT JUDGE

Alexandria, Virginia
February 25, 2022