IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| COALITION FOR TJ, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil No. 1:21-cv-00296-CMH-JFA |
| | ) |
| FAIRFAX COUNTY SCHOOL BOARD, | ) |
| | ) |
| Defendant. | ) |

**BRIEF IN SUPPORT OF DEFENDANT'S
MOTION FOR STAY PENDING APPEAL**

The process to select this fall's entering class at Thomas Jefferson High School for Science and Technology ("TJ") is nearly complete. Last fall, nearly 3,000 students applied for admission, under the process the Fairfax County School Board (the "School Board") adopted in 2020 to eliminate historical barriers and guarantee access to students from every part of the County and neighboring jurisdictions. New to the process in 2020, the application fee, standardized testing, and teacher recommendations were all eliminated; the minimum GPA requirement was raised from 3.0 to 3.5; certain "experience factors" were considered; and each public middle school was guaranteed seats in the freshman class for its top applicants, in a number equal to 1.5% of each school's eighth-grade population. More than 2,500 applicants now remain in the process. They recently completed the essay-writing requirement and, until last week, anticipated receiving admission decisions by the end of April.

This process was moving to an orderly conclusion when the Court issued its order categorically enjoining the School Board "from further use or enforcement of the Fall 2020 Admissions Plan." Dkt. 144. The scope of the injunction is sweeping, reaching far beyond the

1

two elements of the admissions process that Plaintiff Coalition for TJ (the "Coalition") identified in its summary judgment papers as having a disparate impact on Asian students. *See* Dkt. 122 at 15–19 (specifically challenging the "1.5% middle school allocation" and the underrepresented-middle-school experience factor).

The Court should exercise its discretion under Federal Rule of Civil Procedure 62(d) to stay its summary judgment order, pending resolution of the School Board's anticipated appeal to the Fourth Circuit of final judgment, once an order is entered.

The four traditional factors all weigh in favor of granting a stay.

*First*, the School Board has a likelihood of success on appeal. It has amply demonstrated that it has a substantial case on the merits of the Coalition's Equal Protection claim, and that the Fourth Circuit may resolve the issues differently than did this Court.

*Second*, denial of a stay would cause irreparable harm. It would require the School Board to develop, vet, and implement a new admissions process—and all in the space of a few months, if it is to welcome a first-year class at TJ in August as planned. Such a compressed timeline imposes significant burdens on the School Board and admissions staff.

*Third*, granting a stay would impose no significant burden on the Coalition. It identified only two members with 8th-grade children who had applied to TJ this year, and it is not apparent that they have been harmed in any way by having to participate in the current process.

*Fourth*, the public interest lies in granting a stay. Unless stayed, the Court's order will upend the settled expectations of thousands of applicants and their families, delaying and possibly disrupting their plans to make schooling choices for the fall. The compressed schedule for adopting and implementing a new admissions plan also will curtail the time for public input.

The Court should stay its order pending appeal.

# ARGUMENT

Under Federal Rule of Civil Procedure 62, the Court has discretion to stay an injunction pending appeal. *See* Fed. R. Civ. P. 62(c) (judgment "in an action for an injunction" not stayed "[u]nless the court orders otherwise"), (d) (providing that "the court may suspend . . . an injunction"). In considering a request for such a stay, a district court analyzes four factors: (1) whether the applicant has made a strong showing that he is likely to succeed on the merits of his appeal; (2) whether the applicant for the stay will be irreparably injured absent a stay; (3) whether a stay will substantially injure other parties; and (4) whether the public interest lies in granting the stay. *Brinkman v. John Crane, Inc.*, No. 4:14CV142, 2015 WL 13424471, at *1 (E.D. Va. Dec. 14, 2015). "In weighing the four factors, the first two 'are the most critical.'" *Id.* (quoting *Nken v. Holder*, 556 U.S. 418, 421 (2009)).

The School Board satisfies all four factors.

## I. The School Board has raised substantial legal questions on the merits.

To satisfy the first stay factor, the School Board is "not required to establish a certainty of success on appeal." *Amazon.com, Inc. v. WDC Holdings LLC*, No. 1:20-CV-00484, 2020 WL 7680552, at *1 (E.D. Va. Sept. 4, 2020) (citing *Roe v. Dep't of Def.*, 947 F.3d 207, 219 (4th Cir. 2020)). Instead, it must show a "likelihood" of success—a standard that "does not require that the Court concede it was incorrect or change its mind." *Id.* It is sufficient for the movant to establish that their appeal presents a "substantial legal question" on the merits, *Hilton v. Braunskill*, 481 U.S. 770, 778 (1987), meaning that the "issues presented on appeal could be rationally resolved in favor of the party seeking the stay," *Amazon.com, Inc.*, 2020 WL 7680552, at *1.

The School Board easily satisfies this threshold. It has strong arguments that its admissions policy—which the Coalition has always conceded is "facially race-neutral,"

3

Compl. ¶ 63—does not violate the Equal Protection Clause.[1]  Longstanding Supreme Court jurisprudence makes clear that public school systems can use race-neutral means to promote equality of access for all groups, including racial minorities.  The Coalition's arguments to the contrary have been rejected by courts across the country—including by another judge of this Court just last year.[2]

In particular, a facially race-neutral policy like the current TJ admissions plan is not subject to strict scrutiny unless the plaintiff can demonstrate both (1) that the policy has a "racially disproportionate impact," and (2) that it had an "invidious discriminatory purpose." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66 (1977).  As summarized below, the School Board has strong arguments that the Court, in adopting wholesale the arguments of the Coalition, wrongly decided both issues.  "Because the Fourth Circuit may resolve the[se] issues differently, [the School Board] ha[s] at least demonstrated a 'substantial case on the merits.'"  *Miller v. Brown*, 465 F. Supp. 2d 584, 596 (E.D. Va. 2006) (quoting *Hilton*, 481 U.S. at 778), *aff'd*, 503 F.3d 360 (4th Cir. 2007).

---

[1] The Coalition also has failed to carry its burden of establishing associational standing.  *See, e.g.*, *Md. Highways Contractors Ass'n, Inc. v. Maryland*, 933 F.2d 1246, 1253 (4th Cir. 1991).  The Coalition clearly is not a traditional membership organization.  It lacks even the basic formalities:  it has no governing documents; is led by volunteers who self-nominated themselves; and has never put any decisions to a vote.  Nor is it a "functional equivalent of a traditional membership organization." *Heap v. Carter*, 112 F. Supp. 3d 402, 418 (E.D. Va. 2015).  The individuals purportedly represented by the Coalition do not have *any* of the indicia of traditional membership identified in *Heap*, let alone "all the indicia of membership, including (i) electing the entity's leadership, (ii) serving in the entity, and (iii) financing the entity's activities." *Id.*

[2] *See, e.g.*, *Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. of City of Bos.*, 996 F.3d 37, 45 (1st Cir. 2021); *Boyapati v. Loudoun Cty. Sch. Bd.*, No. 1:20-cv-01075 (AJT/IDD), 2021 WL 943112, at *8 (E.D. Va. Feb. 19, 2021) (Trenga, J.).

### A. The admissions policy does not have a disparate impact on Asian Americans.

The Court's assumption that Asian applicants are victims of disparate impact relies primarily on a comparison of the statistics for Asian applicants under the prior admissions policy and the first year of results under the current TJ admissions policy. Dkt. 143 ("Opinion") at 14. Utilizing this before-and-after comparison, the Court concluded there is "substantial evidence of disparate impact" on Asian applicants attributable to two elements of the admissions process: (1) the top-1.5% plan and (2) the use of underrepresented schools as one of four "experience factors" considered as part of the holistic review of each applicant. Opinion at 15–16. The School Board has a strong case that that conclusion is legally and factually unsupported.

First, the Court wrongly concluded that *North Carolina State Conference of NAACP v. McCrory*, 831 F.3d 204, 232 (4th Cir. 2016), endorses use of a "simple before-and-after comparison" to determine an impact from year to year. Opinion at 14–15. Rather, under *McCrory*, the proper comparison here would be the percentage of Asian admitted students against the percentage of Asian applicants. The Court's opinion fails to note that Asian applicants received far *more* offers of admission (54.36%) than any other racial group, and constituted one of only two racial groups that "outperformed" their share of the applicant pool (48.59% of the pool, 54.36% of admitted students). Dkt. 95, Stip. Facts ¶ 20.

Second, the Coalition (and therefore the Court's opinion) failed to cite evidence that the allocation of spots to the top 1.5% of applicants at each middle school has a "substantial racial impact" that disproportionately burdens Asian students. Opinion at 15. The Coalition offered no expert testimony or statistical evidence regarding what Asian enrollment would be in the absence of the top-1.5% plan, holding all other variables constant, as would be necessary "to draw meaningful conclusions." *Garcia v. Johanns*, 444 F.3d 625, 635 (D.C. Cir. 2006). All that the Coalition's arguments tended to support was the unremarkable finding that Asian applicants at

5

certain middle schools benefit from the top-1.5% plan, while Asian applicants at other middle schools do not.

Third, the Court was incorrect to adopt the Coalition's conclusion that Asian applicants are "again treated unequally" during the "holistic review" to fill the 100 unallocated seats because extra consideration is given to students who apply from historically underrepresented schools.  Opinion at 15–16.  Not so.  To demonstrate that the underrepresented-school experience factor is impermissible, the Coalition had to show a *racially* disproportionate impact.  It failed to do so, and for good reason:  *over half of the students* who received offers from the two underrepresented schools exceeding their 1.5% allocation identify as Asian.  Dkt. 126-8 [12/21/21Shughart Decl.] ¶ 11.

**B.      The School Board did not act with discriminatory purpose.**

The Court should have rejected the Coalition's Equal Protection claim for an independent reason:  the Coalition failed to prove an "invidious discriminatory purpose." *Arlington Heights*, 429 U.S. at 265.  There is no evidence that the School Board, or any of its members, voted to change the TJ admission policy "because of" any potential adverse effect on Asian students. *Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 279 (1979).

To begin with, it is well-settled that "the motive of increasing minority participation and access is not suspect."  *Anderson ex rel. Dowd v. City of Bos.*, 375 F.3d 71, 87 (1st Cir. 2004). School boards may consciously "adopt general policies to encourage a diverse student body, one aspect of which is its racial composition." *Parents Involved in Community Schools v. Seattle School District No. 1*, 551 U.S. 701, 788 (2007) (Kennedy, J., concurring in part and concurring in the judgment).  Thus, the Court was wrong to adopt the Coalition's assumption that every

6

motivation connected to race constitutes an "invidious discriminatory purpose."[3] There is intentional discrimination under the Equal Protection Clause only where action is taken "'because of,' not merely 'in spite of,' its *adverse* effects upon an identifiable group." *Feeney*, 442 U.S. at 279 (emphasis added). The Coalition's zero-sum logic collapses that distinction entirely, automatically transforming every "in spite of" case into a "because of" case. A multitude of cases rightly reject that reasoning.[4]

Moreover, decades of Supreme Court jurisprudence involving college admissions undermine the conclusion that a race-neutral admissions policy is subject to strict scrutiny if the policy was adopted with a partial goal of increasing enrollment of students from underserved racial minorities. Indeed, all the Supreme Court admissions cases have *presumed*, as part of the analysis, that schools can pursue "the educational benefits of diversity," and can do so using facially race-neutral methods. *Grutter v. Bollinger*, 539 U.S. 306, 319 (2003).[5]

---

[3] *See, e.g., Rothe Dev., Inc. v. United States Dep't of Def.*, 836 F.3d 57, 72 (D.C. Cir. 2016) ("Policymakers may act with an awareness of race . . . without thereby subjecting the resultant policies to the rigors of strict constitutional scrutiny"); *Hayden v. Cty. of Nassau*, 180 F.3d 42, 50–51 (2d Cir. 1999) ("A desire to reduce the adverse impact on black applicants . . . is not analogous to an intent to discriminate against non-minority candidates.").

[4] School admissions are not uniquely "zero-sum"; societal resources are rarely infinite, so that argument has been made and rejected in a variety of contexts. *See, e.g., Rothe Dev., Inc.*, 836 F.3d at 72 (challenge to a race-neutral law that was allegedly passed to increase access and opportunity for minority-owned businesses to receive government contracts); *Hayden*, 180 F.3d at 46 (challenge to a new admissions test for county police officers, which was "designed with race in mind . . . to minimize the discriminatory impact on minority candidates"); *Raso v. Lago*, 135 F.3d 11, 16 (1st Cir. 1998) (challenge to a HUD decree whose undisputed purpose was "to increase minority opportunities for apartments" in a specific subdivision).

[5] The disputes instead have centered around whether these goals can be pursued using *express* racial classifications. The law currently holds that a university can use race in making admission decisions, so long as race remains but one of many "plus factors" in the calculus. *Fisher v. Univ. of Tex. at Austin*, 570 U.S. 297, 305 (2013).

Finally, the Court's analysis of the *Arlington Heights* factors was flawed. Opinion at 19–28. None of those factors, properly considered, supports an Equal Protection claim. The new admissions process was not adopted against a backdrop of discrimination against Asian students. The Court's conclusion that the process was "remarkably rushed and shoddy," Opinion at 19, is belied by the three months spent by the School Board in deliberating over and receiving public feedback on a series of proposals before settling on the new plan, *see generally id.* at 19–24. And there is nothing in the record to suggest that even a single School Board member voted to change the TJ admissions policy out of a desire to harm Asian students.

For all these reasons, it is clear that the School Board has a "substantial case on the merits," *Hilton*, 481 U.S. at 778, and that the "issues presented on appeal could be rationally resolved in [its] favor." *Amazon.com, Inc.*, 2020 WL 7680552, at *1. And to the extent these are novel legal issues in this context, that too weighs in favor of a stay. *See, e.g.*, *Brinkman*, 2015 WL 13424471, at *1 (finding stay pending appeal appropriate where defendants raised "a matter of first impression in the Fourth Circuit"); *Miller*, 465 F. Supp. 2d at 596 (granting stay pending appeal where the court "recognize[d] that this case raises an issue of first impression"); *Project Vote/Voting for Am., Inc. v. Long*, 275 F.R.D. 473, 474 (E.D. Va. 2011) ("[A]s this case is one of first impression that touches on matters of substantial national importance, there is certainly a 'substantial case on the merits.'").

## II.    The School Board will suffer irreparable harm if a stay is not granted.

The second factor also militates in favor of a granting stay. It is clear that, "considering the time and expense required to implement the changes necessary to comply with this court's . . . judgment, the[ School Board] would suffer irreparable injury absent a stay." *Project Vote/Voting for Am., Inc.*, 275 F.R.D. at 474.

8

Complying with the Court's order is not simply a matter of reverting to the prior admissions policy. As the School Board has consistently explained, that is no longer possible. Decl. of Jeremy Shughart (Mar. 4, 2022) ["3/4/22 Shughart Decl."; attached as Ex. 1] ¶ 8. Before the changes to the admission plan in 2020, students took three tests provided by two different vendors: the ACT Aspire Reading, the ACT Aspire Science, and the Quant-Q. *Id.* But last year, the vendor for the ACT Aspire exams announced that it will no longer offer those tests for 8th-grade students; nor is it offering a comparable replacement. *Id.*

Thus, complying with the Court's order will require the School Board to adopt a new admissions plan. As in Fall 2020, questions will abound—from parents, students, staff, the School Board, and the public—about what components should be included in such a plan. Answering those questions will take considerable time. If standardized testing were to involve new tests, for instance, the process of identifying and selecting those tests has required many months, historically, given the significant stakeholder engagement in that decision. *Id.* ¶ 9(b). Whether or not testing is retained as a component of the admissions plan, the School Board will need time to develop, consider, and vet the range of alternatives. The Court can hardly doubt the need for time—despite the three months of public debate, meetings, and work sessions that the School Board devoted to TJ admissions in Fall 2020, the Court concluded that the process was "remarkably rushed" and "not transparent." Opinion at 19, 24. Yet devising and then implementing a new process in time to select the members of the entering Class of 2026 would seriously limit the opportunity to collect and incorporate community feedback. 3/4/22 Shughart Decl. ¶ 9(b).

Compressing the period in which to conduct the admissions process, once it is chosen, causes its own harm. Even assuming that some of the work from this year's near-complete

9

admissions process can be salvaged, there likely will be many additional candidates who emerge in a revised admissions process. For instance, returning the minimum GPA threshold to 3.0 and eliminating the more burdensome course requirements would dramatically increase the number of students eligible to apply. These "new" applicants will need to be evaluated too, necessitating even more staff time. While TJ admissions staff began assembling a team of evaluators in January, and those evaluators were scheduled to bring reviewing candidates yesterday, that step is on hold due to the Court's order, *see* 3/4/22 Shughart Decl. ¶ 7(d)—and it may need to remain on hold until a new admissions process is adopted, creating a bottleneck of work over the summer months. Delays in the admission timetable will adversely impact the TJ administration's ability to ensure staffing and coursework that will meet the needs of the incoming students. *Id.* ¶ 9(b).

In short, forcing the School Board to choose a new admissions process, and then conduct that process on a compressed schedule, will impose unnecessary administrative burdens amounting to irreparable harm. See *Project Vote/Voting for Am., Inc.*, 275 F.R.D. at 474–75 (referencing declaration evidence that it would take a state agency approximately six months to institute necessary changes).

**III.    The Coalition will suffer little, if any, harm if a stay is granted.**

The Court has already effectively decided that the Coalition faces no irreparable injury by continued application of the admissions policy. It did so when it twice denied motions by the Coalition to enjoin the policy's use for selecting the Class of 2026. *See* Dkt. 50, 72.

In any event, the Coalition cannot claim any harm to itself if the stay is granted. Even assuming that the Coalition may count injury to children of its members as an irreparable harm for stay purposes, *but see Christa McAuliffe Intermed. Sch. PTO, Inc. v. de Blasio*, 788 F. App'x 85 (2d Cir. 2019), the Coalition previously identified only *two* children of members who have

10

applied to TJ in the current cycle, *see* Dkt. 101, 102. And it is not at all apparent how either would be harmed by adhering to the current admissions process.[6]

## IV. The public interest supports granting a stay.

"Finally, the Court must weigh the public interest, which is the determining factor in this case." *Miller*, 465 F. Supp. 2d at 596. The public interest would not be served by scrapping the current admissions process so close to the end of the cycle, scrambling to consider and select a new process, and conducting that new process—all in the space of a few short months. As the Court previously recognized, "Fairfax County has an interest in seeing that their schools operate in an orderly fashion and not be interrupted." Dkt. 52 [5/21/21 Hr'g Tr.] at 34:25–35:2.

With the Class of 2026 admissions process nearly complete, "a stay pending appeal will mitigate the likelihood of confusion during the . . . process." *Miller*, 465 F. Supp. 2d at 597. Over 2,500 students remain in the application process and, until the Court's order, they expected to know the results of the admissions process by the end of April. *See* 3/4/22 Shughart Decl. ¶ 7(e). Allowing the Court's judgment to take effect, thereby delaying admissions decisions, would disrupt the expectations of these applicants' families and may preclude them from meeting other deadlines. *Id.* ¶¶ 5(h), 9(a).

The components of whatever replacement process is chosen may also throw applicants' plans into disarray. The potential lowering of the minimum GPA back to 3.0 or loosening of the course requirements would introduce many more students into the admissions process. It would likewise be disruptive to add new testing or other assessment elements to the process.

---

[6] Indeed, Coalition member Ying McCaskill, who filed declarations in 2021 to support motions to enjoin the current admission process, and alleging that the process discriminated against her then-8th-grade daughter, had to drop that claim when her daughter was admitted under the current process. *Compare* Dkt. 16-2 at 1 ¶ 4, *with* Dkt. 59-2 at 1 ¶ 3.

11

Whiplashing back to a testing regime would not only refortify the barriers to access that the School Board chose to eliminate, it would upend the expectations of applicants who had not been anticipating (much less preparing for) such tests.  To suddenly revert, mid-stream, to a process for which students have not been preparing would cause hardship and distress to students.

Adding to all this confusion, TJ admissions staff would be far less able to provide students and parents with ongoing support, if a new admissions process suddenly had to be developed and undertaken.  *See* 3/4/22 Shughart Decl. ¶ 9(c).  Rather than engaging in community outreach and answering parent calls and emails, staff instead would be occupied with crafting and implementing the new admissions process.  The public interest clearly favors a stay.

## **CONCLUSION**

The Court should stay the effect of its summary judgment order pending appeal.

Respectfully submitted,

FAIRFAX COUNTY SCHOOL BOARD

By: _____/s/_____
Sona Rewari (VSB No. 47327)
Daniel Stefany (VSB No. 91093)
HUNTON ANDREWS KURTH LLP
2200 Pennsylvania Avenue, NW
Washington, DC 20037
Telephone: (202) 955-1500
Facsimile: (202) 778-2201
srewari@HuntonAK.com
dstefany@HuntonAK.com

Trevor S. Cox (VSB No. 78396)
HUNTON ANDREWS KURTH LLP
951 E. Byrd Street
Richmond, VA 23219
Telephone: (804) 788-7221
Facsimile: (804) 788-8218
tcox@HuntonAK.com

*Counsel for Defendant*

## **CERTIFICATE OF SERVICE**

I hereby certify that on March 4, 2022, I electronically filed this document with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing (NEF) to counsel of record for all Parties.

By:    /s/
       Sona Rewari (VSB No. 47327)