FILED:  March 31, 2022

**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

No. 22-1280
(1:21-cv-00296-CMH-JFA)

———————

COALITION FOR TJ,

       Plaintiff – Appellee,

v.

FAIRFAX COUNTY SCHOOL BOARD,

       Defendant – Appellant,

and

SCOTT BRABAND, in his official capacity as Superintendent of the Fairfax
County School Board,

       Defendant.

———————

O R D E R

———————

    The Court grants appellant's motion for a stay pending appeal. Appellant has

satisfied the applicable legal requirements for a stay pending appeal, see *Nken v. Holder*,

556 U.S. 418 (2009), and thus may proceed with its use of the challenged admissions plan.

Entered at the direction of Judge Heytens with the concurrence of Judge King. Judge Rushing voted to deny the motion.

Judge Heytens filed a concurring opinion. Judge Rushing filed a dissenting opinion.

For the Court

/s/ Patricia S. Connor, Clerk

TOBY HEYTENS, Circuit Judge, concurring:

I agree with the decision to grant a stay pending appeal. The issues in this case are materially different from those currently before the Supreme Court in *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College* (No. 20-1199), and *Students for Fair Admissions, Inc. v. University of North Carolina* (No. 21-707). There, the question is whether—and if so when—universities may use *race conscious* policies in admissions. Here, in contrast, it is undisputed that the challenged admissions policy is *race neutral*— indeed, evaluators are not told the race or even the name of any given applicant. And, under existing precedent, such policies are not constitutionally suspect unless a plaintiff can demonstrate (in addition to "actual discriminatory impact") that the challenged policy was adopted "with discriminatory intent." *North Carolina State Conf. of the NAACP v. Raymond*, 981 F.3d 295, 302 (4th Cir. 2020); see *Washington v. Davis*, 426 U.S. 229, 241 (1976); *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 265 (1977).

In my view, appellant Fairfax County School Board is likely to succeed in its appeal. I have grave doubts about the district court's conclusions regarding both disparate impact and discriminatory purpose, as well as its decision to grant summary judgment in favor of a plaintiff that would bear the burden of proof on those issues at trial. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986) (discussing how the burden of proof impacts summary judgment analysis). The other stay factors also weigh in the Board's favor, in no small part because of the significant logistical difficulties and time constraints associated with creating a new admissions policy and making thousands of admissions decisions for

3

the class of 2026 under that new policy after the application process was complete and just as decisions were about to go out under the current one.

## I.     Background

This case involves an Equal Protection Clause challenge to a high school admissions policy. Located in Fairfax County, Virginia, Thomas Jefferson High School for Science & Technology (TJ) offers advanced academic opportunities for students in the surrounding area. Plaintiff Coalition for TJ is an organization of parents and community members.

Because the district court's analysis depends heavily on the change from TJ's former admissions policy to its current one, I begin by describing the former policy. Before December 2020, applicants were required to reside in one of five participating school divisions, be enrolled in 8th grade, have a minimum 3.0 GPA, be enrolled in or have completed Algebra I, and pay a $100 application fee. A-99.[1] Students meeting those criteria were administered three standardized tests. *Id.* Students who achieved a certain minimum percentile ranking on the standardized tests and maintained a 3.0 GPA were then administered another exam that included three writing prompts and a problem-solving essay and asked to submit two teacher recommendations. *Id.* Students who made it through all the required steps were selected for admission based on a holistic review of their application materials. A-99–100.

During the summer of 2020, statistics revealed that the number of Black students admitted to TJ's incoming class was too small to be reported. A-213. A state level task

---

[1] This refers to the appendix filed with the Board's stay motion, CA4 ECF 8-2.

force on diversity, equity, and inclusion was convened to examine barriers to access at Virginia's Governor's Schools, including TJ. A-118, 214. Throughout the fall, the Board considered various changes to TJ's admissions policy.

In December 2020, the Board adopted the admissions policy challenged here by a vote of 10-1-1. A-217. Under that policy, prospective students must still reside in one of five participating school divisions, be enrolled in 8th grade, and be enrolled in or have completed Algebra I. A-100. Unlike the former policy, the minimum GPA has been raised (from 3.0 to 3.5) and students are required to have taken certain specified honors courses. *Id.* Eligible students are then evaluated holistically on their GPA, answers to essay questions, and experience factors: whether the applicant qualifies for free or reduced-price meals, is an English language learner, has an Individualized Education Plan, or attends a historically underrepresented middle school. A-212. Evaluators are not told the race, ethnicity, gender, or even names of applicants. A-100–01.

The current policy guarantees each participating public middle school a number of seats equivalent to 1.5% of that school's 8th grade class. A-212. Those slots are offered to the highest evaluated applicants from each middle school, with the remaining applicants competing for about 100 unallocated seats. *Id.*

The class of 2025 (who started at TJ this past fall) is the first cohort admitted under the new admissions process. A-101. In the policy's first year, 3,470 students applied and 550 received offers. *Id.* Just under half of applicants (48.59%) self-identified as Asian American and well over half of offers (54.36%) went to such students. A-102. Over the

previous five years, Asian American students had accounted for at least 65% of offers made. A-212, 222.

The Coalition sued the Board in March 2021. The Coalition twice moved for a preliminary injunction, but the district court denied both motions. D. Ct. ECF 50, 73. On February 25, 2022, the district court granted summary judgment to the Coalition, concluding the current policy triggered and failed strict scrutiny because it has a disparate impact on Asian American applicants and the Board acted with the purpose of disadvantaging such applicants. A-209–39. The same day, the district court enjoined use of the challenged admissions policy—including for the class of 2026, for whom the admissions cycle is currently ongoing. D. Ct. ECF 144. On March 11, the district court denied a stay pending appeal. D. Ct. ECF 150; see Fed. R. App. P. 8(a)(1)(a).

## II.    Stay factors

I agree the Board is entitled to a stay pending appeal under the traditional *Nken* standard. See *Nken v. Holder*, 556 U.S. 418, 434 (2009). That is, the Board "has made a strong showing that [it] is likely to succeed on the merits," that it "will be irreparably injured absent a stay," that "issuance of the stay will [not] substantially injure the other parties interested in the proceeding," and that a stay is in "the public interest." *Id.* (quotation marks omitted).

### A.    Likelihood of success on the merits

In my view, the district court's reasoning on the merits of the Coalition's Equal Protection Clause claim is questionable in multiple respects.

6

1.      I think the district court's disparate impact analysis is likely flawed because it relies on the wrong comparator. The court's conclusion that the new admissions policy has a disparate impact on Asian American applicants appears to have rested almost exclusively on a comparison between the percentage of Asian American applicants offered admission under the current policy and the percentage of such applicants offered admission under the former one, *i.e.*, that "the number and proportion of Asian American students offered admission to TJ fell following the challenged changes." A-222.

The district court never explained, however, why the percentage of Asian American applicants offered enrollment under the prior policy is the proper baseline for comparison. The only case the district court cited in support of its statement that a "simple before-and-after comparison" is the proper method for assessing disparate impact, A-223—*North Carolina State Conference of NAACP v. McCrory*, 831 F.3d 204, 231 (4th Cir. 2016)— simply does not say that. To the contrary, in addressing whether certain voting procedures disproportionately burdened African Americans, *McCrory* specifically *rejected* an election-to-election comparison of voter turnout to assess disparate impact. *Id.* at 232–33. Nor am I aware of any other authority for the proposition that current government policy creates a floor against which all future policies will be judged, a principle that would, if adopted, make it exceedingly difficult for government actors to change existing policies that have a real (albeit unintentional) racially disparate impact.

To me, the more obviously relevant comparator for determining whether this race neutral admissions policy has an outsized impact on a particular racial group is the percentage of applicants versus the percentage of offers. Such a metric targets more directly

the core question for assessing disparate impact: whether members of one group have, proportionally, more difficulty securing admission than others. And, by that metric, there does not seem to be any disparate impact whatsoever. Indeed, during the one previous year under the challenged policy, Asian American applicants made up a *higher* percentage of students offered a spot at TJ (54.36%) than of total applicants (48.69%). A-102.

The district court also suggested that the policy's allocation of 1.5% of seats for the highest evaluated applicants from each public middle school and the preference for students from underrepresented middle schools disparately impacts Asian American applicants. A-223–24. The problem is that conclusion is barely reasoned and is not supported by a single citation to the record. To be sure, the Coalition's brief opposing a stay includes its own citations in support of the district court's conclusions. CA4 ECF 17 at 15. But the Board's stay motion argues that the record shows just the opposite—that Asian American students are not differently situated from any other students when it comes to the 1.5% allocation or the preference for underrepresented middle schools, so those parts of the admissions policy do not disparately impact Asian American applicants at all. CA4 ECF 8-1 at 12–13. At the very least, the record reveals a likely dispute of fact on this question that would preclude summary judgment in favor of the Coalition.

2.     I also am skeptical of the district court's conclusion that there is no genuine issue of material fact implicated by its conclusion that the Board adopted the current admissions policy for a constitutionally impermissible purpose. A-235–36. The centerpiece of the district court's analysis on this point is its statement that "the Board's policy was

designed to increase Black and Hispanic enrollment, which would, *by necessity*, decrease the representation of Asian-Americans at TJ." *Id.* (emphasis added).

That approach seems flatly inconsistent with the Supreme Court's decision in *Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256, 279 (1979). *Feeney* involved a constitutional challenge to a Massachusetts statute mandating a categorical employment preference for qualified veterans over qualified non-veterans. 442 U.S. at 259. Even though "over 98% of the veterans in Massachusetts were male," *id.* at 270—and even though no one claimed that those who crafted and decided to maintain the law were unaware of that fact—the Supreme Court declined to apply heightened scrutiny. In language directly relevant to this case, the Court specifically held that "awareness of consequences" is not enough to show discriminatory intent and that a plaintiff challenging a facially neutral policy must show that a decisionmaker acted "at least in part '*because of,*' not merely '*in spite of,*' its adverse effects upon an identifiable group." 442 U.S. at 279 (emphasis added).

Nor does the fact that the current policy may have been adopted, at least in part, with the expectation that it would "increase Black and Hispanic enrollment" change this analysis. A-235–36. Under *Feeney*, the question is whether the decisionmaker acted "at least in part because of [a race neutral policy's] *adverse* effects upon an identifiable group," 442 U.S. at 279 (quotation marks and emphasis added), and the Coalition has never claimed that the challenged policy was motivated by or has any sort of adverse effect on Black or Hispanic applicants. This aspect of *Feeney*'s holding operates as a critical limitation on the

potential to lodge constitutional challenges to facially neutral laws of all stripes, which often are passed with the aim of winning favor with a particular constituency.

The Supreme Court has repeatedly stated that it is constitutionally permissible to seek to increase racial (and other) diversity through race neutral means. Indeed, it has *required* public officials to consider such measures before turning to race conscious alternatives. See *Fisher v. University of Texas at Austin*, 570 U.S. 297, 312, 315 (2013) (stating that universities must consider whether "workable race-neutral alternatives would produce the educational benefits of diversity" before considering race and remanding for further consideration of whether the university had done so); see also *Texas Dep't of Hous. and Community Affs. v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 545 (2015) (local housing authorities may "choose to foster diversity" with race neutral tools); *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 509–10 (1989) (governments may "increase the opportunities available to minority business" through measures such as altered "bidding procedures" that do not "classify[] individuals on the basis of race"). Under the district court's analysis, it is difficult to see why policies such as Texas's famous Top Ten Percent Law—which "grants automatic admission to any public state college . . . to all students in the top 10% of their class at high schools in Texas," *Fisher*, 570 U.S. at 305, and was plainly intended at least in part to ensure that Texas's public universities retained some measure of racial diversity after the Fifth Circuit's decision in *Hopwood v. Texas*, 78 F.3d 932 (5th Cir. 1996)—would not have triggered strict scrutiny. Given these decades of guidance, it would be quite the judicial bait-and-switch to hold that such race neutral efforts—much less, the *race blind* policy at issue here—are also subject to strict scrutiny.

I am no more persuaded by the Coalition's argument that the challenged policy was motivated by impermissible "racial balancing," CA4 ECF 17 at 13, a term the Supreme Court has defined as striving for "some specified percentage of a particular group merely because of its race or ethnic origin." *Fisher*, 570 U.S. at 311 (quotation marks omitted). The race neutral policy challenged here includes no racial quotas or targets. And the Coalition appears to have identified no evidence that TJ's current race neutral policy is intended to achieve a certain percentage of Black, Hispanic, or Asian American students— much less such overwhelming evidence as to warrant summary judgment in favor of the party that would bear the burden of proof at trial.[2]

The district court's extensive reliance on alleged procedural irregularities in the Board's adoption of the challenged admissions policy also strikes me as unpersuasive, especially for purposes of granting summary judgment to the Coalition. The district court acknowledged that the Board's actions did not violate any state law or procedural rules, A-227, and, under *Arlington Heights*, procedural irregularities are not themselves proof of discriminatory intent, 429 U.S. at 267. Instead, "[d]epartures from the normal procedural sequence" are relevant to the extent they "afford evidence that improper purposes are playing a role." *Id*. Here, the evidence the district court identified and certain statements highlighted by the Coalition, see CA4 ECF 17 at 17, tend to show what is not only obvious

---

[2] The Coalition points to a presentation and various text messages between Board members discussing how certain proposed policies might reduce Asian American representation at TJ. CA4 ECF 17 at 6–8. As the Board explains, however, both the presentation and the messages were about *different* potential policies that the Board *rejected*. CA4 ECF 19 at 6–7 & n.4.

but, as discussed above, perfectly permissible under existing law—that the Board felt compelled to address TJ's longstanding lack of diversity. Such evidence is hardly an appropriate basis for concluding—much less as a matter of law—that a race neutral policy was enacted with a constitutionally impermissible intent.

## B.    Irreparable harm absent a stay

The Board has also shown that it will suffer irreparable harm without a stay. Preventing elected representatives from carrying out "a duly enacted" policy always "constitutes irreparable harm." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers). Moreover, there are currently 2,540 students awaiting their TJ admissions decisions, which are supposed to be released "no later than April" 2022. A-246; A-283. The Board persuasively argues that there is no way for it simply to revert to the previous admissions policy. None of the current applicants was required to take the formerly mandated standardized tests, two-thirds of which are no longer commercially available. CA4 ECF 8-1 at 18; A-246. The Coalition insists that the Board should have approached competing vendors in anticipation of identifying replacement tests at some point last year or whipped up a fully formed backup plan even as it was defending its chosen policy in litigation, see CA4 ECF 17 at 20, 23, but that strikes me as completely unrealistic: It took the Board three months to adopt the challenged policy in the first place, A228–32, and the district court thought even that was "rushed," A-232.[3]

---

[3] The Coalition also argues the Board should have been on notice of the need for a backup policy because the district court suggested in September 2021 that it could "try this case in January and get a decision," which would be "plenty of time to get corrected (Continued)

I also am persuaded that requiring the Board to design a new admissions policy and then solicit and review applications under a new process, all on a highly compressed timetable and with little opportunity for community input or outreach, would irreparably damage its credibility and reputation in the community and irreparably harm TJ's ability to compete for students, many of whom apply to other selective schools with late spring enrollment deadlines. See CA4 ECF 8-1 at 20. It is no mere "administrative inconvenience" the district court's order mandates, CA4 ECF 17 at 23, but a gigantic undertaking. Such a significant outlay of public resources goes far beyond requiring private citizens to initiate routine administrative processes, see, *e.g.*, *Di Biase v. SPX Corp.*, 872 F.3d 224, 235 (4th Cir. 2017), and constitutes a "genuinely extraordinary situation" justifying interim equitable relief, *Sampson v. Murray*, 415 U.S. 61, 92 n.68 (1974).[4]

### C.     Effect on the Coalition and the public interest

The Coalition does not represent a class or putative class of applicants; rather, it is a group of interested parents and community members. Based on the record, it appears the Coalition has identified only two children of its members who are even eligible for

---

whatever needs to be corrected." CA4 ECF 17 at 9. But the district court did not reach a decision in January—instead, it granted summary judgment during the last week of February and did not deny the Board's motion to stay until mid-March.

[4] The Coalition suggests the Board could simply excise the two aspects of the current plan that the Coalition finds most objectionable. CA4 ECF 17 at 22. But if the Coalition is right that the current plan was adopted with discriminatory *intent*, it is not clear how these surgical alterations would remedy the constitutional problem. And, regardless, the Coalition offers zero analysis of how the current plan would function without those components.

admission to TJ this year, and those children may yet be admitted. See A-106; A-210; CA4 ECF 8-1 at 21. For that reason, it appears that the impact of a stay on the Coalition, if any, would be significantly less severe than the lack of a stay would be on the Board. See *Nken*, 556 U.S. at 435 (balance of the harms "assess[es] the harm to the opposing *party*" (emphasis added)).

Likewise—even factoring in potential harms to similarly situated Asian American students whose parents are neither Coalition members nor otherwise parties—I think the public interest favors a stay given the timing and logistical constraints associated with scrapping the current admissions policy and creating a new one so close to the end of the current admissions cycle. If the district court's order is not stayed, thousands of students and their families will be thrown into disarray for the next several months. By contrast, undisputed data presented to the district court show that a higher percentage of Asian American students were admitted than applied even under the current plan. Taking all this into account, it seems the more prudent course is to allow the current admissions cycle to proceed according to settled expectations and require a change, if any, beginning with the next class.

RUSHING, Circuit Judge, dissenting:

In the fall of 2020, the Fairfax County School Board changed the admissions policy for Thomas Jefferson High School for Science and Technology (TJ), a magnet school in Alexandria, Virginia. A group of parents and community members, including Asian-American parents with children who have applied to TJ or intend to do so, sued the Board, alleging that the Board acted with discriminatory intent when it changed the admissions policy to disfavor Asian-American students. After discovery, both parties moved for summary judgment on the undisputed factual record. The district court concluded that the Board acted with discriminatory intent and, on February 25, 2022, enjoined the Board from further use of the revised admissions policy.

The Board now seeks a stay of the district court's order pending appeal so that it can use the prohibited policy to make admissions decisions for the incoming class. Because the Board has not made the showing necessary to warrant the "extraordinary relief" of a stay, I would deny the motion. *Williams v. Zbaraz*, 442 U.S. 1309, 1316 (1979) (Stevens, J., in chambers).

One of the "most critical" factors in deciding a stay motion is "whether the applicant will be irreparably injured absent a stay." *Nken v. Holder*, 556 U.S. 418, 434 (2009) (internal quotation marks omitted). The Board claims that the district court's order will require it to expend significant time and energy to design and implement a new policy, that it will have to delay admissions decisions until after the original April deadline, and that hurriedly changing the policy at this stage will injure its reputation and public confidence in the school. But "'[m]ere injuries, however substantial, in terms of money, time and

energy necessarily expended in the absence of a stay are not enough.'"  *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017) (quoting *Sampson v. Murray*, 415 U.S. 61, 90 (1974)); *see also A Helping Hand, LLC v. Balt. Cnty.*, 355 Fed. App. 773, 776 (4th Cir. 2009) (holding that being forced to relocate business was not irreparable harm because "time and energy expended," "injury to reputation," and "loss of profits" are not irreparable (internal quotation marks omitted)).  As the Board acknowledges, it can move the April deadline—as it did last year due to this same litigation—and still field a superlative class of students.  While designing and implementing a new admissions policy on a short timeline may be inconvenient, it is not irreparable.  Nor is it unforeseen; since at least September of 2021, the Board has been on notice that it should be prepared with a new policy in the event of an adverse decision.  And the Board offers no support for its speculation that complying with a court order to modify the admissions policy will irreparably harm its reputation.

Another important factor—"whether issuance of the stay will substantially injure the other parties interested in the proceeding"—counsels against granting a stay here. *Nken*, 556 U.S. 434 (internal quotation marks omitted).  The district court found that the current admissions policy violates the Equal Protection rights of Asian-American students. The violation of constitutional rights "'for even minimal periods of time[] unquestionably constitutes irreparable harm.'"  *Leaders of a Beautiful Struggle v. Balt. Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021) (en banc) (quoting *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009)); *see Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion).  The Board disagrees with the district court's ruling, but we need not (and do not)

yet decide whether the Board will ultimately prevail; that question will be answered later in this appeal, which we have expedited in recognition of the importance of a timely decision to both parties.  Rather, the question before us now is whether the Board has made a sufficiently "strong showing" of likely success on the merits in view of the risk that, by granting a stay, we would perpetuate the denial of Asian Americans' constitutional rights. *Nken*, 556 U.S. at 434 (internal quotation marks omitted).  In my view, the Board has not yet carried its burden.

When motivated by discrimination, facially neutral policies like TJ's admissions plan "are just as abhorrent, and just as unconstitutional, as [policies] that expressly discriminate on the basis of race." *N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 220 (4th Cir. 2016); *cf. Yick Wo v. Hopkins*, 118 U.S. 356, 373–374 (1886) (prohibiting discriminatory enforcement of facially neutral laws).  A "[c]hallenger[] need not show that discriminatory purpose was the sole or even a primary motive" behind the policy, "just that it was a motivating factor." *McCrory*, 831 F.3d at 220 (internal quotation marks and alterations omitted).  This means that, under current law, a facially neutral policy may be constitutional in one context but unconstitutional in another, depending on whether it was motivated in part by impermissible racial intent.

Here, following the Supreme Court's directive in *Arlington Heights*, the district court undertook the "sensitive inquiry" into all "circumstantial and direct evidence" of the Board's intent in adopting TJ's current admissions policy. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977).  The court considered the historical background, the sequence of events leading to the new policy, departures from normal

procedures in enacting the policy, the disproportionate impact of the policy, and relevant administrative history, including official and private statements by Board members, meeting minutes, and reports. *See McCrory*, 831 F.3d at 220. Based on the undisputed evidence before it, the district court found that the Board pursued the policy change "at least in part 'because of,' and not merely 'in spite of,' its adverse effects" upon Asian Americans. *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). Specifically, the court determined that the Board acted with an impermissible racial purpose when it sought to decrease enrollment of "overrepresented" Asian-American students at TJ to better "reflect the racial composition" of the surrounding area. As the court explained, Board member discussions were permeated with racial balancing, as were its stated aims and its use of racial data to model proposed outcomes.

The Supreme Court has repeatedly emphasized that racial balancing for its own sake is unconstitutional. *See Fisher v. Univ. of Tex. at Austin*, 570 U.S. 297, 311 (2013); *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 729–730 (2007); *Grutter v. Bollinger*, 539 U.S. 306, 330 (2003). Racial balancing is no less pernicious if, instead of using a facial quota, the government uses a facially neutral proxy motivated by discriminatory intent. And while the Supreme Court has endorsed certain race-based motivations—specifically to remedy past intentional discrimination or, in higher education, to obtain the benefits of diversity—neither motivation is at issue here.

The Board particularly disagrees with the district court's evaluation of the policy's disparate impact on Asian Americans. It suffices at this stage to observe that, under our precedent, when a plaintiff contends a law is motivated by discriminatory intent, proof of

disproportionate impact is but one factor to consider "in the totality of the circumstances"; it is not "the sole touchstone" of the claim. *McCrory*, 831 F.3d at 231 (internal quotation marks omitted).  The district court found that, under the new policy, Asian-American enrollment dropped 19 percentage points from the previous year and decreased from a historical average of 71% over class years 2020–2024 to 54% in class year 2025.  Although "such an onerous showing" is not required in every case, *id.* at 232, and a year-over-year comparison may be influenced by other variables, it is nevertheless probative.  The Board has not yet made a "strong showing" of likely success on the merits sufficient to counter the risk that our premature action will, as the district court concluded, violate the constitutional rights of Asian-American students.  This is especially true given the absence of irreparable harm to the Board.

Finally, the "public interest" likewise disfavors a stay.  *Nken*, 556 U.S. at 434 (internal quotation marks omitted).  The Board urges us to consider the current TJ applicants who are awaiting a decision for the upcoming school year.  While it would be frustrating to receive an admissions decision later than expected, or to be asked for additional admissions materials at this point in the process, these harms simply do not outweigh the infringement of constitutional rights.  And everyone—even temporarily frustrated applicants and their families—ultimately benefits from a public-school admissions process not tainted by unconstitutional discrimination. *See Legend Night Club v. Miller*, 637 F.3d 291, 303 (4th Cir. 2011) ("[U]pholding constitutional rights is in the public interest."); *Newsom ex rel. Newsom v. Albermarle Cnty. Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003) (same).

I respectfully dissent.